# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| | ) | CASE NO. 1:10CR387 |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | OPINION AND ORDER |
| | ) | |
| JAMES C. DIMORA, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are five motions challenging, in one way or another, the integrity of the Indictment[1] in this case. Defendant James C. Dimora has filed a motion to dismiss Counts 3, 10, 12, 14, 22, 24, and 26 in light of *Brock v. United States* (Doc. No. 414) and a motion to dismiss Counts 3, 10, 12, 14, 21, 22, 24, and 26[2] as violative of Wharton's Rule (Doc. No. 415). Defendant Michael Gabor has filed a motion to dismiss Count 33 and "schemes" B and C from Count 1 (Doc. No. 428) as well as a motion to dismiss Counts 31 and 32 for failure to state an offense (Doc. No. 427). Gabor also seeks a bill of particulars. (Doc. No. 298.) For the reasons set forth below, all five motions are **DENIED**.

---

[1] As regards the Indictment, all count number, paragraph number, and other organizational references in this opinion are to the Second Superseding Indictment, Doc. No. 401. Four of the five motions at issue here are argued based on the organizational scheme of the Second Superseding Indictment, and no substantive changes affecting the outcome of these five motions were made in the Third Superseding Indictment, Doc. No. 444.

[2] Dimora omits Count 22 from the title and cover page of his motion but includes it in the body of his memorandum in support.

**I. Dimora's Motion to Dismiss in light of *Brock***

Defendant Dimora contends that seven of the Hobbs Act (18 U.S.C. § 1951) conspiracy-to-extort counts against him (Counts 3, 10, 12, 13, 21, 24, and 26) should be dismissed in light of the Sixth Circuit's decision in *Brock v. United States*, 501 F.3d 762 (6th Cir. 2007). The Hobbs Act provides, in relevant part, that

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The Act goes on to define extortion as "the obtaining of *property from another*, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added).

In *Brock*, the Sixth Circuit held that "[t]o be covered by the [Hobbs Act], the alleged conspirators . . . must have formed an agreement to obtain 'property from *another*,' which is to say, formed an agreement to obtain property from someone outside the conspiracy." 501 F.3d at 767. Each of the seven counts challenged in Dimora's motion names, as a member of the alleged conspiracy, a person who also held a position—as an employee, owner, or otherwise—with the entity from which property was allegedly extorted. Dimora argues that, under *Brock*, the close relationship between each of these co-conspirators and their respective entities means that the "property from another" requirement (that "other," as construed by the court in *Brock*, being someone outside the conspiracy) has not been met and thus that these counts must be dismissed. To

2

properly address this contention, a closer look at *Brock* and the chief case interpreting *Brock*, *United States v. Gray*, 521 F.3d 514 (6th Cir. 2008), is necessary.

### A. *United States v. Brock*

The defendants in *Brock*, brothers Michael and Jerry Brock, ran a bail bond business, Brock Bonding. To avoid forfeiture of the bond money they had loaned to criminal defendants who had fled the county and to procure other benefits, the Brocks paid bribes to a clerk at the county court who, among other things, erased from the court calendar hearings at which the absconded defendants were scheduled to appear. *Brock*, 501 F.3d at 765.

The record before the court in *Brock* was not clear as to whether the money paid to the clerk came from the Brocks' personal bank accounts or from the company's account. *Id.* at 769. The court ruled that, because the money had come either from the Brocks themselves or from their company, the "property from another" requirement was not met, and thus the Brocks could not be convicted of conspiracy to extort under the Hobbs Act. *Id.* at 766. The court came to this conclusion, at least in part, because, even if the money came from Brock Bonding, that company was "their [i.e., the Brocks'] own company." *Id.* at 767 ("And how could it be said that the Brocks conspired with [the court clerk] to obtain their [own] consent to give . . . [the clerk] money which came from their own pockets or at most from *their own company* . . . ?") (emphasis added).

The nature of the *Brock* opinion makes prospective application of its holding difficult in two respects. First, the court in *Brock* declined to provide any

3

standard or rule as to how its holding should be applied to cases other than those with virtually identical facts. Second, even the facts of *Brock*, and thus how the court applied the law to those facts, are ambiguous. Because it is unclear whether the "extorted" funds came from the Brocks themselves or from Brock Bonding, and because the *Brock* opinion does not discuss the legal and practical status of Brock Bonding (e.g., whether Brock Bonding was incorporated, whether any individuals other than the Brocks had an ownership interest in the business, or whether the business employed anyone in addition to the two Brock brothers), it is difficult to determine which of these variables—if any—played into the court's analysis.

With these limitations in mind, it is nevertheless possible to make some modest conclusions as to the consequences of *Brock*. First, *Brock* stands for the proposition that the ties between an individual conspirator and a business controlled or owned by that conspirator can be so close as to make the individual and the business indistinguishable for purposes of the "property from another" Hobbs Act conspiracy requirement. The issue left open, of course, is the nature and extent of the ties that must be present between the individual conspirator and the business in order for the two to be considered one-and-the-same for the purposes of Hobbs Act conspiracy.

*Brock* also indicates, albeit indirectly, that an individual conspirator's status as an employee, even a high-ranking employee, is not by itself enough to "merge" the individual with the business for purposes of the "property from another" requirement. Along these lines, the court in *Brock* distinguished the case before it from *United States v. Spitler*, 800 F.2d 1267 (4th Cir. 1986). In *Spitler*, the defendant was the vice president of a company known as TEI. Defendant Spitler used TEI's money to pay bribes to a

4

Maryland state official, who in turn approved TEI's overbilling of the state. The *Brock* court, analyzing *Spitler*, said that Spitler had "facilitated the extortion of TEI's property, not his own." *Brock*, 501 F.3d at 769. Thus the "property from another" requirement was met.

### B. *United States v. Gray*

Shortly after *Brock* was decided, the Sixth Circuit was faced with a somewhat-similar set of circumstances in *United States v. Gray*, 521 F.3d 514 (6th Cir. 2008). In *Gray*, the court addressed the validity of a number of conspiracy-to-extort convictions, upholding some while reversing others. The court reaffirmed the principle from *Brock* that the "property from another" element of conspiracy-to-extort under the Hobbs Act requires a showing that the conspirators tried to extort property from "an unrelated entity outside the conspiracy." *Gray*, 521 F.3d at 540. It thus reversed convictions on several counts where "there was no evidence that the allegedly extortionate payments [to a city of Houston official] . . . came from a source other than Gray [a defendant who was a private citizen and also a named conspirator]." *Id.* at 539.

Yet the court in *Gray* upheld a separate conspiracy-to-extort Hobbs Act conviction involving a conspiracy that included, among others, (1) defendant Gray, (2) a vice president of the Honeywell Corporation, and (3) a Houston city official, as named conspirators. *Id.* at 536–37. The scheme involved Gray making payments of money from Honeywell to the Houston official in exchange for favors for Honeywell. The presence of

a Honeywell vice president in the conspiracy apparently did not mean that the "property

from another" requirement was not met.[3]

   The *Gray* decision thus follows the broad contours of *Brock*. *Gray*

affirmed that the conspirators must have conspired to extort property from someone

outside the conspiracy. And, in accord with the *Brock* panel's reading of *Spitler*, the *Gray*

panel did not merge the individual-corporate-officer conspirator and the extorted

corporation into a single entity for purposes of the "property from another" requirement.

The *Gray* decision is, unfortunately, similar to *Brock* in another respect—it provided little

guidance as to under what circumstances such merger might in fact occur.


### C. Application to Dimora

   It is this less-than-precise *Brock-Gray* framework that must be applied to

the Hobbs Act conspiracy counts at issue here. Each Count names, in addition to Dimora,

at least one other conspirator. As to the specific nature of the relationship each of these

---

[3] Puzzlingly, the court never addressed head-on precisely how the relationship between the Honeywell vice president and the Honeywell Corporation affected its "property from another" analysis. Instead, the court resolved the issue with the following paragraph:

> Contrary to defendants' claims, and unlike *Brock,* where the illegal payments came from defendants' own bank accounts or from their company's bank account, the evidence showed that the payments and privileges bestowed upon McGilbra [the Houston city official] did not originate with defendants. Gray's corporate clients, seeking government contracts, funneled the illegal payments through defendants to McGilbra. We therefore conclude that the evidence was sufficient to sustain defendants' convictions on these counts. *Gray*, 521 F.3d at 538–39 (internal citation omitted).

Elsewhere in the opinion, however, the court did imply that it considered the Honeywell Corporation to be an "unrelated entity outside of" another conspiracy involving the same Honeywell vice president. *Id.* at 540.

6

co-conspirators had with the respective entities from which property was allegedly extorted, the Indictment provides only the following information:

> Count 3 – Co-conspirator Brian Schuman was an "employee" of the extorted "non-profit organization," Alternatives Agency.

> Count 10 – Co-conspirator John Valentin was a "principal" of the extorted "retailer," Salva Stone.

> Count 12 – Co-conspirator Nicholas Zavarella was a "shareholder" of the extorted "subcontractor," Zavarella Brothers Construction Company.

> Count 14 – Co-conspirator William Neiheiser was the "president and [c]hief [e]xecutive [o]fficer" of the extorted "company," Reliance Mechanical. He also had an "ownership interest" in that company.

> Count 22 – Co-conspirator Anthony Melaragno was an "officer or employee" of the extorted "company," Vandra Brothers Construction Co.

> Count 24 – Co-conspirator Robert Rybak was the "[b]usiness [m]anager" of the extorted "labor organization," Local Union No. 55. His relationship to the Union's "employee benefit plan" (the Joint Apprenticeship and Training Committee Fund), also an allegedly extorted entity, is not stated.

> Count 26 – Co-conspirator Charles Randazzo was the "president and chief executive officer" of the extorted entity, Financial Network of America.

While brevity may be the soul of wit, it is not, at least in this context, an aid—let alone the key—to expeditious resolution. The barebones nature of the Indictment's description of the relationships between these co-conspirators and their related entities makes application of the already vague framework supplied by *Brock* and *Gray* even more challenging.

But this lack of detail is not so much indicative of a problem with the indictment as it is of a problem with the stage of the proceedings at which these *Brock* arguments are being raised. *See* FED. R. CRIM. P. 7(c) (indictment need only contain the "*essential* facts constituting the offense charged") (emphasis added). Dimora's *Brock*

concerns are more appropriately raised after the presentation of evidence at trial. There, evidence will presumably be presented making the exact nature of the relationship between each of these co-conspirators and their related entities clearer. As the case currently stands, there is simply not enough information to conclude that the relationship between each of these co-conspirators and their respective entities was or was not tantamount to the relationship between the Brock brothers and Brock Bonding. In both *Brock* and *Gray*, of course, the Sixth Circuit was able to resolve the "property from another" issue by looking to the evidence presented at trial. That same type of evidence is also necessary here. Dimora's motion to dismiss Counts 3, 10, 12, 13, 21, 24, and 26 must therefore be DENIED.

## II. Dimora's Motion to Dismiss under Wharton's Rule

Dimora also asserts that eight of the Hobbs Act conspiracy counts against him (Counts 3, 10, 12, 14, 21, 22, 24, and 26) should be dismissed because they are charged in violation of Wharton's Rule. The general rule in criminal law is that a defendant may be convicted of both a substantive crime and conspiracy to commit that crime. This is because the formation of the conspiracy is itself seen as an evil separate from the commission of the substantive crime. *See Salinas v. United States*, 522 U.S. 52, 64 (1997) ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.") (citing *Callanan v. United States*, 364 U.S. 587, 594 (1961)).

8

Wharton's Rule provides an exception to this general rule. Wharton's Rule, as quoted in the Supreme Court's definitive opinion on the Rule, states that

> An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission.

*Iannelli v. United States*, 420 U.S. 770, 773 n.5 (1975) (citing 1 R. Anderson, *Wharton's Criminal Law and Procedure* § 89 (1957)). Application of Wharton's Rule has traditionally been limited to the crimes of adultery, incest, bigamy, and dueling. *Iannelli*, 420 U.S. at 782. Dimora acknowledges this traditional limitation but argues that "some [c]ourts and legal scholars" have expanded the list and that the Court should follow these trailblazers. (Doc. No. 415, pp. 4, 5.) The authorities supporting such an expansion appear to be sparse. Regardless, the Sixth Circuit's post-*Iannelli* decision in *United States v. Shelton*, 573 F.2d 917 (6th Cir. 1978), prevents this Court from entertaining the possibility of such an expansion.

In *Iannelli*, the Supreme Court stated that Wharton's Rule "has current vitality only as a judicial presumption, to be applied in the absence of legislative intent to the contrary." *Iannelli*, 420 U.S. at 782. In *Shelton*, a Hobbs Act conspiracy-to-extort case decided three years after *Iannelli*, the Sixth Circuit determined that Wharton's Rule did not apply. *Shelton*, 573 F.2d at 920. Adhering to the Supreme Court's pronouncement in *Iannelli*, the court based its decision in part on a blunt determination that "Congress clearly intended to make conspiracy to extort and the substantive crime of extortion two different offenses, since both 18 U.S.C. §§ 1951(a) and 1951(b)(2) [the sections of the Hobbs Act dealing with extortion] . . . are phrased in the alternative." *Id.* at 920. This legislative intent was thus enough, under *Iannelli*, to rebut the "judicial presumption" of

Wharton's Rule. The case law in the Sixth Circuit is thus clear: Wharton's Rule does not apply to the Hobbs Act. Dimora does not cite, nor has the Court been able to locate, any Sixth Circuit authority that calls *Shelton* into question.

In his Wharton's Rule reply brief (Doc. No. 491), Dimora essentially concedes that *Shelton*, on its face, requires the Court to deny his motion to dismiss Counts 3, 10, 12, 14, 21, 22, 24, and 26. He argues, however, that this Court should conduct an individualized factual analysis like that conducted by the district court in *Shelton*—and subsequently cited with approval by the Sixth Circuit in its *Shelton* decision—to determine whether Wharton's Rule should be applied to the case at bar. But *Shelton* itself eliminates the need for such analysis in a Hobbs Act extortion case. The purpose of individualized analysis is to determine whether the substantive crime in question possesses the characteristics of a "classic" Wharton's Rule offense and thus whether application of the Rule might be appropriate. *See Iannelli*, 420 U.S. at 782–83 (listing three characteristics of "classic Wharton's Rule offenses").

The Sixth Circuit in *Shelton* determined that Congress intended to punish substantive Hobbs Act extortion and conspiracy to commit Hobbs Act extortion separately. Such legislative intent trumps Wharton's Rule, regardless of the outcome of an individualized analysis. Individualized analysis was appropriate for the *Shelton* district court because that case was decided—to state the obvious—pre-(Sixth Circuit) *Shelton*.

Post-*Shelton*, such analysis in a Hobbs Act extortion case is rendered moot.[4] Dimora's motion must therefore be DENIED.

## III. Gabor's Motion to Dismiss Count 33 and "Schemes" B and C from Count 1

### A. Count 33

Defendant Gabor argues that Count 33 of the Indictment, charging Hobbs Act extortion under a color of official right theory, must be dismissed. Gabor maintains he cannot be charged under a color of official right theory because he was only a "low level Auditor's Office employee" and because the allegedly extorted parties were induced to pay not because of Gabor's position but because of the position held by Frank Russo, the County Auditor who was Gabor's employer and to whom the money allegedly extorted was ultimately paid. (Doc. No. 428, p. 9.) Were Gabor's premise—that the Indictment charges him with extortion *on his own behalf* under color of official right—correct, this argument might perhaps be compelling. But as the government points out, Count 33 charges that Gabor *aided and abetted* Russo in extorting property. (Second Superseding Indictment at ¶ 505.)

In *United States v. Saadey*, the Sixth Circuit stated that "a private citizen

---

[4] If an individualized analysis were conducted and the legislative intent preclusion did not apply, Dimora would still likely be unsuccessful in his bid to have Wharton's Rule applied here. The Court in *Iannelli* listed three characteristics of "classic Wharton's Rule offenses": (1) the "parties to the [conspiracy] agreement are the only persons who participate in the commission of the substantive offense"; (2) "the immediate consequences of the crime rest on the parties themselves"; and (3) "the agreement that attends the substantive offense does not appear likely to pose the distinct kinds of threats to society that the law of conspiracy seeks to avert." *Iannelli*, 420 U.S. at 782–83. The conspiracy-to-extort charges contested by Dimora do not meet this "test" for a number of reasons, not least of which is that public corruption has a negative effect not just on the parties but on society at large. *See United States v. Finazzo*, 704 F.2d 300, 306 (6th Cir. 1983) ("[T]he consequences of bribery not only affect the parties to the crime but also have a negative effect on society at large," and thus *Iannelli* factor two counseled against application of Wharton's Rule.).

who is not in the process of becoming a public official may be convicted of Hobbs Act extortion under the 'color of official right' theory only if that private citizen either conspires with, or aids and abets, a public official in the act of extortion." 393 F.3d 669, 675 (2005); s*ee also United States v. Gray*, 521 F.3d 514, 533 (6th Cir. 2008) (citations omitted) (noting that the rule from *Saadey* is "well settled" in the Sixth Circuit). This is exactly what Gabor is charged with in Count 33.

True, Gabor was a "low level" county employee at the time of the alleged extortion, and thus may not technically qualify as a "private citizen." But if color-of-official-right aiding and abetting charges may be brought against a true "private citizen," a fortiori they may be brought against someone in a position like Gabor's. *Saadey* teaches that an individual can be convicted of aiding and abetting extortion under a color of official right theory (even though he may not be convicted of substantive extortion under such a theory) despite the fact that the extortion was not committed under color *of that individual's* (i.e., the aider and abettor's) official right.

Despite the clear language of *Saadey*, at oral argument on this motion, Gabor asserted that the case of *United States v. Tillem*, 906 F.2d 814 (2d Cir. 1990), nevertheless supports his contention that the Indictment did not properly charge him with aiding and abetting Hobbs Act extortion under a color of official right theory. Gabor is incorrect. In *Tillem*, defendant Campbell was an independent restaurant consultant who had made illicit payments to New York City Department of Health officials in exchange for favorable action in regard to Campbell's client restaurants. Campbell was charged with and convicted of aiding and abetting the officials' extortion in violation of the Hobbs Act. *Id.* at 822. The Second Circuit reversed Campbell's conviction, noting that

12

Campbell "did not *initiate* a 'symbiotic relationship' between the victims—his clients restaurants—and the corrupt government officials." *Id.* at 823. Instead, this "relationship was initiated by the Department defendants who apparently extorted money from Campbell." *Id.* The court distinguished the facts of *Tillem* from a prior case where the court had upheld an aiding and abetting conviction. In that prior case, there had been sufficient evidence that the defendants "'associated themselves' with the . . . criminal venture, participated in it as something that they wished to bring about, or sought by their action to make it succeed." *Id.* (quoting *United States v. Stolfi*, 889 F.2d 378, 381 (2d Cir. 1989)). The court concluded a reasonable jury could not have found that Campbell "promoted the conspiracy and had a stake in its outcome." *Id.*

*Tillem* was decided at the appellate level, the Second Circuit reviewing the sufficiency of the evidence adduced at trial to determine whether Campbell's conviction could stand. Gabor essentially asks this Court to perform a similar analysis before the trial has even begun, looking only to the language of the Indictment. But the Indictment, unlike the evidence adduced at trial, need not be sufficient to *prove* commission of the crime charged, it need only sufficiently *allege* such crime. The standard is therefore considerably lower.

The Indictment alleges that Gabor served as an "intermediary" between the allegedly extorted individual—"BE41"—and Russo. The Indictment further alleges that Gabor and BE41 were acquaintances and that Gabor "communicated to Russo" the terms of the proposed deal, namely, that BE41 would give Russo cash in exchange for a job for another individual—"PE57." (Second Superseding Indictment at ¶ 508.) Even on these skeletal allegations—which are sufficient for purposes of the Indictment—a crucial

13

distinction can be made between this case and *Tillem*. Here, the Indictment asserts that Gabor, unlike Campbell, did indeed "initiate a 'symbiotic relationship' between the victim[] . . . and the corrupt government official[]." *Tillem*, 906 F.2d at 823 (emphasis deleted).

### B. "Schemes" B and C from Count 1

Gabor also seeks the dismissal of two of the acts that the government contends were committed in furtherance of the RICO conspiracy alleged in Count 1. The parties refer to these two alleged acts (detailed in paragraphs 103–114 of the Indictment) as schemes B and C or, respectively, the "Gabor Job Buying" and "Gabor Judicial Corruption" schemes. Gabor asserts the Job Buying and Judicial Corruption schemes should be dismissed because neither properly alleges a RICO predicate act. Gabor makes several arguments supporting this contention, including that: (1) neither scheme cites to a specific RICO predicate statute or is covered by any of the four statutes listed as violated at some point during the conspiracy; (2) neither scheme is connected with the alleged RICO enterprise; and (3) the Judicial Corruption scheme does not indicate an intent by Gabor to join a RICO enterprise. It is unclear whether Gabor is seeking dismissal of these two schemes because (1) he believes the Indictment as to Count 1 will be insufficient without them or (2) because he believes the presence of these schemes in the Indictment will prejudice the jury against him. Either way, his motion fails.

Count 1 charges both Gabor and Dimora with RICO conspiracy in violation of 18 U.S.C. § 1962(d). That provision simply states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this

14

section."  Section 1962(c), the substantive RICO provision applicable in this case, provides that

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"Racketeering activity," "pattern of racketeering activity," and "enterprise" are defined terms under the RICO Act. "Racketeering activity" means any of a number of listed acts or threats that are independently prohibited under State or federal law. 18 U.S.C. § 1961(1). A "pattern of racketeering activity," in turn, "requires at least two acts of racketeering activity" occurring within specified time limits. 18 U.S.C. § 1961(5). These acts of "racketeering activity" are the so-called "predicate acts" required for a substantive RICO conviction. An "'enterprise' includes any individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

### 1. Specific Predicate Acts Not Necessary

Count 1 of the Indictment in this case charges only RICO conspiracy under § 1962(d). A RICO conspiracy indictment need not allege specific RICO predicate acts, and thus the Indictment would not automatically fail in the absence of the two schemes at issue.

First, there is no requirement that, to be convicted, a RICO conspiracy defendant—or anyone else involved in the conspiracy, for that matter—must have committed any predicate acts. In *Salinas v. United States*, the Supreme Court itself stated

as much. 522 U.S. 52, 65 (1997) ("The interplay between [§§ 1962(c) and (d)] does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense."). The court held that

> A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor . . . . One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.

*Id.* Section 1962(d) contains "no requirement of some overt act or specific act." *Id.* at 63. The Sixth Circuit, relying on *Salinas*, has explicitly stated that "conviction on a charge of RICO conspiracy does not require the government to prove that *any* predicate act was actually committed at all." *United States v. Saadey*, 393 F.3d 669, 677 (6th Cir. 2005). True, requiring proof of a predicate act at trial and requiring the inclusion of such an act in the Indictment are two different issues, but it is difficult to see how one would justify requiring a predicate act in the latter situation and not the former.

Second, in *United States v. Glecier*, the Seventh Circuit explicitly held that an indictment under § 1962(d) does not have to allege either "overt acts" or "specific predicate acts that the defendant agreed personally to commit." 923 F.2d 496, 500 (7th Cir. 1991). The Second Circuit has explicitly endorsed the *Glecier* position, *United States v. Applins*, 637 F.3d 59, 82 (2d Cir. 2011), and at least one other circuit has taken essentially the same position, *United States v. Phillips*, 874 F.2d 123, 127 n.4 (3d Cir. 1989) (Indictment count charging RICO conspiracy was valid despite "failure to specify, with particularity, which acts of bribery and extortion appellants allegedly agreed to commit."). While it appears that the Sixth Circuit has never ruled on this issue, the

16

Seventh Circuit's holding in *Glecier* seems to be the natural conclusion of the Sixth Circuit's position in *Saadey*.

That there is no need to allege specific predicate acts in a RICO conspiracy indictment does not, however, let the government completely off the hook. The government ultimately must still prove that the RICO conspiracy defendant "intended to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas*, 522 U.S. at 65. In this case, that means the government must prove that the defendant intended to further a "pattern of racketeering" activity.

Further, when charging RICO conspiracy, the government must "allege . . . that the defendant[] agreed to the commission of multiple violations of a specific statutory provision that qualifies as RICO racketeering activity." *Applins*, 637 F.3d at 81 (citing a number of helpful cases on the topic of what a RICO conspiracy indictment needs to allege). The indictment must allege specific crimes or types of crimes that the conspiracy agreed to commit and that would constitute a "pattern of racketeering activity" if carried out. As the *Glecier* court put it: "[T]o list adequately the elements of section 1962(d) [RICO conspiracy], an indictment need only charge—after identifying [1] a proper enterprise and [2] the defendant's association with that enterprise—that the defendant [3] knowingly joined a conspiracy the objective of which was to operate that enterprise through an [4] identified pattern of racketeering activity. *Glecier*, 923 F.2d at 500.

The government has met this burden here.

17

## 2. Job Buying and Judicial Corruption Schemes Nevertheless Meet Predicate Act Requirements

### a) Failure to Cite a Predicate Statute

Even if recitation of predicate acts were required for a sufficient RICO conspiracy indictment, Gabor's argument would still fail. As part of his argument that the Job Buying and Judicial Corruption schemes should be dismissed, Gabor asserts that no predicate statute is cited concerning those schemes. Gabor contends that none of the four statutes generally cited in Count 1 (Second Superseding Indictment at ¶ 93) covers either of the schemes. This includes the Ohio statute governing bribery, Ohio Rev. Code § 2921.02, which Gabor claims is not implicated by either the Job Buying or Judicial Corruption scheme, because "Ohio state law does not outlaw conspiracy to commit bribery." (Doc. No. 428, p. 6.) Gabor is correct that the case he cites, *State v. Trice*, No. 89933, 2008 WL 2424804, at *3 (Ohio Ct. App. June 16, 2008), supports his position, and that § 2921.02 certainly does not, on its face, cover conspiracy to commit bribery.

Gabor's argument nevertheless misses the mark. As the government points out, the Indictment sufficiently alleges the *substantive* crime of bribery under § 2921.02. It makes no mention of conspiracy to commit bribery as regards the Job Buying or Judicial Corruption schemes. Section 2921.02(A) provides that

> No person, with purpose to corrupt a public servant or party official, or improperly to influence him with respect to the discharge of his duty, whether before or after he is elected, appointed, qualified, employed, summoned, or sworn, shall promise, offer, or give any valuable thing or valuable benefit.

The allegations contained in both the Job Buying and Judicial Corruption scheme sections of the Indictment, if true, would rise to a violation of this section. The Job

18

Buying scheme alleges that Gabor paid County Auditor Frank Russo $5,000 in exchange for a job with the auditor's office. The Judicial Corruption scheme alleges that Gabor, through an intermediary, gave a Cuyahoga County Domestic Relations Court judge approximately $10,000 in exchange for a favorable ruling in Gabor's divorce case and that part of the money was returned when the ruling was not as favorable to Gabor as hoped.

Gabor's claim that the Job Buying and Judicial Corruption schemes fail to cite an applicable predicate statute itself fails, as both are covered by Ohio Rev. Code § 2921.02.

### b) Failure to show connection with the RICO enterprise or intent to join a RICO conspiracy

Gabor also contends that the Job Buying and Judicial Corruption schemes fail to show the required connection to the alleged RICO enterprise (here, Cuyahoga County).[5] The Sixth Circuit employs the "continuity plus relationship" test to determine

---

[5] Gabor also briefly contends that the Gallucci Election Fraud scheme alleged in Counts 31 and 32 of the Indictment cannot be considered a RICO predicate act for two reasons. First, Gabor "incorporate[s] by reference" his arguments made in his separate motion to dismiss Counts 31 and 32. (Doc. No. 427.) Those arguments are addressed in the separate portion of this opinion dealing with that motion. Second, Gabor contends that the Gallucci Election Fraud scheme was not related to the RICO enterprise, asserting that the real enterprise in this case was not Cuyahoga County, as specified in the Indictment, but rather one that "center[ed] on Defendant Dimora" exclusively. (Doc. No. 428, p. 9.) Gabor claims that the Gallucci Election Fraud scheme "furthered only Russo's person interests" and "was not connected to the pattern of racketeering activity involving Dimora alleged in the Second Superseding Indictment." (*Id.*) This argument lacks merit. It simply contradicts the Indictment's assertions as to the scope and purposes of the conspiracy and enterprise and, further, fails to recognize the need for an enterprise separate and apart from an individual participant. "Under Section 1962(c), a defendant and the enterprise must be distinct." *DeFalco v. Bernas*, 244 F.3d 286, 307 (2d Cir. 2001); *see Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 397 (6th Cir. 1989) ("It is true that a RICO 'enterprise' must be separate and different from the 'person' or 'persons' participating in the enterprise."); *see also Davis v. Mutual Life Ins. Co.*, 6 F.3d 367, 378 (6th Cir. 1993) ("Both the language of [section 1962(c)] and the articulated primary motivation behind RICO show that Congress intended to separate the enterprise from the criminal 'person' or 'persons.'")

19

whether the government has sufficiently established that "any two predicate acts constitute a pattern of racketeering activity." *United States v. Fowler*, 535 F. 3d 408, 419 (6th Cir. 2008) (citations omitted).  This test requires proof of "(1) a relationship between the predicate acts and (2) the threat of continued activity." *Id.* (citations omitted). It appears to be the first prong of this test that Gabor alleges is not met here. The relatedness prong does not require that predicate acts be related to one another but rather only requires that they "be connected to the affairs and operations of the criminal enterprise." *Id.* at 420 (citations omitted); *see United States v. Corrado*, 227 F.3d 543, 554 (6th Cir. 2000) (citations omitted) ("The predicate acts do not necessarily need to be directly interrelated; they must, however, be connected to the affairs and operations of the criminal enterprise.").

The Supreme Court stated in *H.J., Inc. v. Northwestern Bell Telephone Co.* that "Congress intended to take a flexible approach [in determining what relationships must be present among predicate acts to constitute a pattern of racketeering activity], and envisaged that a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates, within the expansive bounds set." 492 U.S. 229, 238 (1989). A pattern is formed if the criminal acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240.

The Indictment alleges that Cuyahoga County[6] constitutes the RICO "enterprise" for purposes of the Count 1 RICO charge. The Indictment further alleges that defendants Dimora and Gabor were "employed by and associated with" the enterprise and that the purposes of the Defendants were to (1) "us[e] the power and authority of public officials for the personal and financial benefit of Dimora, Gabor, their co-conspirators, and their designees" and to (2) "promote, conceal and otherwise protect [purpose (1)] of the conspirators from public exposure and possible criminal prosecution." (Second Superseding Indictment at ¶ 92.)

Based on the standard established by the Supreme Court and the Sixth Circuit, and in light of the allegations set forth in the Indictment as to (1) the nature and goals of the enterprise and (2) the "facts" of the Job Buying and Judicial Corruption schemes, the government has met the minimal burden placed upon it at the indictment stage. The Indictment contains sufficient information to support the contention at trial that Gabor's alleged actions as part of the Job Buying and Judicial Corruption schemes had "the same or similar purposes, results, participants, victims, or methods of commission" as those of the broader conspiracy. Both schemes involved attempts to use "the power and authority of public officials" (here, Frank Russo and a Cuyahoga County Domestic Relations Court judge) for the benefit of Gabor. Some of the connections between Gabor's alleged acts and the broader conspiracy may indeed seem tenuous, but

---

[6] Gabor argues, almost in passing, that an entity as "sweeping" as Cuyahoga County perhaps cannot be considered a RICO "enterprise" under 18 U.S.C. § 1961(4). The Court notes that similarly large and complex government entities have been deemed "enterprises" (or members of enterprises) in other RICO prosecutions. *See Steinhauser v. City of St. Paul*, 595 F. Supp. 2d 987, 1014 (D. Minn. 2008), *rev'd in part on other grounds by Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010) ("A city [here, St. Paul, Minnesota] may constitute an 'enterprise' within the meaning of RICO."); *United States v. Cianci*, 378 F.3d 71, 83 (1st Cir. 2004) (city of Providence, Rhode Island, was a member of a RICO enterprise).

the proper time for a rigorous review of the relatedness requirement would be after presentation of evidence at trial, when the government will have had an opportunity to flesh out its allegations.

Along these lines, the district court in *United States v. Cuong Gia Le*, clearly enunciated the distinction between the relatively lenient standard to which a RICO indictment is held when it comes to relatedness and the need for proof of relatedness at trial. The court stated that "the Indictment must . . . contain sufficient facts to reflect continuity and relationship because proof of continuity and relationship must be adduced at trial." 310 F. Supp. 2d 763, 776 (E.D. Va. 2004). But the court also held that "continuity and relationship of racketeering acts are not essential elements of the charged offenses; it is the 'pattern of racketeering activity' that is the essential element [of the racketeering offenses at issue] . . . . As such, continuity and relationship need not be alleged in the Indictment." *Id.* at 775.

For all of the above reasons, Gabor's motion is DENIED.

**IV. Gabor's Motion to Dismiss Counts 31 and 32**

Gabor challenges the sufficiency of Counts 31 and 32, and seeks to have these counts dismissed for failure to state an offense. (Doc. No. 427.) Count 31 charges Gabor with conspiracy to commit mail fraud and honest services mail fraud, 18 U.S.C. §§ 1341 and 1346, in violation of 18 U.S.C. § 1349. Count 32 charges Gabor with mail fraud and honest services mail fraud, 18 U.S.C. §§ 1341, 1346 & 2. Gabor complains that the facts contained in the Indictment fail to satisfy the Supreme Court's decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010), for honest services fraud claims.

22

Instead, he argues that these two counts impermissibly charge state law claims for election fraud.

Count 31 alleges that, in and around August 2005, Joseph Gallucci approached John Kevin Kelley about obtaining a job with Cuyahoga County in order to secure health benefits. In exchange for employment, Gallucci indicated that he would be willing to raise approximately $15,000 dollars for the reelection campaign of then Cuyahoga County Auditor Frank Russo. (Second Superseding Indictment at ¶ 485.) It goes on to allege that Kelley and Russo discussed the matter, and Russo concluded that what he really needed was a Republican opponent who would not run an aggressive campaign against him. (*Id.* at ¶ 486.) Gallucci agreed to run a sham campaign, and then pull out of the race after it was too late for the Republicans to produce a substitute candidate. In exchange, Gallucci understood that, after the campaign, he would receive a job in the Auditor's Office. (*Id.* at ¶¶ 486–88.)

According to the charging instrument, Gallucci ran a minimal campaign against Russo in the 2006 election, spending only a few hundred dollars on his campaign efforts. (*Id.* at ¶ 488.) Gallucci withdrew from the race on October 2, 2006, "guaranteeing Russo would be [re-]elected as County Auditor." (*Id.* at ¶ 494.) On November, 29, 2006, Russo hired Gallucci in the Auditor's Office. (*Id.* at ¶ 495.) It is further alleged that, at Gabor's suggestion, Gallucci "thanked" Russo and co-defendant Dimora for his new position with $250.00 in cash. (*Id.* at ¶ 496.)

Count 31 further alleges that Gabor conspired with Russo, Kelley, and others, to assist Russo in depriving "the County and the Auditor's Office of money and property by making salary decisions based on things of value provided by Gallucci and

23

not based on merit." (*Id*. at ¶¶ 477–79.) Count 32 alleges that Gabor aided and abetted Russo's efforts to commit mail fraud and honest services mail fraud. (*Id.* at ¶ 501.)

The government maintains that the Indictment meets the modest pleading requirements of Rule 7 of the Federal Rules of Criminal Procedure. Further, it insists that it was careful to follow the language of the Supreme Court's decision in *Skilling*, and is in full compliance with the court requirement in *Skilling* that honest services fraud charges include the presence of a bribe or kickback.

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment be a "plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c)(1). *See United States v. Blandford*, 33 F.3d 685, 704 (6th Cir. 1994) (quoting *United States v. Piccolo*, 723 F.2d 1234, 1238 (6th Cir. 1983) (en banc) (The Sixth Amendment requires an indictment to "inform the defendant of 'the nature and cause of the accusation.'")). It need only contain those facts and elements necessary to inform the accused of the charges so that he may prepare a defense, *see Williams v. Haviland*, 467 F.3d 527, 535 (6th Cir. 2006), and protect against double jeopardy. *See United States v. Douglas*, 398 F.3d 407, 413 (6th Cir. 2005). "An indictment is generally sufficient if it 'fully, directly, and expressly . . . set[s] forth all the elements necessary to constitute the offense intended to be punished.'" *United States v. Kuehne*, 547 F.3d 667, 696 (6th Cir. 2008) (quoting *Douglas*, 398 F.3d at 411).

The mail fraud statute prohibits individuals from using the mail to carry out a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1341, which includes

"a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

The Court recently considered the Supreme Court's ruling in *Skilling* and the impact it had on the honest services fraud statute in *United States v. Terry*, Case No. 1:10CR390, another case that grew out of the FBI's county public corruption investigation. Terry, a sitting common pleas judge, was alleged to have fixed a case in his court in exchange for campaign contributions and other things of value. The Court observed:

> In 2010, the United States Supreme Court revisited the honest services fraud statute in an effort to clarify and define the contours of the conduct covered by the statute. Specifically, the Court in *Skilling* narrowed the reach of the statute, limiting it to fraudulent schemes involving bribes or kickbacks. *Skilling*, 130 S. Ct. at 2931. In so ruling, the Court refused to include what it considered "amorphous" conduct, including "some schemes of non-disclosure and concealment of material information" courts had previously permitted to fall within the statute. *Id*. at 2932 (internal citation omitted).

(Case No. 1:10CR390, Doc. No. 54 at 4–5.)

This Court found that the superseding indictment in *Terry* met the pleading requirements under *Skilling* because it alleged that Terry participated in a fraudulent scheme to deprive the parties to the lawsuit and the citizens of his honest services through the use of bribery or kickbacks and involving the United States mail. Similarly here, the Indictment charges that Russo participated in a fraudulent scheme to deprive the County of his honest services through bribery and kickbacks that utilized the mail. It also identifies the nature of the benefit Russo was suspected to have received (a straw opponent for the 2006 election and cash) and further set forth the official act (hiring Gallucci as an employee in the Auditor's Office) that Russo was alleged to have

25

performed in exchange for the benefits he received from Gallucci. The inclusion of bribery or kickbacks as part of the alleged fraudulent scheme insulates the charging instrument from running afoul of *Skilling*.[7] *Cf. United States v. Ford*, 639 F.3d 718, 723 (6th Cir. 2011) (conviction of honest services fraud was vacated, pursuant to *Skilling,* due to the fact that the fraudulent scheme was "based upon [the defendant's] failure to disclose his financial interests, not bribes or kickbacks.")

Relying on the pre-*Skilling* decision in *United States v. Turner*, 465 F.3d 667, 671–73 (6th Cir. 2006), Gabor argues that the Indictment is fatally flawed because it impermissibly relies on election fraud. *Turner* involved a scheme that centered around vote buying and the use of "straw contributors." The Sixth Circuit found that the intangible right of honest elections could not support a charge under § 1346 for honest services fraud. The court explained that "[w]hile candidates may be dishonest in seeking election, such dishonesty does not deprive anyone of any right to honest 'services' for the simple reason that candidates, unlike the elected officials that they hope to become, provide no 'services' to the public." *Id*. at 671–72. Boring in on Gallucci's actions, Gabor notes that as a candidate and a private citizen Gallucci could not have taken any official actions and, therefore, could not have deprived anyone of his honest services.

Gabor misunderstands the nature of these counts. Instead of focusing on Gallucci's election activities, these counts revolve around Russo's official action of

---

[7] The inclusion of a bribery or kickback scheme also defeats Gabor's argument, based exclusively on pre-*Skilling* cases, that § 1346 is unconstitutionally vague. The Supreme Court in *Skilling* ruled that by limiting the reach of the statute to fraudulent schemes involving bribery or kickbacks, the due process concerns underlying the vagueness doctrine were put to rest. *See Skilling*, 130 S. Ct. at 2934.

basing a hiring decision on the receipt of things of value rather than on merit and qualifications. The Indictment charges that "Russo provided official action for the benefit of Gallucci both as requested and as future opportunities arose, including hiring Gallucci in a position that offered OPERS benefits." (Second Superseding Indictment at ¶ 483.) The fact that an election took place in the background of this fraudulent bribery scheme is irrelevant and in no way takes these counts outside of the realm of honest services fraud.

   Gabor takes further issue with these counts, noting that they do not allege that he received anything of value or that he took any official action. In so arguing, he fails to notice that he has been charged with conspiracy in Count 31 and with aiding and abetting Russo's actions in Count 32. As the Sixth Circuit Pattern Jury Instructions explain, to find a defendant guilty of a substantive crime, it is not necessary to find that he personally committed the crime. Rather, it is sufficient to find that he aided and abetted the crime if he intentionally helped or encouraged someone to commit the crime. *See* Sixth Circuit Pattern Jury Instructions 4.01; *United States v. Katuramu*, 174 F. App'x 272, 279 (6th Cir. 2006); *see, e.g., Kuehne*, 547 F.3d at 698. Likewise, a defendant can be found guilty of (non-RICO) conspiracy if it is determined that two or more persons conspired to commit a crime, that the defendant knowingly joined the conspiracy, and that a member of the conspiracy did one overt act described in the indictment for the purpose of advancing the conspiracy. *See* Sixth Circuit Pattern Jury Instruction 3.01A. "The government need not show that a defendant participated in all aspects of the conspiracy; it need only prove that the defendant was a party to the general conspiratorial agreement." *United States v. Ross*, 190 F.3d 446, 450 (6th Cir. 1999) (quoting *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997)).

Count 31 charges that Gabor arranged a meeting between Russo and Gallucci to discuss Gallucci's withdrawal from the County Auditor's race. (Second Superseding Indictment at ¶ 489.) It also alleges that Gabor delivered approximately $2,000 to Gallucci on a monthly basis for five months so that Gallucci would have sufficient funds to remain in the race as long as possible. (*Id.* at ¶¶ 490–92.) Finally, it is alleged that, after Gallucci was hired by Russo, Gabor asked Gallucci to contribute cash to Russo and Dimora. Gallucci ultimately gave Gabor $250.00 in cash "in part to thank Russo for the job." (*Id.* at ¶ 496.) Count 32, in turn, alleges that the actions of Russo and others were "aided and abetted" by Gabor. (*Id.* at ¶ 501.) These allegations clearly support a charge that Gabor participated in the conspiracy charged in Count 31, and aided and abetted the crime charged in Count 32.[8]

In his final challenge to these counts, Gabor claims that Counts 31 and 32 are deficient because they fail to allege the violation of a state law duty. The courts are split on whether 18 U.S.C. § 1346 requires the existence of a legal duty under state law, and this split, while recognized in *Skilling*, was never resolved by the high court. *See Skilling*, 130 S.Ct. at 2928 n.36 (collecting cases). Moreover, the Sixth Circuit has not ruled on this issue.

---

[8] Without support, Gabor argues that "in order to show a substantive mail fraud violation, the Government must allege that Mr. Gabor himself used the mail or wire." (Doc. No. 427, p. 11.) He suggests that Count 32 is deficient for its failure to so allege. He is mistaken. "A defendant may commit mail fraud even if he personally has not used the mails." *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997) (citing *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir. 1994)). Relying on language from *Frost*, Sixth Circuit Pattern Jury Instruction 10.10 clearly states that the mailing element is satisfied if "the defendant [used the mail][caused another to use the mail] in furtherance of the scheme." The instructions further explain that "[t]o 'cause' the mail to be used is to do an act with knowledge that the use of the mail will follow in the ordinary course of business or where such use can reasonably be foreseen." *Id.* at 10.01(2)(F); *see also Frost*, 125 F.3d at 354.

The issue arose in *Terry* because the government attempted to rely on the Ohio Code of Judicial Conduct to support a finding of a violation of a state duty. The Court found that any deprivation of honest services by a public employee must be based on the defendant's violation of a state law duty. *See United States v. Brumley*, 116 F.3d 728, 734 (5th Cir. 1997). This Court ruled, however, that the state judicial canons did not have the force of law and, therefore, could not support the finding of a legal duty. Nonetheless, the Court found that the superseding indictment had properly charged the violation of a state law duty because it described a bribery scheme that was criminalized under the Ohio Revised Code. Specifically, the Court observed that Ohio Rev. Code § 2921.02(B) renders illegal the accepting of a bribe by a public official. Ohio law further prohibits a public official from using his office to secure anything of value for personal gain, and places the official in a fiduciary relationship with the public. *See* Ohio Rev. Code § 102.03.[9]

A similar result is warranted here. As a public official, Russo had a legal duty not to take anything of value in exchange for influence over his decision-making duties. The Indictment charges a bribery scheme wherein it is alleged that Russo took

---

[9] Specifically, § 102.03(D) provides that: "No public official or employee shall use or authorize the use of the authority or influence of office or employment to secure anything of value or the promise or offer of anything of value that is of such a character as to manifest a substantial and improper influence upon the public official or employee with respect to that person's duties."

29

things of value in exchange for influence over his hiring decisions. Such conduct would clearly have violated state law.[10]

        The fact that the Ohio bribery statutes are not specifically identified is not fatal to the charging instrument. *See United States v. Caldwell*, 302 F.3d 399, 409 (5th Cir. 2002) (An indictment need not specify the state law source of the right to honest services, as long as the government "prove[s] that the defendant deprived the employer of such services."); *see also* Fed. R. Crim. P. 7(c)(2) ("Unless the defendant was misled and thereby prejudiced, neither an error in a citation nor a citation's omission is a ground to dismiss the indictment or information or to reverse a conviction.").[11]

        In *Williams v. United States*, 168 U.S. 382, 389 (1897), the Supreme Court explained:

> It is wholly immaterial what statute was in the mind of the District Attorney when he drew the indictment, if the charges made are embraced by some statute in force. The endorsement on the margin of the indictment constitutes no part of the indictment and does not add to or weaken the legal force of its averments. We must look to the indictment itself, and, if it properly charges an offense under the laws of the United States, that is sufficient to sustain it, although the representative of the United States

---

[10] The government argues that, in light of the ruling in *Skilling*, there is no longer a need to find a legal duty under state law, and cites at least one post-*Skilling* decision that dispensed with the duty requirement. *See United States v. Bryant*, Nos. 09-3243 & 09-3275, 2011WL 3715811, at *7 (3d Cir. Aug. 25, 2011). This Court does not, however, read *Skilling* as extinguishing the need for a fiduciary relationship. Indeed, in his concurring opinion, Justice Scalia observed that "[t]he Court maintains that 'the intangible right of honest services' means the right not to have one's fiduciaries accept 'bribes or kickbacks.'" *Skilling*, 130 U.S. at 2935 (Scalia, J., concurring). Of course, the *Skilling* Court's requirement of a bribery or kickback scheme will, in most cases, supply the necessary legal duty, as bribery of public officials is illegal in most, if not all, states.

[11] Further, the Notes to Rule 7(c) provide, in part, "The law at present regards citations to statutes or regulations as not part of the indictment. A conviction may be sustained on the basis of a statute or regulation other than that cited. The provision of the rule, in view of the many statutes and regulations, is for the benefit of the defendant and is not intended to cause a dismissal of the indictment, but simply to provide a means by which he can be properly informed without danger to the prosecution." (Internal citations omitted.)

may have supposed that the offense charged was covered by a different statute.

This sentiment was echoed by the Court 45 years later:

In order to determine whether an indictment charges an offense against the United States, designation by the pleader of the statute under which he purported to lay the charge is immaterial. He may have conceived the charge under one statute which would not sustain the indictment, but it may nevertheless come within the terms of another statute.

*United States v. Hutcheson*, 312 U.S. 219, 229 (1941). *See United States v. Groff*, 643 F.2d 396, 402 (6th Cir. 1981) ("The citation of an erroneous statutory provision is not fatal to the conviction, then, if the defendant knew the nature of the charges against him.").

In *Groff*, the Sixth Circuit held that the fact that an indictment erroneously identified Michigan statutory law as forming the basis for the charges, instead of Ohio statutory law, did not render it fatally deficient. Noting that the court must "look at the facts alleged in the indictment to determine whether an offense has been properly charged," the court found that the factual statements in the indictment sufficiently alleged a violation under Ohio statutory law. *Id*. at 402.

Here, the factual statements in the Indictment support a charge of bribery under Ohio Rev. Code § 2921.02(B). (*See* Second Superseding Indictment at ¶¶ 477–98.) *See, e.g., United States v. Delaughter*, No. 3:09-002GHD-SAA-2, 2009 WL 1424424, at *2 (N.D. Miss. May 18, 2009) (In an honest services fraud case, even though the statutory provision upon which the legal duty rested was not cited in the indictment, the court found the indictment sufficient, observing that the defendant, an elected official, "should have known that the alleged conduct would also violate Mississippi Code

31

Annotated Section 97-11-53, which makes it a felony under state law for a public official to offer or agree to receive any intangible thing of value as an incentive for an official act."). Consequently, the violation of a legal duty, to the extent that such a requirement is still necessary in the wake of *Skilling*, is properly pled.

For all of the foregoing reasons, Gabor's motion to dismiss Counts 31 and 32 is DENIED.

### V. Gabor's Motion for a Bill of Particulars

Gabor requests that the government be required to file a bill of particulars in this case pursuant to Fed. R. Crim. P. 7(f). Gabor makes a number of arguments pertaining to the alleged vagueness or insufficiency of the Indictment. The most salient of these are the following: (1) the scope of the "enterprise" alleged in the Indictment is ill-defined and overly broad, thus making it "impossible to fashion a defense against such an unrestrained allegation" (Doc. No. 298, p. 2); (2) the "manner and means" described in the Indictment, particularly in paragraph 95 of the Second Superseding Indictment, are too vague; (3) the specific schemes that are subsequently enumerated in the Indictment "confuse rather than clarify" exactly how Gabor was involved in the alleged conspiracy (*Id.* at 2–3); (4) the Job Buying and Judicial Corruption schemes alleged against Gabor in Count 1 of the Indictment do not clearly indicate how those schemes are related to the broader conspiracy; and (5) the overall complexity of this case makes a bill of particulars especially appropriate. Regarding specific information to be included in a bill of particulars, Gabor requests data as to: (1) the time, date, and manner in which Gabor

joined and/or participated in the conspiracy;[12] (2) the structure of the enterprise; and (3) the facts and theories supporting Gabor's liability for the Honest Services Fraud charges found in Counts 2, 9, 16, 31, and 32.[13]

The test a trial court should apply when ruling on a motion for a bill of particulars is "whether providing such details is necessary to the preparation of the defense and avoidance of prejudicial surprise." *United States v. Musick*, 291 F. App'x 706, 724 (6th Cir. 2008) (citing 1 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 129 (3d ed. 1999)). Put another way, "[t]he purpose of a bill of particulars is [1] to inform a defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, [2] to prevent surprise, or [3] to plead his acquittal or conviction in bar of another prosecution for the same offense, *where the indictment itself is too vague or indefinite for such purposes*." *United States v. Finegan*, 189 F. Supp. 728, 729 (N.D. Ohio 1960) (internal citation and quotation omitted) (emphasis added). Thus, where an indictment has set out the charges in sufficient detail, no bill of particulars is necessary.

For starters, the Job Buying and Judicial Corruption schemes are, as addressed earlier in this opinion, sufficiently pleaded in the Indictment, and thus a bill of particulars as to how those schemes are connected to the larger conspiracy is unnecessary. Likewise, as already discussed, Honest Services Fraud Counts 31 and 32 are

---

[12] Beyond the alleged date on which Gabor joined the conspiracy, this request also seeks information as to how the Job Buying and Judicial Corruption schemes are connected to the conspiracy and whether and how Gabor participated in the numerous schemes in the Indictment where Gabor is either not mentioned or mentioned as playing only an apparently minor or non-criminal role. (Doc. No. 298, pp. 9–10.)

[13] Gabor also included in his motion a request for specific information as to the identities of all unnamed persons listed in the Indictment (i.e., those identified by "code names" only), but states in his Reply (Doc. No. 496) that the government has supplied him with such a list.

sufficiently pleaded. The counts are sufficiently detailed so as to allow Gabor to properly prepare for trial, to minimize the danger of surprise at trial, and to guard against double jeopardy.

As to the other Honest Services Fraud-related counts that Gabor mentions in his motion for a bill of particulars—Counts 2, 9, and 16—Gabor is charged in none of the three counts. Gabor is not even mentioned in Count 2, so it seems safe to assume that the government will not attempt to use this Count as one of the RICO predicate acts to which Gabor agreed. Count 9 discusses Gabor's involvement in the alleged conspiracies at issue in significant detail. It is difficult to imagine what other information Gabor could claim he is entitled to as to this Count. Count 16 alleges that Gabor served as an "intermediary" between Dimora and Neiheiser, the businessman allegedly involved in the Count 16 conspiracy. (Second Superseding Indictment at ¶ 318.) While this language is admittedly somewhat vague, the Indictment goes on to allege a specific restaurant meeting between Dimora, Neiheiser, Gabor, and others as well as a specific instance where Dimora requested Gabor to "call Neiheiser regarding the Atlantic City trip." (*Id.* at ¶ 333.) Gabor therefore has sufficient notice to prepare for trial and is sufficiently protected against double jeopardy. That said, if the government intends to establish at trial participation by Gabor in a Count 16 scheme that is significantly different from the nature of the participation already alleged therein, then the Court shall require a bill of particulars as to that Count.

As to Gabor's contention that paragraph 95 in the Count 1 "Manner and Means of the Conspiracy" section is overly vague, this (indeed quite broad and vague) paragraph is followed by an incorporation of the specific facts alleged in Counts 2–29

34

and 31–33 of the Indictment and the specific allegations of the Gabor Job Buying and Judicial Corruption schemes. The sufficiency of the Job Buying and Judicial Corruption schemes has already been addressed. These more precise allegations fill in many of the gaps left by paragraph 95 and severely weaken Gabor's argument as to that paragraph's insufficiency.

Gabor's contention that the "enterprise" is too broad appears to be misplaced. Gabor's real qualm here, it seems, is not with the "scope" of the enterprise but rather with the scope of the conspiracy. It is the conspiracy, after all (and not the enterprise) whose "objectives" and "manner and means," referred to by Gabor, matter for purposes of RICO conspiracy. (Doc. No. 298, p. 2.) Gabor's contention that the Job Buying, the Judicial Corruption, and possibly other schemes are not connected to the broader conspiracy may ultimately prove correct, but this is an issue to be resolved on the evidence presented at trial, not in a bill of particulars.

This leaves us with essentially two major Gabor contentions to resolve, both relating to his request as to more information on the "time, date, and manner" of his alleged involvement in the RICO conspiracy. First, Gabor asserts that, "From the Superseding Indictment, it is not possible to tell when or how Gabor allegedly became aware of the existence of the enterprise." (Doc. No. 298, p. 9.) Despite the language used, it appears that Gabor is in fact referring to the existence of the *conspiracy*, not the *enterprise*—Cuyahoga County—which was created in 1810 and the existence of which will hopefully not become a point of contention in this case. On this issue of when Gabor became involved with the conspiracy, then, the Indictment states that the "Racketeering Conspiracy" alleged in Count 1 and involving, among others, Dimora and Gabor

35

"[b]eg[an] in or around 2000 and continu[ed] to on or about July 20, 2010 . . . ." (Second Superseding Indictment at ¶ 93.) This time period is somewhat ambiguous, but the Sixth Circuit has held that "an indictment that is open-ended as to beginning dates but not end dates suffices." *United States v. Vassar*, 346 F. App'x 17, 22 (6th Cir. 2009). The language of the Indictment is therefore sufficient.

Second, Gabor repines that "[m]any of the charges of the indictment cross referenced in the RICO claim have no mention of Gabor" and others make only "tangential references" to Gabor. This certainly does not create a need for a bill of particulars on these counts insofar as it would relate to substantive charges against Gabor, since Gabor is, obviously, not charged in any of the counts where he is either not mentioned or only mentioned in passing. These cross-references, however, will prove very important if the government attempts to use any of these counts as one of the two substantive predicate acts (which Gabor intended to further and which were committed or agreed to be committed by another in the conspiracy) required to convict Gabor of RICO conspiracy. But even this consideration does not warrant requiring the government to disclose additional detail in regard to Gabor's alleged involvement with these other acts, though the Court expects that the government will not go beyond those counts in which Gabor is mentioned, whether as a charged party or otherwise, in its attempt at trial to prove Gabor intended to further an endeavor which would have constituted a pattern of racketeering activity (a necessary element of a RICO conspiracy conviction). *See United States v. Garland*, 320 Fed. App'x 295, 304–05 (6th Cir. 2008). Reaching beyond this may indeed create a danger of surprise at trial.

With the possible exception of Count 16, the Indictment in this case

sufficiently apprises Gabor of the charges against him and is detailed enough to guard against double jeopardy and prevent surprise at trial. Within fourteen (14) days of the issuance of this Opinion and Order the government shall indicate whether it intends to establish at trial that Gabor participated in a Count 16-realted scheme that is significantly different from the nature of his participation already alleged in Paragraph 333 of Count 16. Therefore, subject to this possible exception, Gabor's motion for a bill of particulars is DENIED.

For all of the foregoing reasons, the defendants' motions challenging the Indictment (Doc. Nos. 298, 414–415, and 427–428) are DENIED.

**IT IS SO ORDERED**.

Dated: October 28, 2011

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**