**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:10CR387 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | OPINION & ORDER |
| | ) | |
| JAMES C. DIMORA, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are a series of motions in limine filed by the government and the defendants, James C. Dimora and Michael D. Gabor. (Doc. Nos. 532-537 and 561.) The Court conducted a motion hearing on December 16, 2011.

**I. Background**

The facts of this particular action have been set forth previously in numerous opinions and orders by this Court. Familiarity with those facts is therefore presumed, and only a brief review of the most salient facts is necessary to frame these in limine motions. On September 14, 2010, the grand jury returned a multi-count indictment against Dimora, Gabor, and five other individuals. The indictment was one in a string of indictments growing out of an expansive federal investigation, conducted over a number of years, into allegations of public corruption and conspiracy in Cuyahoga County, Ohio. The Third Superseding Indictment[1] charges both defendants with, among other things, RICO conspiracy, conspiracy to commit mail

---

[1] All subsequent references in this opinion and order to the Indictment are to the Third Superseding Indictment, filed

fraud and honest services mail fraud, Hobbs Act conspiracy and Hobbs Act substantive violations, conspiracy to commit bribery in programs receiving federal funds, and conspiracy to obstruct justice. Dimora is also charged with conspiracy to commit wire fraud and honest services wire fraud; destruction, alteration or falsification of records in a federal investigation; mail fraud; and false statements on tax returns.

At all times relevant to the Indictment, Dimora was one of three County Commissioners who had day-to-day responsibilities for the administration of the Cuyahoga County government. During this same period, Gabor was employed by the County Auditor's Office. It is alleged that Dimora and Gabor conspired with other public officials and private citizens to engage in a pattern of racketeering and fraudulent activities for the purpose of receiving things of value in exchange for the performance of official acts.

## II. Legal Standards

### A. Motion in Limine Standard

Although not explicitly authorized by the Federal Rules of Evidence or the Federal Rules of Criminal Procedure, the practice of ruling on motions in limine "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Motions in limine allow the court to rule on evidentiary issues prior to trial in order to avoid delay and to allow the parties to focus remaining preparation time on issues that will in fact be considered by the jury. *See United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999); *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997).

Courts should exclude evidence on a motion in limine only when it is clearly inadmissible. *Indiana Ins. Co. v. General Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). If the court is unable to determine whether certain evidence is clearly inadmissible, it should defer ruling until trial so that questions of foundation, relevancy, and potential prejudice can be evaluated in proper context. *Id*. Ultimately, the determination whether to grant or deny a motion in limine is within the sound discretion of the trial court. *Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 858 (W.D. Mich. 2008) (citing *United States v. Certain Lands Situated in the City of Detroit*, 547 F. Supp. 680, 681 (E.D. Mich. 1982)). In limine rulings are preliminary, and the district court may change its ruling at trial for any reason it deems appropriate. *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994).

### B. Federal Rules of Evidence

All relevant evidence is admissible and evidence that is not relevant is not admissible. Fed. R. Evid. 402.[2] "Evidence is relevant if (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The relevancy standard is liberal. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 587 (1993). Relevant evidence, however, may be excluded if its "probative value is substantially outweighed by the danger of one of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

---

[2] Stylistic amendments to the Federal Rules of Evidence became effective on December 1, 2011. The briefing on the instant motions in limine was completed in November 2011. Thus, the briefs cite the former version of the Rules. This opinion cites to the current version of the Rules, noting, when applicable, any changes in nomenclature.

## III. Government's Motion in Limine (Doc. No. 532)

By its motion, the government seeks permission to: (1) have two case agents and an expert witness present during trial; (2) divide FBI Special Agent R. Michael Massie's testimony into segments; and (3) introduce evidence of uncharged criminal activity. The government also seeks to preclude the defendants from: (1) presenting irrelevant defenses; (2) presenting evidence of lawfulness; and (3) arguing or discussing the consequences of a guilty verdict.

### A. Two Case Agents and an Expert Witness Present at Trial

In anticipation of the Court's witness sequestration order pursuant to Fed. R. Evid. 615, the government requests permission for two case agents and an expert witness to remain in the courtroom during trial. The government anticipates designating FBI Special Agent Massie as its party representative pursuant to Rule 615(b).[3] Further, pursuant to Rule 615(c),[4] the government requests that FBI Special Agent Christine Oliver be permitted to remain at counsel table, as her familiarity with the case and exhibits is essential to aid the government's presentation of evidence at trial. Finally, the government asserts that, pursuant to Rule 615(c), its expert tax witness, IRS Special Agent Kelly Fatula, should be permitted to remain in the courtroom to hear the evidence presented at trial so that she may testify as to whether the bribes and kickbacks defendant Dimora allegedly received should have been classified as taxable income. *Id.*

---

[3] Formerly Rule 615(2).
[4] Formerly Rule 615(3).

4

As to SA Massie, the defendants offer no opposition to his presence as the government's designated representative. Indeed, Rule 615(b) expressly permits the government, who is "not a natural person," to designate "an officer or employee . . . as its representative," and further provides that person may not be excluded from the courtroom during trial.

Defendant Dimora objects, however, to SA Oliver and SA Fatula's presence in the courtroom during trial. He asserts that while SA Oliver's presence is convenient, it is not "essential to the presentation" of the government's case. (Doc. 547 at 2.) Further, he argues that SA Massie is equally familiar with the evidence and exhibits in this case and is equally competent to assist the government therewith. As to SA Fatula, Dimora argues that Rule 615(c) does not support the government's purported justification for the request. He asserts that, because the government has already disclosed to Fatula the information she needs to formulate her expert opinion, it is not necessary for her to hear the testimony at trial.

Rule 615 of the Federal Rules of Evidence provides, in relevant part:

> At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own. But this rule does not authorize excluding: . . . (b) an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney; (c) a person whose presence a party shows to be essential to presenting the party's claim or defense . . . .

The exclusion of witnesses is a matter of right subject to narrowly defined exceptions. *United States v. Phibbs*, 999 F.2d 1053, 1073 (6th Cir. 1993). The "essential" person exception "contemplates such persons as an agent who handled the transaction being litigated or an expert needed to advise counsel in the management of the litigation." *Id.* at 1073 (citing Fed. R. Evid. 615, Advisory Committee Notes). The decision to permit a witness to remain in the courtroom is

within the sound discretion of the trial court. *United States v. Mohney*, 949 F.2d 1397, 1404 (6th Cir. 1991).

### 1. FBI Special Agent Oliver

The government requests that the Court permit SA Oliver to assist it at counsel table during trial. Counsel for the government anticipates several boxes of documentary exhibits, in addition to demonstrative exhibits and electronic evidence. The government maintains that an additional agent at counsel table is essential in order for it to organize, maintain, and track the evidence and to present it a coherent and efficient manner. According to the government, SA Oliver is most suited to provide this assistance, as: (1) she and SA Massie were the two primary agents assigned to this complex investigation; (2) she prepared and organized the exhibits; and (3) she is intimately familiar with the evidence. Further, the government contended at oral argument that, due to the large volume of exhibits in this case, it is necessary to have one agent responsible for the organization and presentation of its paper exhibits and another dedicated to the electronic presentation of exhibits. Additionally, the government argues that it needs a second agent at counsel table—one who is at least as familiar as SA Massie with the voluminous evidence in this case—to assist when Massie, a critical government witness, takes the stand. Finally, at oral argument, the government indicated that it is not likely to call SA Oliver as a witness and that even if it does call her to testify, her testimony is not likely to overlap SA Massie's. It is thus unlikely that defendants will suffer any unfair prejudice as a result of Oliver's presence.

"When the government wants to have two agent-witnesses in attendance throughout a trial, 'it is always free to designate one agent as its representative under subpart [(b)

6

of Rule 615] and to try to show under subpart [(c)] that the presence of the second agent is 'essential' to the presentation of its case.'" *Phibbs*, 999 F.2d at 1072 (quoting *Pulley v. United States,* 922 F.2d 1283, 1286 (6th Cir. 1991)). "[C]ertain prosecutions may be complex enough that aid of more than one law enforcement officer is needed to sort through extensive, technical evidence, and to help 'map out strategy.'" *Id.* at 1072 (quoting *United States v. Martin,* 920 F.2d 393, 397 (6th Cir. 1990)). The burden of demonstrating that an additional agent is "essential," however, is "no easy task" and must be balanced against a criminal defendant's interest in "discouraging and exposing fabrication, inaccuracy, and collusion" related to in-court testimony. *Id.* at 1073. To satisfy the exception, the government "must show . . . that 'the witness's presence is 'essential' rather than simply desirable.'" *Kozlowski v. Hampton Sch. Bd.*, 77 Fed. App'x 133, 152 (4th Cir. 2003) (quoting *United States v. Jackson*, 60 F.3d 128, 135 (2d Cir. 1995)).

In *Phibbs*, the Sixth Circuit affirmed a district court's decision to permit the government to have two agent-witnesses in attendance at trial pursuant to the "essential witness" exception in Rule 615(c), noting:

> We are persuaded that [the second agent] fell within this category due to the particular circumstances of the case at bar. This was a trial that was scheduled for approximately one month, *involving several defendants* and a *great deal of evidence, not all of which was readily accessible*. After [a case agent] was designated the government's representative in accordance with Rule 615([b]), the court determined that [the second agent], who was intimately familiar with portions of the evidence, was also needed to advise the government in its handling of the prosecution. As [both agents] were, for the most part, responsible for distinct aspects . . . of a far-flung investigation, this was not an abuse of discretion.

999 F.2d at 1073 (emphasis added). Further, the court noted that the trial court had taken additional steps to guarantee that the agent-witnesses did not "parrot each other's testimony" or coach other witnesses, including requiring that neither agent be present for the other's testimony.

7

*Id.* at 1073. Finally, the Court noted that any concerns the defendants had about witness coaching were adequately addressed by the trial court's order that the agents not discuss the case with other witnesses and by the defense's ability to freely cross-examine the agents and allegedly-coached witnesses regarding such coaching. *Id*.

The circumstances in this case are considerably more compelling than those in *Phibbs*. As set forth above, the present indictment grew out of one of the most expansive federal investigations into public corruption in recent history, lasting nearly three years and involving numerous government agencies. To date over 60 individuals—including politicians, judges, and other public officials, as well as private businessmen—have been indicted. Many have entered into plea agreements and have been sentenced or are awaiting sentencing. Unlike *Phibbs*, which was limited to a single, albeit complex, narcotics distribution conspiracy, the defendants here are charged with multiple conspiracies. The RICO conspiracy, itself, alleges fifteen different schemes. Additionally, the trial in this case is anticipated to last three months; the trial in *Phibbs* was much shorter.

The present case is further complicated by the extensive discovery involved, by the quantity and complexity of the anticipated exhibits, and by the number of witnesses expected to testify.[5] Additionally, each defendant has been provided with two terabytes of electronic information, which includes over 44,000 recorded communications that were captured during ten months of court-authorized wiretaps. While not *all* of the evidence unearthed during the investigation will be utilized in this trial, the fact remains that Dimora was one of the main targets of the investigation, and much of it—including hundreds, if not thousands, of recorded

---

[5] In disclosures to the Court on January 3, 2012, the parties have identified 139 potential witnesses.

telephone calls—will be. Further, the Court has been advised that the government intends to offer an enormous number of other exhibits, both documentary and electronic, at trial. As was the case in *Phibbs*, only agents who possess a thorough understanding of the entire investigation will be able to expeditiously access these exhibits at trial.

Given the scope of this case and the sheer enormity of the evidence to be presented at trial, the Court concludes that the presence of two agents is essential to sort through the voluminous exhibits and to provide strategic advice to the prosecutors. SAs Massie and Oliver were the two lead agents in this case, were largely responsible for overseeing the entire investigation, and are, therefore, best equipped to organize and access this evidence. SA Massie is the government's key witness and is expected to give critical testimony as to each scheme alleged. He will obviously be unable to assist with exhibits and evidence while testifying. It is therefore essential that the government have someone in addition to SA Massie—someone whose familiarity with the case rivals Massie's—at counsel table. Only SA Oliver meets these criteria.[6] Thus, the Court finds that the government has met its burden of demonstrating that SA Oliver's presence is essential to the government's presentation of its case. *See, e.g., United States v. Cooper*, 283 F. Supp. 2d 1215, 1226 (D. Kan. 2003) (permitting two agents to remain in courtroom during "document-intensive and complex" trial involving "numerous witnesses and exhibits," where second agent was needed to manage evidence, assist with electronic presentation, and advise on trial strategy, and his testimony was not likely to overlap with other agent's testimony).

---

[6] IRS SA Fatula is also a possibility, but she has been identified as the government's expert witness in this case and, as discussed below, must therefore turn her attention to trial testimony that will form the basis of her opinions when called to testify. Thus, she will not be available to assist at counsel table.

There has been no showing that SA Oliver has knowledge of some of the evidence that SA Massie does not have or that, like the investigators in *Phibbs*, the two agents were responsible for distinct aspects of the investigation. But the government has assured the Court that, in the unlikely event that SA Oliver testifies, her testimony is not likely to overlap with SA Massie's testimony. Consequently, the risk of prejudice to the defendants is low. Even so, recognizing the defendants' interest in the accurate and fair presentation of testimony at trial, the Court will not permit SA Oliver to remain in the courtroom during any portion of SA Massie's testimony—or during any portion of testimony by any other government witness which is likely to overlap with Oliver's testimony—unless SA Oliver's testimony precedes that testimony. The Court believes that this restriction is necessary to safeguard the fact-finding process. Subject to this restriction, the Court will permit SA Oliver to be present in the courtroom during trial.[7] The overwhelming amount of evidence, including the number of potential witnesses and exhibits, the complexity of the case, and the unlikelihood that SA Oliver's assistance at counsel table will unfairly prejudice the defendants all weigh strongly in favor of allowing SA Oliver to be present. *See Kosko*, 870 F.2d at 164 (noting that where agents' testimony does not overlap, their mutual presence during trial does not undermine integrity of fact-finding process).

---

[7] This decision to allow SA Oliver to be present in the courtroom to assist at counsel table is without prejudice to defendants making a renewed request at trial that demonstrates the necessity of SA Oliver's sequestration to prevent prejudice. *See United States v. Jackson,* 60 F.3d 128, 135 (2d Cir. 1995) (holding party opposing sequestration has initial burden of demonstrating why "essential" witness exception applies and thereafter party seeking sequestration should have chance to demonstrate necessity).

## 2. IRS Special Agent Fatula

At the hearing, the government indicated that SA Fatula would testify: (1) as a summary witness with respect to defendant Dimora's bank accounts and credit card charges; (2) as an expert witness with respect to the taxable nature of Dimora's transactions; and (3) as a fact witness with respect to her participation in a single act of surveillance. As to SA Fatula's fact testimony, the government stated that it will not overlap with that of any other agent but that it may overlap with the testimony of a lay witness.

"[W]here a party seeks to except an expert witness from exclusion under Rule 615 on the basis that he needs to hear firsthand the testimony of the witnesses, the decision whether to permit him to remain is within the discretion of the trial judge." *Morvant v. Construction Aggregates Corp.*, 570 F.2d 626, 630 (6th Cir. 1978). In *Morvant*, the Sixth Circuit recognized that

> the presence in the courtroom of an expert witness who does not testify to the facts of the case but rather gives his opinion based upon the testimony of others hardly seems suspect and will in most cases be beneficial, for he will be more likely to base his expert opinion on a more accurate understanding of the testimony as it evolves before the jury.

*Id.* at 629. "Therefore, 'where a fair showing has been made that the expert witness is in fact required for the management of the case, and this is made clear to the trial court, . . . the trial court is bound to accept any reasonable, substantiated representation to this effect by counsel.'" *Mohney*, 949 F.2d at 1404 (quoting *Morvant*, 949 F.2d at 630) (affirming trial court's decision to permit expert witness to remain in courtroom where his calculations of individual tax returns depended on testimony of another witness as to calculations of corporate tax returns).

Insofar as SA Fatula's testimony consists of expert witness testimony, her presence at counsel table is permissible, as the government has made a "fair showing" that her

presence is "required for the management of the case." If SA Fatula were sequestered, the government would be required to repeat previous testimony in the form of lengthy hypothetical questions. SA Fatula's presence will thus serve the interests of expediency and efficiency. Given that SA Fatula will render an opinion as to whether a particular thing of value Dimora received should be classified as taxable income, the Court finds that it would be beneficial for her to be present in the courtroom to hear the testimony as to the things of value allegedly received by Dimora that the government believes should have been claimed by him as taxable income. Thus, the Court further finds that the government has established that SA Fatula's presence in the courtroom is necessary for the management of the case. *See United States v. Callan,* 22 Fed. App'x 434, 449-50 (6th Cir. 2001) (no abuse of discretion where trial court permitted federal agent with specialized knowledge of subject matter at issue to remain in court and to testify against defendant after government made "reasonable, substantiated representation" that agent's testimony was essential to the government's presentation of the case); *see also United States v. Kosko*, 870 F.2d 162 (4th Cir. 1989) (not improper to allow DEA agent and IRS agent to remain in courtroom where IRS agent testified as expert and where testimony of two agents did not overlap as to any matter on which they had personal knowledge); *Opus 3 v. Heritage Park,* 91 F.3d 625, 629 (4th Cir. 1996) ("Because Rule 615 is designed to preclude fact witnesses from shaping their testimony based on other witnesses' testimony, it does not mandate the sequestration of expert witnesses who are to give *only* expert opinions at trial. Indeed, an expert who . . . only assumes facts for purposes of rendering opinions, might just as well hear all of the trial testimony . . . ."); *Mohney,* 949 F.2d at 1405 (no abuse of discretion where district court permitted IRS agent to remain in courtroom and to testify as to his calculation of taxes due based

on testimony and documents in evidence). Accordingly, to the extent she will testify as an expert witness, the Court will permit Agent Fatula to remain in the courtroom during trial.

As with SA Oliver, however, to the extent that SA Fatula will testify as a fact witness, and where that testimony will overlap with portions of the testimony of any other government witness, the Court will require sequestration of SA Fatula during those portions of any such witness's testimony.

### B. Dividing Case Agent's Testimony into Segments

The government moves the Court to allow SA Massie to testify in segments at trial. The government argues segmentation of SA Massie's testimony serves the interest of efficiency and will minimize the risk of jury confusion, especially in light of the complexity of this case, which, again, involves multiple alleged criminal schemes spanning more than ten years. According to the government, if SA Massie is not permitted to testify at the introduction of each new scheme, then it anticipates it will be necessary for it to extend trial by presenting more witnesses and conducting lengthier examinations of presently-anticipated witnesses.

Dimora opposes the government's motion. He argues there is no support for the government's contention that preventing SA Massie from segmenting his testimony will prolong trial. Further, he contends that whether SA Massie or another witness testifies at each stage of the trial, the government cannot present the same evidence or testimony twice as that would be unnecessarily repetitive. Finally, Dimora asserts that no rule or legal precedent authorizes SA Massie to testify in stages.

The government's proposed method of presenting SA Massie's testimony is neither unheard of nor unsupported by the Federal Rules of Evidence or legal precedent. The

mode and order of interrogation and presentation of evidence are matters placed within the discretion of the trial court. *Brinlee v. United States*, 496 F.2d 351, 355 (8th Cir.), *cert. denied*, 419 U.S. 878 (1974) (citing FED. R. EVID. 611(a)). Rule 611(a) provides, in relevant part that, "The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; [and] (2) avoid wasting time . . . ." "Spelling out detailed rules to govern the mode and order of interrogating witnesses and presenting evidence is neither desirable nor feasible." FED. R. EVID. 611, Advisory Committee Notes. "The ultimate responsibility for the effective working of the adversary system rests with the judge. The rule sets forth the objectives which [the Court] should seek to attain." *Id.*

Other courts have approved of the practice of recalling witnesses to testify to discrete incidents in cases involving complex conspiracies or activities occurring over a long period. *See United States v. Edelin,* 128 F. Supp. 2d 23, 47 (D.D.C. 2001) (permitting government to present case in chronological order by recalling witnesses); *United States v. DeLuna,* 763 F.2d 897 (8th Cir.), *cert. denied*, 474 U.S. 980 (1985) (no abuse of discretion in permitting government to present key witness's testimony in installments); *United States v. Butera,* 677 F.2d 1376, 1381 (11th Cir. 1982), *cert. denied*, 459 U.S. 1108 (1983) (finding no error by trial court when it permitted sequential presentation by case agent); *United States v. Jackson,* 549 F.2d 517, 528–29 (8th Cir.), *cert. denied*, 430 U.S. 985 (1977). As recognized by the court in *Edelin*, this method of presentation will provide a clear and orderly trial and will aid the jury's understanding of the evidence, which will be beneficial to the defendants. *Edelin*, 128 F. Supp. 2d at 47. Further, in *Jackson*, the court held that while the interest in orderly presentation does not outweigh a defendant's right to a fair trial, a defendant's Sixth Amendment

14

rights are appropriately safeguarded by allowing the defendant to cross-examine the witness after each appearance as to the matters covered on direct and as to credibility issues. *Jackson*, 549 F.2d at 528-29.

In light of this case law and because Rule 611(a) authorizes the Court to control the order of interrogation and the presentation of evidence, the Court finds that in order to facilitate an orderly and comprehensible presentation of this complex case, avoid inefficient use of court time, and avoid jury confusion (and thereby prevent prejudice to the defendants), the government will be permitted to allow SA Massie to testify in segments related to specific schemes during its case-in-chief. Further, as in the cases cited, *supra*, the Court shall permit the defendants to cross-examine SA Massie after each appearance with respect to the testimony covered on direct during that appearance and as to issues of credibility.

### C. Admission of Uncharged Criminal Activity

The government states that it has provided defendants with notice of its intent to offer "other acts" evidence and now seeks leave to offer such evidence at trial. More precisely, the government indicates that it may offer evidence of acts not specifically pleaded in the Indictment but nevertheless relevant establishing the existence of the RICO conspiracy. Rule 404(b) states:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must: provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

FED. R. EVID. 404(b) (internal numerals and letters omitted). Rule 404(b) is "'actually a rule of inclusion rather than exclusion, since only one use is forbidden and several permissible uses of such evidence are identified.'" *United States v. Vance,* 871 F.2d 572, 575 (6th Cir. 1989) (quoting *United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985)).

The government suggests that such evidence would be "background" evidence. "Background" evidence, often referred to as the "res gestae" of the case, does not implicate Rule 404(b) because such evidence is intrinsic to the crime charged. *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) (citing 2 JACK B. WEINSTEIN, MARGARET A. BERGER & JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE § 404.20[2][c]). Crimes or other wrongs that are unrelated to the charged offense are considered "extrinsic," and are generally not admissible, except under limited circumstances. Intrinsic acts, or those "inextricably intertwined" with the crime charged, *United States v. Everett,* 270 F.3d 986, 992 (6th Cir. 2001), or "part of a single criminal episode," however, are admissible and beyond the reach of Rule 404(b). *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995); s*ee also United States v. Ellisor*, 522 F.3d 1255, 1269 (11th Cir. 2008) (evidence of an unpaid bill incurred during the episode of alleged mail fraud was inextricably intertwined because it was "a necessary part of the evidence relating to the charged offense"); *United States v. Daulton*, 266 Fed. App'x 381, 384 (6th Cir. 2008) (in tax fraud case, other act evidence, including statements of clients from years not charged in the indictment, was intrinsic as part of a "continuing criminal episode"). As the Sixth Circuit has explained:

> Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the

story of the charged offense.

*Hardy*, 228 F.3d at 748. *See Daulton*, 266 Fed. App'x at 384 (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)) (background evidence can be "necessary preliminaries to the crime charged"). In addition, the Sixth Circuit has held that evidence that "constitutes 'a continuing pattern of illegal activity'" is not considered an "other act" and, therefore, is not governed by Rule 404(b). *United States v. Buchanan*, 213 F.3d 302, 311 (6th Cir. 2000) (quoting *Barnes*, 49 F.3d at 1149). While such evidence is not subject to Rule 404(b) analysis, before admitting such evidence, the Court must still satisfy the traditional Rule 403 balancing test. *See Hardy*, 228 F.3d at 750.

Here, the government argues that other evidence supporting the RICO conspiracy charged in Count 1 would be proper background evidence supporting the existence of the conspiracy because it completes the story, arises out of the same events, or is evidence of a continuing pattern of criminal activity charged in the RICO conspiracy. In fact, the government represents that "any evidence of bribery schemes that fall [sic] within the ambit of Count 1 is admissible res gestae, and should be admissible in the Government's case-in-chief." (Doc. No. 532 at 12.)

Courts regularly apply this evidentiary exception in conspiracy cases where the uncharged crimes fall within the parameters of the conspiracy and tend to prove the existence of the conspiracy. *See United States v. Rice*, 90 Fed. App'x 921, 924 (6th Cir. 2004). "Evidence which is probative of the crime charged and does not solely concern uncharged crimes is not 'other crimes' evidence." *United States v. DeClue*, 899 F.2d 1465, 1472 (6th Cir. 1990). For example, in *Buchanan*, the defendant was charged with participating in a drug conspiracy from 1990 to 1997. The district court admitted evidence that the defendant sold drugs to an informant

17

in 1994, which was not specifically charged in the indictment. The Sixth Circuit held that this evidence was res gestae and thus Rule 404(b) did not apply because the evidence showed a continuing pattern of illegal activity associated with the charged drug conspiracy. *Buchanan,* 213 F.3d at 311; *see also United States v. Long*, No. 09-1863, 2011 WL 6005198, at *5 (6th Cir. Dec. 2, 2011) (in conspiracy to unlawfully discharge industrial wastewater, evidence of prohibited discharges occurring before those charged in the indictment was properly admitted as res gestae as part of a continuing pattern of illegal activity); *United States v. Cornell,* 162 Fed. App'x 404, 411 (6th Cir. 2006), *cert. denied*, 549 U.S. 828 (2006) (in drug conspiracy case, evidence that the defendant possessed a firearm and robbed two of the government's witnesses during the period of the conspiracy was proper res gestae because it demonstrated the defendant's continued involvement in the conspiracy); *United States v. Comer*, 93 F.3d 1271, 1277-78 (6th Cir. 1996) (finding that evidence that defendant engaged in an ongoing scheme to steal jewelry using the mails directly related to the crime charged and thus did not pose a rule 404(b) problem).

The government also argues that this proposed evidence may be admissible under Rule 404(b) because it goes to the defendants' knowledge and intent. In *United States v. Allen*, the Sixth Circuit set forth the familiar three-part test for determining the admissibility of evidence under Rule 404(b):

> Prior to admitting Rule 404(b) evidence, the district court must: (1) make a preliminary finding as to whether sufficient evidence exists that the prior act occurred; (2) determine whether the evidence is admissible for one of the proper purposes outlined in Rule 404(b); and (3) apply Rule 403 balancing to determine whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice or the other concerns embodied in Rule 403.

619 F.3d 518, 523 (6th Cir. 2010) (citing *United States v. Mack*, 258 F.3d 548, 553 (6th Cir. 2001)); *see United States v. Trujillo*, 376 F.3d 593, 605 (6th Cir. 2004) (quoting *United States v.*

*Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003)); *United States v. Merriweather*, 78 F.3d 1070, 1074 (6th Cir. 1996).

To be admissible under Rule 404(b), the other act "must also be 'substantially similar and reasonably near in time to the offense for which the defendant is being tried.'" *United States v. Love*, 254 Fed. App'x 511, 515 (6th Cir. 2007) (citing *United States v. Carney*, 387 F.3d 436, 451 (6th Cir. 2004)). With regard to the "substantially similar" requirement, the Sixth Circuit has held that "when the prior bad acts evidence is being offered for the purpose of showing intent, it 'need not duplicate exactly the instant charge, but need only be sufficiently analogous to support an inference of criminal intent.'" *Love*, 254 Fed. App'x at 515-16 (quoting *United States v. Benton*, 852 F.2d 1456, 1468 (6th Cir. 1988);) *see also United States v. Johnson*, 27 F.3d 1186 (6th Cir. 1994) (where the crime charged is one requiring specific intent, the government may use Rule 404(b) evidence to prove that the defendant acted with the requisite specific intent). Finally, should the court find that admission of "other acts" evidence is proper under Rule 404(b), the court should instruct the jury on the limited purpose for which the evidence is being offered. *See Merriweather*, 78 F.3d at 1077.

There are eleven categories (or items) of "other acts" evidence that the government wishes to introduce.

### 1. Session No. 396DCT

The first piece of evidence in question is a call between Dimora and then-Cuyahoga County Auditor Frank Russo, wherein Dimora contemplates refusing to assist a person, whom the government represents was a potential judicial candidate, because that person

19

has not extended favors to Dimora and Russo in the past.[8] The government desires to offer this evidence to show that when Dimora performs a "favor," he expects to receive something in return. According to the government, this evidence goes directly to proving the charge in Count 1 that "Dimora, Russo, and others used and agreed to use the powers of their County offices . . . to receive things of value," as well as to show Dimora's intent for Counts 2 through 27, the bribery and honest services counts.

The defendants argue that this is not res gestae evidence, as it relates to action Dimora was contemplating as the Chairman of the Cuyahoga County Democratic Party. They insist that the schemes set forth in the Indictment are confined to official action Dimora took (or did not take) as Cuyahoga County Commissioner and that this politic act as party chairman in no way explains, or grew out of, the charged conspiracies. There is some appeal to this argument. The Count 1 language relied upon by the government to support admission of this evidence as res gestae alleges that Dimora and others used "the powers of their *County* offices to influence" official actions. (Doc. No. 444 at ¶ 95.) In this particular instance, it appears that Dimora was being asked as Chairman of the Cuyahoga County Democratic Party to support a potential judicial candidate. This would not relate to his duties as county commissioner. Thus, the Court finds that this evidence cannot be considered res gestae.

Still, as the government suggests, the statement could be properly admitted as "other acts" evidence pursuant to Rule 404(b) to prove such things as motive and intent. In this case, the government suggests that this evidence demonstrates that Dimora expects something that benefits him personally—a favor—in return for performing an official act (e.g., endorsing a

---

[8] A partial transcript of the call was reprinted in the government's motion. (Doc. No. 532 at 14-15.)

candidate). While the Court acknowledges that Count 1 charges that Dimora used the powers of his *county commissioner office to influence official actions*, this evidence would become relevant if he raises the defense that he always acted in the best interest of the county and the public. Thus, in balancing its probative value against the danger of unfair prejudice, the Court is inclined to allow this evidence to rebut any such defense raised by Dimora, and, if requested, will give a Rule 404(b) limiting instruction to the jury.

### 2. Session No. 6749KCT

This recorded conversation on Kevin Kelley's cellular telephone involves a discussion between Kelley and Dimora during which, according to the government, Dimora agrees to delay a contract award to a company because the company refused to purchase a table at a Democratic Party function.[9] The government represents that this call supports Count 1 allegations that Dimora awarded public business in exchange for things of value and also demonstrates intent relative to Counts 2 through 27.

Like the prior call, this evidence touches on Democratic Party concerns. It differs from Session No. 396DCT, discussed above, however, because it clearly involves an instance during the conspiracy period where Dimora's official action as County Commissioner was allegedly, at times, influenced by the receipt of (or in this case the failure to receive) things of value, including political contributions, as charged in the Indictment. This call tends to show, relative to Count 1, that "D[imora], Russo, and others used and agreed to use the powers of their County Offices and of certain public entities . . . to influence official actions, including actions in

---

[9] A transcript of the entire call was reprinted in the government's motion. (Doc. No. 532 at 16.) The Court notes that the call participants never specifically state that the contractor in question failed to buy a table at the political fundraiser.

connection with: (1) awarding public business" as it was part of an allegedly-continuing pattern of illegal activity where official action was prefaced on the receipt of benefits by various public officials, including Dimora. The Court finds that this call may be properly offered as res gestae relative to the charged conspiracy and is beyond the reach of the 404(b) exclusion.

Of course, even if Rule 404(b) applied in this situation, such evidence is probative of Dimora's alleged criminal intent charged in Count 1 and Counts 2 through 27 of the indictment. *See, e.g., United States v. Hopper*, 436 Fed. App'x 414, 421 (6th Cir. 2011) (approving of admission of evidence of other robberies committed by the defendant immediately prior to the offenses charged in the conspiracy to prove intent because "conspiracy is a specific intent crime" in that "the government must prove that the defendant had the specific intent to further the common unlawful objective of the conspiracy"). Given the fact that this is a discrete event, for which sufficient evidence exists to establish that it occurred and can be easily compartmentalized by the jury, the Court finds that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice to the defendants or confusion to the jury. The Court shall permit the government to offer evidence of this call at trial.

### 3. Session No. 194DCT

This call, captured on Dimora's cellular telephone between Dimora and an individual identified as BE29 in the Indictment, is offered in connection with testimony that BE29 gave things of value to Dimora to influence the award of work to BE29's company.[10] In addition to the call, the government intends to offer testimony that BE29 provided Dimora with

---

[10] A partial transcript of this call was reprinted in the government's motion. (Doc. No. 532 at 18-20.)

free meals in return for Dimora trying to influence the Cuyahoga County Engineer's Office to award work to BE29's company. The government indicates that this goes to establishing intent for Counts 2 through 27 and to proving the allegation in Count 1 that, "at times, Dimora and Russo acted as intermediaries and through intermediaries." (Doc. No. 444 at ¶ 100.) According to the government, BE29 acted as an intermediary between Steve Pumper, President of DAS Construction, and other co-conspirators following Pumper's meeting with the FBI. The call also includes a reference to the County Engineer who wanted to "spread things around," instead of just rewarding friends with public contracts. Dimora challenges this evidence, noting that BE29 did not actually receive any work and that there is no indication that Dimora did anything wrong.

The Court disagrees with Dimora's assessment, and finds this evidence is properly admitted as res gestae because it provides important background on the relationship between Dimora and BE29, who is alleged to have served as the intermediary in the Count 28 obstruction charge. *See United States v. Paulino*, 935 F.2d 739, 755 (6th Cir.), *cert. denied*, 502 U.S. 914 (1991) (internal quotations and citation omitted) (In a drug conspiracy, evidence of prior drug dealing was properly admitted for the "legitimate purpose of showing the background and development of a conspiracy."). Even if it did not qualify as res gestae, admission of the call would still be proper under Rule 404(b), because it evidences Dimora's alleged criminal intent in soliciting things of value in exchange for performing official acts, such as awarding public contracts or intervening with another public official regarding the rewarding of public contracts. The call also provides sufficient evidence to support a finding that the prior actions (the attempts to solicit and/or receive things of value in exchange for official action) took place. Given that these events took place during the charged conspiracies and are very similar to several of the charged schemes, the evidence is highly probative and it cannot be said that the probative value

is substantially outweighed by the risk of unfair prejudice. Further, a limiting instruction can cure any possible prejudice that the admission of this evidence would pose. The Court will permit the introduction of such evidence.

### 4. Session No. 667KCT

This December 28, 2007, call between Dimora and Kelley discusses the "free" party that Dimora could attend at a local restaurant named "Dante's" owing to the fact that the restaurant's owner wanted a favor from the County Engineer.[11] The government indicates that this call is relevant to Count 1 and Counts 2 through 27, and that it proves Dimora believed that a free meal has value. Again, Dimora notes that there is no evidence that he did anything wrong in connection with a free party he did not attend.

Dimora misunderstands the purpose for which the government would like to offer the evidence. It is not offered for the improper purpose of establishing action in conformity with Dimora's character. Instead, the Court finds that this is proper res gestae evidence because the jury could find that it is part of a pattern of criminal activity, as it tends to prove that Dimora conspired with others to obtain things of value in exchange for official action. The Court also finds that it is admissible Rule 404(b) "other acts" evidence that the government may offer to demonstrate Dimora's alleged criminal intent in connecting things of value, such as meals, with official action, such as favorable zoning of property for restaurant parking. It also demonstrates the quid pro quo nature of the charged schemes. In this respect, based upon the evidence it has already reviewed, the Court finds that there is sufficient evidence to preliminarily find that Dimora and Kelley conspired to commit Hobbs Act and RICO violations, even if the acts did not

---

[11] A partial transcript of the call is reprinted in the government's motion. (Doc. No. 532 at 22-23.)

24

ultimately result in a completed fraudulent scheme. In light of the highly probative nature of this evidence, the government may offer such evidence.

### 5. Evidence that Dimora Solicited or Accepted Things of Value from Pat Gallina (2006-2008)

Though not charged in the Indictment, the government argues that evidence that Dimora solicited and accepted things of value from Pat Gallina in return for promising and performing official acts related to public contracts and personnel decisions "is part and parcel of the RICO conspiracy." (Doc. No. 532 at 24.) The government contends that this evidence tends: to prove that Dimora agreed with another conspirator that a conspirator would commit a racketeering act, namely bribery or fraud; to prove intent; and to establish that Dimora accepted a "stream of benefits" from Gallina, and Gallina asked for a "stream of favors" in return. (*Id.*)

These alleged transactions, occurring during the conspiracy period, are highly probative in that they are very similar to the schemes charged in the Indictment and are alleged to have taken place during the conspiracy. This similarity makes it more probable that Dimora's alleged actions in the charged schemes were influenced by his desire to receive things of value. *See Ellisor*, 522 F.3d at 1269 (quoting *Ramirez*, 426 F.3d at 1354) ("A similarity between the other act and the charged offense will make the other offense highly probative with regard to a defendant's intent in the charged offense."). As such, evidence of such events would constitute proper res gestae evidence. Further, the uncharged "Gallina schemes" would likely be admissible as "other acts" evidence under Rule 404(b), because they demonstrate Dimora's intent relative to Count 1 and Counts 2 through 27. Moreover, the acts are discrete and, with a proper limiting instruction, could be considered by the jury without the risk of undue prejudice. While the Court

is inclined to permit the introduction of this evidence, because the government did not set forth the precise nature of the evidence it intends to offer, the Court cannot definitively rule on this issue. Thus, the Court will require the government to make a more substantial proffer before it attempts to introduce this evidence.

### 6. Evidence that Dimora Solicited or Accepted Things of Value from Robert DiGeronimo

Likewise, evidence that, during the period of the conspiracy, Dimora received event tickets and parking passes from Robert DiGeronimo in return for Dimora promising to perform official acts related to a public land sale would be highly probative res gestae evidence tending to show a pattern of alleged criminal activity associated with the charged conspiracy. It is also likely that such evidence may be properly offered as Rule 404(b) evidence to demonstrate criminal intent by tying official action to the receipt of personal benefits. To lessen the potential for unfair prejudice and jury confusion, the government has represented that it will limit this evidence to that directly relating to one particular land sale. Again, because the government did not set forth the precise nature of the evidence it intends to offer, the Court cannot adequately perform a Rule 404(b) analysis. Specifically, the Court cannot determine preliminarily if there is sufficient evidence that the prior acts in question actually took place. Thus, in an abundance of caution, the Court will require the government to make a more substantial proffer prior to the introduction of such evidence.

### 7. Evidence related to Pumper and DAS Construction

The government represents that this category of evidence includes evidence that

26

alleged co-conspirator Pumper provided free or discounted home improvements at Dimora's residence in exchange for Dimora performing official actions. According to the government, this evidence is similar to that charged in Count 17 but pre-dates the conduct charged by two years (though still within the conspiracy period). The government argues that this is background evidence, detailing the relationship between Dimora and Pumper. The Court agrees that evidence tending to prove this alleged uncharged scheme would qualify as background evidence. *See United States v. Reyes*, 51 Fed. App'x 488, 494 (6th Cir. 2002) ("Evidence that shows the circumstances from which the conspiracy arose, such as a description of the personal relationships and events in which the conspiracy took root, is proper background evidence."). It would also likely be properly admitted as "other acts" evidence under Rule 404(b) as probative of intent relative to Count 1 and Counts 2 through 27. Further, chances are relatively slim prejudice would result from the introduction of such evidence. The government represents that there will be other evidence offered at trial as to the charged offenses involving Pumper and DAS Construction. Thus, Rule 403 would support the introduction of this evidence.

### 8. Television Ferris Kleem provided to Dimora in 2005

The television in question was allegedly offered in return for Dimora promising to perform official acts (outside the conspiracies charged in Counts 4 through 7 but still within the RICO conspiracy period set forth in Count 1). The government argues that this "[e]vidence is critical for the jury to understand the charged conduct [involving Kleem offering additional things of value in exchange for County work] that followed." (Doc. No. 532 at 27.) The government fails to edify the Court as to the specific nature of the evidence it intends to offer. But assuming that the evidence in question would be otherwise admissible, it would constitute

proper res gestae evidence, as it would complete the story of (or set the scene for) the 2008 trip to Las Vegas, attended by Dimora, Kelley, and others, and allegedly paid for by Ferris Kleem in exchange for favorable official action. It also provides important background evidence regarding the relationship between Kleem and Dimora. As was the case with the earlier Pumper schemes, given the expected amount of evidence as to Kleem and the 2008 Las Vegas trip, little prejudice would be likely to result from the introduction of this evidence. Assuming that the government can make a sufficient proffer as to this category of evidence, the Court will permit this evidence to be introduced.

### 9. Evidence of Dimora Seeking to Influence Judicial Proceedings

The government cites eight instances where the defendants appear to be attempting to influence judicial proceedings on behalf of others.[12] The government seeks to introduce evidence of these "other acts" to show that "Dimora, Gabor, and other RICO conspirators worked together to try to influence court cases, such as the cases influenced in Judge Terry's court and Judge McCafferty's court[.]" (Doc. No. 532 at 30.) The government states that "judicial corruption" evidence is important to Count 1, in that it establishes that Defendants Dimora and Gabor agreed that a conspirator would commit one racketeering act, and that "us[ed] the power and authority of public officials for the personal and financial benefit of Dimora and Gabor" by "expediting, facilitating, and influencing judicial action in pending litigation." (Doc. No. 444 at ¶¶ 92A, 95.) According to the government, the evidence also tends to rebut Gabor's anticipated defense that he was only involved in isolated events, rather than acts

---

[12] In its motion, the government summarized the identified calls. The Court ultimately required the government to provide a copy of the cited calls and, where available, transcripts of the calls to assist in the Court's review.

that were part of a pattern of racketeering activity. Dimora argues that these are wholly unrelated and uncharged schemes, which do not show him doing anything wrong.

The Court begins with some general principles that are applicable to the admission of these uncharged "judicial schemes." The Court will then address the probative value and admissibility of the evidence offered in support of each individual uncharged scheme. At the outset, the Court finds that Dimora misunderstands the intended purpose of the proffered evidence. While it would be impermissible to offer this evidence to show conformity with certain criminal behavior, these uncharged "judicial schemes" took place during the charged RICO conspiracy and tend to prove the existence of the conspiracy itself. As a general matter, therefore, they represent proper res gestae evidence that the government may use to demonstrate a continuing pattern of illegal conduct as charged in the Indictment.

Additionally, the government may properly use these uncharged schemes to show Dimora's access to judicial officers and their staff, and his ability to use his influence to affect the outcomes of judicial proceedings to benefit himself, other co-conspirators, and their designees, as charged in Count 1.[13] *See, e.g., United States v. U.S. Infrastructure, Inc.*, 576 F.3d 1195, 1210 (11th Cir. 2009) (internal quotation omitted) (approving of trial court's admission of evidence that coconspirator county commissioner awarded a public contract as a reward to a contractor who provided free plumbing and electrical work for the public officials' personal business for the stated reasons that such uncharged conduct "tended to be evidence of a common

---

[13] As set forth below, one of the schemes, the scheme relating to the handling of a traffic ticket received by the son of Joe Gouker, demonstrates Gabor's access to a public official, his brother-in-law Sam Alai, the mayor of Broadview Heights, Ohio.

plan, scheme and design of how business was being carried out in the Environmental Services Department at that time.").

Further, several of the uncharged judicial schemes qualify as proper "other acts" evidence under Rule 404(b) because they are substantially similar to the judicial scheme alleged in Count 18 of the Indictment (wherein Dimora is alleged to have attempted to influence a proceeding in Judge McCafferty's court) and, therefore, would be relevant to prove Dimora's intent and knowledge when he contacted Judge McCafferty's bailiff to give Pumper an advantage in the case pending in Judge McCafferty's court. Such evidence is also permissible for use in proving the specific intent required to establish Gabor and Dimora's involvement in the RICO conspiracy. Moreover, because the calls tend to document the progression of each uncharged scheme from inception to completion, there is sufficient evidence to establish that the prior acts occurred. Given the similarity of the conduct discussed in the calls to the charged offenses, the significant probative value is not substantially outweighed by unfair prejudice. If such evidence is offered by the government, the Court will consider any request for a limiting instruction to insure that the jury does not consider this evidence for an improper purpose.

The Court will now address each individual scheme. With respect to each scheme that the Court will permit to be introduced at trial, the government shall provide counsel for the defendants with advance notice of any evidence it intends to offer in support of the uncharged scheme, including the excerpts from any calls the government intends to play for the jury. Defense counsel will then have an opportunity to test the particular evidence on relevancy, completeness, or other appropriate grounds.

### a. Gary Johnson's DUI

Evidence of the first scheme identified by the government involves a 2008 call between Gabor and Dimora wherein Gabor informed Dimora that Gary Johnson "got all good" with his DUI in Garfield, Ohio. (Doc. No. 532 at 27.) Dimora instructed Gabor to advise Gabor that Johnson "owes an early Christmas present." (*Id.*)

The Court has reviewed this recorded communication and determines that the factors in favor of and against admission of the evidence are nearly evenly balanced. While the call clearly demonstrates that Dimora and Gabor have knowledge regarding how this judicial proceeding was handled, and by whom, there is no direct connection to any intervention by either defendant. As such, the Court is inclined to prohibit the government from introducing this call.

### b. Christine Blasko Poundage Fee

The next scheme involves Dimora allegedly intervening in a domestic relations matter. In the first call, Session No. 2403DCT, Dimora speaks with a member of his staff, who relayed a message that Christine Blasko's husband was in arrears on the poundage fee and that the judge did not follow the child support enforcement agency's recommendation. During the call, Dimora states that he will call the judge's bailiff and have him fix it. In the second call, Session No. 2626DCT, the staff member updates Dimora on the situation. The staff member is heard to resist Dimora's suggestion that he attempt to influence the agency to cut the fees out of concern that "word [would] get out on the street that you can reduce child support by calling Jimmy Dimora."

31

The Court is not clear on the purpose for which this evidence is being offered. Thus, the Court will afford the government an opportunity at trial to explain how it intends to use this evidence before it rules on the admissibility of this evidence.

### c. John Corsi, Jr. Request

In this scheme, the government offers another 2008 call between Dimora and a staff member. During the call, the staff member relays a message from John Corsi, Jr., who is purportedly seeking Dimora's assistance in an action pending before a certain judge identified in the call. Dimora states that he does not want to intervene in a matter before the identified judge because "she is crazy." (Doc. No. 532 at 28.) Dimora directs his staff member to contact Corsi and advise him to contact another individual who is close to the judge's bailiff. Dimora explains that the judge identified is not the type of judge you can approach.

The Court finds that this call, taking place during the period of the conspiracy, constitutes admissible Rule 404(b) evidence because it demonstrates Dimora's intent to influence proceedings with judges that he does choose to approach. Moreover, the call, itself, provides sufficient evidence that the prior acts occurred. Given the highly probative nature of this evidence, the Court finds that the probative value is not substantially outweighed by any unfair prejudice.

### d. E-mail Regarding Ropchok Divorce

On September 4, 2006, Mark Ropchok allegedly wrote an email to Peter Lawson Jones, one of the three County Commissioners, asking Jones to see if Dimora could expedite Ropchok's divorce. In his reply, Jones wrote that he would discuss the matter with Dimora and

noted in the email "Jimmy, another note re: Mark's case with AR. Thanx [sic] for all of your help and intervention." The government represents that this evidence was seized from Dimora's residence.

The government did not produce this email for the Court's review. At this point, the Court cannot say that the evidence necessarily tends to prove the conspiracy that Dimora and other coconspirators sought to influence judicial proceedings, or that there is sufficient evidence that these alleged events actually took place. Therefore, for now, the Court rules that the government may not rely on this alleged scheme. The government may, however, renew its request at trial.

### e. Mort Weisberg Request

This scheme involves a series of calls between Dimora, Mort Weisberg, and Pat Smock. Mort Weisberg contacted Dimora because Kevin Millstein had a case pending in Judge Corrigan's court, and he was concerned that neither the judge nor the law clerk would take the time to read his summary judgment motion. He asked Dimora to see if he could speak to the judge or the judge's bailiff to convince the judge to give serious consideration to granting the summary judgment motion. After directing Weisberg to contact Dimora's staff member with the information on the case, Dimora directs the staff member, Pat Smock, to obtain the name of the judge's bailiff.

This evidence shows Dimora allegedly taking steps to intervene in a judicial proceeding during the period of the conspiracy. It is, therefore, proper res gestae evidence, as it tends to prove the existence of the conspiracy itself. It also demonstrates Dimora's intent, making the calls admissible as "other acts" evidence under Rule 404(b). The calls themselves

provide sufficient evidence that this prior conduct actually took place, and the Court finds that the probative value is not substantially outweighed by any unfair prejudice to the defendants.

### f. Juvenile's Traffic Ticket

The government points to a string of calls that document Gabor's alleged intervention into a matter involving a traffic ticket received by an acquaintance's son. During the calls, Kelley tells Gabor that the juvenile was in a car accident in Broadview Heights, and inquires as to whether the ticket, which is pending in juvenile court, can be "pulled" so that it can be addressed in Mayor's Court. Kelley suggests that Gabor ask his brother-in-law, Sam Alai, the Mayor of Broadview Heights, to pull the ticket. Gabor connects Alai to the conversation and Alai takes down the ticket information. A subsequent message confirms that the ticket had been diverted to Mayor's Court.

The Court finds that this evidence is proper res gestae, as it tends to prove the existence of the RICO conspiracy and further demonstrates Gabor's involvement therein. It is also admissible under Rule 404(b) to demonstrate Gabor's intent to join the conspiracy. The calls themselves provide sufficient evidence that the intervention took place, and the probative value of evidence of this substantially-similar incident, occurring during the conspiracy period, is not substantially outweighed by any unfair prejudice to the defendants.

### g. Juvenile Case

Another uncharged scheme proffered by the government involves a request that Dimora intercede in the placement of a juvenile who has been sentenced to prison. The request is made by Rich Maripese, who explains that his secretary's son was too old to qualify for a youth

34

offender's program. In a subsequent call, Dimora contacts the judge and requests that she reconsider her decision not to send the juvenile to the youth offender's program and also asks her to consider early release. Dimora follows up with Maripese and offers to "lob in" another call closer to the hearing. (Doc. No. 532 at 29.)

These calls clearly constitute res gestae evidence, as they occurred during the conspiracy period and demonstrate Dimora's ability and intent to intervene in judicial proceedings for the benefit of himself and his designees, as charged in Count 1. The evidence would also be admissible under Rule 404(b) because the calls provide sufficient evidence that the intervention took place, and the probative value of demonstrating intent for the conspiracy and Counts 17 and 18 would not be substantially outweighed by any unfair prejudice. The government may offer evidence of this scheme for these stated purposes.

### h. Action Involving Dave Hegedus

To support this uncharged scheme, the government produces a 2008 call between Dimora's wife and Dave Hegedus. During the call, Hegedus informs Dimora's wife that he is a party to a pending legal matter. While he indicates that he would like to "fight" the action, he states that Dimora suggested that he (Dimora) could mention something on Hegedus's behalf to the judge and explain a couple of things.

This is clearly res gestae evidence, as it tends to prove that Dimora conspires with others to intervene in judicial proceedings for the benefit of his designees, as charged in Count 1. The evidence is also admissible under Rule 404(b) because it demonstrates Dimora's intent for Count 1 and Counts 17 and 18, and the call itself is sufficient evidence that Dimora has conspired to intervene in this judicial proceeding. The government may offer evidence of this

uncharged scheme for these stated purposes.

### i. Bissler Divorce

In the final "judicial scheme," the government identifies a series of calls relating to a divorce action involving the brother of Dimora's wife. The Court has reviewed these calls and finds that they constitute appropriate res gestae evidence because they show Dimora allegedly conspiring with Joe O'Malley to influence the divorce proceeding to the benefit of his wife's brother. In one call, Dimora asks Joe O'Malley, who is related to the judge to whom the divorce action has been assigned, to make sure that the judge handles the matter herself. In a subsequent call, he informs O'Malley of the hearing date and asks O'Malley to speak with the judge before the hearing to advise her that Dimora's wife's brother wanted custody of two of the children and a break on alimony payments.

Like several of the other schemes, the Court finds that this is proper res gestae evidence, as it tends to prove the conspiracy set forth in Count 1. It also serves as admissible Rule 404(b) evidence, as it demonstrates Dimora's criminal intent. Again, the calls, showing the progression of the action, provide sufficient evidence that the prior acts took place. Finally, the Court finds that the probative value of this evidence is not substantially outweighed by any unfair prejudice. The government may offer evidence of this uncharged scheme for the reasons set forth above.

### 10. Session No. 1910DCT

This piece of evidence documents a call between Dimora and Tom Day, Bedford Clerk of Court, which the government believes shows Dimora lobbying to include specifications

for a county project that would require the use of Pumper's Company's (Greensource) products. Specifically, the government seeks to offer the beginning and the end of the call where Dimora discusses his concern about media inquiry into Day's relationship with a printing company by stating "cause anybody that's gonna bribe somebody or take care of somebody isn't gonna pay 'em with a check." According to the government, such evidence supports its theory that Dimora took cash bribes and then attempted to cover up by writing checks. In contrast, Dimora argues that his belief that bribery would probably not be carried out with a check is irrelevant because "[t]here are few people in this country that would not hold the opinion that a bribe is not usually in check form." (Doc. No. 547 at 13.)

The Court has reviewed this lengthy call and finds, at best, that its probative value is marginal. Taken out of context, Dimora's observation regarding the reliance on cash payments for bribery schemes might seem to be probative as to Dimora's intent. However, when the entire call is considered, it is clear that Dimora is merely defending the unrelated actions of another public official by offering his common sense belief that no one who is "on the take" would be likely to leave the kind of paper trail that checks create. While the Court agrees that this insight might have some probative force, the Court finds that such limited value is substantially outweighed by the risk of unfair prejudice to the defendants. The government may not offer this evidence.

### 11. Evidence Relating to a Meeting Between Kelley and Gabor

Likewise, the Court finds that the final category of "other acts" evidence the government proposes to offer is unfairly prejudicial to the defendants. During a December 28, 2008, meeting, Kelley and Gabor discuss the death of Rosemary Vinci, an individual employed

in the County Auditor's Office. When news of the FBI's investigation first broke in 2008, it was alleged that Vinci was one of the "ghost employees" working in the Auditor's Office. The two men express concern that Vinci may have "written something down" before she died. Kelley indicates that Dimora, in jest, advised that he hoped no one would find the arsenic in Vinci's food and added "that is what happens to people who talk." While it is clearly relevant res gestae evidence because it arises out of the same series of transactions as the conspiracy, and is probative because it goes to criminal intent in that it shows that co-conspirators are concerned about exposure for their alleged criminal actions, such evidence should be excluded under Rule 403 because of its obvious prejudicial effect. There are no allegations that Vinci was murdered, and it would be unduly prejudicial to the defendants to interject allegations of such criminal activity into the case. Further, because neither defendant has been accused of any wrongdoing in the death of Vinci, it is likely to have the effect of confusing the jury. For all of these reasons, the Court will not permit this evidence.

### D. Exclusion of Irrelevant Defenses

The government requests a ruling precluding the defendants from offering "other acts" evidence to support irrelevant defenses, such as the "politics as usual" defense, a "selective prosecution" defense,[14] or the "good guy" defense. "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina,* 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). Being allowed to present "relevant evidence is integral to that right." *Baze v. Parker*, 371 F.3d

---

[14] In response to the government's motion, the defendants have each indicated that they do not intend to offer a "selective prosecution" defense. As such, this portion of the government's motion is moot.

310, 323 (6th Cir. 2004) (citing *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988)). A criminal defendant does not, however, "have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence." *Taylor*, 484 U.S. at 410.

Both defendants represent that they do not intend to offer a "politics as usual" defense. Gabor states that he may present evidence that certain monies paid were legitimate campaign contributions. Gabor also indicates that he may offer evidence that paying for meals is an acceptable custom and practice in the private sector because such information goes directly to his *knowledge* that Dimora, Russo, and Kelley were violating the law. He also intends to offer evidence that the co-conspirators are friends and that friends often buy each other meals and drinks without running afoul of ethics rules governing public officials or criminal laws.

Rule 401 provides that evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. The fact that the receipt of things of value in exchange for some business benefit may be acceptable in the private sector satisfies neither prong of the relevancy test. That a practice is acceptable under other circumstances not present does not make it any more or less probable that, under these circumstances, the defendants violated the law. Likewise, the question of what is permissible in the private sector is of no consequence in determining whether the law was violated in this action, where the defendants are charged with offenses allegedly committed while serving as *public* employees. Further, even if such evidence had relevance under Rule 401, its admission would still be barred under Rule 403 because of the very real likelihood of misleading the jury or confusing the issues

by injecting into these proceedings matters that are simply not germane. The Court will not permit evidence relating to practices in the private sector.

That said, evidence that certain things of value were legitimate campaign contributions would be relevant because it would make it more probable that the defendants did not receive the thing of value with corrupt intent, which is of consequence to the bribery, Hobbs Act, and conspiracy charges. The Court will also permit evidence that various things of value were offered or received as tokens of friendship, with no expectation of the receipt of a reciprocal benefit, such as the award of a public contract. Again, such evidence would have the effect of demonstrating that the defendants did not corruptly solicit or receive things of value under the various statutes charged in the Indictment.

Dimora states that he may also touch upon certain ethics and reporting requirements by offering evidence that he reported meals and gifts in his State public disclosure forms. If evidence of such disclosures is admitted, the government requests leave to offer evidence regarding the purpose of the ethics forms, Ohio rules governing conflicts of interest and misuse of public office, and ethics training. Dimora does not oppose the introduction of evidence relating to the purpose of disclosure forms, but objects to any other evidence relating to disclosure forms, ethics, and ethics training.

It is unclear from Dimora's response the purpose for which he would offer this "other acts" evidence. The Court is unaware of any authority supporting the proposition that the disclosure of a bribe absolves the public official of criminal liability for accepting the bribe. To the extent that such evidence is offered to negate knowledge of illegality, the introduction of such evidence might very well open the door to other evidence of Dimora's knowledge of reporting requirements. The Court, therefore, cannot provide a definitive ruling as to whether the

40

introduction of evidence of Dimora's public disclosure forms would even be relevant or would open the door to more extensive evidence of the ethical rules governing public officials. Thus, before Dimora offers such evidence at trial, or his counsel mentions Dimora's public disclosure forms before the jury, Dimora shall identify the legal theory under which he believes these documents are relevant and obtain a ruling on their admissibility.

### E. Reverse Rule 404(b) Evidence and Similar Evidence

The government also seeks to preclude the defendants from raising a "good guy" defense at trial. Specifically, the government argues that the defendants should be precluded from offering instances of lawfulness to counter the government's allegations of corruption and conspiracy. Both defendants indicate that they intend to offer evidence that might be considered "good acts" evidence.

Gabor seeks to offer evidence relating to his work in his delicatessen for thirty years to show that he was qualified for the position in the Auditor's Office by demonstrating his knowledge and experience with weights and measures. He claims that he needs to offer such evidence to rebut the government's allegation that he was a "ghost employee," who performed no meaningful work for the Auditor's Office and was often away from work during business hours. Dimora plans to offer evidence of non-criminal conduct to negate or rebut the government's theory that he was involved in an expansive RICO conspiracy with the county as the enterprise. The Court begins with Dimora's proffer.

### 1. Dimora's Reverse Rule 404(b) Evidence

Evidence of noncriminal activities offered by a defendant to disprove an aspect of

the government's case is a subset of "other acts" evidence known as "reverse 404(b)" evidence. The Sixth Circuit has held that the admission of "reverse 404(b)" evidence is subject to the same standard Rule 404(b) analysis applicable to "other acts" evidence most often offered by the government. *See United States v. Clark*, 377 Fed. App'x 451, 458 (6th Cir. 2010); *United States v. Lucas*, 357 F.3d 599, 605 (6th Cir. 2004).

Evidence that an individual acted lawfully on other occasions not charged in the Indictment is generally inadmissible in that it does not negate the charge that he acted with criminal intent on another occasion. *See United States v. Dobbs*, 506 F.2d 445, 447 (6th Cir. 1975) ("evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant"); *see, e.g., Ellisor*, 522 F.3d at 1255 (In fraud trial involving bogus entertainment event, evidence that defendant had produced a prior legitimate event was not relevant to "negate criminal intent"); *see generally Daulton*, 266 Fed. App'x at 386 ("Rule 404(b) prohibits the use of extrinsic evidence of other crimes, wrongs, or acts in order to show that a person acted in conformity therewith."). It may be probative, however, where a defendant is alleged to have "always" or "continuously" committed the acts alleged. *United States v. Damti*, 109 Fed. App'x 454, 455-56 (2d Cir. 2004); s*ee also Daulton*, 266 Fed. App'x at 386 (quoting *United States v. Scarpa*, 913 F.2d 993, 1011 (2d Cir. 1990)) ("Evidence of noncriminal activities 'would only be relevant if the indictment charged the defendants with ceaseless criminal conduct.'"); *United States v. Dobbs*, 506 F.2d at 447 (finding reverse 404(b) evidence not relevant where the defendant was not charged with a scheme).

Dimora argues that, given the scope and breadth of the RICO conspiracy charged in the Indictment, the government has essentially charged him with ceaselessly operating a RICO conspiracy during his tenure as County Commissioner. The government takes issue with this

assessment. During the motion hearing, counsel for the government argued that Dimora has not been charged with engaging in a ceaseless pattern of racketeering and fraud, nor is it alleged that Dimora *always* engaged in corrupt and fraudulent behavior. As such, the government does not intend to offer evidence that *every* action taken by Dimora as County Commissioner advanced the conspiracy charged in the indictment. Instead, the government plans to offer evidence to support the specific schemes outlined in the Indictment to demonstrate that, on specific occasions, Dimora permitted the receipt of things of value to influence his official actions.

Several "reverse 404(b)" cases are instructive as to the question of when specific instances of lawfulness may serve to negate criminal intent. In *Daulton*, the defendant was charged with aiding and assisting with the preparation of false federal income tax returns for certain tax years, in violation of 26 U.S.C. § 7206(2). At trial, the defendant sought to introduce evidence of non-fraudulent tax returns he had prepared in other years. The district court refused to permit the evidence, finding it irrelevant and immaterial to whether the defendant fraudulently prepared the returns identified in the indictment. In affirming his conviction, the Sixth Circuit panel rejected the defendant's argument that the other returns should have been admitted to rebut the government's theory that he had engaged in a conspiracy to falsify tax returns, noting that the government did not contend that the defendant had "always" engaged in criminal activity when preparing tax returns. *Id.* at 386. The court found that the "other acts" evidence would have been legally inadequate in that, at best, it would have "proved only that [the defendant] did not *always* include false deductions on his clients' tax returns."[15] *Id.*

---

[15] Likewise, in *Ellisor*, the Eleventh Circuit ruled that evidence that a defendant had produced other entertainment events in the past was inadmissible "reverse 404(b)" evidence because it did not "bear on his intent to defraud with respect to the Christmas show [identified in the indictment], and is therefore irrelevant." *Ellisor*, 522 F.3d at 1270.

Similarly, in *Damti*, a case involving conspiracy to commit fraud in financial transactions, the court found no error in the exclusion of proposed evidence that, on other occasions not charged in the indictment, the defendants had made financial investments without defrauding or extorting money from their clients. In reaching this conclusion, the court noted that the government "did not allege to the jury that the defendants engaged in 'ceaseless' criminal conduct, that 'all' of the defendants' customers were defrauded, or that the defendants' business was 'permeated with fraud.'" 109 Fed. App'x at 456. Instead, the government restricted its case to ten specific instances, which it argued were representative of the substantial number of the financial "moves" performed by the defendants during the period of the conspiracy.[16] The Court explained, "[e]ven if many or most of these moves were fraudulent, it follows that a substantial portion also presumably were legitimate. Evidence of 'good moves,' therefore, would not have been probative of the key issue during trial." *Id.*

Here, the government represents that it does not intend to offer evidence or argument supporting a theory that the defendants "always" engaged in corrupt action, or that the alleged corrupt practices permeated every aspect of county business during the period of the conspiracy. To be sure, the government has alleged an expansive RICO conspiracy, with multiple schemes and hundreds of overt acts specifically set forth in the Indictment. Still, the government maintains that it will confine itself to proving those schemes specifically charged in the indictment, along with other schemes arising out of the same conspiracy during the relevant period. Under such circumstances, evidence that Dimora did not on other occasions receive a personal benefit for performing his official actions, or that he properly awarded a county contract

---

[16] According to the government, the conspiracy involved "more than four-thousand moves." *Damti*, 109 Fed. App'x at 456.

to the lowest bidder in accordance with county policies and practices, would not negate allegations that he acted corruptly on those occasions set forth in the Indictment. Further, if admitted, any probative value of this evidence is substantially outweighed by the likelihood of jury confusion. The Court, therefore, will not permit Dimora to offer specific instances of lawfulness.[17] *See, e.g., United States v. Marlinga*, 457 F. Supp. 2d 769, 776 (E.D. Mich. 2006) (evidence that the defendant allegedly refused to accept bribes on two occasions not set forth in the indictment was "the very type of propensity evidence explicitly prohibited under 404(b)").

The Court stresses, however, that the government has ventured down a very narrow path. While the Indictment does identify discrete instances of alleged fraud, the government admits that it has charged "a wide-ranging RICO Conspiracy." (Doc. No. 532 at 7.) Should the government stray from its chosen path, and offer evidence or argument that supports a theory that Dimora always or ceaselessly engaged in such fraud, the Court would not hesitate to revisit its ruling. At least for now, Dimora may not present evidence of specific instances of lawfulness.

### 2. Gabor's Evidence of Experience and Qualifications

Gabor also seeks to offer "other acts" evidence, not to negate criminal intent, but to challenge the government's theory that he was a "ghost employee." In support of his position,

---

[17] While the Court finds that specific instances of lawfulness would be irrelevant, other types of "reverse 404(b)" evidence, including policies or training Dimora promoted as County Commissioner, might be relevant to negate the government's theory of the case. For example, in *United States v. Hayes*, 219 Fed. App'x 114, 115-16 (3d Cir. 2007), the court held that testimony that the defendant never asked direct subordinates to falsify tests, and evidence that he supported policies that were contrary to the goals of the alleged conspiracy to falsify tests, was relevant as to whether the defendant was a member of the alleged conspiracy. *See, e.g., United States v. Marlinga*, 457 F. Supp. 2d 769, 775 (E.D. Mich. 2006) (evidence that, prior to seeking public office, it was the defendant's practice to extend certain courtesies to cases he deemed worthy would negate his criminal intent for the charged conspiracy).

he cites the Court to its recent decision in *United States v. Terry*. As part of the present FBI public corruption investigation, Terry, a sitting common pleas judge, was indicted on charges of conspiracy to commit mail fraud and honest services mail fraud, as well as substantive. It was alleged that he fixed a case pending before him as a favor to Russo for the benefit of Pumper and Pumper's company, DAS Construction (a party to the case pending before Terry). The Court permitted Terry to offer evidence as to his qualifications and political contacts to rebut the government's stated theory that Terry fixed the case before him to appease Russo, whose political support it was alleged Terry had needed in order to obtain his seat on the bench (and whose continued support Terry would allegedly need in order to retain his seat).

The Court does not understand the government to be pursuing a theory that Gabor was unqualified to fill his position in the Auditor's Office, but rather that he simply performed little or no work in his position. Evidence that he had past work experience in weights and measures would not tend to negate allegations that he was often absent from his county position and collected a paycheck for work he never performed. Such "other acts" evidence, therefore, would be irrelevant and would have the effect of confusing the jury. Of course, should the government seek to establish that Gabor was unqualified for his county position, the Court would permit Gabor to offer evidence to rebut such a theory.

### 3. Notice as to 404(b) Evidence

The government argues that the defendants should be required to give advance notice before offering "good acts" evidence at trial. While the government correctly observes that criminal defendants are not required by rule or law to provide such notice, the government argues that such a requirement would avoid surprise and possible error at trial. *See, e.g., United*

46

*States v. Shields*, No. 90CR1044, 1991 WL 236492, at *2 (N.D. Ill. August 13, 1991) (imposing such a notice requirement on defendants); *but see United States v. Warner*, 396 F. Supp. 2d 924, 942 (N.D. Ill. 2005) (refusing to impose such a requirement). In light of the Court's ruling that "reverse 404(b)" evidence will not be permitted unless the government offers a theory of the case for which such evidence would serve to negate criminal liability, the Court will require the defendants to seek leave before offering "reverse 404(b)" evidence.


### F. Consequences of Guilty Verdicts

The government moves in limine to prohibit defendants from eliciting any testimony or making any argument that may directly or indirectly inform the jury of sentencing options or engender their sympathy for defendants. Further, in its motion, the government objects to defendants asking witnesses to make comparisons between their plea agreements and the defendants' status, or attempts to contrast the witnesses' situation to that of defendants' perceived situation.

The government indicates that it is not opposed to defendants questioning cooperating witnesses about potential bias from their plea agreements and as to benefits set out therein, such as any differential in the witness's sentencing calculation because of his substantial assistance or acceptance of responsibility. But the government has expressed concern that defendants may impermissibly attempt to inform the jury about the potential sentences they face. The government argues that such an inquiry will lead to jury confusion and possible jury nullification.

For example, at hearing, the government objected to any inquiry on cross-examination into potential maximum sentences the witness could have faced on uncharged

offenses, including those that the defendants are charged with, as a way to inform the jury of the penalties defendants face. The government argues that this would lead to mini-trials on the complexities of sentencing and guideline calculations, and would therefore unduly prejudice the government's case by sidetracking, confusing, and misleading the jury as to issues not within its province. This is especially true where, according to the government, such uncharged offenses were not even an objective possibility in some cases and therefore, a witness's erroneous subjective belief that he avoided those charges is wholly irrelevant.

Dimora acknowledges that he cannot ask the jury to acquit him because of potential penalties and that he cannot discuss the penalties he faces or ask the Court to instruct the jury as to the extent of those penalties. On the other hand, Dimora argues that it is entirely permissible for him to explore a cooperating witness's potential bias or motivations for testifying that flow from that witness's plea agreement with the government, including not only the government's recommendation as to sentence reductions, but also the potential sentence and losses the witness believed he avoided by cooperating. At oral argument, Dimora elaborated that he should be permitted to inquire into a cooperating witness's subjective beliefs, motives, or expectations with respect to the perceived benefits contained in the witness's plea agreement, including the witness's subjective believes, motives, and expectations as to uncharged counts. Dimora contends that this subjective perception is paramount to the jury's consideration of the cooperating witness's bias and motives and that the length of the witness's sentence or potential sentence directly correlates with the witness's propensity to testify untruthfully.[18] Without this

---

[18] Dimora has filed a motion to supplement the in-court discussion regarding cross-examination of cooperating witnesses (Doc. 584), which the Court has considered herein

information, Dimora contends the jury will be unable to evaluate properly the witnesses' bias and motives.

"The Confrontation Clause of the Sixth Amendment guarantees a defendant an opportunity to impeach the credibility of a witness against him because impeachment is fundamental to effective cross-examination." *United States v. Holden*, 557 F.3d 698, 704 (6th Cir. 2009) (citing *Davis v. Alaska*, 415 U.S. 308, 315-18 (1974)). *See also Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (recognizing that exposing a witness's motivation for testifying is an important part of the rights guaranteed by the Confrontation Clause). The guarantee of an opportunity for effective cross-examination, is not, however, a guarantee of "cross-examination that is effective in whatever way and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679; *United States v. Davis*, 430 F.3d 345, 360 (6th Cir. 2005) (internal citations and quotations omitted) (trial courts "retain great discretion to impose reasonable limits on cross-examination of witnesses").

In exercising its discretion to impose reasonable limits on cross-examination, a trial court should weigh "whether, despite the limitation on cross-examination, the jury [is] otherwise in possession of sufficient information . . . to make a 'discriminating appraisal' of a witness' motives and bias." *United States v. Kone*, 307 F.3d 430, 436 (6th Cir. 2002) (internal citations, quotations, and alterations omitted); *Brown v. Powell,* 975 F.2d 1, 5 (1st Cir. 1992), *cert. dismissed,* 506 U.S. 1073 (1993) (no abuse of discretion if there is sufficient evidence

49

before the jury from which it could "make a discriminating appraisal of the possible biases and motivations of the witnesses"). Further, particular care is warranted, "where . . . the Government's case may stand or fall on the jury's belief or disbelief of one witness . . . [whose] credibility is subject to close[r] scrutiny." *Hargrave v. McKee*, 248 Fed. App'x 718, 727 (6th Cir. 2007) (quoting *Gordon v. United States,* 344 U.S. 414, 417 (1953)).

The issue before the Court is whether the Sixth Amendment requires that defendants be permitted to expose the bias that a cooperating witnesses may have by asking those witnesses (some of whom are former co-conspirators) about details of their sentences and plea agreements with the government, including the witness's subjective beliefs as to the specific sentences avoided or hoped to be avoided. The Sixth Circuit recently noted that it has not considered this issue in a published decision and that there is currently a circuit split on the issue. *United States v. Lanham*, 617 F.3d 873, 884 (6th Cir. 2010) (en banc).[19]

---

[19] Dimora cites *United States v. Thornton*, 609 F. 3d 373, 378 (6th Cir. 2010), for the proposition that a witness's subjective understanding of the benefit he either received or expected to receive for cooperating with the government is central to a defendant's Sixth Amendment right to confront a witness against him. In *Thornton*, a conspiracy case, the defendant appealed the trial court's admission of details, offered by the government, of a codefendant's plea agreement. *Id.* at 377. At trial, the government questioned the codefendant as to the statutory penalties and sentencing guideline range he faced absent his cooperation with the government. *Id.* Defendant objected that the question regarding the guidelines prejudiced him, in part, because the information about his codefendant's sentence may have confused the jury about his own sentence. *Id.* The Sixth Circuit indicated that "some discussion of a codefendant's potential sentence is inevitable if the Government is allowed to explore a codefendant's motivation for testifying," but rejected the defendant's claim of prejudice because his counsel was also permitted to inquire into the codefendant's potential sentence and thus he could not legitimately claim prejudice. *Id.* at 378. This case is inapposite to the issue before this Court. The court in *Thornton* did not decide that this type of evidence is *always* admissible, or that such information is or is not likely to confuse the jury, or that the Sixth Amendment prevents a trial court from limiting this type of inquiry. Moreover, the court did not hold that a defendant must be permitted to inquire into a witness's subjective belief as to potential sentences avoided on uncharged offenses. In that case, the defendant's inquiry was properly limited to the witness's understanding of the express bargain reached with the government.

Likewise, Dimora's reliance on *United States v. Jeffries*, 82 F.3d 419 (Table), 1996 WL 166655 (6th Cir. April 5, 1996) is misplaced. Dimora asserts that the court in *Jeffries* held that error existed where defense counsel was prevented by the trial court from eliciting testimony, on cross-examination, about the witness's understanding of his plea bargain and the benefits flowing therefrom. Dimora, however, overstates the Court's holding. In *Jeffries*, the trial judge prohibited defense counsel from asking a co-conspirator witness *any* questions about the recommendations the government promised to give at his sentencing in exchange for his cooperation or any questions about the witness's belief as to the benefits his testimony would bring him. The judge's stated reason for

The Third, Fifth, and Ninth Circuits have held that a district court abuses its discretion by limiting a defendant's ability to cross-examine co-conspirators about their beliefs as to the sentences they avoided by testifying. These courts hold that a defendant's Confrontation Clause right to inquire into potential sentencing ranges, minimums or maximums, outweighs the risk of undue prejudice. *See United States v. Chandler*, 326 F.3d 210 (3d Cir. 2003) (trial court committed reversible error when it limited cross-examination regarding cooperating witnesses's belief as to magnitude of sentence reductions they believed they earned; limitation violated defendant's Confrontation Clause rights, which outweighed government's interest in preventing jury from inferring defendant's potential sentence on same charge); *United States v. Cooks*, 52 F.3d 101, 103-04 (5th Cir. 1995) (district court erred when it precluded defendant from exploring effect of cooperating witness's potentially serious sentence on his motivation for testifying); *United States v. Landerman*, 109 F.3d 1053, 1063 (5th Cir. 1997) (same); *United States v. Larson*, 495 F.3d 1094, 1106-07 (9th Cir. 2007) (en banc) (district court erred when it prohibited cross-examination of cooperating witness regarding potential mandatory life sentence; information was necessary for jury to evaluate witness's credibility and defendant's Confrontation Clause interests not outweighed by risks of jury confusion or jury nullification).

---

doing so was that he did "not accept recommendations from anybody, the United States Attorney or anyone else." The Sixth Circuit ruled that the district court "erred to the extent that it restricted, in barring cross-examination on the witness' understanding of his plea bargain, important impeachment evidence." *Id.* at *6. The Court concluded the error was harmless because counsel was otherwise permitted to elicit from the witness that he knew he was facing a 20 to 30 year sentence and had received a letter from the government assuring him of a recommendation of two to four year sentence. This Court does not read this case as holding that a trial court must always permit inquiry into sentencing ranges or that a trial court may not limit such inquiry in the interests of preventing undue prejudice and jury confusion. Nor does the Court read this opinion to hold that defendant must be permitted to ask cooperating witnesses's questions concerning uncharged offenses and the sentences they believe they avoided on those uncharged counts. Moreover, unlike in *Jeffries*, this Court does not intend to prohibit all inquiry into the government's sentencing recommendation, and has already stated that defendants shall be permitted to inquire as to the length of the sentence reduction a government witness expects to receive under his plea agreements in exchange for his testimony.

51

In contrast, the First, Second, Fourth,[20] Seventh, and Eighth Circuits have held that a defendant's Confrontation Clause rights are not violated by limitations on cross-examination that prohibit a defendant from asking cooperating witnesses about specific sentences avoided or hoped to be avoided by their cooperation. These courts hold that this type of information has only marginal probative value, which is substantially outweighed by the risk of jury nullification and jury confusion. *See United States v. Luciano-Mosquera*, 63 F.3d 1142, 1153 (1st Cir. 1995) (upholding trial court's limitation on cross-examination that prevented defendant from inquiring about precise length of sentence cooperating witness avoided; probative value of additional information was slight and outweighed by risk of jury inferring defendant's potential sentence on same charge); *United States v. Reid*, 300 Fed. App'x 50, 52 (2d Cir. 2008) (same); *United States v. Cropp*, 127 F.3d 354, 358 (4th Cir. 1997) (affirming trial court's prohibition of questions about cooperating witnesses' specific penalties at stake, including questioning as to specific sentencing guideline ranges and maximum total sentences expected); *United States v. Arocho*, 305 F.3d 627, 636 (7th Cir. 2002) (inquiry into specific sentencing ranges and sentences is only marginally relevant and likely results in jury nullification and can create side issues that could confuse the jury, especially in light of other sufficient evidence and instruction that jury should consider cooperating witnesses' testimony with great caution); *United States v. Walley*, 567 F.3d 354, 358-60 (8th Cir. 2009) (specific

---

[20] An intra-circuit split exists in the Fourth Circuit on this issue, as revealed by that circuit's dissimilar opinions in *Cropp*, *supra*, and *Hoover v. Maryland*, 714 F.2d 301 (4th Cir. 1983) (holding that trial court's refusal to allow inquiry into witness's understanding of his bargain with the government violated defendant's right to confront the witness against him). Recent opinions from the Fourth Circuit, however, generally tend toward disallowing inquiry into the particular details of a witness's potential sentence due to the risk of jury confusion and the potential for jury nullification. *See United States v. Johnson*, 363 Fed. App'x 247, 249 (4th Cir. 2010) (district court permissibly restricted inquiry into actual sentence an additional uncharged count would have carried where defendant faced the same count and revealing sentence); *United States v. Shelton*, 200 Fed. App'x 219, 221 (4th Cir. 2006) (noting that the court has restrictions on inquiry into minimum and maximum penalties faced by cooperating witnesses as appropriate discretionary limitation).

possible lengths of cooperating witness's sentence is not relevant and any probative value is outweighed by unfair prejudice).

Recognizing that defendants have a right guaranteed by the Confrontation Clause to explore bias on cross-examination, the Court will permit defendants to inquire into bias and a cooperating witness's motivation to testify. Defendants' inquiry may include whether the witness has entered into a plea agreement with the government; whether the witness has been sentenced or is awaiting sentencing; what the sentence the witness has received (or expects to receive on the charged counts); whether the witness has received or expects to receive certain benefits in exchange for his testimony, including the withdrawal of additional charges or consideration for a sentence reduction. The Court believes that this evidence, coupled with the Court's instruction to the jury to consider a cooperating witness's testimony with caution, is sufficient to protect the defendants' right to inquire as to a cooperating witness's bias or motives. To permit much beyond this would result in the need to elicit testimony regarding the intricacies of the sentencing guidelines and, in turn, risk confusing the jury. Anything more would also risk putting before the jury inappropriate information regarding a defendant's potential sentence in this case.

Any inquiry beyond these parameters into specific sentencing ranges or specific sentences avoided, including those applicable to uncharged offenses, may be subject to limitation at trial. No court has held that a defendant has a "categorical right to inquire into a penalty a cooperating witness would otherwise have received" absent his or her cooperation with the government. *United States v. Mussare*, 405 F.3d 161, 170 (3d Cir. 2005). Further, the majority of courts, including the Sixth Circuit, have upheld limitations on cross-examination as to the operation of the United States Sentencing Guidelines due to the risks of unfair prejudice and jury confusion. *See U.S. v. Tate*, 124 Fed. App'x 398, 401 (6th Cir. 2005) (upholding limitation on

inquiry into witness's career offender status under the guidelines) ("Testimony regarding the operation of the United States Sentencing Guidelines would have been cumulative, time consuming, and confusing to the jury."); *United States v. Wilson*, 408 Fed. App'x 798, 803 (5th Cir. 2010) ("Rather than enter into a complex discussion about the mechanics of the advisory Sentencing Guidelines, the district court was correct to avoid confusing jurors, as well as avoid revelation of prejudicial information concerning [defendants'] possible sentences."); *United States v. Ambers*, 85 F.3d 173, 177 (4th Cir. 1996) ("To entitle defense counsel to explore the intricacies of the Guidelines scheme on cross-examination might do much to confuse lay jurors and little to enlighten them."); *Arocho*, 305 F.3d at 636 ("[T]his testimony would place before the jury information from which it could infer the potential sentences the appellants faced and that could improperly sway the jury."). These very real concerns are present in this case. Accordingly, should a party seek to inquire beyond the proscriptions established by the Court above, that party must notify the Court well in advance and shall have the burden of demonstrating that inquiry into additional matters is necessary to the jury's "discriminating appraisal" of the witness's motives and bias and that the admission of any such additional evidence is not outweighed by the risk of unfair prejudice.

## IV. Defendants' Motions in Limine (Doc. Nos. 533-37 and 561)

### A. Prejudicial or Inflammatory Language

Defendant Dimora moves to preclude the government and its witnesses from using certain terms and phrases, including "kickbacks," "bribes," "godfather," "corrupt commissioner," "corruption scandal," "corruption investigation," and "county corruption probe." (Doc. No. 533.) In addition, Dimora asks the Court to prohibit the government from referring to

a causal link between its investigation and a transition in government style in Cuyahoga County. He urges that the aforementioned terms, phrases, and references are inflammatory, are unfairly prejudicial to him, convey a negative connotation and assume guilt, are not probative, and would impermissibly lead the jury to render its decision on an improper basis.

"Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission." *Cooley v. Carmike Cinemas,* 25 F.3d 1325, 1330 (6th Cir. 1994). "In assessing whether the use of particular language is improper, [the Court] look[s] beyond the technical accuracy of a phrase and considers such factors as the "threat of unfair prejudice, frequency of use, and alternative means of description." *United States v. Felton,* 417 F.3d 97, 103 (1st Cir. 2005). A district court has broad discretion in determining whether the danger of undue prejudice outweighs the probative value of evidence. *United States v. Vance,* 871 F.2d 572, 576 (6th Cir. 1989).

### 1. "Bribes" or "Kickbacks"

Dimora seeks to preclude the government from using the terms "kickbacks" and "bribes" pursuant to Rule 403 because those terms do not appear in any of the charged statutes, and further, because there are no allegations that he received any "kickbacks" in the form of a percentage of any money first received by an alleged coconspirator.

"An important indication of probative value of evidence is the prosecution's need for the evidence in proving its case." *Vance,* 871 F.2d at 577 (citing *United States v. Benton,* 637 F.2d 1052, 1057 (5th Cir.1981)). Although Dimora is correct that the texts of the statutes under which he is charged do not themselves include the terms "bribe" or "kickback," in *Skilling v. United States,* 130 S. Ct. 2896, 2931 (2010), the Supreme Court held that bribery and kickbacks

55

are precisely the type of conduct the government is required to prove under at least one of those

texts: the honest services fraud statute, 18 U.S.C. § 1346. As the Sixth Circuit has put it in the

context of honest services mail fraud:

> The mail-fraud statute prohibits individuals from using the mail to carry out a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1341, which includes "a scheme or artifice to deprive another of the intangible right of honest services," 18 U.S.C. § 1346. The "intangible right of honest services," *Skilling* observed, is imprecise, and broad applications of the phrase raise serious constitutional questions, particularly in the context of criminal prosecutions. 130 S. Ct. at 2929–31. The Court, as a result, construed "honest services" mail fraud to cover only schemes in which the individual deprives another of his honest services by participating in a *bribery or kickback* scheme. *Id.* at 2931.

*United States v. Jones*, 408 Fed. App'x 949, 951-52 (6th Cir. 2011) (emphasis added) (citing

*Skilling*, 130 S. Ct. at 2929-31). Bribery and kickbacks are also frequently crucial components of

some of the crimes delineated in other statutes under which Dimora is charged. *See, e.g., United*

*States v. Abbey*, 560 F.3d 513, 518 (6th Cir. 2009) (citing *Wilkie v. Robbins*, 551 U.S. 537

(2007)) ("A public official thus commits extortion [pursuant to the Hobbs Act] "under color of

official right" whenever he knowingly receives a bribe."); *Wilkie*, 551 U.S. at 564 (internal

quotations and citation omitted) ("At common law, extortion was a property offense committed

by a public official who took any money or thing of value that was not due to him under the

pretense that he was entitled to such property by virtue of his office."); *id.* (citation and internal

quotation omitted) ("In short, [e]xtortion by the public official was the rough equivalent of what

we would now describe as taking a bribe.")).

As for Dimora's alternative argument regarding the term "kickback," while the

Indictment does not allege that he engaged in the quintessential kickback scheme—whereby a

public official, in exchange for some official act, receives a portion of another's illicit income—

the charged conduct does fit within the broader definition of "kickback" cited by the Supreme Court in *Skilling*. In *Skilling*, the Court observed that a "kickback" may also be defined by reference to other federal statutes proscribing and defining similar crimes. This includes 41 U.S.C. § 52(2), which defines "kickback" as, "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided directly or indirectly, to [enumerated persons] for the purpose of improperly obtaining or rewarding favorable treatment in connection with [enumerated circumstances]." *Skilling*, 130 S. Ct. at 2933-34. Here, Dimora's alleged conduct fits squarely within the definition of "kickback" cited by the Supreme Court.

In summary, there is nothing irrelevant or unduly prejudicial about the use of terms that the Supreme Court has defined, and in fact held the government must prove under the honest services mail and wire fraud statutes. The Court is confident that an appropriate jury instruction based on the language in *Skilling* will safeguard against the possibility of unfair prejudice or that the jury will be confused as to the use of the terms "bribe" or "kickback" in this case. Accordingly, the use of the terms "bribes" or "kickbacks" by the government or its witnesses will be permitted.

### 2. "Corruption Investigation," "County Corruption Investigation," "Corrupt Commissioner," or "Corruption Scandal"

Dimora contends that phrases including the terms "corruption" or "corrupt" not only convey a negative connotation, but also suggest preconceived guilt without any actual proof, effectively implying wrongdoing in a conclusory fashion and should be excluded. The government argues that use of the phrase "corruption investigation" is an accurate shorthand

description for the focus of the investigation. Further, the government asserts that these terms would not prejudice a properly instructed jury.

Here, as far as the phrase "corruption" is used in conjunction with references to the investigation at issue in this case, the Court concludes that the term accurately describes the investigation and is not unduly prejudicial.[21] Black's Law Dictionary defines "corruption" as, "the act of doing something with an intent to give some advantage inconsistent with official duty and the rights of others; a fiduciary's or official's use of a station or office to procure some benefit either personally or for someone else, contrary to the rights of others." BLACK'S LAW DICTIONARY (9th ed. 2009) ("corruption"). This definition describes the alleged conduct subject to investigation in this case and conveys information that the government hopes to prove at trial. *See United States v. Tolbert*, 8 Fed. App'x 372, 379 (6th Cir. 2001) (finding trial court did not commit plain error by allowing prosecutor and witness to refer to defendant's alleged offense as "the carjacking," where term was used in vernacular as short-hand description of event, and not as legal conclusion). Indeed, as noted by the government, Dimora did not object to the Court's use of this shorthand in its jury instructions. When used in moderation and with proper instruction,[22] the likelihood that the jury will blur the elements necessary for conviction or confuse the issues will be minimal. Accordingly, the Court will not preclude the use of phrases such as "corruption investigation," "county corruption investigation," and "county corruption probe" at trial. Of course, the Court cannot anticipate the frequency with which such terms will be used, nor can it predict every variation of these phrases that might be uttered by a witness or

---

[21] "Corrupt" is defined as "[h]aving an unlawful or depraved motive; esp., influence by bribery." BLACK'S LAW DICTIONARY (9th ed. 2009) ("corrupt").

[22] Upon submission by defendant, the Court will consider a proper limiting instruction with respect to the jury's consideration of the term "corruption" and phrases incorporating that term.

counsel. Accordingly, if a phrase is used excessively or in a way that counsel believes is objectionable, counsel may certainly object and move to strike.

The phrase "corrupt commissioner" presents a closer call. Undoubtedly, mischaracterization or overuse of the terms, "corrupt" or "corruption" as shorthand for the government's investigation or charged conduct carries with it the potential for prejudice to Dimora. Indeed, "[o]ne can imagine situations in which an epithet carries connotations well beyond the crime charged . . . or cases in which [a] description is gratuitously inflammatory, serving no purpose in summarizing the government's position." *United States v. Felton*, 417 F.3d 97, 103 (1st Cir. 2005) (finding that the government's use of the term "terrorist" to describe the defendants and their actions was "highly pejorative," but that this was "a function of the acts that the defendants engaged in, not the government's inaccurate description of those acts"); *see also United States v. Sanchez-Berrios*, 424 F.3d 65, 73-74 (1st Cir. 2005) (noting use of phrase "corrupt officers" is potentially inflammatory). In this respect, referring to Dimora as the "corrupt commissioner," may be gratuitously inflammatory, especially when alternative and less inflammatory means of summarizing the government's position are available. Further, describing him as "corrupt" tends to suggest guilt in a conclusory fashion without reference to the elements of the crime charged. Therefore, the Court will not permit counsel for the government to use the phrase "corrupt commissioner" at trial.

### 3. "Godfather"

Dimora also objects that any references to him as a "godfather" are inappropriate and suggest a racial or ethnic connotation — that he is one of those "Italian-American men who

consort and control violent organized crime"— that is highly prejudicial and will not be lost on the jurors.

The government counters that in previous trials it did not use such a term; rather, the term came up during the sentencing of Bridget McCafferty, and it was she who referred to Dimora as her "political godfather." The government also observes that it does not coach its witnesses in how to testify and what words to use when testifying. The government argues, however, that the phrase "political godfather" is not inherently prejudicial or inflammatory and can be used in a positive way to describe a political mentor who nurtures young politicians in a positive way. The government offers that one or more of its witnesses may testify that they considered Dimora to be their "political godfather," and that any spontaneous use by them of this phrase will aid the jury's understanding of the witnesses' relationships with Dimora and the tremendous political power he wielded. The Court has weighed whether the probative value of phrase "political godfather," is substantially outweighed by the danger of unfair prejudice to Dimora, and concludes that it is not.

The Court believes that precluding the use the phrase "political godfather" at trial by government witnesses will unduly restrict their honest testimony. In the context described by the government, the term "political godfather" may be an accurate description of Dimora's relationship with his political peers and subordinates. While there are certainly alternative terms and means that may be used to describe a witness's relationship with Dimora, the Court does not wish to restrict or impinge upon a witness's ability to accurately and honestly testify regarding their impressions of their relationship with him.

Use of the word "godfather" alone by the government in the context of a criminal trial, however, is likely to be understood by the jury to mean "the leader of an organized crime

60

syndicate." *United States v. Clarke*, 767 F. Supp. 2d 12, 89-90 (D.D.C. 2011) (quoting MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 500 (10th ed. 1993) ("godfather")). Here, any characterization of Dimora as a "godfather" by the government has the very real potential of being "improperly transformed . . . to invoke negative and sinister connotations, and to convey strong prejudicial overtones." *Mathis v. United States*, 513 A.2d 1344, 1348 (D.C. 1986) (finding "repeated" references to a defendant as "the godfather" and "the self-proclaimed Godfather" as requiring a new trial, where the prosecution used the term by taking it out-of-context from a single sentence of a witness's testimony); *see also United States v. Steinkoetter,* 633 F.2d 719, 720 (6th Cir. 1980) (prosecutor's references to Pontius Pilate and Judas constituted reversible error); *Harris v. United States,* 430 A.2d 536, 540 (D.C. 1981) (prosecutor's analogy to the Mafia was improper); *cf. United States v. Crooks,* 766 F.2d 7, 12 (1st Cir. 1985) (while trial court properly excluded testimony associating appellant with the word "Mafia," reference to appellant "and his enforcer friends" who got into the car with ENFORCER license plates not obviously improper). Thus, while the Court will not place prophylactic restrictions on witness testimony, the Court will not permit counsel for the government to refer to Dimora as the "godfather."

### 4. County Reform

Finally, Dimora seeks to preclude the government and its witnesses from referring to a causal link between the federal government's corruption investigation and the recent transition in the Cuyahoga County government style from a commissioner-based system to a charter system. He contends that there is no factual basis for such references and that the county reform effort in fact predated the indictments and the raid that made the investigation public. Dimora asserts that references to the investigation causing the reform would cause a jury to make

61

a determination on an improper basis—that his alleged actions played some role in the transition—which would unnecessarily prejudice him.

The Court agrees that references or inferences to a causal link between the investigation and the county reform efforts are speculative at best, and at worst misleading. The government, therefore, will not be permitted to offer evidence to show that Dimora's conduct led to a change in county government style, as this evidence is not relevant to the conduct charged in the Indictment and may lead the jury to render a verdict on an improper basis. Insofar as Dimora seeks a blanket prohibition on the mere mention of county reform efforts, however, his request is denied.

The government assures the Court that it does not intend to "conduct a mini-trial" on the county reform efforts and that it will instead focus solely on events within the scope of the conduct charged in the Indictment. The government concedes that its witnesses may mention county reform when testifying with respect to their employment histories or that the county records custodian may mention the county reform with respect to its effect on the county's records policies. Such contextual references to the county reform efforts provide relevant background information and are not unfairly prejudicial. Further, if necessary, the Court will consider a request for an appropriate limiting instruction restricting the jury's consideration of this testimony as background, which will decrease the risk that the jury will improperly infer a link between the reform efforts and the crimes charged.

### B. Evidence of Conduct Outside the Applicable Statutes of Limitation

Pursuant to 18 U.S.C. § 3282, "[N]o person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within

five years next after such offense shall have been committed." Further, 18 U.S.C. § 1981(5) provides that a proscribed "pattern of racketeering activity" requires at least two acts of racketeering activity within ten years of each other. Pursuant to these statutes, Dimora moves the Court to limit the evidence of his conduct to the ten years preceding the September 14, 2010, indictment as to Count 1 (RICO) and to the five years preceding the indictment as to the remaining counts. He has not, however, cited any particular evidence he seeks to preclude or any Counts of the Indictment related thereto.

The government opposes the motion, arguing that under the continuing offense doctrine, the limitations period as to the conspiracy charges here did not begin to run until the last overt act in furtherance of the alleged conspiracy, or where no overt act is required, when the purposes of the alleged conspiracy was accomplished or abandoned. *United States v. Yashar*, 166 F.3d 873, 875 n.1 (7th Cir. 1999). Further, the government notes that the continuing offense doctrine extends the limitations period for bribery and conspiracy charges brought under the Hobbs Act for payments begun beyond the limitations period and continuing to a date within the statute of limitations. *United States v. Hedman*, 630 F.2d 1184, 1199 (7th Cir. 1980); *United States v. Rastelli*, 870 F.2d 822, 839 (2d Cir. 1989). The government's arguments are well taken.

Counts 1, 12, 17, 22, 26, and 31 of the Indictment each allege conspiracies. As a continuing crime, a conspiracy continues for as long as the conspirators engage in overt acts in furtherance of the conspiracy, *Grunewald v. United States,* 353 U.S. 391, 397 (1957), or until the goals of the conspiracy have been achieved, *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993), or the agreement is abandoned. *United States v. Rogers*, 118 F.3d 466, 473-74 (6th Cir. 1997); s*ee also United States v. Saadey*, 393 F.3d 669, 677 (6th Cir. 2005) (citation omitted) ("[A] RICO conspiracy offense is complete, for purposes of determining when the five-year

63

statutory period begins to run, 'when the purposes of the conspiracy have either been accomplished or abandoned.'"). It is not necessary to prove the entire conspiracy was committed within the statute of limitations period. "[T]he statute of limitations is satisfied if the government 'alleges and proves that the conspiracy continued into the limitations period.'" *United States v. Hohn,* 293 Fed. App'x 395, 397 (6th Cir. 2008) (quoting *United States v. Harriston,* 329 F.3d 779, 783 (11th Cir. 2003)); *see also Grunewald,* 353 U.S. at 397 (stating that it was "incumbent on the Government to prove that the conspiracy, as contemplated in the agreement as finally formulated, was still in existence [within the limitations period]"). Thus, evidence of Dimora's conduct that occurred outside the applicable limitations periods is admissible so long as that conduct was part of any of the charged conspiracies alleged to have continued into the limitations period.

Counts 7, 8, 13, 20, 23, and 27 of the Indictment allege violations of the Hobbs Act. Several appellate courts have held that Hobbs Act extortion is a continuing crime. *Hedman*, 630 F.2d at 1199 (citing *United States v. Provenzano,* 334 F.2d 678 (3d Cir.), *cert. denied*, 379 U.S. 947 (1964)) (upholding an indictment under the Act alleging a single, continuous plan of extortion with multiple payments begun outside the limitations period, but continuing to a date within the statutory period); *United States v. Bucci,* 839 F.2d 825, 829-30 (1st Cir.1988) (quoting *Provenzano,* 334 F.2d at 685) (Prosecution proved the Hobbs Act violation "by presenting overwhelming evidence that all the payments . . . 'were the consummation of [an] extortionate scheme which was a single and unified one.'"). Thus, evidence of Dimora's conduct related to the Hobbs Act counts occurring outside the limitations period is admissible so long as that conduct was part of the alleged continuous criminal behavior.

64

### C. Rule of Completeness

Both defendants seek an order essentially asking the Court to acknowledge and enforce the rule of completeness. Defendant Gabor cites two examples from the government's proposed exhibit list of excerpts from intercepted wire communications, and suggests that a failure to play the entire calls will result in a misleading impression. In Dimora's untimely motion, he concedes that he is merely requesting that the Court follow the rule and permit him to challenge the government's excerpts of conversations at the time they are offered.

Rule 106, which partially codified the common law "rule of completeness," provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing  or recorded statement—that in fairness ought to be considered at the same time." FED. R. EVID. 106. The Advisory Committee Notes explain that the purpose of the rule is to avoid a "misleading impression created by taking matters out of context." *Id.*, Advisory Committee Notes; *see United States v. Holden*, 557 F.3d 698, 706 (6th Cir. 2009) (the "purpose of the rule of completeness is to ensure fairness in the presentation of evidence at trial"); *see also United States v. Henderson*, 626 F.3d 326, 344 (6th Cir. 2010); *United States v. Howard*, 216 Fed. App'x 463, 472-73 (6th Cir. 2007) (quoting *United States v. Costner*, 684 F.2d 370, 373 (6th Cir. 1982)) (Rule 106 "allows a party who is prejudiced by an opponent's introduction of part of a 'document, or a correspondence, or a conversation,' to enter so much of the remainder as necessary to explain or rebut a misleading impression caused by the 'incomplete character' of that evidence."). Importantly, it is not sufficient that the redacted evidence is "necessary to explain [the defendant's] theory of the case." *United States v. Velasco*, 953 F.2d 1467, 1476 (7th Cir. 1992).

Moreover, "the doctrine [of completeness] 'does not make inadmissible evidence admissible.'" *United States v. Cosgrove*, 637 F.3d 646, 661 (6th Cir. 2011) (quoting *Howard*, 216 Fed. App'x at 472-73) (internal citations omitted); *Costner*, 684 F.2d at 373 ("The rule covers an order of proof problem; it is not designed to make something admissible that should be excluded."). Instead, under the doctrine, other portions of conversations or other forms of correspondence are admissible if "necessary to correct a 'misleading impression' caused by the 'incomplete character' of the portion of the statement admitted." *Cosgrove*, 637 F.3d at 661 (quoting *Howard*, 216 Fed. App'x at 472); *see Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172 (1988) ("When one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible under Rules 401 and 402."); *United States v. Gallagher*, 57 Fed. App'x 622, 628-29 (6th Cir. 2003) (self-serving exculpatory statements were not required for completeness and were properly excluded as inadmissible hearsay); *United States v. Burreson*, 643 F.2d 1344, 1349 (9th Cir.), *cert. denied*, 454 U.S. 830 (1981) (holding no abuse of discretion in excluding part of a prior statement as irrelevant and inadmissible hearsay). Thus, a defendant's hearsay statement will only be admitted under the rule of completeness if it is needed to correct an otherwise incomplete statement. *See* FED. R. EVID. 106, Advisory Committee Notes; *United States v. Sutton*, 801 F.2d 1346 (D.C. Cir. 1986).

"Because neither the Constitution nor the rule of completeness requires admission of [the] entire statement once any portion is admitted in criminal prosecution, courts have required defendants to demonstrate with particularity any unfairness in selective admission of the prior . . . statement." *United States v. Fisher*, Case No. 06CR20415, 2008 WL 2605405, at *1 (E.D. Mich. July 1, 2008). In determining whether the moving party has met its burden, courts

66

often look to whether the omitted evidence is necessary to: (1) explain the excerpted portion; (2) place the excerpted portion in context; (3) avoid misleading the finder of fact; and (4) insure a fair and impartial understanding. *See United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996), *rev'd on other grounds*, 531 U.S. 198 (2001); *United States v. Soures*, 736 F.2d 87, 91 (3d Cir. 1984); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982).

Given the clear limitations of the rule, the Court will not require the government to play the entire recording of each call it wishes to offer at trial as the defendants suggest. *See Trepe v. Roadway Express Inc.*, 40 Fed. App'x 104, 110 (6th Cir. 2002) ("A district court is not obligated to admit the entire document under Rule 106."). It will, however, permit the immediate admission of any un-played portion of a wire communication, or other type of communication or correspondence, that is necessary to correct any "misleading impression" caused by the introduction of only part of the communication.

The Court has reviewed audio from the two calls identified in Gabor's motion, as well as the transcripts from the portions of the calls that the government intends to play at trial. (*See* Doc. No. 582.) In order to provide the proper context for this first call, Session No. 3140DCT, the Court will require the recording to begin at 6:29, where Dimora states "I could go Monday night." As for the second call, Session No. 3686KCT, the Court finds that it is necessary to play the call between 2:48 and 4:38 in order to provide the proper context and avoid the misimpression that the call was placed solely for the purpose of arranging for one particular individual to join a poker game.

Given the fact that the government has represented that, on August 29, 2011, and October 7, 2011, it provided defendants with calls and transcripts for the calls it plans to offer at trial, it is disconcerting to the Court that other than the two calls identified by Gabor, both

defendants indicate that they anticipate that throughout the jury trial they may object to other excerpts on the ground of completeness. To avoid lengthy delays caused by side bar conferences, the Court shall implement the following procedure to address future Rule 106 objections. At two week intervals, the government shall be required to identify for the defendants any calls it anticipates offering for the two week period beginning 14 days from the date of identification.[23] The defendants shall then have one week to lodge with the Court written objections to the excerpts. Such objections should state clearly the particularized need for immediately offering more than the limited excerpt, and shall be accompanied by the audio of the entire call, as well as a transcript of the portion of the call the defendant wishes to offer.

### D. Exclusion of Evidence Relating to Lies to the Press

Defendant Gabor seeks to preclude the government from offering evidence that he or other co-conspirators lied or planned to lie to the Plain Dealer and other news agencies.[24] The discussions centered on an investigation by the Plain Dealer into staffing at the County Auditor's Office. Gabor argues that evidence of such discussions is not relevant because lying to the press is not a crime. He continues that because lying to the FBI is illegal, evidence that the defendants or alleged co-conspirators lied to the press might be confusing. He identifies a number of calls that address the Plain Dealer's investigation and argues that they should all be excluded at trial.

---

[23] The Court is aware that the government may not always be able to identify in advance precisely which calls it intends to introduce during any given point in the trial. Indeed, on the one hand, it may have a need to introduce calls that it did not anticipate introducing, or it may not seek to introduce calls that it originally intended to play. Accordingly, the government's notice obligation will be satisfied if it makes a good faith effort to identify the calls it anticipates offering. If it determines that it would like to introduce calls not previously identified for any given period, it should advise defense counsel as soon as possible.

[24] The parties did not provide the intercepted calls at issue in this motion. The Court notes, however, that the parties do not dispute the nature of the calls, but only the relevance of the calls and the likely prejudice.

The government highlights the fact that certain calls Gabor identifies do not mention *lying* to the Plain Dealer and, therefore, should not be excluded for that reason alone. (*See, e.g.,* Session No. 8953KCT.) Other calls, the government posits, are relevant and probative as to proving the RICO conspiracy charged in Count 1 because they show "Russo, O'Malley, Kelley and Gabor concealing and protecting from public exposure and possible criminal prosecution the fact they conspired to run a sham election, which resulted in Russo winning public office and Gallucci receiving a County job at an inflated salary." (Doc. No. 532 at 4 (citing Doc. No. 444 at ¶ 93).) According to the government, the calls also support Gabor's involvement in the "Gallucci Election Scheme" (Counts 31 and 32), and the steps taken by the various alleged co-conspirators to conceal their illicit action.

Courts routinely consider acts of concealment relevant to determining whether a conspiracy exists. *See United States v. Smith*, 294 F.3d 473, 479 (3d Cir. 2002) (collecting cases); *United States v. Reagan*, Case Nos. 08-10068 & 08-10069, 2009 WL 1185666, at *1 (9th Cir. May 4, 2009) ("The tax returns, which were contemporaneous with the conspiracy and the kickback checks arguably demonstrated an attempt to conceal the overall scheme and were thus relevant, circumstantial evidence of Defendants' fraudulent intent."); *see generally United States v. Williams*, 612 F.3d 417, 423 (6th Cir. 2010) (where a defendant is charged with conspiracy, evidence of the existence of the conspiracy is not evidence of other crimes, wrongs, or acts; it is evidence of the charged offense of conspiracy). Such an application is especially appropriate here where concealment is charged as an integral part of the alleged conspiracy.

The Plain Dealer's investigation was directly related to the charged RICO conspiracy in that the newspaper was investigating allegations that Russo and others were rewarding friends and business associates with positions in the Auditor's Office. While

obviously a newspaper has no authority to bring criminal charges, it is understandable that any evidence of wrongdoing uncovered by the Plain Dealer would have exposed the conspiracy and subjected the co-conspirators to possible criminal charges imposed by a proper law enforcement agency. For example, in Session No. 1250RCT, Russo and Joe O'Malley discuss the media's inquiry into possible cronyism in the Auditor's Office. During the call, the two men discuss the need to alter certain personnel files before the newspaper obtained the records; and Russo specifically cites Gallucci's file as one that was "really pathetic," and had to be "superb." Allegations that Gallucci was rewarded for withdrawing from the 2006 Auditor's race with a position in the Auditor's Office form the sum and substance of Count 31, conspiracy to commit mail fraud and honest services mail fraud.

The Court finds that these calls are relevant to establishing the existence of a conspiracy. The fact that the co-conspirators were concerned that the Plain Dealer might shed light on alleged job buying in the Auditor's Office is directly probative of the existence of the conspiracy. Further, the Court does not share Gabor's concern that such evidence would be unfairly prejudicial and confusing. Neither defendant is charged with lying to the FBI under 18 U.S.C. § 1001. Upon request, and if appropriate, the Court can provide a limiting instruction that explains that lying to the press is not a criminal offense. Finding that the probative value is not substantially outweighed by any unfair prejudice to the defendants, Gabor's motion to exclude this evidence is not well taken.

### E. Exclusion of Evidence of Acts of Infidelity

By this motion, Gabor seeks to preclude the government from offering evidence of: (1) Gabor's infidelity and (2) Gabor's solicitation of prostitution. Gabor argues that his

70

alleged infidelity has no relationship to the RICO conspiracy and, while the fact that he may have been away from work during business hours may be relevant to allegations that he was a "ghost employee," that he may have visited his mistress is not. As for evidence of prostitutes, Gabor argues that evidence that other co-conspirators may have engaged the services of prostitutes, while illegal under state law, is not relevant to the federal charges.

The government insists that it does not intend to offer graphic evidence of Gabor's visits with his mistress or his alleged use of prostitutes in its case-in-chief. It notes, however, that evidence that Dimora received the services of prostitutes as a "thing of value" is relevant to a number of charges, and the fact that Gabor knew about it, and sometimes participated in it, is relevant to Gabor's knowledge of and participation in the conspiracy. It also notes that several identified calls do not even mention Gabor. With respect to Gabor's infidelity, the government indicates that it intends to elicit limited evidence of Gabor's infidelity to show that Dimora engaged Gabor's company because he brought good-looking women and drama to the "group." It also argues that evidence of the mistress will show that Gabor, with Dimora's knowledge, spent large amounts of time with his mistress on county time.

The Court finds that evidence relating to Gabor's alleged visits to his mistress on county time does not constitute "other acts" evidence under Rule 404(b) because such conduct is inextricably intertwined with evidence that he spent large parts of the county work day away from the Auditor's Office on personal matters. *See United States v. Marrero*, 651 F.3d 453, 470-71 (6th Cir. 2011) (Evidence that the defendant struggled with police at the time of his arrest was inextricably intertwined in that it had a "temporal connection to, and completes the story of, the charged drug offenses.") The evidence is also proper background evidence because it explains Gabor's connection to the enterprise and explains the benefits he received from allegedly paying

71

Russo for his position with the county, namely, the collection of a public paycheck for little or no work performed. Further, the government has already represented that it does not intend to elicit any graphic details regarding Gabor's alleged sexual encounters. With a proper limiting instruction advising the jury for what purposes this evidence may and may not be considered, the Court finds that the probative value would not be substantially outweighed by any unfairly prejudicial effect.

Evidence that Dimora received the services of prostitutes as a thing of value is also relevant. Count 8 of the Indictment charges Dimora with violating the Hobbs Act by accepting things of value, including prostitutes, from Kevin Payne and Payne's law practice, and Count 27 charges Dimora with accepting things of value from Charles Randazzo.[25] Gabor's alleged knowledge of these schemes, as well as his own alleged participation in certain activity involving prostitutes, is relevant and may be used by the government to establish Gabor's connection to the conspiracy. If requested, a proper limiting instruction can cure any potential prejudice from the introduction of such evidence.[26]

## F. Untimely Motion in Limine

In his timely motion in limine (Doc. No. 533), Dimora requested 21 additional days in which to file other (yet to be determined) motions in limine. The Court denied the request, as the deadline for filing in limine motions had passed and Dimora had not shown good

---

[25] One of the referenced calls, Session No. 2916DCT, is highly relevant to Count 1 and Counts 4 through 7 because it involves Dimora thanking Ferris Kleem for "sponsoring" the Las Vegas trip, which included Dimora's visit to the Bare Pool. The government intends to offer this call to show Dimora soliciting a thing of value from Kleem and thanking him for a prior thing of value. As is the case with many of the calls objected to by Gabor, the government points out that there is no direct reference to Gabor or any reference to him using prostitutes.

[26] Defendant Gabor also moved in limine for an order precluding the opinion of Kelley that Gallucci was not qualified for his job in the County Auditor's Office. (Doc. No. 535.) The government has indicated that it does not intend to offer such evidence in its case-in-chief. The motion, therefore, is moot.

cause for an extension. On December 5, 2011, Dimora nevertheless filed a second motion in limine. (Doc. No. 561.) While the Court is troubled by Dimora's casual treatment of both its orders and its deadlines, in an abundance of caution, and to avoid unnecessary delays at trial, the Court will address Dimora's untimely motion.

By this motion, Dimora seeks an order: (1) precluding the government from offering expert witnesses; (2) enforcing the rule of completeness;[27] (3) providing for a "mini-hearing" on the admissibility of co-conspirator statements; (4) precluding evidence of alleged wrongful conduct of Dimora as Chairman of the Cuyahoga County Democratic Party; (5) banning evidence "prohibited" by *Skilling*; and (6) precluding evidence of "nonofficial acts" performed by Dimora. The government has filed a response. (Doc. No. 589.)

### 1. The Government's Expert Witnesses

Dimora objects to the anticipated testimony of two witnesses who the government has identified as potential expert witnesses, IRS Special Agent Fatula and FBI Special Agent Arseni. According to Dimora, Agent Fatula is expected to testify that "bribes and kickbacks are taxable income."[28] Dimora maintains, without support, that this is an improper subject for expert testimony and that the Court can instruct upon this subject.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

---

[27] Dimora's concerns regarding the rule of completeness were addressed earlier in this opinion and order.

[28] While Dimora refers to the government's notices relating to the two potential expert witnesses, he fails to attach these notices to his motion.

understand the evidence or to determine a fact in issue; (b) the testimony is based
on sufficient facts or data; (c) the testimony is the product of reliable principles
and methods; and (d) the expert has reliably applied the principles and methods to
the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592 (1993), the Supreme Court

held that trial judges are to serve as gatekeepers, excluding unreliable expert testimony, and  in

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999), the Court clarified that this

gatekeeper function applies to all expert testimony, scientific and nonscientific. 526 U.S. at 147-

48.[29]

Given the complexity of the federal tax code, courts have found that expert

testimony on the subject of taxable income can assist the jury. *See United States v. Monus*, 128

F.3d 376, 386 (6th Cir. 1997) (expert testimony from IRS agent as to whether certain fraudulent

transfers constituted taxable income was proper); *United States v. DeClue*, 899 F.2d 1465, 1472

(6th Cir. 1990) (In tax evasion case, IRS agent properly testified as an expert on the subject of

taxable income). Thus, assuming that SA Fatula is qualified, under Rule 702, her expected

testimony as to whether bribes constitute taxable income would be appropriate expert testimony.


### 2. Co-Conspirator Statements

Dimora also requests that no statements of alleged co-conspirators be admitted

"without a pretrial hearing on the admissibility of such statements." (Doc. No. 561 at 5.)  Rule

801(d)(2)(E) of the Federal Rules of Evidence permits the admission of statements made by co-

conspirators provided the government can show by a preponderance of the evidence (1) that a

---

[29] Dimora also argues that SA Arseni's expected testimony should be precluded based on relevance. Because
Dimora did not attach the government's notice to his motion, the Court cannot properly evaluate his argument.

conspiracy existed, (2) that the defendant against whom the statement is offered was a member of the conspiracy, and (3) that the statement was made during the course of and in furtherance of the conspiracy. *See United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979). This preliminary finding is made by the trial judge, FED. R. EVID. 104(a), and with respect to this determination, the Court has considerable discretion "in controlling the mode and order of proof." *Vinson*, 606 F.2d at 152.

There are several options available to the trial judge. First, the court could conduct a "mini-hearing" outside the presence of the jury, where the court receives proof of the conspiracy and makes a preliminary finding. *See Vinson*, 606 F.2d at 152; *United States v. Enright*, 579 F.2d 980, 986-87 (6th Cir. 1978). If the court finds that the statements are properly admitted as statements of co-conspirators, the evidence is presented to the jury. "While the Sixth Circuit has acknowledged that a trial judge has the discretion to order the proof in this manner, it has also recognized that 'this procedure has been criticized as burdensome, time-consuming, and uneconomic.'" *See United States v. Coffman*, No. 09CR181, 2010 WL 4510976, at *1 (E.D. Ky. Sept. 29, 2010) (quoting *Vinson*, 606 F.2d at 152).

Second, the court can "require the government to meet its initial burden by producing the non-hearsay evidence of conspiracy first prior to making the *Enright* finding concerning the hearsay's admissibility." *Vinson*, 606 F.2d at 152. This option "clearly avoids 'the danger . . . of injecting the record with inadmissible hearsay in anticipation of proof of a conspiracy which never materializes.'" *Id.* at 152-53 (quoting *United States v. Macklin*, 573 F.2d 1046, 1049 n.3 (8th Cir.), *cert. denied*, 439 U.S. 852 (1978)).

A third, and final, option permits a trial court to conditionally "admit the hearsay statements subject to later demonstration of their admissibility by a preponderance of the

75

evidence." *Vinson*, 606 F.2d at 153. The danger in this option is that if the government fails to carry its burden as to the conspiracy, the trial court "should, on the defendant's motion, declare a mistrial unless convinced that a cautionary jury instruction would shield the defendant from prejudice." *Vinson*, 606 F.2d at 153. Nonetheless, the Sixth Circuit has approved of this final approach, recognizing that it is "firmly entrenched in this circuit's practice." *United States v. Holloway*, 740 F.2d 1373, 1375 n.2 (6th Cir. 1984).

Dimora urges the Court to select the first option and conduct a "mini-hearing." Given the inherent complexity of conspiracies, however, the Court finds that a full evidentiary hearing would be cumbersome and would unnecessarily add considerable length to a trial that is already projected to last for several months. Instead, the Court selects the third approach and shall conditionally admit the statements subject to a ruling on admissibility at the close of the government's case-in-chief. The Court finds that this approach will preserve judicial resources, while also permitting the Court "to rely on the hearsay statements themselves to determine whether the statements are admissible under Fed. R. Evid. 801(d)(2)(E)." *United States v. Estrada*, Nos. 86-3695, 86-3697, 1987 WL 44857, at *4 (6th Cir. Sept. 24, 1987) (approving of such an approach and citing various authorities, including *Bourjaily v. United States*, 483 U.S. 171 (1987)).

### 3. Dimora's Role as Political Party Chairman

Because he has not been charged with any wrongful conduct as the Cuyahoga County Democratic Chairman, Dimora insists that the government "should be prohibited from offering any evidence that Mr. Dimora broke any laws while performing functions or 'wearing the hat of the Party Chair." (Doc. No. 561 at 6.) The government agrees that the Indictment does

76

not charge Dimora with crimes as the Cuyahoga County Democratic Chairman, but notes that "it is likely that Defendant's role as party chair will come up in the course of testimony." (Doc. No. 589 at 2.) Thus, to the extent that the motion seeks a ruling prohibiting the government from offering evidence of crimes allegedly committed by Dimora as the Chairman of the Cuyahoga County Democratic Party, there appears to be no disagreement between Dimora and the government, therefore making the motion moot. It is inevitable that Dimora's role as party chair will come up during the testimony, however. The Court cannot rule on every conceivable way in which this fact may be mentioned; therefore, the Court shall defer any more specific ruling until any objection lodged is evaluated at trial in its proper context.

### 4. Post-*Skilling* Conduct

Relying on the Supreme Court's decision in *Skilling*, Dimora moves to preclude the government from offering evidence to prove a violation of 18 U.S.C. § 1346 based on a nondisclosure of a conflict of interest. As previously discussed, the Supreme Court narrowed the reach of the honest services fraud statute, limiting it to fraudulent schemes involving bribes or kickbacks. *Skilling,* 130 S. Ct. at 2931. In accordance with *Skilling*, the present Indictment charges a bribery or kickback scheme with respect to each count of honest services fraud, and the government acknowledges, "evidence of a concealed conflict alone is not sufficient to prove a violation." (Doc. No. 589 at 2.) It also states, however, that "evidence of concealment of a bribe is certainly evidence of corrupt intent, and the Court should admit any such evidence at trial." (*Id.*) Because the government does not intend to rely upon the nondisclosure of a conflict of interest to support its honest services fraud counts, Dimora's motion is moot.

**5. Evidence of "Non-Official" Acts**

Finally, Dimora argues that the government should be precluded from relying on any evidence of his "non-official" acts to support any of the charges in the Indictment. Specifically, he moves to exclude any evidence relating to: (1) any phone call or contact by Dimora with then-Mayor of Lakewood Ed Fitzgerald regarding William Neiheiser or (2) any phone call or contact by Dimora with Bedford Clerk of Court Tom Day. The Court has addressed the admissibility of the two phone calls between Dimora and Day elsewhere in this opinion and order. Without the proper context, the Court cannot rule in advance on the admissibility of any other such call. In addition, because the Court can certainly envision situations where discussions regarding alleged co-conspirators, such as William Neiheiser, might be relevant to the conspiracy charges in the Indictment, it cannot issue a blanket ruling that evidence of each and every such call must be excluded from trial. The Court, therefore, will permit Dimora to renew his objection to this category of evidence once the Court can evaluate questions of relevancy and potential prejudice in the proper context.

**IT IS SO ORDERED**.

Dated: January 4, 2012

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

78