**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.  1:10CR387 |
| | ) | |
| | ) | |
| | ) | JUDGE SARA LIOI |
| PLAINTIFF, | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION & |
| | ) | ORDER |
| JAMES C. DIMORA, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are defendant Michal C. Gabor's motion for a new trial (Doc. No. 785), and his motion for a judgment of acquittal (Doc. No. 786). The government has responded in opposition to both motions. (Doc. Nos. 865, 866.)

*Background*

In 2007, the Federal Bureau of Investigation launched a large-scale probe into potential public corruption in local government. Targeting political and business activity in Cuyahoga County, Ohio, the investigation to date has resulted in over 60 arrests. Most arrestees have entered into plea agreements with the federal government and have been sentenced or are awaiting sentencing, a few have gone to trial, and several others are still awaiting trial. Gabor and his co-defendant, James C. Dimora, were among those arrested who elected to go to trial.

Between 1998 and 2010, Dimora served as an elected County Commissioner for Cuyahoga County. It was the government's theory that he and Frank

Russo, who served for much of this same period as Cuyahoga County Auditor, orchestrated a conspiracy whereby the two men would benefit themselves, their co-conspirators, and their designees, by using the power and authority of their public offices to elicit monetary and in-kind bribes in exchange for public contracts and employment with the County.

At all times relevant to the federal investigation, defendant Gabor was employed by the Cuyahoga County Auditor's Office. Evidence presented at trial demonstrated that Gabor used his long-standing relationship with Dimora to secure work in the auditor's office under Russo, and paid Russo a fee of $5,000 for his position in the Department of Weights and Measures. By the Third Superseding Indictment,[1] Gabor was charged, along with Dimora, in Count 1 with RICO conspiracy. He was also charged (along with Dimora) with conspiracy to commit bribery concerning programs receiving federal funds, Hobbs Act conspiracy, and conspiracy to obstruct justice. He was separately charged with conspiracy to commit mail fraud and honest services mail fraud, relating to Russo's alleged efforts to compensate Joseph Gallucci for running a sham campaign against Russo in the 2006 Auditor's race.

On March 9, 2012, after a 37 day jury trial, the jury returned nine guilty verdicts against Gabor contained in seven of the eight counts in which he was charged. He was acquitted by the jury on one count. The charges of which Gabor was found guilty included: RICO conspiracy, conspiracy to commit bribery concerning programs receiving federal funds, aiding and abetting bribery concerning programs receiving federal funds,

---

[1] All indictment references are to the Third Superseding Indictment. (Doc. No. 444.)

conspiracy to commit Hobbs Act extortion, conspiracy to obstruct justice, conspiracy to commit mail fraud and honest services mail fraud, and aiding and abetting mail fraud and honest services mail fraud. (Gabor Verdicts, Doc. No. 739.) Dimora was found guilty by the jury on 33 of the 34 counts in which he was charged. He, too, was acquitted by the jury on one count. (Dimora Verdicts, Doc. No. 738.) The instant motions followed the jury's verdicts.

In his motion for judgment of acquittal, brought under Rule 29 of the Federal Rules of Criminal Procedure, Gabor requests that the Court grant a judgment of acquittal on all counts of which he was convicted on the ground that the evidence was insufficient to support the verdicts. In the alternative, and with respect to his Rule 33(a) motion, Gabor argues that he is entitled to a new trial because the verdicts are against the manifest weight of the evidence, or that the interest of justice otherwise requires a new trial.

*Standards*

If the defendant moves for a judgment of acquittal after the government concludes its case, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[2] FED. R. CRIM. P. 29(a). "The relevant inquiry is whether, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

---

[2] At the conclusion of the government's case, both defendants moved for a judgment of acquittal, and the Court denied these motions for reasons stated on the record. Gabor's present Rule 29 motion is a renewal of his previous motion, and the Court incorporates by reference its prior findings and conclusions set forth on the record.

beyond a reasonable doubt.' " *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). "Under the *Jackson v. Virginia* standard, a reviewing court does 'not reweigh  the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury.' " *Id.* (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)). " 'Substantial and competent circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt.' " *Id.* (quoting *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004)).

A motion for a new trial is governed by Federal Rules of Criminal Procedure 33. The rule provides that the court may "vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "The paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that 'the [jury's] verdict was against the manifest weight of the evidence.' " *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (quoting *United States v. Crumb*, 187 F. App'x 532, 536 (6th Cir. 2006)). "Generally, such motions are granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.' " *United States v. Graham*, 125 F. App'x 624, 628 (6th Cir. 2005) (quoting *United States v. Turner*, 490 F. Supp. 583, 593 (E.D. Mich. 1979)). The district judge may act as a "thirteenth juror," assessing the credibility of witnesses and the weight of the evidence. *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). "The defendant bears the burden of proving the need for a new trial and such motions should be granted sparingly and with caution." *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993) (citing *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991)).

Thus, while Rule 29(c) and Rule 33(a) deal with similar issues, the two rules are governed by different standards of review. On a motion for judgment of acquittal, pursuant to Rule 29(c), a court is required to approach the evidence from a standpoint most favorable to the government, and to assume the truth of the evidence offered by the prosecution. On a motion for new trial pursuant to Rule 33(a), on the ground that the jury's verdict was against the manifest weight of the evidence, the power of a court is much broader because a court may weigh the evidence and consider the credibility of the witnesses. *See Turner*, 490 F. Supp. at 593 (citing 2 Wright & Miller, FED. PRAC. & PROC. § 553 (3d ed 2004)). Because Gabor relies on much of the same evidence and offers many of the same arguments to support both motions, the Court shall address the issues together, applying each standard to a consideration of the sufficiency of the evidence supporting the verdicts.

FED. R. CRIM. P. 33's "interest of justice" standard also "allows the grant of a new trial where substantial legal error has occurred." *Munoz*, 605 F.3d at 373. This includes "any error of sufficient magnitude to require reversal on appeal." *Id.* (quoting *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004)). The trial court does not assume the role of the "thirteenth juror" for purposes of this type of challenge. *Id.* at 373 n.9. While the vast majority of Gabor's Rule 33 arguments rely on the "against the manifest weight of the evidence standard," a limited number appear to invoke the "substantial legal error" standard. The Court shall, therefore, apply the standard applicable to each argument advanced.

*Discussion*

1.        Conspiracy Involving Steve Pumper and GreenSource

Counts 17, 19 and 21 dealt with Gabor's involvement with co-conspirator Steven Pumper and GreenSource: Count 17 charged Gabor with conspiracy to commit bribery concerning programs receiving federal funds; Count 19 charged aiding and abetting bribery concerning programs receiving federal funds; and Count 21 charged conspiracy to violate the Hobbs Act.

Pumper, a local contractor, was a part-owner of a number of companies including DAS Construction and GreenSource. DAS Construction performed primarily commercial renovation projects locally and out of state. (Doc. No. 698, Page ID # 13786-87.) GreenSource was a manufacturing company that created exterior wall and roof panels by utilizing "green," or environmentally friendly, building materials. (Page ID # 13788.) The government maintained that Gabor entered into a conspiracy with Pumper whereby the two men would utilize Dimora's considerable influence over county works project to ensure that GreenSource products would be used in the construction and renovation of county buildings, including the 2008 renovation of the Cuyahoga County Juvenile Justice Center (JJC). According to the indictment, Gabor was to receive a commission for placing GreenSource products in county buildings and Dimora was to receive a portion of this commission as a kickback. Gabor argues that the evidence presented at trial showed that no agreement was ever reached between Pumper and Gabor, and, therefore, there was insufficient evidence to establish that he ever joined the conspiracy.

6

Under 18 U.S.C. § 371, it is illegal for "two or more persons [to] conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose . . . . The government may establish the existence of a conspiracy if it can prove beyond a reasonable doubt: (1) the existence of an agreement to violate the law; (2) knowledge and intent to join the conspiracy; (3) and an overt act constituting actual participation in the conspiracy. *See United States v. Hughes*, 505 F.3d 578, 594 (6th Cir. 2007).

"To prove that a conspiracy existed, the government need not show a formal written agreement." *Fisher*, 648 F.3d at 450 (citing *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000)). "A showing of 'tacit or mutual understanding among the parties' is sufficient." *Id.* (quoting *Crossley*, 224 F.3d at 856). "Likewise, direct evidence of the conspiracy is not necessary. It is enough to present 'circumstantial evidence which a reasonable person could interpret as showing participation in a common plan . . . .' " *United States v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008) (quoting *Crossley*, 224 F.3d at 856); *see United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002) (internal citations omitted) (A conspiracy may be inferred from "circumstantial evidence which may reasonably be interpreted as participation in a common plan.").

For purposes of the relevant indictment, the elements of the offense of bribery concerning programs receiving federal funds, under 18 U.S.C. § 666, are: (1) that Dimora was an agent of Cuyahoga County; (2) that Cuyahoga County received federal benefits in excess of $10,000 in a one-year period identified in the particular count; (3) that Dimora solicited, demanded, accepted, or agreed to accept something of value from the persons or entities identified in the specific count; (4) that Dimora did so corruptly

with the intent to be influenced or rewarded in connection with the business, a transaction or series of transactions of Cuyahoga County; and (5) that the value of the business, transaction, or series of transactions in question and to which payment related was at least $5,000. *See United States v. Mills*, 140 F.3d 630, 632-33 (6th Cir. 1998) (citing 18 U.S.C. § 666). Thus, to convict Gabor of conspiracy to commit bribery concerning programs receiving federal funds, the government was required to prove beyond a reasonable doubt that: (1) two or more persons conspired, or agreed, to commit the substantive crime of bribery concerning programs receiving federal funds; (2) that Gabor knowingly and voluntarily joined the conspiracy; and (3) that a member of the conspiracy, not necessarily Gabor, committed one overt act for the purposes of advancing or helping the conspiracy.

The statute for aider and abettor liability provides that "[w]hoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). Thus, in order to convict Gabor as an aider and abettor of the bribery charged, pursuant to 18 U.S.C. § 2, the government was required to prove beyond a reasonable doubt: (1) that the crime of bribery concerning programs receiving federal funds was committed by Dimora; (2) that Gabor in some way aided or abetted Dimora in committing the crime; and (3) that Gabor intended to help commit the crime. *See United States v. Katuramu*, 174 F. App'x 272, 278-280 (6th Cir. 2006); *United States v. Thomas*, 11 F.3d 620, 631 (6th Cir. 1993); Sixth Circuit Pattern Instruction § 4.01.

For purposes of the indictment in this case, the essential elements of the crime of Hobbs Act extortion are: (1) that Dimora obtained or attempted to obtain

property; (2) that Dimora did so knowingly by extortion under color of official right; (3) that the property was given with the giver's consent; and (4) that in so acting, interstate or foreign commerce was obstructed, delayed or affected, would have been affected, or had the potential to be affected in any way or degree. *See Evans v. United States*, 504 U.S. 255, 268 (1992); *United States v. Gray*, 521 F.3d 514, 533-34 (6th Cir. 2008). Thus, in order for the jury to have convicted Gabor of conspiracy to commit Hobbs Act violations, the government would have had to prove beyond a reasonable doubt that: (1) two or more persons conspired, or agreed, to commit the substantive crime of Hobbs Act extortion; and (2) Gabor knowingly and voluntarily joined the conspiracy.

Gabor argues that Pumper's trial testimony failed to prove that Gabor and Pumper ever reached an agreement. But this was not the only evidence offered on the subject. Recorded phone calls played at trial between Gabor and Pumper established that the two men discussed their business relationship in detail, including: how Gabor would receive $80,000 as a base for his salary, that he would receive 30% of the GreenSource profits from the JJC project, how Dimora would be able to help him while he was "still in power," and that he [Dimora] would be "rewarded" for his efforts.[3] (Gov. Exs. 1700-R, 1700-KK). Other phone calls between the two men showed that Gabor was obtaining business cards so that he could start passing them out as a GreenSource salesman. The

---

[3] In one call, Gabor hinted that Dimora was beginning to question, though without so many words, when he was going to see his cut for the JJC deal. Pumper advised Gabor that Dimora was going to have to be patient. (Gov. Ex. 1700-KK; Doc. No. 698, Page ID # 13948.) In another call, Gabor and Pumper discussed the possibility of GreenSource providing products for a new recreational complex that was being built in Broadview Heights. At the time of the building project, Gabor's brother-in-law, Sam Alai, was the Mayor of Broadview Heights. Gabor was planning to exploit his relationship with Alai to secure the business for GreenSource, and in a phone call with Pumper, he explained that he would treat Alai "like Jim" (Gov. Ex. 1700-S), which was a reference to the kickback arrangement that Gabor had with Dimora. (Page ID # 13918.)

calls also showed Gabor taking active steps to involve Dimora in the JJC project by arranging for meetings between Dimora and county officials who may assist GreenSource. (Gov. Exs. 1700-X, 1717.) The evidence further established that Gabor, Dimora and Pumper met with Anthony Maldonado, a county employee who had power over certain county works projects, to discuss GreenSource being "spec'ed"[4] into the JJC project.[5]

Gabor ultimately walked away from the business arrangement with Pumper and GreenSource. In an April 11, 2008 phone call to Russo, Gabor indicated that he was "done" with Pumper (Gov. Ex. 1701), and Russo testified that it was his understanding that the relationship between Gabor and Pumper was deteriorating in April of 2008. (Doc. No. 703, Page ID # 14419.) The indictment, however, charged that the conspiracy involving Pumper and GreenSource extended only until March or April 2008. (Indictment at ¶ 353, Page ID # 9722.) The evidence from the recorded conversations between Pumper and Gabor demonstrated that the two men were discussing and taking steps to ensure GreenSource's involvement in the JJC project well into March 2008.[6] The fact that the relationship ultimately soured before the conspiracy generated any fruits does not detract from the evidence that Gabor and Pumper were actively pursuing the goals of the conspiracy. *See Collins v. United States*, 284 F.2d 517 (6th Cir. 1960) ("In

---

[4] The term "spec'ed" referred to having the architects write into the plans that GreenSource products were to be used in the construction project.
[5] Following the lunch meeting, Gabor commented enthusiastically to Pumper that Dimora had really pushed for GreenSource, and Pumper indicated that he was pleased with Dimora's efforts on behalf of GreenSource.
[6] Calls played at trial also chronicled Gabor's continued efforts to involve Dimora in the quest to have GreenSource products utilized in the JJC project.

order to convict for conspiracy, it is not necessary to prove that the conspiracy was successful.").

Gabor further attacks the sufficiency of the evidence by arguing that the government's theory of the conspiracy "defies logic" because Gabor stood to make less than he would have made as a county employee.[7] While this might explain why Gabor walked away from the deal, as the government correctly observed, however, the wisdom of the deal is not an element of the conspiracy, as the government was not required to prove that Gabor would have favorably benefitted from the arrangement. Likewise, the government was not required to prove that Gabor's assistance was essential to the conspiracy. While Pumper testified at trial that he had a personal friendship with Dimora, he also testified that he believed that enlisting Gabor's help would be beneficial to the fraudulent plan involving GreenSource because Gabor had an especially close relationship with Dimora, and because Gabor was becoming well-known in the political arena. (Doc. No. 698, Page ID # 13902.) Moreover, it was clear that Pumper relied on Gabor's special relationship with Dimora to further the JJC project and to otherwise

---

[7] Though not necessary to the resolution of Gabor's motion, the Court observes that it appeared from the recorded conversations between Gabor and Pumper that Gabor failed to understand the nature of a commission-based sales position. While Gabor and Pumper discussed a base salary of $80,000, against which his commissions would be drawn, there was nothing in the discussion that would have suggested that Gabor was *limited* to earning $80,000 in commissions—a fact that Pumper attempted to explain to Gabor on at least one occasion. Indeed, had the venture been successful, Gabor stood to profit considerably from the arrangement.

benefit himself and his interests.[8] (Doc. No. 698, Page ID # 13900; Doc. No. 699, Page ID # 13984; Gov. Exs. 1700-R,1700-V,1700-BB, 1700-JJ.)

Finally, Gabor attacks Pumper's credibility, noting that he was charged in connection with the FBI's public corruption investigation, he entered into a plea agreement with the government, he was an alcoholic, and he engaged in the destruction of evidence. Pumper's plea agreement, however, required him to cooperate with the government by providing truthful testimony. Further, defendants were able to explore Pumper's bias at length at trial. Pumper's testimony relating to his conspiratorial relationship with Gabor was also corroborated by the testimony of other witnesses, Gabor's own words in tape recorded conversations played for the jury at trial, as well as documents and records.

In regard to these conspiracy counts, the Court concludes that the jury could reasonably find from the evidence that Gabor engaged in a conspiracy to commit bribery concerning programs receiving federal funds, and in a conspiracy to commit Hobbs Act violations. The record also supports a jury finding, beyond a reasonable doubt, that he aided and abetted Dimora in a conspiracy to commit bribery concerning programs receiving federal funds. The evidence offered at trial, when viewed in a light most

---

[8] Still, Gabor claims that Pumper did not benefit from the arrangement, noting that the only assistance Dimora provided Pumper was to supply Pumper with the published public number for Cuyahoga County Jobs and Family Services, to be used by Pumper in connection with a domestic relations matter. This argument ignores the testimony of Frank Russo, who explained that Dimora assisted GreenSource in obtaining loans, helping with Pumper's divorce, and interceding with common pleas judge Bridgette McCafferty on a case between DAS Construction and Letter Perfect. (Doc. No. 703, Page ID # 14421-23.)

favorable to the prosecution—in the form of testimony, wiretaps, and documents—was sufficient to establish a tacit or mutual understanding between Gabor and Pumper to utilize Dimora's power and influence to secure work for GreenSource, and to reward Dimora for his efforts with kickbacks and bribes.

The Court also had the opportunity to observe Pumper on the witness stand during the three days in which he testified. The Court found his testimony credible, especially in light of the fact that it was entirely consistent with the content of the recorded conversations between Pumper and Gabor, and was corroborated by the testimony of other witnesses. Given the extent of the evidence offered on these counts, the Court finds that the evidence produced at trial does not preponderate heavily against the verdicts of guilty arrived at by the jury. *See United States v. Hughes*, 505 F.3d 578, 592-93 (6th Cir. 2007).

2.      Conspiracy to Obstruct Justice

In Count 28 of the indictment, Gabor was charged, along with Dimora, with conspiracy to obstruct justice. The facts supporting this charge relate to the events immediately following the FBI approach of Pumper on May 23, 2008. According to the indictment, that same day (May 23, 2008), Dimora caused a series of checks to be written to various contractors that had provided Dimora with free services as bribes for his assistance with various matters of county business. The indictment further charged that other conspirators, including Gabor, took additional steps to frustrate the FBI's investigation by concealing and encouraging others to conceal from law enforcement and

the grand jury the fact that Dimora had solicited and accepted bribes, kickbacks, and gratuities. (Indictment at ¶¶ 445-49, Page ID # 9752-58.)

The jury was presented with evidence of two types of obstruction: one involving the influencing of testimony, and the second involving the altering or impairing of evidence. With respect to the first type of obstruction, the substantive elements of obstruction include: (1) that a conspirator persuaded another, or attempted to persuade another, to engage in misleading conduct; (2) that the conspirator did so knowingly and corruptly; (3) that the conspirator acted with intent to influence the testimony of any person in an official proceeding; (4) that the conspirator knew or should have known that the official proceeding was pending or was likely to be instituted; and (5) that the official proceeding was a federal proceeding. *See* 18 U.S.C. § 1512. The elements of the second type of substantive obstruction of justice include: (1) that an identified conspirator persuaded another person or attempted to do so; (2) that the conspirator did so knowingly and corruptly; (3) that the conspirator acted with intent to alter, destroy, mutilate or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding; (4) that the conspirator knew or should have known that the official proceeding was pending or was likely to be instituted; and (5) that the official proceeding was a federal proceeding. *See United States v. Fillers*, 1:09-CR-144, 2012 U.S. Dist. LEXIS 70346, at *6-*7 (E.D. Tenn. May 21, 2012). Thus, to prove Gabor guilty of conspiracy for this count, the government was required to prove beyond a reasonable doubt: that two or more persons conspired to, or agreed to, commit the substantive crime of obstruction of justice; that Gabor knowingly and voluntarily joined the conspiracy; and

14

that a member of the conspiracy did one of the overt acts listed in Count 28 for the purpose of advancing or helping the conspiracy.

Gabor relies upon two Supreme Court decisions to demonstrate that the government's evidence offered in support of Count 28 was legally insufficient. In *Arthur Anderson LLP v. United States*, the Court held that the jury instructions, relating to the charge of obstruction of justice, under 18 U.S.C. § 1512, were legally deficient because they "failed to convey properly the elements of a 'corrup[t] persuas[ion]' under § 1512(b) . . . ." 544 U.S. 696, 698 (2005) (citing 18 U.S.C. § 1512). Specifically, the Court held that the instructions fell short because they did not convey the "requisite consciousness of wrongdoing," they "diluted the meaning of 'corruptly' so that it covered innocent conduct," and failed to alert the jury that it needed to find a "nexus" between the " 'persuasion' to destroy documents and any particular proceeding."[9] *Id.* at 706-07. *See also United States v. Aguilar*, 515 U.S. 593, 600 (1995) ("We do not believe that uttering false statements to an investigating agent—and that seems to be all that was proved here—who might or might not testify before a grand jury is sufficient to make out a violation of the catch-all provision of [18 U.S.C.] § 1503 [endeavoring to obstruct the due administration of justice].").

Applying the teachings found in these two decisions, Gabor analyzes the evidence at trial, and offers several examples he believes show that his conduct was not knowing and dishonest, and that there was no "nexus" between his conduct and any particular proceeding. While the Court shall address each example in turn, it is important

---

[9] The Court notes that its jury instruction did not suffer from these deficiencies, nor does Gabor suggest any such deficiency.

to note at the outset that all of the examples suffer from two significant deficiencies. First, the purpose for which the examples are offered fails to take into consideration that Gabor was convicted of conspiracy to obstruct justice, and not the underlying crime of obstruction. Thus, it was not necessary that each and every one of his actions, standing alone, constituted obstruction. Rather, all acts of the conspiracy, taken together, must form a conspiracy which, if successful, would have resulted in obstruction. Second, the examples improperly take and consider Gabor's conduct in a vacuum. But it is well settled that "[s]eemingly innocent acts, taken individually, may indicate complicity when viewed collectively and with reference to circumstances in general." *United States v. Mariani*, 725 F.2d 862, 865-66 (2d Cir. 1984) (cited favorably by *United States v. Ashworth*, 836 F.2d 260, 265 (6th Cir. 1988)).

For example, Gabor complains that Pumper's testimony failed to establish that Gabor acted illegally with respect to taking a contract from Pumper to Dimora, or when he returned the unsigned contract to Pumper, advising him that the dates on the contract were wrong. Pumper testified that two days after he was approached by the FBI (the day of the approach being May 23, 2008), he created a bogus construction agreement between DAS Construction Dimora, which purported to demonstrate that Dimora was billed for the work done by DAS Construction at his residence. (Gov. Ex. 2800-G.) Pumper then arranged to have Gabor deliver the agreement to Dimora for his signature. Gabor ultimately returned the contract unsigned to Pumper because the dates did not accurately reflect the work done on Dimora's residence. Gabor argues that the evidence did not demonstrate that Gabor knew the contents of the contract, or that they would be

16

used by the grand jury. In support, he argues that it was not dishonest to simply note that the dates were wrong.

If Gabor's conduct was considered in a vacuum then his arguments may have some force. The totality of the evidence, however, offered demonstrated that immediately after the conspirators learned that Pumper had been approached by the FBI, they (including Gabor) began to meet in small groups to discuss the matter, gather information, warn other members of the conspiracy, and take steps to get their stories straight and cover up the RICO conspiracy. For his part, Gabor acted in much the same way that he did during the course of the conspiracy: attending to Dimora's errands and serving in a go-between role. There was substantial evidence offered at trial that Gabor often served as an intermediary between Dimora and Russo and other members of the conspiracy by conveying information and other things to further the conspiracy. As to his specific conduct, while Gabor was correct that the dates on the bogus contract were wrong, the dishonesty comes in the fact that Gabor's efforts were designed to ensure that the forged documents were convincing enough to cover up the bribes. The evidence, if believed, demonstrated that Dimora, Gabor and others agreed to commit the crime of obstruction, and that Gabor took an active role in that conspiracy.

Similarly unavailing is Gabor's suggestion that his approach of Kleem was equally innocent because he did nothing more than truthfully advise Kleem that Pumper was speaking with the FBI. When he approached Kleem, he did so knowing of Kleem's role in the RICO conspiracy, and knowing that the grand jury was investigating similar conduct. This "seemingly innocent" conduct, placed in the context of the overall conspiracy is sufficient to demonstrate Gabor's complicity therein.

The same analysis applies to evidence that Gabor spoke with Gallucci to determine whether he had been approached by the FBI. Of course, such conduct demonstrates that Gabor was aware of the FBI's investigation, and the likelihood of grand jury proceedings. Additionally, evidence that Gabor was gathering information from other conspirators supports the jury's finding that he was complicit in the conspiracy to obstruct.

Gabor also takes issue with the government's position that Gabor's comment to Gallucci—"you didn't pay for your job. I didn't pay for my job"—was an attempt to influence misleading testimony. Gabor argues that the statement was not untrue because Galluci did not "pay" for his job—he "exchanged political favors for his job." (Doc. No. 785, Page ID # 17803.) Notwithstanding this splitting of hairs, the evidence clearly supported a finding that such efforts were designed to influence Mr. Gallucci into misrepresenting to the grand jury that he obtained his county position by lawful means.

When viewed in its entirety, and in a light most favorable to the government, a reasonable jury could find that there existed a conspiracy to obstruct justice, that Gabor, by his words and actions, joined that conspiracy, and that one of the named conspirators performed at least one overt act identified in Count 28 of the indictment. Consequently, Gabor is not entitled to judgment of acquittal on this count.

Additionally, the Court finds that the timing of the generation of the false records and checks immediately after Pumper was approached by the FBI, combined with other actions taken by various conspirators (including the meetings, updates, and efforts to reconcile stories), was compelling evidence with which the jury could find the

18

existence of a conspiracy to obstruct. Gabor's actions, as evidenced in recorded wiretaps and the trial testimony of co-conspirators, was sufficient evidence to prove to the jury his decision to join the conspiracy. The Court cannot, therefore, find that the jury's verdict was against the manifest weight of the evidence.

3.      Conspiracy Involving Gallucci and the 2006 Auditor's Race

Counts 31 and 32 of the indictment charged that defendant Gabor participated in a conspiracy to have Joseph Gallucci run a sham campaign against Russo in the 2006 Cuyahoga County Auditor's race. At trial, Gallucci testified that he approached Kevin Kelley about obtaining a position in the auditor's office. Kelley first suggested that Gallucci could raise money for Russo's campaign. When Russo decided that he was not interested in campaign contributions, Kelley brought to Gallucci a plan to have Gallucci seek the Republican nomination for the auditor's position, and then drop out of the race after it was too late for the Republicans to find another candidate. Gallucci agreed to the plan, sought and secured the Republican nomination, and then stayed in the race long enough to prevent the Republicans from offering up another candidate. After Russo was re-elected, Gallucci began employment in the auditor's office.

The elements of the substantive crime of mail fraud are: (1) an individual identified in the count knowingly participated in a scheme to defraud; (2) that the scheme involved a material misrepresentation or concealment of a material fact; (3) that the same individual had the intent to defraud; and (4) an individual used the mails. *Neder v. United States*, 527 U.S. 1, 20-25 (1999); *United States v. Gold Unlimited, Inc*., 177 F.3d 472, 488 (6th Cir. 1999); *United States v. Frost*, 125 F.3d 346, 358-59 (6th Cir. 1997); Sixth

Circuit Pattern Instruction 10.01. The elements of the substantive crime of honest service mail fraud are: (1) an individual intended to defraud the County and its citizens of their right to the honest services of a public official through bribery or kickbacks; (2) an individual identified in the count included a material misrepresentation or concealment of a material fact; (3) that the same individual intended to defraud the County and its citizens; and (4) an individual used the mails. *See generally, Skilling v. United States*, 130 S. Ct. 2896 (2010); *see United States v. Bruno*, 661 F.3d 733, 743-44 (2d Cir. 2011). Thus, in order for the government to convict defendant Gabor of conspiracy to commit mail fraud and honest mail fraud, it was required to prove beyond a reasonable doubt that: (1) two or more persons conspired, or agreed, to commit mail fraud or honest services mail fraud; and (2) that Gabor knowingly and voluntarily joined the conspiracy. Likewise, for the government to convict defendant Gabor of aiding and abetting mail fraud or honest services mail fraud, the government was required to prove beyond a reasonable doubt that: (1) the crime of mail fraud or honest services mail fraud was committed by Frank Russo or Kevin Kelley; (2) Gabor helped to commit the crime; and (3) Gabor intended to help commit the crime.

Gabor seeks a Rule 29 acquittal on these counts for the same reasons he advanced when he sought a pretrial dismissal of the charges. He argues that Counts 31 and 32 cannot stand because they impermissibly rely on election fraud, in violation of *United States v. Turner*, 465 F.3d 667, 671-73 (6th Cir. 2006). In a pretrial ruling, the Court concluded that the charges were properly pled because, instead of focusing on Gallucci's election activities, these counts revolved around Russo's official action of basing a hiring decision on the receipt of things of value rather than on merit and

20

qualifications. (Doc. No. 530, Page ID # 11077-11087.) The Court also found that the indictment pled a conspiracy to commit honest services fraud that satisfied the requirements for such a crime as set forth in the Supreme Court's decision in *Skilling*. Because Gabor offers the same arguments upon which he relied in his pretrial motion, the Court relies upon and incorporates by reference its pretrial ruling. (*See* Doc. No. 530.)

Additionally, the Court finds that substantial and competent evidence was presented by which a rational trier of fact could find the essential elements of conspiracy to commit mail fraud and honest services mail fraud and aiding and abetting mail fraud and honest services mail fraud beyond a reasonable doubt. The Court accordingly denies defendant Gabor's motion for a judgment of acquittal on these counts.

In support of a motion for a new trial on Counts 31 and 32, Gabor points to what he believes are inconsistencies in the testimony of several key government witnesses. At trial, Gallucci testified that, during the 2006 campaign, he received $4,000 per month to supplement his income while he ran a minimal campaign against Russo. (Doc. No. 733, Page ID # 16889-16896.) Gabor claims that this testimony conflicted with that of Russo and Kelley, who each testified that they supplied Gallucci with $2,000 per month. (*See* Doc. No. 723, Page ID # 15797; Doc. No. 703, Page ID # 14394.) While the district court may, under Rule 33, reverse a conviction if it disagrees with the jury's resolution of conflicting testimony, *see United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998), generally, "conflicting testimony or a question as to credibility of a witness are not sufficient grounds for granting a new trial." *United States v. Kuzniar*, 881 F.2d 466, 470-71 (7th Cir. 1989).

21

More to the point, however, there was no inconsistency. Gallucci testified that he received $2,000 in cash from Russo, which was delivered each month to him by Gabor, and another $2,000 by check from an organization known as "1-888-OHIOCOMP." (Doc. No. 733, Page ID # 16889-16902.) According to Gallucci, the second $2,000 came from Kelley. (Doc. No. 733, Page ID # 16889.) Kelley and Russo corroborated Gallucci's testimony to the extent that they each testified to the $2,000 that they provided Gallucci on a monthly basis. (Doc. No. 723, Page ID # 15797; Doc. No. 703, Page ID # 14394.) Neither individual was asked about contributions that may have been made by any other co-conspirator. Further, Russo testified that he sent his contribution through Gabor because he did not trust Kelley, which was corroborated by Kelley, who testified that Russo had eventually cut him out of the loop on the Gallucci fraud scheme. (Doc. No. 703, Page ID # 14392, 14394; Doc. No. 723, Page ID # 15798.).

Gabor also claims that the proofs at trial failed because no one was deceived by the scam election. While Russo testified that certain employees in the auditor's office figured it out *after* the election, Russo also testified that he did not share the details of the fraud with anyone outside of the conspiracy. (Doc. No. 703, Page ID # 14399.) He further testified that he went to lengths to keep the conspiracy from the public by padding Gallucci's personnel file in response to a newspaper's inquiry into hiring practices in the auditor's office. (Doc. No. 703, Page ID # 14402; *see also* Doc. No. 733, Page ID # 16919.)

The Court had the opportunity to hear all the proofs offered at trial and observe the witnesses first-hand. The Court has considered the credibility of all the testifying witnesses, which was corroborated by public and financial records (including

22

the checks sent to Mr. Gallucci). The jury's decision was not against the manifest weight of the evidence. This is not "the extraordinary circumstance where the evidence preponderates heavily against the verdict." *See Hughes*, 505 F.3d at 592-93 (internal quotation and citation omitted).

        4.      <u>RICO Conspiracy</u>

Count 1 of the indictment charged Gabor and Dimora with participating in a conspiracy whereby they, along with other conspirators, knowingly and intentionally conspired to conduct the affairs of the enterprise through a pattern of racketeering activity. The purpose of the conspiracy was to benefit Russo, Dimora and their co-conspirators and designees, and to conceal the activities of the enterprise. The enterprise was identified as Cuyahoga County. The indictment also identified five specific schemes, including Gabor's efforts to procure a position in the Cuyahoga County Auditor's Office.

The elements of substantive RICO include: (1) that an enterprise existed that engaged in or affected interstate or foreign commerce; (2) that an individual identified in the indictment was associated with or employed by the enterprise; (3) that the same individual knowingly conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity. 18 U.S.C. § 1962(c). *See United States v. Sinto*, 723 F.2d 1250, 1260 (6th Cir. 1983), *cert. denied*, 469 U.S. 817 (1984). Thus, in order to prove Gabor guilty of engaging in a RICO conspiracy, the government was required to prove beyond a reasonable doubt: (1) that two or more persons agreed to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering

activity; (2) that Gabor knowingly and voluntarily joined the conspiracy or agreement with knowledge of its purpose; and (3) that Gabor agreed that a conspirator, not necessarily Gabor, would commit at least two of the racketeering acts described in the indictment.

Gabor argues that the evidence offered a trial showed only his mere association with the enterprise, and with those who may have joined the conspiracy. He maintains that there were no specifics as to the dinners he allegedly attended, that some dinners and outings mentioned at trial had nothing to do with the conspiracy, and that there was no evidence that Gabor knew who paid for Dimora's meals, hotel accommodations, and other expenses.

Such a representation ignores the wealth of evidence offered at trial regarding the intimate details of the dinners attended by Gabor and other conspirators, the trips taken to casinos in Las Vegas and elsewhere, and gambling activities at Stonebridge, a building leased by the County. The fact that the evidence may not have shown that Gabor knew every detail of every event was not fatal to the government's case. *See Crossley*, 224 F.3d at 856 ("The government is not required to prove that each member of the conspiracy knew every detail or the identity of all the other members involved in the conspiracy."); Sixth Circuit Pattern Instruction 2.02(2).

There was more than sufficient evidence from which the jury could find that Gabor knowingly and voluntarily joined the conspiracy. The government offered evidence that Gabor routinely served as an intermediary in a number of schemes, including the schemes involving co-conspirators William Neiheiser and Charlie Randazzo. Other evidence demonstrated that Gabor understood the nature of the

conspiracy. For example, in an intercepted conversation between Dimora and Gabor, Gabor agreed to feign ignorance about the County's plan to throw out a contractor's bid (in favor of allowing a co-conspirator another shot at bidding on the project). (*See* Gov. Ex. 400-RR.) Gabor's participation in other schemes, not specifically charged in Count 1 but falling within the definition of the illegal RICO enterprise, such as the Gallucci election scheme and the Pumper schemes, also provided compelling evidence from which the jury could find that Gabor knowingly and voluntarily joined the RICO conspiracy.[10]

Gabor also challenges the strength of the evidence on the ground that much of the testimony on this count came from cooperating co-conspirators, who had admitted to engaging in criminal behavior and had sought and obtained favorable treatment from the government in exchange for their cooperation. As even Gabor concedes, however, the jury was instructed that they were to treat such testimony with caution. Moreover, the defendants were given considerable latitude in exploring on cross examination biases these witnesses may have had, including their understanding of the consideration they would receive from the government and the possible sentences they would face if they did not cooperate.

Importantly, however, this testimony was supported by, and corroborated by, hundreds of wiretaps, surveillance videos, photographs, documents, and the testimony of non-cooperating witnesses. Again, the Court had the opportunity to view all of the

---

[10] In addition, Gabor suggests that the government did not establish a sufficient relationship between the racketeering acts and the charged RICO conspiracy. Of course, the racketeering acts need not be directly interrelated. Instead, the racketeering acts must be connected to the affairs and operations of the criminal enterprise. *See United States v. Lawson*, 535 F.3d 434, 444 (6th Cir. 2008) (*citing United States v. Corrado*, 227 F.3d 543, 554 (6th Cir. 2000)). Each act was clearly related to the enterprise, which was defined as Cuyahoga County. As such, the evidence offered at trial was sufficient for this element.

government's proofs offered at trial, and it cannot say that the guilty verdict the jury returned against Gabor on this count was against the manifest weight of the evidence.

     5.    <u>Denial of a Motion to Sever</u>

     In pretrial motions, each defendant sought a severance from his co-defendant. In a detailed decision, the Court denied both motions. (*See* Doc. No. 531.) Because Gabor raises the same arguments now that he did before trial, the Court refers to, and incorporates herein, its ruling on these motions.

*Conclusion*

     Viewing the evidence in a light most favorable to the government, a rational juror could have found beyond a reasonable doubt the essential elements of each crime for which Gabor was convicted. As such, he is not entitled to a judgment of acquittal. In addition, because the guilty verdicts are not against the manifest weight of the evidence, taking into consideration the nature and the strength of all of the evidence and the credibility of the witnesses, and justice does not otherwise require a new trial, he is not entitled to a new trial. His motions for a judgment of acquittal and for a new trial, therefore, are DENIED.

     **IT IS SO ORDERED**.

Dated: July 12, 2012

                             **HONORABLE SARA LIOI**
                             **UNITED STATES DISTRICT JUDGE**