

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

MICHAEL D. GABOR,             )     Case No. 1:10-cr-00387-SL-5
                                         )
                 Petitioner,      )     Judge Sara Lioi
                                         )
    vs.                                       )
                                         )
UNITED STATES OF AMERICA,    )
                                         )
                 Respondent.    )

## MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE

Now comes Michael D. Gabor, Petitioner, *pro se*, with his Motion to Vacate, Set Aside or Correct Sentence. A Memorandum in Support is attached hereto and incorporated herein.

Respectfully submitted,

Dated: 11/6/15

*Michael D Gabor.*

Michael D. Gabor, Petitioner, *pro se*
Fed. Reg. No. 56277-060
FCI Elkton
PO Box 10
Lisbon, Ohio 44432

**MEMORANDUM IN SUPPORT**

## I.    **INTRODUCTION**

This Motion to Vacate, Set Aside or Correct Sentence (this "Motion") enumerates and describes a litany of instances of blatant judicial misconduct, prosecutorial misconduct and ineffective assistance of counsel. Michael D. Gabor (the "Petitioner") has been subjected to highly prejudicial misconduct by a myriad of parties to this matter. The Petitioner's basic constitutional rights have been systematically and repeatedly violated by those charged with protecting these very same constitutional rights.

It is not only unfortunate, but ironic, that many of the charges brought in the Cuyahoga County Public Corruption Investigation (the "Investigation") constitute the same type of conduct perpetuated by those presiding over the Investigation. In summary, Judge Kathleen McDonald O'Malley, members of the United States Attorneys Office for the Northern District of Ohio and several other individuals had undisclosed relationships, conflicts of interest, pecuniary interests, familial ties, and/or other extrajudicial contacts with those the subject of the Investigation that highly prejudiced the Petitioner and violated his constitutional rights.

This Motion explains the conduct that permeated and tainted the Investigation, the Petitioner's conviction and many other defendants' convictions. The information in this Motion not only affects the Petitioner, but has seismic consequences for dozens of other individuals targeted by the Investigation.

2

## II. GROUND ONE – DENIAL OF THE PETITIONER'S CONSTITUTIONAL RIGHTS TO A FAIR LEGAL PROCEEDING AND DUE PROCESS DUE TO JUDICIAL BIAS AND JUDICIAL MISCONDUCT.

A.     Introduction to Judicial Misconduct.

The Petitioner's constitutional right to a fair proceeding and trial were severely prejudiced by the actions of the initial presiding judge, Judge Kathleen McDonald O'Malley ("Judge O'Malley"). Title 28 U.S.C. Section 455(a), specifically states that:

> Any justice, judge or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

28 U.S.C. Section 455(a). As explained herein, there are a myriad of reasons why Judge O'Malley should have disqualified herself. Section 455(a) invites an objective inquiry as to "whether a reasonable person, with knowledge of all of the facts, would conclude that the judge's impartiality might reasonably be questioned." Blackman v. Eaton Corporation, 2014 U.S. App. LEXIS 19915 (6th Cir. 2014); United States v. Adams, 722 F.3d 788 (6th Cir. 2013). While the language from the federal recusal statute, 28 U.S.C. Section 455, is important in determining judicial bias and the appearance of bias, the violation of the Petitioner's due process is even more important and problematic in this matter. See Suh v. Pierce, 630 F.3d 685 (7th Dist. 2011) (language from recusal cases often bolsters a petitioner's arguments about whether his due process rights have been violated). While the federal recusal statute often requires stricter grounds for disqualification than the Due Process Clause, the analysis is similar. While the foregoing Section 455 analysis is instructive, the key analysis is of judicial bias and judicial misconduct violating the Due Process Clause. This analysis follows herein.

It is beyond dispute that judicial bias is structural error, not susceptible to forfeiture or harmless error analysis. Railey v. Webb, 540 F.3d 393 (6th Cir. 2007); See Washington v.

Recuenco, 548 U.S. 212, 126 S. Ct. 2546, 2551 (n. 2), 165 L. Ed. 2d 466 (2006); Sullivan v. Louisiana, 508 U.S. 275, 283, 114 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). Judicial bias "is a structural error" that, if found on habeas, "requires automatic reversal." Chapman v. California, 386 U.S. 18 (1966); Marino v. Johnson, 210 F.3d 638, 644 (6th Cir. 2000); Billingslea v. Jackson, 83 Fed. Appx. 33 (6th Cir. 2003). Judicial bias is not reviewed for harmless error. United States v. Lawrence, 735 F.3d 385 (6th Cir. 2011).

Notably, Judge O'Malley has recently addressed most of the issues described in this Motion relating to judicial bias and judicial misconduct as a jurist. Judge O'Malley recently authored the opinion in Shell Oil Company and Atlantic Richfield Company v. United States, 672 F.3d 1283 (Fed. Cir. 2012). In Shell, the government contended that the trial judge was required to recuse himself from the entire proceeding because the judge's spouse had an interest in one of the parties. Id. The trial judge severed the companies in which the trial judge's spouse had an interest. Id. The remaining non-severed companies argued that the severance properly cured the conflict. Id. Judge O'Malley held that the trial judge was required to recuse himself from the entire proceeding and that vacating the judgments was the proper remedy. Id. Judge O'Malley also held in Shell that the failure to recuse was not harmless error because, among other reasons, retaining the judgments against the non-severed companies could have a prejudicial effect on the severed litigation. Id. Importantly, Judge O'Malley also ordered that the trial judge's failure to recuse created a risk of undermining public confidence in the judicial process. Id. The instant facts echo the same issues described herein. The Petitioner urges the same result that Judge O'Malley herself recently ordered, namely vacating the Petitioner's conviction.

The Due Process Clause of the Fourteenth Amendment requires a fair proceeding in a fair tribunal before a judge with no actual bias against the defendant and no interest in the outcome of the case. Bracy v. Gramley, 520 U.S. 899, 904-905, 117 S. Ct, 1793, 138 L. Ed. 2d 97 (1997). The Sixth Circuit has often held that judicial bias violates a defendant's due process rights. Getsy v. Mitchell, 456 F.3d 575 (6th Cir. 2005). The law regarding judicial bias and judicial misconduct in this matter is more fully described herein.

B.    The Facts Surrounding the Judicial Bias and the Judicial Misconduct.

1.    Judge O'Malley's Involvement in this Matter.

There are a myriad of facts surrounding the judicial bias and judicial misconduct related to this matter. Judge O'Malley intersects with the Investigation, this matter and the related cases in so many ways that no reasonable person would ever believe that she should have been involved at all. Although Judge O'Malley did not preside over the Petitioner's trial, she had massive involvement in his matter, the Investigation and numerous related cases.

Specifically, Judge O'Malley presided over the informations, indictments, plea proceedings and significant other proceedings (some of which remain under seal) of at least the following 28 individuals and the Petitioner himself:

| | |
|---|---|
| J. Kevin Kelley | Richard Huberty |
| Brian Schuman | James McCullough |
| Daniel Gallagher | Lawrence Skule |
| Frank P. Russo | Richard Kocuba |
| Vince Russo | Juan Alejandro |
| Steven Wayne Pumper | Dennis Dooley |

| | |
|---|---|
| Anthony Sinagra | John J. Carroll |
| Santina Klimkowski | Nilesh R. Patel |
| Nicholes Zavarella | Timothy Armstrong |
| John Valentin | Bruce Zaccagnini |
| Joseph Gallucci | Thomas Greco |
| Dinesh Banfa | Robert W. Rybak |
| Joseph P. O'Malley | William Neiheiser |
| Daniel Weaver | James C. Dimora |

A significant number of the foregoing individuals participated in the Investigation, proffered against the Petitioner and testified at the Petitioner's trial. Further, Messrs. Kelley, Schuman, Gallagher, Pumper, Gallucci and Russo all provided especially damaging testimony against the Petitioner at his trial. These individuals worked out their deals with Judge O'Malley acting as the presiding judge which is a central issue in this Motion. Further, Judge O'Malley made rulings in these related cases and in this matter that directly affected this matter.

While it is true that the Petitioner's case was originally assigned to this Honorable Court, it was reassigned to the docket of Judge O'Malley on September 16, 2010. *See* Petitioner's Docket. The Petitioner's case was then once again returned to the docket of this Honorable Court on January 21, 2011, after Judge O'Malley was appointed to the Federal Circuit Court of Appeals. *See* Petitioner's Docket. During the time that Judge O'Malley presided over the Petitioner's case, she made numerous rulings and decisions. In fact, there are over 40 entries on the Petitioner's docket and over 100 documents involved in this matter while Judge O'Malley handled this case. Id.

A few examples of the relevant proceedings over which Judge O'Malley presided include the Notice of Related Case, filed by Ann C. Rowland on September 15, 2010, and thereafter approved by Judge O'Malley. *See* Exhibit A attached hereto and incorporated herein. This Notice explains generally how many of the cases that were filed to that point were inter-related. There were also other pre-trials involving the Petitioner over which Judge O'Malley presided. For example, Judge O'Malley presided over a pre-trial involving the Petitioner on October 5, 2010. *See* Exhibit B attached hereto and incorporated herein. Dominic Vitantonio ("Mr. Vitantonio") acted as counsel for the Petitioner at this pre-trial (issues involving Mr. Vitantonio are more fully discussed herein). Judge O'Malley also presided over the November 10, 2010 pre-trial after appointing Leif B. Christman ("Mr. Christman") to be counsel for Petitioner. *See* Exhibit C attached hereto and incorporated herein. At the November 10, 2010 pre-trial, Judge O'Malley presided over crucial decisions about the deposition of Kevin Payne, protective order issues, discovery issues, cooperation and plea agreement issues, the trial date and how much time to allow counsel to review the voluminous discovery and many other important matters. *See* Exhibit D attached hereto and incorporated herein. The foregoing litany of information is just some of the examples of the extensive involvement Judge O'Malley had in the Petitioner's case, not to mention the nearly 30 related cases in which she presided. Judge O'Malley's rulings, decisions and involvement in the related cases significantly impacted the Petitioner's case as well. There is no doubt that Judge O'Malley's fingerprints are all over the Petitioner's case as well as dozens of related cases.

2.     <u>Judge O'Malley had a Number of Undisclosed and Impermissible Relationships in this Case and the Investigation.</u>

a)     <u>Judge O'Malley had a very close relationship with Mark Dottore.</u>

Mark Dottore ("Mr. Dottore") is referenced as "an intermediary" in the Petitioner's indictment and conviction relating to the "Gabor Judicial Corruption." Mr. Dottore is involved in numerous other aspects of the Investigation and related cases as described herein. Judge O'Malley appointed Mr. Dottore as the Master Commissioner for the Northern District of Ohio. Judge O'Malley appointed Mr. Dottore as the Master Commissioner in dozens of matters, including, but not limited to, <u>NovaStar Mortgage, Inc. v. Sardon, et al.</u>, Case No. 1:05-cv-02804 (N.D. Ohio 2005); <u>RRE VIP Borrower, LLC v. Bingham Building Limited Partnership, et al.</u>, Case No. 1:10-cv-00793 (N.D. Ohio 2010); <u>Colonial Savings, F.A. v. Tony L. Burns, et al.</u>, Case No. 1:05-cv-01822 (N.D. Ohio 2005); <u>GMAC Mortgage Corporation v. Hanna, et al.</u>, Case No. 1:05-cv-02816 (N.D. Ohio 2005); <u>Deutsche Bank National Trust v. Dillon, et al.</u>, Case No. 1:05-cv-02895 (N.D. Ohio 2005). Judge O'Malley appointed Mr. Dottore to numerous federal receiverships, some of which received negative publicity due to Mr. Dottore's conduct, including, but not limited to, the Dadante receivership. *See* Exhibit E attached hereto and incorporated herein. Judge O'Malley received impermissible and undisclosed meals and things of value from Mr. Dottore. *See* Exhibits F and G attached hereto and incorporated herein. Specifically, Mr. Dottore often boasted to the Petitioner and others that he was very close with Judge O'Malley. *See* Exhibits G and H attached hereto and incorporated herein.

The most egregious, prejudicial and outrageous issue involving Judge O'Malley is that Judge O'Malley received significant free home improvements at her former home in Chagrin Falls, Ohio from Mr. Dottore. *See* Exhibit F attached hereto and incorporated herein. Further, Mr. Dottore often boasted to many individuals that he "had Judge O'Malley in his pocket." *See*

Exhibit H attached hereto and incorporated herein. None of the foregoing relationships was ever disclosed by Judge O'Malley to the Petitioner.

Mr. Dottore also appears as an unindicted co-conspirator in several court filings in addition to the "Gabor Judicial Corruption" matter. Mr. Dottore is also named as an unindicted co-conspirator with J. Kevin Kelley ("Kelley") and Tony Calabrese ("Calabrese") in the Calabrese indictment under "Alternatives Agency Property Tax Scheme." Judge O'Malley presided over the proceedings involving the filing of Kelley's information and related proceedings. Kelley and Calabrese were key participants in all of the schemes involving Alternatives Agency, Inc. ("AAI") which was a major component of the Petitioner's case and trial. It is beyond any reasonable doubt that Judge O'Malley had a close relationship with Mr. Dottore.

       b)    <u>Judge O'Malley and Vorys, Sater, Seymour and Pease LLP.</u>

Judge O'Malley also enjoyed a very close relationship with the law firm of Vorys, Sater, Seymour and Pease LLP (the "Vorys Firm") and the managing partner of the Cleveland Office, namely her then-husband, Anthony J. O'Malley. Interestingly, Calabrese was also a partner with the Vorys Firm. *See* Calabrese Indictment. Further, Judge O'Malley employed a law clerk named Scott Lonardo. Scott Lonardo is the son of Joseph D. Lonardo, who is the managing partner of the Washington, D.C. office of the Vorys Firm, which is yet another tie. *See* Exhibit G attached hereto and incorporated herein. Notably, Joseph D. Lonardo and Anthony J. O'Malley were also listed on subpoenas in the Investigation and gave grand jury testimony and interviews related to the Investigation. <u>Id</u>. The Vorys Firm, Anthony J. O'Malley and Calabrese were mentioned in thousands of documents throughout the discovery process, intercepted on Title III intercepts and involved in many aspects of the Investigation. Calabrese later pled guilty to many

charges. The Vorys Firm also had a number of clients and business relationships that were implicated in the Investigation. *See* Calabrese Indictment. Further, James C. Dimora's ("Dimora") son was an employee at the Cleveland Office of the Vorys Firm. *See* Exhibit G attached hereto and incorporated herein. In fact, Dimora's son, Anthony, worked for several years in the Cleveland Office of the Vorys Firm directly with Anthony J. O'Malley and Calabrese. <u>Id</u>. The Vorys Firm and Calabrese were mentioned and involved in the Petitioner's case. Specifically, the Vorys Firm and Calabrese were central figures in the matters surrounding AAI, the Vegas trip, the Delmonico's dinner and other events implicating the Vorys Firm and Calabrese. *See* Petitioner's Indictment.

The Vorys Firm and Calabrese were referenced in a multitude of instances involving misconduct as early as June 2009 when the Kelley information was filed. *See* Kelley Information. Judge O'Malley presided over that case at that time and for years thereafter. *See* Kelley Docket. Judge O'Malley never disclosed any relationship with the Vorys Firm or its attorneys. In fact, Judge O'Malley was precluded from hearing any cases where the Vorys Firm represented a party. *See* Exhibit I attached hereto and incorporated herein. It is common sense to assume that if Judge O'Malley had a conflict of interest presiding over any case where the Vorys Firm represented a party, it stands to reason that Judge O'Malley should have disqualified herself in any matter where the Vorys Firm or any of its attorneys are implicated as unindicted co-conspirators, witnesses and/or defendants. The conflict is even more concrete in these circumstances. None of these conflicts of interest was disclosed to the Petitioner by Judge O'Malley. This is not a close call: Judge O'Malley should not have been involved with any filings involving Mr. Dottore, the Vorys Firm, its clients or its attorneys.

Judge O'Malley had appointed Mr. Dottore to a myriad of receiverships and other fee-generating federal court assignments. Judge O'Malley not only enjoyed a close professional relationship with Mr. Dottore as her hand-picked receiver and Master Commissioner of choice, but she received significant things of value from Mr. Dottore while she was appointing him to lucrative receiverships. In fact, Mr. Dottore earned in excess of $3 million in fees in the Dadante receivership alone thanks to Judge O'Malley's appointments. *See* Exhibit J attached hereto and incorporated herein.

Additionally, based on Mr. Dottore's representations to several individuals, he had an inappropriate relationship with Judge O'Malley. *See* Exhibits F, G and H attached hereto and incorporated herein. In fact, Judge O'Malley continued to appoint Mr. Dottore to receiverships and approve his fee applications even though allegations of illegal conduct by Mr. Dottore permeated the Investigation and several public filings, informations and indictments.

3.     Other Relevant Judge O'Malley Relationships.

Judge O'Malley also had ties to other aspects of the Investigation. Her son, Jack O'Malley, worked for Tom Day at the Bedford Municipal Court. *See* Exhibit G attached hereto and incorporated herein. Both Tom Day and the Bedford Municipal Court were integral aspects of the "Gina Coopers scheme." *See* Petitioner's Indictment. Judge O'Malley did not disclose this conflict to anyone.

Additionally, Ken Schuman, brother of Brian Schuman, formerly Executive Director of AAI, told the Petitioner that he represented Judge O'Malley's son, Jack O'Malley, in the Bedford Municipal Court related to drug charges arising out of a traffic incident in Moreland Hills, Ohio. *See* Exhibit G attached hereto and incorporated herein. Judge O'Malley presided over significant proceedings involving Brian Schuman, including, but not limited to, his

information filing, his plea and other matters. As this Honorable Court is aware, Brian Schuman

testified at the trial of the Petitioner and was involved in many aspects of the Petitioner's

convictions. Judge O'Malley never disclosed these conflicts of interest.

C.     The Law Governing the Foregoing Facts.

It is beyond dispute that a litigant is entitled to basic due process which mandates a fair

tribunal. Our system has always endeavored to prevent even the probability of unfairness. In re:

Murchison, 349 U.S. 133, 136, 99 L. Ed. 942, 75 S. Ct. 623 (1955). This Circuit has held for

over a half century that:

> One of the fundamental rights of a litigant under our judicial system is
> that he is entitled to . . . a fair tribunal, and that fairness requires an absence
> of actual bias or prejudice . . . If this principle is violated, the judgment
> must be reversed. Bias or prejudice on the part of the judge may exhibit
> itself prior to the trial.

Railey v. Webb, 540 F.3d 393 (6th Cir. 2007); Knapp v. Kinsey, 343. F.2d 458, 465-67 (6th Cir.),

cert. denied, 352 U.S. 892, 1 L. Ed. 2d 86, 775, S. Ct. 131 (1956). In this matter, Judge

O'Malley's bias or prejudice clearly exhibited "itself prior to the trial." In Marshall v. Jerrico,

Inc., 446 U.S. 238, 64 L. Ed. 2d 182, 100 S. Ct. 1610 (1980), the Supreme Court recognized that

the "requirement of neutrality in adjudicative proceedings" serves the dual interests of equal

importance as "it preserves both the appearance and reality of fairness." Id. at 252. Justice must

satisfy the appearance of justice. Murchinson, 349 U.S. at 136.

All of the detailed instances of Judge O'Malley's judicial bias, at best, and judicial

misconduct, at worst, conflict with her judicial obligation to be free of actual or perceived

impartiality. See Johnson v. Carroll, 369 F.3d 253, 262 (3rd Cir. 2004). The Petitioner does not

have to show actual bias although such a showing is clear in this case. The Petitioner must only

demonstrate that Judge O'Malley's impartiality could reasonably be questioned. See Reed v. Rhodes, 177 F.3d 453 (6th Cir. 1999).

One of the seminal cases involving Section 455(a) is Liljeberg v. Health Svcs. Acq. Corp., 486 U.S. 847 (1988). In Liljeberg, the Supreme Court reasoned that judges must avoid even the appearance of impropriety. Id. Liljeberg continues that if it "would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation, then an appearance of partiality is created." Id. Judge O'Malley absolutely had knowledge of facts giving her an impermissible interest in the Petitioner's matter. The Section 455 cases, like Liljeberg, provide context for the type of conduct that is impermissible from a due process standpoint. However, the Petitioner agrees that Liljeberg interprets Section 455 not the Due Process Clause. Any person, not just a "reasonable person" would determine that Judge O'Malley should not have been involved in the Petitioner's case, any related cases or any case involving the Investigation. Judge O'Malley's actions were untenable because of the probability of actual bias on her part was too high to be constitutionally tolerable. See Withrow v. Larkin, 421 U.S. 35, 47, 95 S. Ct. 1456, 54 L. Ed. 2d 712 (1975).

All of the foregoing facts of Judge O'Malley's interest in this matter, the related cases and the Investigation are also particularly problematic in light of her own words in the Shell opinion. The trial judge in Shell did not disclose any conflicts, like the instant matter. The trial judge handled multiple permutations of the same fact pattern by severing certain parties from the case, similar to all of the related cases in this matter. Judge O'Malley in Shell held that rulings in one matter could affect the other matter, like the situation of the related cases in this matter. In Shell, Judge O'Malley also held that the trial judge's failure to recuse created a risk of undermining public confidence in the judicial process. In the instant matter, such a finding is

even more compelling due to the fact that this is a serious criminal matter where the stakes are very high and the ultra-high profile nature of this matter has broad impact. Judge O'Malley's own words in Shell provide guidance.

It is common sense why Judge O'Malley should not have been involved. Was she protecting the Dottores? Did she stay involved to assist the government's cooperators to curry favor with the government? Did her rulings sway the direction of the Investigation? Would she rule for the government to avoid a potential investigation of her conduct with the Dottores? Did she rule for the government because she wanted to protect her ex-husband, Anthony J. O'Malley, and the Vorys Firm or their clients? Did she want to stay involved in all of the proceedings for as long as possible to control and influence the outcome? Did her adverse rulings in the Petitioner's case and the related cases create adverse "law of the case" holdings? One can speculate *ad infinitum* but the case law is clear that a motive is not required. Due process demands that a judge be unbiased. Murchinson, 349 U.S. at 136. Furthermore, a judge can and should be removed for "bias, a likelihood of bias, or [even] an appearance of bias." See Ungar v. Sarafite, 376 U.S. 575, 588, 84 S. Ct. 841, 11 L. Ed. 2d 921 (1964); Railey v. Webb, 540 F.3d 393 (6th Cir. 2007); Anderson v. Sheppard, 856 F.2d 741, 746 (6th Cir. 1988). Judge O'Malley's conduct implicates all of the above reasons for reversal.

Courts have held that there must be a "realistic appraisal of psychological tendencies and human weakness" in analyzing whether there is a risk of bias which would violate a litigant's due process rights. Murchinson, 349 U.S. at 149. Circumstances and relationships must be considered. Id. The circumstances and relationships attendant with Judge O'Malley's extensive conduct, concealment, non-disclosure and actions all demand reversal as there is clear structural error. Judge O'Malley's rulings, actions and presence permeate innumerable proceedings.

Due process requires recusal where the judge has a direct, personal and substantial pecuniary interest. Turney v. Ohio, 273 U.S. 510, 532, 47 S. Ct. 437, 71 L. Ed. 749 (1929); Carey v. Wolnitzek, 614 F.3d 189 (6th Cir. 2010); United States v. Prince, 618 F.3d 551 (6th Cir. 2010). As already enumerated and described, Judge O'Malley had many different direct, personal and pecuniary interests in the proceedings over which she presided.

The instant facts involve a perfect storm of rare incidents that are highly unlikely to repeat themselves. The Supreme Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his or her position is likely to be neutral, or whether there is an unconstitutional potential for bias. Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 129 S. Ct. 2252, 2262, 173 L. Ed. 2d 1208 (2009). A litigant need not prove actual bias to make out a due process violation. Johnson v. Mississippi, 403 U.S. 212, 215, 91 S. Ct. 1778, 29 L. Ed. 2d 423 (1971); Aetna Life Ins. Co. v. Lavoie, 375 U.S. 813, 825, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986). A disqualifying prejudice or bias must ordinarily be personal or extrajudicial. Latham v. United States, 106 Fed. Appx. 395 (6th Cir. 2004); United States v. Dandy, 998 F.2d 1344 (6th Cir. 1993); United States v. Sammons, 918 F.2d 592, 598 (6th Cir. 1990); Wheeler v. Southland Corp., 875 F.2d 1246, 1250 (6th Cir. 1989). Moreover, the Sixth Circuit has consistently held that a judge need not recuse herself on the basis of prior contact with a party or a witness, as long as the judge does not have a familial, financial, or similarly close relationship with the party or witness and as long as the judge has not received out-of-court information about the case at hand. See, e.g., United States v. Dandy, 998 F.2d 1344, 1349-50 (6th Cir. 1993);

United States v. Sammons, 918 F.2d 592, 598-99 (6th Cir. 1990).[1]  There is clear evidence that Judge O'Malley had many extrajudicial ties to this matter with parties and witnesses -- i.e. Mr. Dottore, her ex-husband, Calabrese, the Vorys Firm, the Vorys Firm's clients, her son's former employer, her law clerk and others.  Further, her then-husband had many clients involved in the Investigation: AAI, Parma City School District, Cuyahoga County, Doan Pyramid Electric, the Carpenter's Union Pension Fund, Michael Baker, Woolpert, the City of Lorain and several others.  It should be noted that Judge O'Malley and Anthony J. O'Malley were married during most of the Investigation.

Being that Judge O'Malley and Anthony J. O'Malley were not divorced until shortly before the raids in the Investigation and being that they had a financial relationship post-divorce involving their two children, it is clear that Judge O'Malley had a financial interest in the Vorys Firm, its attorneys and its clients.  These clients were paying the Vorys Firm millions of dollars of legal fees from 1998 through the Investigation and even after the indictment of the Petitioner. In light of the Northern District of Ohio order prohibiting Judge O'Malley from hearing cases involving her ex-husband's law firm, existing case law regarding the Due Process Clause, the federal recusal statute and the appearance of impropriety, Judge O'Malley should not have been involved in the Petitioner's case or any of the other related cases.  The bottom line is that Judge O'Malley had a multi-faceted, personal interest in the Investigation, this matter and many of the related matters.

---

[1] There were other federal judges who presided over cases arising out of the Investigation.  Some of these other judges had ties to the Investigation.  For example, Judge Boyko sold his home to Kelley and did business with Mr. Dottore.  *See* Exhibit G attached hereto and incorporated herein.  Judge Gwin had a tie to the Investigation which resulted in his no longer presiding over the Forlani case.  Judge Nugent was intercepted on Title III intercepts and interviewed by the FBI.  The Petitioner understands that there are instances where federal judges may have a connection to a case before them, like the foregoing instances.  However, the foregoing instances are vastly different than the types and number of connections that Judge O'Malley has to this matter, the related cases and the Investigation.

This Circuit has expressly held that, "when there is a credible allegation of extraneous influences, the court must investigate sufficiently to assure itself that the constitutional rights of the criminal defendant have not been violated. United States v. Rigsby, 45 F.3d 120, 124-25 (6th Cir. 1995); United States v. Herndon, 156 F.3d 629, 635 (6th Cir. 1998); United States v. Shackelford, 777 F.2d 1141, 1145 (6th Cir. 1985).

An average judge in Judge O'Malley's position might be tempted to demonstrate a lack of bias by overcompensating and ruling in a manner to avoid any suggestion that she harbored ill will against the Federal Bureau of Investigation (the "FBI") or the United States Attorneys Office for their having conducted the Investigation which probed Mr. Dottore, her ex-husband, his law firm, his partners, his clients and others. An average judge, again looking to Caperton and its progency, might be tempted to avoid rulings unfavorable to the FBI or the United States Attorneys Office in order to appease the government and avoid any further investigation. Again, actual bias need not be shown but the risk of bias on the part of Judge O'Malley in this case was too high to allow confidence that the Petitioner and others were adjudicated fairly and consistent with the Due Process Clause of the United States Constitution. When a defendant's rights to have his case before an impartial judge are compromised, there is structural error that requires automatic reversal. United States v. Mack, 792 F.3d 594 (6th Cir. 2008); Greenway v. Schriro, 653 F.3d 790, 805 (9th Cir. 2011) (citing Turney, 273 U.S. at 535 and Chapman v. California, 386 U.S. 18, 23, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). This matter involved absolute structural error.

## III.   GROUND TWO – THE PROSECUTOR'S ENGAGED IN MISCONDUCT.

Not only was the Petitioner subjected to judicial bias and judicial misconduct as described herein but the prosecutors also engaged in a variety of prejudicial conduct.

A.    The Lead Prosecutor has Undisclosed Conflicts.

It has come to the Petitioner's attention that the lead counsel for the government, Antoinette T. Bacon (formerly Antoinette Thomas) ("Ms. Bacon") had an undisclosed conflict. Upon information and belief, Ms. Bacon's mother and father ("Mr. and Mrs. Thomas" or the "Thomases") provide accounting-related services and legal services. *See* Exhibits G and K attached hereto and incorporated herein. Further, it has been brought to the Petitioner's attention that Ms. Bacon's parents' accounting firm provided accounting services to Frank Russo, Vince Russo (collectively, "the Russos") and several vendors of AAI. Id. These relationships were never disclosed to the Petitioner.

As this Honorable Court is well aware, Frank Russo and Vince Russo were significant cooperating witnesses for the government. Apparently, the Russos were in contact with Mr. and Mrs. Thomas for several years regarding their tax matters, their financial and bank information, permissible tax deductions and sources of income. The Petitioner is not aware of the full extent of these relationships. The Petitioner does not know if the Thomases advised the Russos about what income to disclose to the Internal Revenue Service (the "IRS") or other taxing agencies. The Petitioner also has no information if the Thomases were interviewed by the FBI or the IRS, received subpoenas or were otherwise involved in the Investigation. The Petitioner is aware that Ms. Bacon interviewed the Russos about their business practices. The potential for abuse, the lack of disclosure and other unintended consequences of these relationships create an appearance of impropriety, at a minimum. The Petitioner is not alleging any misconduct by the Thomases despite their failure to disclose the conflicts to their clients.

It is beyond dispute from the Russos' proffer sessions, testimony and plea agreements that their finances were inextricably tied together through disguised loans, home purchases and

business dealings with Jerry Skuhrovec, Joseph P. O'Malley and others tied to the Investigation. In fact, the charges against Vince Russo alleged that Frank Russo had an illicit and undisclosed interest in Vince Russo's business, VinCore, LLC ("VinCore"). *See* Vince Russo Indictment. Being that the Russos' financial transactions and holdings were the subject of the Investigation and Ms. Bacon's parents, the Thomases, were advisors to the Russos and VinCore, a clear conflict existed and none of this was ever disclosed to the Petitioner in violation of Brady v. Maryland, 373 U.S. 83 (1963). At a minimum, this relationship and the concealment of it raise more questions than answers.

In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court imposed upon the prosecutorial arm of the government the "obligation to turn over material that is both favorable to the defendant and material to guilt or punishment." United States v. Bencs, 28 F.3d 555, 560 (6th Cir. 1994). "Moreover, it is well-settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness." Schledwitz v. United States, 169 F.3d 1003, 1011 (6th Cir. 1999) (citing Giglio v. United States, 405 U.S. 150, 154-55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)). By the government concealing these relationships, the Petitioner was not afforded the opportunity to use this information in his defense. Obviously, this information would be helpful on cross-examination and for impeachment purposes.[2]

Upon information and belief, Ms. Bacon's parents also provided accounting services to several vendors and individuals associated with AAI. *See* Exhibits G and K attached hereto and incorporated herein. MRG Group, Inc. ("MRG Group"), Food Service, Inc. ("Food Service") and Michael Guarino ("Mr. Guarino") all provided significant services to AAI. Id. Specifically, Food Service was paid millions of dollars by AAI to provide food service to AAI. Food Service,

---

[2] The Petitioner also asserts that, at a minimum, the Assistant US Attorneys with any conflict in the Investigation would not have been involved in the Investigation had their superiors been aware of these conflicts.

Mr. Guarino and MRG Group were all subpoenaed as part of the Investigation. Id. One of the primary focuses of the investigation of these entities involved their respective tax records and financial information. Id. Mr. Guarino advised that the Thomases provided accounting services to him and his companies for years and they always advised him that "he had no issues with the IRS." Id. He met with the Thomases at AAI and at their offices in North Royalton on many occasions. Id. The investigation of Mr. Guarino was even described in The Plain Dealer. *See* Exhibit L attached hereto and incorporated herein.

Like the relationship with the Russos, this relationship was never disclosed to the Petitioner by the government. The Petitioner has no knowledge of any other relationships that Ms. Bacon's parents have with other defendants or individuals involved in the Investigation. Like the relationship with the Russos, the lack of disclosure is a violation of Brady and also creates a major appearance of impropriety. The Petitioner was never given an opportunity to interview the Thomases or discern how their role in the Investigation impacted the Petitioner.

Ms. Bacon's actions exhibit conduct consistent with prosecutorial vindictiveness. In the Sixth Circuit, a *prima facie* case of vindictive prosecution requires allegations of fact showing: (1) exercise of protected right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's conduct; and (4) the intent to punish the defendant for exercise of the protected right." United States v. Suarez, 263, F.3d 468, 479 (6th Cir. 2001). Ms. Bacon's actions meet all of the requirements. The Petitioner exercised his protected right to a jury trial. Ms. Bacon held a personal stake in this matter as her parents were professionally involved with Frank Russo, Vince Russo, Mike Guarino, VinCore, MRG Group, Food Service and possibly others. Ms. Bacon's conduct was unreasonable and she should have disclosed all of the relationships. "Presumably, if the first three elements are present, this may help establish

grounds to believe the fourth is present, that there is a required 'realistic likelihood of vindictiveness,' which the government would have to rebut." Id.

B.    Another Member of the Prosecution Team had a Conflict of Interest.

Based on information and belief, yet another government attorney had a conflict of interest and violated Brady. The facts are as follows:

- Ann Rowland ("Ms. Rowland") was a member of the prosecution team prosecuting the Petitioner. *See* Petitioner's Docket.

- Ms. Rowland is married to Gordon Kinder. *See* Exhibit G attached hereto and incorporated herein.

- Gordon Kinder was an attorney at Ulmer & Berne LLP ("Ulmer") during the Investigation. Id.

- For many years, Ulmer paid significant sums of money to Vince Russo during the Investigation for certain ambiguous services. Id. *See* Exhibit M attached hereto and incorporated herein.

- For many years, Vince Russo provided services to the Carpenter's Union at the behest and direction of Robert Peto ("Mr. Peto"). Id. *See* Exhibit G attached hereto and incorporated herein.

- Mr. Peto employed Ulmer as counsel for the Carpenter's Union. Id.

- Mr. Peto's wife worked for Frank Russo. Id.

- Mr. Peto's wife worked in the same County Department as the Petitioner. Id.

- The Investigation included inquiries of Russo, Peto and others as to whether there was an exchange of favors between Russo and Peto: namely, Peto's wife had her job and salary in exchange for Peto hiring Russo's son's consulting firm, VinCore. Id.

- Upon information and belief, Ulmer paid Vince Russo money on a regular basis so his involvement with the Carpenter's Union was concealed from the public and law enforcement. Vince Russo's real client was the Carpenter's Union, not Ulmer. This was a sham transaction.

The government never disclosed any of the foregoing information to the Petitioner. It is very troubling that Ms. Rowland's husband, Gordon Kinder, was a principal in a law firm which

was working closely with two prominent defendants in the Investigation, namely Vince Russo and Robert Peto. Upon information and belief, the government questioned many individuals in this Investigation about whether Frank Russo employed Mary Peto in exchange for Mr. Peto's hiring Vince Russo. It was never disclosed or even hinted that Ulmer was involved in the financial component of these transactions. Id.

The foregoing arrangement was never disclosed to the Petitioner in violation of Brady and creates a significant appearance of impropriety coupled with the fact that neither Ulmer nor any of its attorneys were investigated (as far as the Petitioner knows) far less indicted. Further, the same discussion of prosecutorial vindictiveness applies to Ms. Rowland for the same reasons as it would apply to Ms. Bacon, as discussed in detail earlier. Again, one can only speculate as to the motives behind why the United States Attorneys Office concealed these relationships and facts from the Petitioner.

      C.     The Government Intruded into the Petitioner's Attorney-Client Relationship.

The Petitioner was being investigated for several years before he was initially indicted. *See* Petitioner's Indictment. The Petitioner had engaged counsel, namely Dominic Vitantonio, to represent him during the Investigation and his ultimate indictment. *See* Exhibit N attached hereto and incorporated herein. In fact, Mr. Vitantonio represented the Petitioner at some of the initial proceedings in this matter. Id. Mr. Vitantonio is very experienced in white collar defense and public corruption cases. The Petitioner worked with Mr. Vitantonio for several years before the government indicted the Petitioner. Id. The Petitioner and Mr. Vitantonio discussed many aspects of the Investigation. However, based on conversations that Mr. Vitantonio had with Ms. Rowland, Mr. Vitantonio withdrew as the Petitioner's attorney. *See* Exhibit N attached

hereto and incorporated herein. Neither Mr. Vitantonio nor the Petitioner wanted this withdrawal to occur.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a defendant in a criminal case the right to the assistance of counsel in his or her defense. Faretta v. California, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." United States v. Gonzalez-Lopez, 548 U.S. 140, 144, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006). In other words, "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624-625, 109 S. Ct. 2646, 109 S. Ct. 2667, 105 L. Ed. 2d 528 (1989). The Petitioner had chosen Mr. Vitantonio to be his counsel.

"A choice-of-counsel violation occurs whenever the defendant's choice is wrongfully denied." Gonzales-Lopez, 548 U.S. at 150 (emphasis in original). Consequently, the wrongful deprivation of choice of counsel is structural error, immune from review for harmlessness, because it pervades the entire trial." Kaley v. United States, 134 S. Ct. 1090, 1102, 188 L. Ed. 2d 46 (2014) (quotation marks omitted). The petitioner "need not show prejudice or demonstrate that the counsel he received was ineffective." Abby v. Howe, 742 F.3d 221, 227 (6th Cir. 2014).

A defendant has a Sixth Amendment right to counsel. The government may not intrude or interfere in an attorney-client relationship. Weatherford v. Bursey, 429 U.S. 545 (1977); Shillinger v. Haworth, 70 F.3d 1132 (10th Cir. 1995); Sanborn v. Parker, 2005 U.S. Dist. LEXIS 44697 (W.D. Ky. 2005). The actions taken by Ms. Rowland caused Mr. Vitantonio to withdraw. Based on the context of the December 30, 2009 letter from Mr. Vitantonio to the Petitioner,

Mr. Vitantonio felt compelled to withdraw. The general basis for Mr. Vitantonio's withdrawal

was that Ms. Rowland demanded it because one of Mr. Vitantonio's colleagues, George J. Argie,

was involved in the Investigation. Notably, George J. Argie was never charged. This

withdrawal stripped the Petitioner of the constitutional right to hire an attorney of his choosing

and rendered the several years of prior legal work useless.

Another byproduct of Ms. Rowland's actions was the appointment of Mr. Christman as

counsel for the Petitioner. Judge O'Malley appointed Mr. Christman as Petitioner's counsel on

November 8, 2010. *See* Petitioner's Docket. While the Petitioner had never met Mr. Christman

before his appointment as his counsel, he has since learned the following facts: that Mr. Christman

had never been involved in a matter as complex as this matter; Mr. Christman had never had a public

corruption RICO trial; Mr. Christman had never had a public corruption trial; Mr. Christman mostly

represented defendants in drug cases and DUIs in state and federal court; and Mr. Christman had

little to no experience relevant to the Petitioner's case. Judge O'Malley was obviously aware of

Mr. Christman's lack of qualifications when she appointed him. Unfortunately, the Petitioner was

deprived of Mr. Vitantonio's expertise and experience by the actions of Ms. Rowland. Further, as

Mr. Vitantonio's letter states, the Petitioner had no ability to resolve his legal issues pre-trial if he

continued to work with Mr. Vitantonio.

Ms. Rowland's actions intruded on the Petitioner's attorney-client relationship. Further,

Ms. Rowland was not consistent in this type of behavior. Ms. Rowland allowed other attorneys

with clear conflicts to continue to represent their clients. For example, Ms. Rowland did not

prohibit attorney James Kersey ("Mr. Kersey") from representing Russ Masetta ("Mr. Masetta")

of Nature Stone. Mr. Kersey was a member of the Board of Trustees of AAI. However,

Mr. Kersey was permitted to represent Mr. Masetta during proffer sessions and other contacts

during the Investigation. Simultaneously with the Investigation, Mr. Kersey was a member of the Board of Trustees of AAI. Mr. Kersey also had contact with law enforcement as a witness in regard to AAI and as counsel in regard to Mr. Masetta and Nature Stone. *See* Exhibit G attached hereto and incorporated herein. Other examples of this type of picking and choosing of counsel for defendants existed and permeated the Investigation.

The Supreme Court has held that an investigation by the government into the attorney-client relationship and a showing of prejudice violate a defendant's right to effective assistance of counsel. Weatherford v. Bursey, 429 U.S. 545, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977); United States v. Steele, 727 F.2d 580, 586 (6th Cir. 1984). When Ms. Rowland intruded into the Petitioner's attorney-client relationship subsequent prejudice ensued: namely, the Petitioner's deprivation of working with counsel of his choice, the Petitioner's deprivation of resolving his legal issues pre-trial, and the appointment of inexperienced counsel to replace Mr. Vitantonio.

D.     The Prosecution Acted in Bad Faith and Vindictively.

It is understood that the general attitude of the courts is that the prosecutor is afforded broad discretion in its decision to prosecute as the courts are ill-suited to review such decisions. In general, the courts are ill-equipped to evaluate the strength of the case, the prosecution's general deterrence value, the government's enforcement priorities, and the case's relationship to the government's overall enforcement plan. Wayte v. United States, 470 U.S. 598, 607 (1985); United States v. Doe, 226 F.3d 672, 678 (6th Cir. 2000). Although broad, prosecutorial discretion is not unlimited. Courts may protect individuals from prosecutorial discretions that are based on unconstitutional motives or executed on bad faith. Wayte v. United States, 470 U.S. at 607-610.

1.    Bad Faith.

There is clearly a threshold a defendant must establish for a claim of bad faith.  This

threshold consists of a standard greater than merely alleging an unconstitutional motive by the

government for its actions.  For instance, in United States v. Blue, 557 F.3d 682, 686 (6th Cir.

2009), the defendant argued that the government acted in bad faith by failing to request a 5K.1

departure after the defendant had cooperated with the government in its investigation of the case.

The defendant argued that the government was punishing her for exercising her constitutional

right to have a jury trial for some of the remaining counts of the case.  Id.  The government

agreed and signed an agreement allowing her to try the disputed counts.  Id.  After the trial, the

government refused to move for a 5K.1 departure.  Id.

The Sixth Circuit held that the government's decision not to move for downward

departure should not be questioned unless the defendant can make a "substantial threshold

showing of an unconstitutional motive."  Id.; Wade v. United States, 504 U.S. 181, 185 (1992).

The court did not define "substantial motive" but it clearly was not present in the case of Blue as

defense counsel at sentencing only asserted that the defendant deserved a sentence less than the

guidelines calculation indicated and that the government's failure to move was unconstitutional.

The court specifically noted that it was "regrettable" that Blue's attorney addressed the issue in a

pre-Booker manner.  Id. at 684.  In other words, the argument was not presented fully as a bad

faith claim.

The bad faith argument was properly raised in United States v. Roe, 445 F.3d 202, 210

(2nd Cir. 2006).  In Roe, the court determined that the prosecutor's decision to move for a

downward departure subject to review in hearing when defendant presents "at least some

evidence" that the government acted in bad faith. Bad faith is interpreted as refusing to act or acting due to an unconstitutional motive. Id.

In Roe, the plea agreement left it to the government to determine whether the defendant fulfilled his cooperation agreement. Id. However, it was noted that the government could not rely on facts known to it at the time of entering into the agreement upon which to base any determination of non-cooperation. Id. If this were allowed, the government would be able to enter into an agreement that it knew at the time it would not honor. Id. at 208, citing United States v. Knights, 968 F.2d 1483 (2nd Cir. 1992).

The Roe court concluded that such disputes could be resolved in an evidentiary hearing. It adopted the following tests from Knights:

> When a defendant claims that the government has acted in bad faith . . ., the government may rebut this allegation by explaining its reasons . . . The defendant must then make a showing of bad faith to trigger some form of hearing on that issue.

Knights, 968 F.2d at 1487 (quoting United States v. Khan, 920 F.2d 1100, 1106 (2nd Cir. 1990)). The Roe court ultimately determined that because the defendant need not establish the government's bad faith in order to secure an evidentiary hearing, he must only "make a showing of bad faith." Id. at 210.

The bad faith claim will be waived unless specifically raised as a "bad faith" claim. In United States v. Snow, 234 F.3d 187, 190-91 (4th Cir. 2000), the Fourth Circuit found no bad faith on behalf of the government where the defendant did not specifically claim it, but only claimed that the government's conduct constituted "unfairness." Snow entered into a plea agreement with the government. Id. At the time of the plea, the government had noted reservations about Snow's credulity. Id. Snow objected to the government's failure to move for

a 5K.1 departure. Id. The circuit court found what Snow was really objecting to was that the contract itself was invalid as the government, arguably, had no intention of honoring the terms. Id. This fact pattern may have met the bad faith standard as a basis to revoke the guilty plea. However, this was not the issue raised on appeal. Id.

In this matter, the Petitioner asserts that the government's conduct described at length herein was in bad faith.

2.    Vindictive Prosecution.

It is clear that vindictive prosecution is a violation of the United States Constitution. What is not so clear is what conduct of the government may be properly classified as vindictive prosecution. The Supreme Court has held that one example of a defendant's due process rights being violated is when a defendant is prosecuted for a more serious charge in a new trial after successful appeal on conviction. Blakeledge v. Perry, 417 U.S. 21, 28-89 (1974). To punish a person for exercising a constitutional right is a "due process violation of the most basic sort." United States v. Goodwin, 457 U.S. 368, 372 (1982). The Second Circuit had found that due process is violated when the prosecution is motivated by "genuine animus." United States v. Sanders, 211 F.3d 711, 721 (2nd Cir. 2000).

In United States v. Cyprian, 23 F.3d 1189, 1196 (7th Cir. 1994), the Seventh Circuit held, as do most, if not all of the circuits, that due process is violated when a defendant is retaliated upon for exercising a protected statutory or constitutional rights. Although this general holding seems fair enough, rarely do the courts find a constitutional right that has been violated. See United States v. Jenkins, 504 F.3d 694, 699-702 (9th Cir. 2007) (due process violated where government decided to press additional charges only after the defendant asserted reasonably credible defense to marijuana import charges).

Prosecutors should remain free to exercise the appropriate discretion to determine the public interest in pursuing prosecution. Goodwin, 457 U.S. at 382. "Due process does not in any sense forbid enhanced sentences or charges, but only enhancement motivated by actual vindictiveness toward the defendant for having exercised a guaranteed right." Wasman v. United States, 468 U.S. 559, 568 (1984). The Sixth Circuit, in accord, has stated that the vindictive prosecution doctrine has been established to estop the government from retaliating against defendants with more severe consequences for exercising statutory or constitutional rights. See United States v. Suarez, 263 F.3d 468, 482 (6th Cir. 2001); see also United States v. Andrews, 633 F.2d 449, 455 (6th Cir. 1980).

Vindictive prosecution can be shown either through "actual vindictiveness or a realistic likelihood of vindictiveness." United States v. Dupree, 323 F.3d 480, 489 (6th Cir. 2003). Dupree holds that actual vindictiveness can be shown by "objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal right." Id. at 489. Dupree acknowledges that a showing of a prosecutor's private motive would be "exceedingly difficult" to make. Id. In the absence of direct evidence of vindictive *animus* a defendant can "demonstrate" a realistic likelihood of vindictiveness by showing:

(1) exercise of a protected right;

(2) a prosecutorial stake in the exercise of that right;

(3) unreasonableness of the prosecutor's conduct; and

(4) the intent to punish the defendant for the exercise of a protected right.

Suarez, 263 F.3d at 479 (citing Nat'l Eng'g & Contracting C. v. Herman, 181 F.3d 715, 722 (6th Cir. 1999)). Suarez holds that if the first three elements can be shown, it gives rise to a

presumption that the fourth element is also present and a realistic likelihood of vindictiveness exists. Id. at 479.

In Andrews, the Sixth Circuit has established narrow permissible explanations that the prosecution may offer to explain its challenged action. The discovery of new evidence not available at the time of the original indictment and "previous legal impossibility" are permissible as objective explanations for the substitution of a more severe charge or sentence imposed after a defendant has exercised a statutorily and constitutionally-protected right. See Andrews, 633 F.2d at 456. Neither of these factors is present in the instant case. The government kept superseding the Petitioner as he proceeded to trial.

Once a defendant demonstrates a reasonable likelihood of vindictiveness, the burden shifts to the prosecution to rebut. Bragen v. Poindexter, 249 F.3d 476, 482 (6th Cir. 2001). The government must present record evidence to justify its conduct. Id. "Only objective, on the record explanations can suffice to rebut a finding of realistic likelihood of vindictiveness." United States v. Andrews, 633 F.2d 449, 456 (6th Cir. 1980).

If the government is unable to rebut a defendant's showing of a reasonable likelihood of vindictiveness, the defendant is entitled to a dismissal of the challenged action. The vindictive prosecution doctrine "allows a court to bar charges in appropriate situations without the need to find that the prosecution acted in bad faith." Andrews, 633 F.2d at 456. The ordinary remedy for failure to rebut a claim is a dismissal of the challenged charge. Id.

The conduct described herein including, the conflicts of interest, the intrusion into the attorney-client relationship and the other examples described herein, is rare and should be viewed as vindictive. The conduct that the Petitioner has been subjected to must be unique and

should be analyzed by this Honorable Court under the doctrines of bad faith and vindictive prosecution.

      3.    <u>Plea Offers</u>.

The government tied its plea offers to impermissible actions. For example, the government offered the Petitioner a five year term of imprisonment. *See* Exhibit O attached hereto and incorporated herein. The plea offer was conditioned on cooperation which is clearly permissible. However, the government further conditioned the plea offer on the Petitioner's withdrawal of a motion to continue the trial. On an earlier plea offer, the government conditioned its plea offer on the Petitioner <u>not</u> requesting nor reviewing any discovery. *See* Exhibit P attached hereto and incorporated herein. The Petitioner has a clear constitutional right to file motions to continue his trial and request and review discovery. These constitutional rights are protected rights.

As stated earlier, <u>United States v. Suarez</u> sets forth the four elements of prosecutorial vindictiveness. The Petitioner's right to obtain and review discovery, seek a motion to continue and have a jury trial are all protected rights. Based on the prior discussion herein regarding certain members of the prosecution team, they each had a stake in the exercise of these rights by the Petitioner. It is unreasonable of the government to condition a plea offer on a defendant waiving his right to review discovery or continue his trial. The government's actions meet all four elements of prosecutorial vindictiveness. The Petitioner understands that the government has every right to reward those who cooperate by giving them more favorable plea agreements. However, to punish a defendant by superseding him because he exercises constitutionally protected rights is vindictive.

4.    Media.

Upon information and belief, the government repeatedly contacted the media regarding

the Investigation, the trial of the Petitioner and the related cases.  For example, the media was

present at Dimora's home at 5:00 a.m. on the morning of his arrest.  How would that be

logistically possible but for the government leaking such information to the media?  Then, the

media ran footage of Dimora in shackles for the next several years prejudicing the jury pool.

Further, persons close to representatives of law enforcement were posting items about the

Investigation on Facebook.  *See* Exhibit Q attached hereto and incorporated herein.  Such posts

further tainted the jury pool.  Such conduct was inappropriate.  Additionally, as this Honorable

Court is aware, there was a leak to the media regarding Judge Nugent's alleged ties to Russo and

Dimora, including, but not limited to, Judge Nugent's efforts to get employment for his girlfriend

in Russo's office.  The government represented to this Honorable Court that it was investigating

such leak.  The results of such investigation were never shared with the Petitioner.

5.    Prosecutorial Misconduct Generally.

Each of the foregoing examples of prosecutorial misconduct contained in this Motion

forms the basis for reversal.  Taken collectively, the bar is cleared even more easily.

Prosecutorial misconduct will form the basis for habeas relief only if the conduct was so

egregious as to render the trial fundamentally unfair based on the totality of the circumstances.

Donnelly v. DeChristoforo, 416 U.S. 637, 643-45, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974);

Caldwell v. Russell, 181 F.3d 731, 736 (6th Cir. 1999).  Prosecutorial misconduct is rare, but the

facts in this matter are equally rare.  This Honorable Court also has authority pursuant to the

exercise of its supervisory powers to reverse a defendant's conviction based on prosecutorial

misconduct. Padgett v. Sexton, 529 Fed. Appx. 590 (6th Cir. 2013); United States v. August, 984

F.2d 705, 714 (6th Cir. 1992); United States v. Krebs, 788 F.2d 1166, 1177 (6th Cir. 1986).[3]

    E.    The Government Violated *Brady* to the Extent it Had Knowledge of the Judicial Bias or Judicial Misconduct Described Herein.

To the extent the government had any knowledge of the issues surrounding Judge

O'Malley's bias and/or misconduct, it violated Brady by not disclosing such information to the

Petitioner. It would be fantastical to imagine that the government was unaware of all of Judge

O'Malley's intersections with the Investigation, this matter and the related matters. It is highly

likely that during the Investigation the government learned about the following facts:

- Judge O'Malley was close to Mr. Dottore.

- Judge O'Malley was married to Anthony J. O'Malley who is the managing partner of the Cleveland office of the Vorys Firm and a former partner of Calabrese.

- Judge O'Malley's son, Jack O'Malley, worked for the Bedford Municipal Court and Tom Day.

- Judge O'Malley appointed Mr. Dottore as a receiver and as the Master Commissioner in dozens of federal cases netting Mr. Dottore over $3 million in income.

- Judge O'Malley had a financial interest in the Investigation being that her then-husband represented the Parma City School District, Cuyahoga County, AAI, Doan Pyramid Electric, the Carpenter's Union Pension Fund, Woolpert, Michael Baker, the City of Lorain and many others.

- Judge O'Malley's law clerk was Scott Lonardo, son of Joseph D. Lonardo, the managing partner of the Washington, D.C. office of the Vorys Firm and an individual listed on subpoenas in the Investigation.

- Judge O'Malley's then-husband, Anthony J. O'Malley, employed Dimora's son at the Vorys Firm.

---

[3] Again, the Petitioner is not asserting that all extrajudicial contact by the United States Attorney's Office is impermissible. For example, AUSA Joseph Pinjuh was Dimora's neighbor, often at his house and intercepted with Title III intercepts in this matter having conversations with Dimora. The Petitioner is not asserting that such conduct is impermissible.

- Judge O'Malley's then-husband, Anthony J. O'Malley, employed Mr. Peto's daughter at the Vorys Firm.

- Judge O'Malley had a close relationship with Mr. Dottore, including free meals and free home improvements provided by Mr. Dottore to Judge O'Malley.

## IV.  GROUND THREE – THE PETITIONER'S COUNSEL PROVIDED REPEATED AND GRAVE INEFFECTIVE ASSISTANCE OF COUNSEL.

### A.  The Petitioner's Counsel Failed to Investigate Many Crucial Aspects of Mounting a Defense.

A federal prisoner may attack the validity of his sentence by filing a motion to vacate, set aside or correct the sentence under 28 U.S.C. §2255 in the district court where he was sentenced. Section 2255 sets forth four grounds upon which a federal prisoner may state a claim for relief: "[1] the sentence was imposed in violation of the Constitution or laws of the United States, or [2] that the court was without jurisdiction to impose such sentence, or [3] that the sentence was in excess of the maximum authorized by law, or [4] [the sentence] is otherwise subject to collateral attack[.]" 28 U.S.C. §2255(a).

In order to obtain relief under Section 2255, a petitioner must show an error of constitutional magnitude that had a substantial and injurious effect or influence on the proceedings. Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)). Therefore, a court may only grant relief under Section 2255 if the petitioner demonstrates "a fundamental defect which inherently results in a complete miscarriage of justice." Griffin, 330 F.3d at 736 (quoting United States v. Davis, 417 U.S. 333, 356, 94 S. Ct. 2298, 41 L. Ed. 109 (1974)). Further, the Supreme Court recognizes a petitioner's *pro se* status, and applies a lenient construction to his motions. See Harris v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972).

A court should hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief[.]" 28 U.S.C. §2255(b). Thus, "no hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999) (quoting Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995)). When (as here) the judge considering the Section 2255 motion also presided over the matter, the judge may also rely on his or her recollections of the proceedings. See Blanton v. United States, 94 F.3d 227, 235 (6th Cir. 1996).

The Sixth Circuit has explicitly recognized that a Section 2255 motion is the proper vehicle for raising an ineffective assistance of counsel claim and that it would not entertain such a claim in a direct appeal, thus the Petitioner has properly brought this claim before this Honorable Court. Singleton v. United States, No. 93-4253, 1994 WL 464245, at *1 (6th Cir. Aug. 26, 1994) (citing United States v. Carr, 5 F.3d 986, 993 (6th Cir. 1993)); see also Massaro v. United States, 538 U.S. 500, 504-05, 123 S. Ct. 1690, 155 L. Ed. 2d 714 (2003) (Supreme Court holding that a Section 2255 motion is preferable to a direct appeal for deciding an effective-assistance claim).

Claims of ineffective assistance of counsel are analyzed under the familiar Strickland standard. Under Strickland, in order to succeed on such a claim, a defendant must make two showings. First, he "must show that [his] counsel's performance was deficient." Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Second, that counsel's deficient performance prejudiced him. Id.

Under the first <u>Strickland</u> prong, deficient performance means that counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id</u>. at 687. At this stage of the analysis, the proper measure of attorney performance is an "objective standard of reasonableness," with reasonableness based on the particular case's facts, viewed as of the time of the attorney's conduct. <u>Id</u>. at 688, 690. Judicial scrutiny of counsel's performance, however, is "highly deferential." <u>Id</u>. at 689. Further, a court's focus is on the adequacy of "counsel's actual performance, not counsel's (hindsight) potential for improvement." <u>Coe v. Bell</u>, 161 F.3d 320, 342 (6th Cir. 1998) (citations omitted).

In considering the second <u>Strickland</u> prong, the Petitioner is required to show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Strickland</u>, 466 U.S. at 687. However, "[an] error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." <u>Id</u>. at 691 (citation omitted). The Petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id</u>. at 694.

1.      <u>Judicial Corruption</u>.

One of the charges against the Petitioner involved an allegation that the Petitioner bribed the judge presiding over his divorce proceeding with a Ten Thousand Dollar ($10,000.00) payment. As is more fully described in the Petitioner's indictment, the alleged scheme generally involved the Petitioner giving a Ten Thousand Dollar ($10,000.00) payment to Kelley so he could give the payment to Mr. Dottore so he could give the payment to Judge James P. Celebrezze ("Judge Celebrezze"), the presiding judge over the Petitioner's divorce proceeding.

Judge Celebrezze vehemently denied the allegations. In fact, through counsel, Judge Celebrezze stated that "[N]o one attempted to bribe [him]." *See* Exhibit R attached hereto and incorporated herein. Judge Celebrezze continued that "he didn't accept a bribe. It never took place." Id.

Armed with this information months before trial, the Petitioner's counsel never interviewed Judge Celebrezze or asked him to testify for the Petitioner. *See* Exhibit G attached hereto and incorporated herein. The testimony of a well-respected jurist, like Judge Celebrezze, that the alleged scheme never took place would have dealt a devastating blow to the Judicial Corruption charge. However, the Petitioner's counsel did nothing to investigate or pursue this extremely promising defense. Id.

"Where counsel fails to investigate and interview promising witnesses, and therefore 'ha[s] no reason to believe they would not be valuable in serving [defendant's] release,' counsel's inaction constitutes negligence, not trial strategy." Workman v. Tate, 957 F.2d 1339, 1345 (6th Cir. 1992) (quoting United States ex rel. Casey v. Wolff, 727 F.2d 656, 658 n. 3 (7th Cir. 1984)); See also Blackburn v. Foltz, 838 F.2d 1177, 1183 (6th Cir. 1987) ("Counsel did not make any attempt to investigate a known lead, nor did he even make a reasoned professional judgment that for some reason investigation was not necessary."). The Petitioner's counsel had no basis for failing to interview far less call Judge Celebrezze as a witness for the defense.

The Sixth Circuit has repeatedly held that defense counsel has a duty to investigate all witnesses who may have information concerning his client's guilt or innocence. Towns v. Smith, 395 F.3d 251, 258 (6th Cir. 2005). Of course, if the Petitioner's counsel's decision not to investigate the Judicial Corruption count was part of a calculated trial strategy, his actions might not constitute ineffectiveness assistance of counsel. See Hughes. v. United States, 258 F.3d 453,

457 (6th Cir. 2001). The record is devoid, however, of any evidence to suggest that not

interviewing witnesses nor investigating the Judicial Corruption charge could ever constitute a

reasonable trial strategy. There is no scenario that exists which would justify this level of gross

prejudicial negligence by the Petitioner's counsel. The Petitioner was prejudiced by this

ineffectiveness of his counsel.

      2.    The Allegations that the Petitioner did not Work.

      The main allegation increasing the Petitioner's length of imprisonment is the allegation

that he was essentially a "ghost employee." By the Petitioner's counsel acquiescing to the

presentation of uncontroverted testimony of three government cooperating witnesses that the

Petitioner did not properly perform his work allowed this Honorable Court to increase the

Petitioner's amount of loss by $118,242.89. *See* Petitioner's Sentencing at 59. That amount of

loss constituted over 55% of the total amount of loss. The record for the allegations that the

Petitioner did not work at his county job revolve around the testimony of Frank Russo, J. Kevin

Kelley and Steve Pumper basically stating that the Petitioner did not do his job as much as he

should have. See United States v. Dimora, et al., Nos.: 12-4004/4051 (6th Cir. 2014) at 14.

      The Petitioner's job duties consisted of traveling to gas stations, grocery stores,

convenience stores, retail stores and other commercial establishments and inspecting gas pumps,

weight and scales, price scanners and other similar equipment for accuracy. Skuhrovec depo. at

54; Russo testimony at 6369. The Petitioner was a certified inspector with the Weights and

Measures Department of Cuyahoga County. *See* Exhibit S attached hereto and incorporated

herein.

      It was crucial that the Petitioner's counsel present credible evidence to refute the

foregoing inculpatory statements of the government's cooperating witnesses. The Petitioner

provided the Petitioner's counsel with an arsenal of credible, unbiased evidence to refute the

contentions of the government's informants. The arsenal that was given to the Petitioner's

counsel included:

- The Petitioner's daily planner documenting every gas station, retail store and location involving his job duties with dates, addresses and times.

- Interview notes of the Petitioner's investigator, Robert E. Friedman ("Mr. Friedman"), relating to his interview with the Petitioner's immediate superior, William Westfall ("Mr. Westfall"). The notes are attached hereto and incorporated herein as Exhibit T. It should be noted that Mr. Friedman is a highly regarded former FBI agent. *See* Exhibit U attached hereto and incorporated herein. The contents of Mr. Friedman's interviews speak for themselves and directly refute the testimony of the cooperating witnesses.

- Interview notes of Jackie Gallagher, Kathleen Sweeney and Anthony Capretta who were all co-workers of the Petitioner. *See* Exhibit V attached hereto and incorporated herein. In fact, the former co-workers which the Petitioner could locate recently provided affidavits. *See* Exhibit W attached hereto and incorporated herein.

- Additional leads of co-workers of Cuyahoga County attesting to the Petitioner's work ethic which include: Robert Chisholm, Robert Hirsch, Robert Chudzik, Michael D'Amico, Thomas Dobeck, Darlene Palumbo, Jacklyn Cahill and Samuel Bonnano.

- Mr. Friedman's interview notes of the managers of dozens of locations that the Petitioner regularly visited and the results of those visits. *See* Exhibit X attached hereto and incorporated herein.

The foregoing exculpatory evidence was totally ignored by the Petitioner's counsel. The

foregoing evidence would have been compelling, especially juxtaposed with the government's

weak evidence on this point. The government presented three cooperating witnesses who made

generalized statements of the Petitioner's lack of work ethic, but who did not work with the

Petitioner.

Conversely, the foregoing exculpatory evidence is drawn from many individuals, co-

workers, the Petitioner's immediate supervisor and "customers" of the Cuyahoga County

Auditor's Office. Each of these individuals attested to the Petitioner's work ethic. Messrs. Russo, Pumper and Kelley never worked with the Petitioner. They had no direct knowledge. All of the witnesses offered by the Petitioner to his counsel had direct knowledge of the Petitioner's work ethic and were not convicted felons like the government's cooperating witnesses. However, the fact-finder was left only with the government's three cooperating witnesses, as the Petitioner's counsel failed to present any evidence, which was readily available, to refute the government's witnesses. There is no doubt that the Petitioner's counsel's insufficient performance affected the outcome of the case.

The introduction of extrinsic evidence, including, but not limited to, presenting witnesses is a tried and true method of forensic persuasion. Michelson v. United States, 335 U.S. 469, 476, 67 S. Ct. 213, 93 L. Ed. 168 (1948) (a defendant "may introduce affirmative testimony that . . . is so favorable that the jury may infer that he would not be likely to commit the offense charged."); United States v. Cylkouski, 556 F.2d 799, 802 (6th Cir. 1977). Given the unbiased testimony of the many witnesses available to the Petitioner's defense, any extrinsic evidence regarding the Petitioner's work ethic and habits would have been particularly compelling to the trier of fact.

Even if one could argue that the Petitioner's counsel should not have used this documentary and testimonial exculpatory evidence at trial, there is no reason that passes any laugh test as to why the Petitioner's counsel should have refrained from presenting this exculpatory evidence at the Petitioner's sentencing. The most important component of the Petitioner's sentencing centered around the loss calculation associated with how much the Petitioner worked. The Petitioner's counsel did nothing to dissuade this Honorable Court on this point.

The earlier discussion about the Petitioner's counsel's failure to investigate also applies to this issue. Being that the "ghost employee" allegations compromised such an overwhelming aspect of the amount of loss calculation, there is no doubt that the Petitioner's counsel should have vigorously refuted such allegations with all of the weapons in the arsenal available to him. The Petitioner was prejudiced by this blatant ineffectiveness of his counsel.

B.    Petitioner's Counsel Failed to Challenge the Hobbs Act Conspiracy Involving Green-Source.

In the Petitioner's indictment, the government alleges that the Petitioner conspired with Messrs. Pumper and Dimora to extract property for Dimora under color of official right. The Hobbs Act is "meant to prohibit public officials from obtaining property from others by extortion . . . [and that] sweeping [individuals] within its coverage through a conspiracy theory effectively transforms the Act into a prohibition on paying bribes to public officials." United States v. Brock, 501 F.3d 762 (6th Cir. 2007). The Brock court emphasized that the Hobbs Act requires the conspirator to extort property from another with his consent and such a requirement necessarily excludes the conspirators own property or their own consent. Id.

In the instant case, the co-conspirators are the Petitioner and Messrs. Pumper and Dimora. The conspiracy involved Dimora's consent to use Green-Source products at the county in exchange for Mr. Pumper's property being given to Dimora. It is a legal impossibility for the government to establish a Hobbs Act Conspiracy because of Brock. Specifically, the Hobbs Act requires the alleged conspirators to reach an agreement to obtain property from outside the conspiracy. Id. Mr. Pumper, as payor of the bribe, cannot conspire with Dimora to extort money from himself (the bribe payor) in violation of the Hobbs Act.

Petitioner's counsel did not raise this issue on direct appeal. The Petitioner's counsel's failure to raise this issue on appeal, in light of the existence of <u>Brock</u>, amounts to a deficient performance which significantly prejudiced the Petitioner.

      C.    <u>Petitioner's Counsel Failed to Properly Obtain Certain Credits Against Loss.</u>

Section 2B1.1 of the United States Sentencing Guidelines governs the determination of the sentence for "economic offenses," including fraud. Application Note 3(E) to Section 2B1.1 directs a sentencing judge to give "credit against loss" that reduces the loss calculation.

The Petitioner's counsel never argued that the amount of taxes paid by the Petitioner should be credited against the amount of loss. The Sixth Circuit has held that taxes paid by a defendant may be credited against the amount of loss due to Section 2B1.1. See <u>United States v. Coker,</u> 514 F.3d 562 (6th Cir. 2008). Other courts have "subtracted the amount withheld for taxes" from the loss amount. See <u>United States v. Nacchia,</u> 573 F.3d 1062 (10th Cir. 2009).

Pursuant to this Honorable Court, the amount of loss attributed to the Petitioner relating to the "Job Buy Scheme" equated to $118,242.89. *See* Petitioner's Sentencing at 59. As this Honorable Court is aware, that amount was determined by taking one-half of the gross amount paid to the Petitioner over his approximate five year tenure as a county employee. <u>Id</u>. However, Petitioner's counsel never argued at sentencing that the Petitioner is entitled to credits for only what he received. In other words, the Petitioner never received a total of $118,242.89 which was his gross pay. The Petitioner only received a net benefit because federal, state and local taxes were withheld by the county as he was a W-2 employee. In fact, this Honorable Court itself stated that "[A]ccording to comment 3 to Section 2C1.1, the value of the benefit received or to be received means the net value of such benefits." *See* Petitioner's Sentencing at 18:8-10. This Honorable Court continued by citing Sixth Circuit cases which stand for the proposition that the

amount of loss attributable to a defendant should only be "net profit figures" in a "bribery scheme." Id. at 18:11-15. Unfortunately, the Petitioner's counsel never seized on this opportunity to argue that any loss attributed to the Petitioner must be the net amount he actually received. Therefore, the Petitioner's counsel should have argued that the loss calculation only amounts to what the Petitioner actually received which would be solely the net amount to the Petitioner not the gross amount to the Petitioner. The county has the records as to what the exact amount of the net pay was that was received by the Petitioner. That said, even assuming that the Petitioner received 80% of the $118,242.89 gross pay as net pay that amount would be $94,594.31.

Such a reduction would lower the Petitioner's total offense level by two points below the $200,000.00 loss threshold. This Honorable Court has repeatedly held in this case and the related cases that the amount of loss attributable to a defendant is the "net" amount received by the defendant or intended loss. For example, this Honorable Court generally did not attribute the entire amount of public contracts to construction company-related defendants but only the net benefit to those defendants. This analysis in regard to the Petitioner makes practical sense also because the relevant taxing authorities were not harmed as they received their appropriate amount of taxes.

D.    Petitioner's Counsel Failed to Properly Cross-Examine Gallucci Regarding the Election Scheme.

Further, the Petitioner's counsel never impeached Gallucci about his truthfulness. For example, Gallucci and Russo both testified that Russo gave Gallucci Two Thousand Dollars ($2,000.00) in cash on several occasions. The Petitioner's counsel never questioned Gallucci as to whether he disclosed these cash payments to the IRS in his tax returns. Also, Gallucci had informed the Petitioner on many occasions that he had "rigged" the water service to his car wash

so that the water bill was reduced by at least 50%. *See* Exhibit G attached hereto and

incorporated herein. The Petitioner's counsel never questioned Gallucci about this fraud

perpetuated by him. Lastly, Gallucci often presented himself as the son of Joseph, Sr. and

Marcinda Gallucci and an heir to the Gallucci hotel empire. Id. However, Gallucci's mother had

an affair with a neighbor named Virgil Narduzzi and gave birth to Gallucci. Gallucci's father

was not Joseph Gallucci, Sr. Id. The Petitioner's counsel never questioned Gallucci about his

misrepresentations as to who his father is and the circumstances of his birth. This line of

questioning would have also exposed Gallucci's propensity to lie.

     E.     <u>Petitioner's Counsel Failed to Properly Cross-Examine Russo Regarding the Job Buying Scheme.</u>

The two stories of the "Gabor Job Buying" on their face were diametrically opposed.

The description of the alleged Job Buying by government witness Skuhrovec and government

witness Russo were wholly inconsistent. Skuhrovec was deposed on July 13, 2011, due to his

health issues. Skuhrovec testified that Petitioner gave him an envelope for Russo to buy his job.

Skuhrovec Depo. at 17-22. Skuhrovec did not see any cash but the envelope "felt like there was

money in [it] or a lot of paper." Id. at 19. Russo never testified that he received the Petitioner's

alleged job buying bribe through Skuhrovec. Instead, Russo testifies that he "received an

envelope with $5,000.00 in it from [the Petitioner]." Russo testimony at 6654:5-6. This

inconsistency should have been exploited by the Petitioner's counsel but the Petitioner did

not do so.

Further, the Petitioner's counsel never fully developed that the Petitioner's job had

flexible hours. Russo himself testified that the hours were "flexible" in the Weights and

Measures Department. Russo testimony at 6370:25-6371:2; 6660:24-6663:01. This testimony

could have been exploited by Petitioner's counsel to show that the Petitioner did his job and was

not a "ghost employee." Russo also admitted that Mr. Westfall was the Petitioner's supervisor. Russo testimony at 6655:20-24. This testimony only bolsters the exculpatory testimony that would have been provided by Mr. Westfall. Russo also conceded that the Petitioner "was a good fit for weights and measures." Russo testimony at 6649:19-6650:2. Further, there was a phone call between Russo and Gabor which was intercepted by the government which is exculpatory. The call in question occurred on April 24, 2008 at 9:12 a.m.[4] In this call, Russo tells the Petitioner that it is permissible to drive Dimora on county time and that Russo, as his boss, gives him permission to do so.

The Petitioner's counsel should have also cross-examined Russo regarding all of the issues relating to the "Job Buy Scheme." His failure to do so was clearly prejudicial and not part of any reasonable trial strategy.

F.    Petitioner's Counsel was Ineffective for Failing to Raise the Issues Relating to Judicial Misconduct and/or Prosecutorial Misconduct.

To the extent Petitioner's counsel had knowledge, should have had knowledge or should have investigated the matters surrounding the rampant judicial bias, judicial misconduct and/or prosecutorial misconduct described herein, he was deficient in his performance. If the Petitioner's counsel did have any of this knowledge, the Petitioner's counsel should have raised many of these issues on behalf of the Petitioner. The Petitioner's counsel's failure to raise any of these issues severely prejudiced the Petitioner. The Petitioner concedes that he does not know what knowledge the Petitioner's counsel had regarding these issues.

G.    Miscellaneous Ineffectiveness of Petitioner's Counsel.

The Petitioner hereby also advises that he was provided only minimal copies of certain parts of the trial transcript and certain trial exhibits. As the Petitioner repeatedly advised his

---

[4] The Petitioner does not have access to any of the discovery but has notes stating that this call is exculpatory for the reasons described herein.

former counsel, he is an inmate in a prison and has no access to a computer to review disks. The Petitioner asked for the trial transcript and certain trial exhibits to be sent to him in paper format. The Petitioner's requests were ignored. Therefore, the Petitioner has prepared this Motion largely relying on his memory. As of the date hereof, the Petitioner never received any of the Protected Materials (as such term is defined in Doc. 1092). Therefore, the Petitioner respectfully requests that this Honorable Court permit him to supplement this Motion once he receives the Protected Materials. Further, Mr. Christman was not prepared for trial, did not enlist the Petitioner's assistance for or during trial and was intoxicated at many points during the trial. *See* Exhibit G attached hereto and incorporated herein. This conduct adversely affected the trial of the Petitioner.[5]

H.     Cumulative Error Doctrine.

The Sixth Circuit held that, regardless of whether each of a petitioner's alleged errors, standing alone, would require a finding of deprivation of due process, a court may look to whether the cumulative effect of the errors was such that the petitioner was denied fundamental fairness. See, e.g., Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir. 1988); Walker v. Engle, 703 F.2d 959, 968 (6th Cir. 1983). Strickland also counsels that an attorney's performance must be considered "in light of all of the circumstances." Strickland, 466 U.S. at 690. "Rather than evaluating each error in isolation [. . .], the pattern of counsel's deficiencies must be considered in their totality." Goodman v. Bertrand, 467 F.3d 1022, 1030 (7th Cir. 2006). See Mackey v. Russell, 148 Fed. Appx. 355, 365 (6th Cir. 2005) ("The Strickland test requires that prejudice be evaluated in light of the cumulative effect of all constitutionally infirm actions by counsel.").

---

[5] The Petitioner understands that his counsel made certain errors which were not prejudicial. For example, the Sixth Circuit held that the Petitioner's counsel erred in not "renew[ing] his motion [to sever] at the close of evidence." United States v. Dimora, et al., Nos.: 12-4004/12-4051 (6th Cir. 2014) at 13. The Petitioner has been careful to only focus on the prejudicial instances of ineffectiveness of this Motion.

Clearly, the foregoing errors singly deprived the Petitioner of due process and his right to effective counsel. However, cumulatively the errors overwhelmed this matter in a manner rarely seen in this Circuit.

## V.  **CONCLUSION.**

For all of the foregoing reasons, the Petitioner respectfully requests that this Honorable Court vacate his judgment, or, alternatively permit discovery relating to the matters requested herein and hold an evidentiary hearing in regard to all issues raised herein.

Respectfully submitted,

Michael D. Gabor, Petitioner, *pro se*
Fed. Reg. No. 56277-060
FCI Elkton
PO Box 10
Lisbon, Ohio 44432

## CERTIFICATE OF SERVICE

A copy of the foregoing *Motion to Vacate, Set Aside or Correct Sentence* has been sent by regular U.S. Mail, first class, postage prepaid, this _6TH_ of _NOVEMBER_ , 2015.

Ann C. Rowland
Antoinette T. Bacon
Heather Tonsing Volosin
James L. Morford
Robert J. Patton
Office of the U.S. Attorney – Cleveland
Northern District of Ohio
Suite 400
801 Superior Avenue, West
Cleveland, Ohio 44113

*Attorneys for the Respondent,*
*United States of America*

_____

Michael D. Gabor, Petitioner, *pro se*