*EXHIBIT E*

Mark Dottore Appointed to Federal Receiverships



# Mark Dottore

**Rachel Dissell, The Plain Dealer By Rachel Dissell, The Plain Dealer**
**Email the author | Follow on Twitter**
on January 31, 2010 at 9:37 AM, updated November 18, 2011 at 2:43 PM



Gus Chan, The PDMark Dottore in court in 2008, when he was a special master for Myers University **Name:** Mark Dottore

**Read all of The Plain Dealer's County in Crisis coverage**

**Born:** 7/9/1958

**Elected position/Job:** Runs Dottore Brothers, which handles receivership cases for state and federal courts

**First noted:** Documents about Dottore were sought by federal agents when they searched the Cuyahoga County engineer's office on July 28, 2008

**Lawyer:** Robert Glickman

**Corruption probe connections:** Dottore's company, was a client of Anthony O. Calabrese III and performed consulting work for the non-profit Alternatives Agency halfway house. Dottore's company is not specifically named in Calabrese's indictment but it matches the description a company that was used to funnel a tax return to Calabrese and Kelley. The indictment says that the company received $5,000 to do so.

Documents about Dottore and his company were also sought by federal agents when they searched **J. Kevin Kelley**'s office in the Cuyahoga County engineer's complex. Kelley worked for Dottore on a receivership of a local brewery. County records also show that Dottore suggested Kelley as a consultant to help a real estate company find tenants for a building on St. Clair Avenue that Dottore oversaw as a court-appointed receiver. Kelley was paid $7,000 by Dottore Brothers for consulting. Dottore denied referring Kelley to the firm. He is not charged with a crime.

© 2015 cleveland.com. All rights reserved.



## Investors still feel the sting of David Dadante's $28 million scam

**Damon Sims, Northeast Ohio Media Group** By Damon Sims, Northeast Ohio Media Group .

on June 19, 2008 at 4:00 AM, updated June 19, 2008 at 9:23 AM

David Dadante is in prison, but his $28 million swindle continues to cause frustration and financial hardships.

Feeling the pain are his victims: more than 100 investors from Cleveland's eastern suburbs who handed Dadante millions, only to find out the Gates Mills man took their money in a Ponzi scheme and blew it on personal extravagances.

The fleeced investors want their millions back, and their quest for the lost money has yielded seven lawsuits, bad blood between investors and ire for the judge handling their case.

To make matters worse, some investors learned that a recent settlement to reclaim some of their losses will actually leave them in further debt because they will have to pay steep taxes on the settlement money.

Then there's brokerage firm Ferris Baker Watts, the Washington-based company through which Dadante, 54, illegally traded stocks as part of his scheme. The firm's lack of supervision of Dadante and rogue broker Stephen Glantz has attracted scrutiny by the Securities and Exchange Commission and the FBI.

The federal investigation played a part in the firm's decision to sell itself to a subsidiary of a Canadian bank, according to SEC documents. It's also facing a fine likely to exceed $1 million.

Then there's Mark Dottore, the court-appointed receiver in charge of securing as much of the lost money as possible. Dottore has come under fire from investors who say that he disregards their interests and is dragging out the case to inflate his fees.

Dottore says he is doing his job and touts the recent $16.2 million settlement between the victims and Ferris Baker Watts as proof that he's getting them back as much money as possible.

The true source of everyone's pain, Dottore says, is Dadante, who received a 13-year sentence after pleading guilty to fraud charges last year in U.S. District Court. Meanwhile, everyone else has been subjected to a sentence of headaches and frustration, some of the conned investors said.

"Our money was stolen, period," said Michael Regalbuto, who figures he lost $850,000. "How we ended up where we are today, I don't know."

Regalbuto is one of 78 investors who complain about a recovery process that has lasted nearly three years.

Leading the charge is Michael's father, wealthy businessman Frank Regalbuto. The elder Regalbuto made the

Case: 2:10-cr-00387-SL  Doc #: 1108-5  Filed: 11/06/13  4 of 27.  PageID #: 31646

decision to partner with Dadante in the 1990s in an investment fund that promised big returns.

Dadante -- an admitted cocaine abuser and a regular at Atlantic City casinos -- told Regalbuto that he knew an executive at Goldman Sachs who could set them up to purchase stock in exclusive initial public offerings.

After some coaxing, a skeptical Regalbuto signed on and put money into Dadante's IPOF fund, which promised an annual return of 10 to 20 percent. Regalbuto not only fronted major cash, he also recruited friends, relatives and business associates. Regalbuto and 17 relatives ultimately invested $7 million in the IPOF fund.

Dadante's fund swelled to $50 million from 107 investors, and Dadante lived the high life, moving from Euclid to a Gates Mills mansion.

But in 2005, a suspicious Regalbuto and other investors confronted Dadante, who admitted that the Goldman Sachs account did not exist and that he had been giving investors phony statements. They also learned that Dadante, with the help of Glantz, had illegally amassed close to 3 million shares of stock in a small company called Innotrac. Ferris Baker Watts fired Glantz, who eventually received a three-year prison sentence.

Their returns, Dadante admitted, came via a Ponzi scheme, where money from new investors was used to pay off old investors.

In all, officials estimate that Dadante burned up $28 million through bad investments, gambling and paying himself.

Regalbuto's role in recruiting so many friends and relatives and then watching them lose their life's savings is what drives his desire to get their money back, his son Michael said. The battle began in court, where Regalbuto sued Dadante, brokerage houses and banks, accusing them of fraud and racketeering.

But Frank Regalbuto's legal battle has drawn criticism from U.S. District Judge Kate O'Malley, who is in charge of the case. O'Malley froze the lawsuits and rebuked Regalbuto and his followers in court, saying they are only slowing down the money recovery.

The investors complain O'Malley doesn't understand the case and has left them powerless while hiding behind the power of the bench.

"All we want is control of our own destiny," investor Sheldon Gordon said. "The judge and Dottore have it all screwed up."

Regalbuto now runs a Web site devoted to the case, posting case filings, letters and harsh opinions on O'Malley and Dottore.

The victims complain that Dottore ignores them but will charge $2 million in fees.

Dottore says the investors do not understand the painstaking way he had to trace all the dollars and work to get back investors a fraction of their money. He defended his fees and says they would be charged much more by a lawyer.

"They think everything that happened in this case is a giant conspiracy," Dottore said.

O'Malley declined to discuss the case.

While Dottore says he will continue to negotiate winning deals for the investors, Michael Regalbuto and others are already questioning Dottore's settlement with Ferris Baker Watts. The brokerage firm agreed to pay $7.2 million in cash to a victims' fund and turn over 3 million shares of Innotrac, all while forgiving $9 million margin debt owed on the stock. Dottore intends to sell the stock to compensate victims.

But some investors recently learned they will end up owing money in the settlement because the taxes owed on the Innotrac stock, which showed a $5 million profit for 2007. Of that profit, $2 million must go to the IRS. It was unclear how many of the investors were facing the extra debt.

An accountant with Dottore's company acknowledged that the investors owe the $2 million in taxes but said members of the group had received a $10 million tax refund for 2005 because they had paid taxes in past years on the bogus profits.

"They're still waiting to get the recovery, and now they're getting taxable income," said accountant Dave Linscott. While it's frustrating for the investors, "these are the IRS rules. We're not in any position to not follow the rules."

© 2015 cleveland.com. All rights reserved.

KING Nothing

# Judges appoint Mark Dottore to stabilize troubled companies. Critics say he's cleaning them out.

by Kevin Hoffman

A bank needed to repossess a plane from a Columbus health-care company, which owned a pair of jets worth more than $20 million. Shortly before, the company had sold one off. The bank had to move before the other disappeared as well.

So Mark Dottore hired three pilots and boarded a small plane. They flew to the airstrip, commandeered the jet, and took off. The bank was later able to sell it, recovering more than $8 million.

"It was one of the ballsiest things I ever heard," says Robert Glickman, a former common pleas judge, "It's stories like that that made me think that if I have a company in trouble, this seems like a good guy to entrust it to."

Many judges do trust Dottore. He works as a receiver, a rough equivalent to a bankruptcy trustee. When a company runs afoul of its creditors, and management is deemed too corrupt or incompetent to right the course, Dottore is called on to restore fiscal sanity and look after the creditors' interests.

Merely by swearing an oath and putting up a minimal bond, receivers are handed the keys to multimillion-dollar businesses. No money moves without their say. The company is at their mercy. "It's like a hostile takeover by the court, in a way," says Judge Nancy Margaret Russo.

Dottore is among a select group of receivers tapped to handle the biggest and messiest of cases. He claims expertise in fields as diverse as banking, polymer coatings, and day care. "Basically, I go in and sift through ashes, and out of that, I have to create value," he says.

It's work that naturally creates enemies.

"If I took all the money out of your pocket and did it every day for a year, how happy would you be with me?" he asks. "A receiver's gotta have the negotiating skills of King Solomon, the mind of a forensic accountant, and definitely the skin of a rhinoceros. Nobody likes you."

But in this profession, Dottore has earned a special enmity. Business owners, employees, and lawyers all complain to the same tune. They say that Dottore uses his political connections to get appointed. That he exploits his position to enrich himself, his brothers, and a hand-picked supporting cast. And that he operates in secrecy, padding fees and siphoning money from companies with nothing to spare.

"He just gets in there and it's feeding time at the company trough," says one lawyer, who requested anonymity. "It's a story about access and greed and poor judicial oversight. They've handed him the cookie jar."

The Dottore family has been in the receivership business for 50 years. It was started by Mark's father, Nunzio, who owned Ivanhoe Furniture in South Euclid. But it flourished under Mark, 46, and his two brothers, Thomas, 45, and Charles, 38, who operate out of an airy warehouse in the Flats just large enough to hold their outsized personalities.

Mark's most prominent feature is his highly cultivated self-regard. He's a natural storyteller with a booming, authoritative voice who boasts readily of being featured on *Dateline NBC* and appearing in *The Washington Post* and *Crain's Cleveland Business.*

"If you died, you'd want to come back as me," he says at one point. "I've got great friends."

Many of them are politicians, and the Dottores have never been shy about currying their favor.

The family was one of the top financial backers of Domestic Relations Court Judge James Celebrezze. When he took office in 1991, the court promptly purchased several thousand dollars' worth of mahogany desks, sofas, and executive chairs from Ivanhoe Furniture. In 2001, Celebrezze appointed Mark Dottore as a receiver for a 10-building apartment complex. Two years later, Mark served as Celebrezze's campaign treasurer.

Mark also has a friend in Governor Bob Taft. He donated $2,000 to Taft's reelection campaign in 2002, and the governor has twice appointed him to the State Lottery Commission.

The Dottores are also involved with a political action committee called Millennium Leadership. Mark is its treasurer and largest contributor. He characterizes the PAC as having all the importance of a dinner party. But since 2001, it's spent $13,900, most of it donated to various candidates, including judges Bridget McCafferty, David Matia, and Nancy Russo.

Though Mark Dottore downplays his political influence in interviews -- "Most of the judges that appoint me to stuff, I've never given a dime to" -- he's less shy on a résumé advertising his credentials, where he brags up his "political judgment" by noting that he's been a "consultant and fund-raiser for many political campaigns at city, county and state levels."

"The Dottores made it clear that their business is politics," says Scott Forster, vice president of General Environmental Management, a company Mark Dottore was appointed to run.

Adds Robert Ranallo, who inherited a receivership from Dottore: "He pretty much said that he was the king of this in Cuyahoga County."

In 1999, Cleveland entrepreneur C. David Snyder spent $2 million to buy a controlling stake of Frederick Brewing Company in Maryland. A year earlier, he had acquired Crooked River Brewing, dreaming of building Snyder International Brewing Group into a microbrew empire. He hired pricey executives from Rolling Rock and Corona, employing as many as six vice-presidents in a company that counted only 50 employees.

But the enterprise soon collapsed under its own weight. It expanded too fast, acquired too much debt, and the microbrew craze was on the wane. An extravagant new plant was operating at less than 50 percent of capacity. The company owed $1.1 million in utility bills and property taxes alone.

Scenting blood in the water, creditors moved in. In August 2002, two of them won a judgment against the brewery worth more than $100,000. Four months later, one petitioned Cuyahoga County Judge Nancy Russo to protect its financial interests. Russo turned to Mark Dottore. (She would later recuse herself when her husband, Michael Chesefka, was introduced to Snyder by the Dottores. Months later, Chesefka became Snyder's attorney.)

Brewery manager John Nizlolek's chief concern was the company's survival. A former nuclear engineer with the Navy, he had been with the company almost from the start. But Dottore assured Nizlolek he was there to help. Snyder told him it was all for the best.

"We could have fought it from the beginning, but he elected not to," Niziolek says of Snyder. "Quite honestly, I think it was probably one of the worst mistakes he ever made." (Snyder did not respond to interview requests.)

If the company had run aground under the weight of too many expensive execs, that wasn't about to change under Dottore. In fact, it would only get worse.

Mark promptly added his brothers, Thomas and Charles, to the payroll -- at $175 and $125 per hour, respectively. Charles was the point man, though his experience was as a former funeral director, not a brewery manager.

"Charlie used to always tell me what judges they have and what judges they didn't have," Niziolek recalls. "He used to walk in with a big fat cigar. He looked like Groucho Marx."

Mark Dottore's patronage didn't stop with family. Kevin Kelley, president of the Parma School Board and a former beer salesman and liquor-store owner, was hired on as a $30,000 consultant. With Kelley, the Dottores, and lawyer Mary Whitmer all routinely flying in from Cleveland, the brewery's costs soared.

"The whole barrage would come in and drive up in their chauffeured limo, stay here for an hour and a half, then get up and leave," Niziolek says. "And I'm getting billed out the fucking kazoo!"

It wasn't like the business could handle it. Payroll checks were bouncing. Once, Kelley gave Niziolek a stack of checks to hand out, he says. A half-hour later, the Dottores sent a fax saying there was no money to cover them.

"Just imagine yourself having to go in front of your employees and say, 'I have your paychecks, but there's no money in the account,'" Niziolek says. "I'm a man, and we're not supposed to admit these things, but the second time it happened, I went into my office and cried. Personally, this has really hurt me. I was writing personal checks to help some of my employees make it until things were good."

At one point, the Dottores canceled the employees' health insurance, Niziolek says. It took three weeks for them to find out. In the meantime, one worker's wife had undergone major surgery. Only after the bill arrived did they learn they were no longer covered.

"He actually is filing for bankruptcy because he can't pay the $30,000 in medical bills," Niziolek says.

But if workers were going broke, the Dottores were living the high life. In December 2003, Mark entertained business associates and friends in Snyder's loge at Browns Stadium. The cost: $10,500. The Browns came to Snyder when Mark's check bounced, according to a deposition from Snyder. Dottore ultimately paid the bill.

The final straw came when the Dottores tried to close the brewery after Snyder refused to supply more money. Snyder asked the courts to remove Mark, citing outrageous fees and failure to run the business properly. In a deposition, he testified that the Dottores neglected to file federal withholding-tax reports, make 401K deposits, and pay water bills and suppliers.

Mark denied the allegations, but agreed to turn over the keys. Still, it was a generous payday. He applied for $280,000 in fees and expenses. His hired guns also hit the jackpot. Whitmer's law firm clocked out with more than $406,000 in bills. The accounting firm of Ciuni & Panichi earned $132,000. All told, Dottore's crew asked for more than $800,000.

"I don't typically see receivership bills that high," says Robert Ranallo, the receiver appointed to replace Dottore. "There was a lot of fence-mending to do with many of the people who had stakes in the receivership."

Other bills practically begged for closer scrutiny. Another company for which Mark acted as a receiver billed $80,000 to the brewery for printing services. Mark paid himself $31,235, saying that he had lent the money to the brewery so it could pay its water bill and avoid a shutoff.

The brewery is still cleaning up the mess. It recently had to pony up $110,000 for 10 months of back taxes that the Dottores didn't pay, Niziolek says. The feds waived the penalties for late payment, but demanded the interest.

"We're still paying off bills that they created," Niziolek says. "You have a financially strapped company who got associated with receivers, and we have more bills than what we started with."

Scott Forster and Eric Lofquist are exactly what Cleveland needs: young, ambitious entrepreneurs. Their company, General Environmental Management, treats industrial waste at a facility on Transport Road and counts 54 jobs on its payroll.

They formed GEM in 2001 to provide marketing services to a waste-treatment company called Pure Tech. But that company's owner, Robert Kattula, wanted out. Facing the loss of their only customer, Lofquist and Forster partnered with him and assumed responsibility for running the company.

Their contract, however, had more holes than the Browns secondary. Before the deal, Kattula had signed a consent agreement to clean up pollution on Pure Tech's property. Lofquist and Forster argued that it was Kattula's responsibility; Kattula said it was theirs. A lender had also filed suit against Pure Tech and Kattula to seize company assets.

To resolve the dispute, Kattula asked Judge Robert Glickman to appoint Mark Dottore as a receiver. Glickman, who would later become Mark's lawyer, granted Dottore the job.

"I gave him a receivership because he's recommended by judges or law firms in town," Glickman says. "I wanted someone who had a business background."

The day after the appointment, Mark and his brothers showed up unannounced to seize control of GEM, Forster says. "The whole clan walks in and says, 'We're now running your company, taking over your checking account.'"

If their arrival was abrupt, the Dottores didn't set off any warning bells. They assured Forster and Lofquist that they were there to help. "You gotta give credibility to the system, right?" Forster says. "Court-appointed -- how bad can this be?"

He would soon find out. "There were numerous times when they threatened me and my partner with being terminated," Forster says.

Over the next several months, the Dottores seemed to run GEM the way a college kid manages his credit card. They overdrew the company's bank account more than 100 times, running up penalty fees just shy of $3,000, according to court documents. They neglected to pay the gas bill, and the gas was shut off. Adding insult to injury, Charles Dottore billed GEM more than $400 for three and a half hours of work to get the gas turned back on.

"The receiver should not be entitled to collect fees for time spent remedying his own negligence," a GEM lawyer noted dryly.

Yet the Dottores kept a tight grip on the company's purse strings when it came to Forster and Lofquist. "I got yelled at for ordering file cabinets," Forster says. "I spend half a million dollars with these guys, and I can't buy an $80 file cabinet?"

That's an exaggeration, but not by much. For nine months of work, Mark Dottore applied for $112,000 in fees. Lawyer Mary Whitmer's firm submitted a $143,000 bill for the same period.

They also billed for work unrelated to the company. Mark spent $2,500 to appraise a property that GEM neither owned nor had interest in purchasing, according to court documents filed by the company's lawyer. Whitmer billed $375 for work on a case to which GEM was not a party.

Whitmer ultimately retracted her request, saying that it was inadvertently submitted, but GEM had little luck with other complaints. By then, Judge Eileen A. Gallagher had taken over the case.

Lofquist and Forster say they couldn't get her ear. The motions they submitted were summarily ignored, they say.

"The biggest issue to me was, we could never get in front of the judge," Lofquist says. "We never got our day in court."

Adds Forster: "It almost seemed like Dottore could steer the judge anywhere he wanted to go." (Gallagher did not respond to interview requests.)

Mark Dottore denies exerting any undue influence. "If I'd charged them seven cents, they'd have been pissed," he says. "They had a judgment against them. It should have been closed. I kept that company alive."

believed that the Dottores were screwing them, so they settled their differences before the family took all they had left.

In the end, the Dottores' stewardship cost them more than $300,000.

Kattula, a native of Iraq who immigrated to America 28 years ago, was surprised that the Dottores could take over the business. "I thought these things happen in Afghanistan or Baghdad," he says. "They happen in Cleveland also."

At one time, Judge Nancy Russo trusted Mark Dottore. In 1999, she appointed him as a receiver in a case involving a $100 million shopping-center development in Mayfield Heights. Three years later, she used him as a receiver for Fortran, a commercial printing company.

The Dottores were also supportive of her. In 2002, the family contributed $1,000 to her campaign.

But now Russo is singing a new song. "I would never appoint him again," she says. The Fortran case changed her mind.

At one time, the Grant Avenue company employed about 100 people. But when the economy went sour, the printing industry was hit hard. Fortran found itself drowning in debt.

In May 2002, one of Fortran's major creditors, FirstMerit Corp. of Akron, won a judgment against the company for $1.7 million. A few weeks later, FirstMerit requested a receiver to protect its assets. Judge Russo appointed Mark Dottore, on the advice of fellow judges.

"I took it on a recommendation of someone taking it on a recommendation," Russo says. (She later recused herself from the case.)

Dottore served as Fortran's receiver for several years, during which he was chronically late submitting his bills. Although receivers are supposed to file reports every three months, Dottore sat on one for more than a year.

When he finally did file it, the bill hardly illuminated what work he had been doing. Of 146 entries, 122 were vaguely described as "General operations."

There was reason for creditors to be suspicious. For example, Fortran paid $4,000 to Canal Street Properties — a company the Dottores own. They later explained that the payment was for the rental of trucks, and that Canal leased them to Fortran at below market price.

Campaign-finance reports listed Fortran as a $2,000 contributor to the Millennium Leadership PAC. Mark explained that a secretary had inadvertently included Fortran as a donor. He says a review of the company's checks backed his case.

The brothers also billed Fortran for labor on the same days they claimed to be working for other companies they were appointed to run. Thomas charged eight hours to Fortran on a day he claimed to have spent seven hours seizing the assets of another printer in Akron. Mark charged six hours to Fortran on the same day he claimed to have spent seven hours in court for another receivership. And he charged five hours to Fortran on a day when he charged two hours to Frederick Brewing for "meeting with lawyers in Washington."

It all added up to a sizable tab. For the first 11 months of the receivership, Mark Dottore asked for more than $600,000 for himself and his lawyers.

At the same time, the company was falling further behind. In the first six months of the receivership, Fortran lost more than $250,000 on receipts of $4.2 million, according to a complaint from creditors.

"It appears that Dottore is using the Fortran receivership to pad his pockets and the pockets of his family members and his favorite professionals, all while carefully avoiding an opportunity for anyone to question his activities or delve too deeply into how he operates as a receiver," one lawyer wrote.

Dottore denies wrongdoing. He points out that there were 200 creditors in the case and only three objected to his fees. His bills were reviewed by another receiver, who for the most part found them justified. Ultimately, the courts ruled in Dottore's favor.

Still, Russo was surprised when she learned of Dottore's bills. "From what I saw, I'm surprised by the amount he was asking for, because I don't think I've ever gotten a fee bill from any receiver for more than $4,000 a quarter," she says.

Russo came away from the Fortran and Snyder cases convinced that receivers need more scrutiny. She suggests a cap on fees to keep receivers from dragging out the process to enrich themselves and says that judges shouldn't rely on word of mouth to make million-dollar decisions. She plans to push state lawmakers for more rules.

"He's one of the reasons that I think the legislature ought to consider it," she says of Dottore. "This whole receivership business is a void. With no list and no regulation, it's a free-for-all."

In the meantime, Dottore continues to cultivate new business. He recently gave a seminar on receiverships as part of a continuing-education class for attorneys, thereby advertising his services to a whole new crop of potential customers.

Robert Glickman spoke at the same event. Although Dottore caught only the last few minutes of his speech, he's no doubt familiar with the sentiment expressed by its title: "Everybody Hates the Receiver."

Like

News Lead archives »

hio Supreme Court report says Cuyahoga County's divorce court nee...    http://blog.cleveland.com/metro//printumil?entry=/2009/07/ohio_su...



# cleveland.com

## Ohio Supreme Court report says Cuyahoga County's divorce court needs major reforms

**Felipe Nieves By Felipe Nieves**

on July 14, 2009 at 7:58 PM, updated July 15, 2009 at 10:13 AM



Domestic Relations Judge Leslie Ann Celebrezze

**Read the Ohio Supreme Court report (pdf)**

CLEVELAND -- Cuyahoga County's divorce court needs major reforms to correct its habitually inefficient and underperforming ways, according to a report released Tuesday by the Ohio Supreme Court.

The high-court's performance review recommended more than 90 improvements and labeled 28 of them as "critical" enough to demand immediate action. Many of the concerns dealt with problems first disclosed in a series of stories published in The Plain Dealer.

In March, the newspaper reported that Domestic Relations Judge James Celebrezze steered hundreds of thousands of dollars of work to his longtime friend Mark Dottore, who charged $225 an hour to handle assets in divorce cases.

The newspaper also found that Celebrezze and his daughter, Leslie Ann, who replaced him on the bench after he retired in December 2008, used teams of special masters to mediate divorce cases rather than doing the work themselves.

In their 91-page report, Supreme Court investigators seized on the questionable practices.

When appointing receivers, their report noted, a judge must do so impartially and on the basis of merit, while avoiding favoritism and unnecessary appointments. The fees, they added, must be "reasonable, fair and affordable."

They went on to caution that, with few exceptions, a judge has no authority to appoint special masters to perform what essentially is the judge's job.

Neither of the Celebrezzes could be reached for comment Tuesday.

Chief Justice Thomas Moyer ordered the review last year after receiving complaints from lawyers and couples about the Domestic Relations Court being so inefficient that divorce cases often took years and tens of thousands of dollars in legal fees to resolve.

After spending months reviewing court records and interviewing court employees, the investigators recommended that judges address the following practices:

Exceeding recommended time frames for resolving contested divorces.

Assigning distasteful and troublesome cases to a visiting judge.

Holding fragmented trials and court hearings, rather than insisting that testimony be presented in consecutive, day-to-day hearings.

Failing to control lawyers, some of whom are so busy they routinely miss hearings, and others who act unprofessionally in court without fear of disciplinary actions.

Timothy Flanagan, the administrative judge who oversees the divorce court, on Tuesday took issue with the Supreme Court on almost every point, including statements that question his leadership abilities.

The report criticized Flanagan for his poor planning and communication skills, for failing to adopt long-term mission or vision statements, and for calling only one judges meeting a year in 2007 and 2008.



Candidate 2008. Scanned from a handout January 15, 2008)Judge Timothy M. Flanagan. Court of Common Pleas Division of Domestic Relations.

"The administrative judge has not demonstrated strong leadership among the judges," the report states.

Countered Flanagan: "I disagree with them."

More importantly, he said, the report is outdated because the court resolved many of the problems after the retirement of James Celebrezze.

He cited statistics that indicate that in 2008 the Cuyahoga court had the lowest percentage of cases exceeding time guidelines of any urban domestic relations court in the state.

"This report was written in the last few months. These are things from the past that are no longer true. Things have changed here."

Flanagan said he will use the report as a guide, but cautioned not to expect immediate action.

"There are suggestions in here and we'll pursue them," he said. "But I don't know if I have enough employees to fill every committee and every task force they want us to."

© 2015 cleveland.com. All rights reserved.



# Names in corruption probe surface in St. Clair Avenue property dealings

**Melodie Smith** By Melodie Smith
**Email the author | Follow on Twitter**
on July 28, 2009 at 4:01 AM, updated July 28, 2009 at 11:04 PM

Several now-familiar names that are a part of the federal public corruption investigation have surfaced tangentially during a look back at the discussions and foreclosure case of the property at 113 St. Clair Ave. There is no indication that the dealings with the property are a part of that probe.

**Anthony O. Calabrese III:** Calabrese, an attorney, has not been charged with any crime in the corruption probe and has not been identified by name in any court filings. But public contracts and descriptions of a lawyer involved in some of the deals under investigation match Calabrese.

Calabrese negotiated The Staubach Co.'s contract with the county and, at the same time, was one of the attorneys for Mark Dottore in his role as receiver.

Rob Roe, a managing partner at Staubach, said Calabrese asked him to recommend a company that could provide leasing services for the building. Roe suggested three firms, including Midwest Real Estate Partners.

**J. Kevin Kelley:** Recently pleaded guilty to several corruption-related counts and is cooperating with investigators.

Mark Dottore, the court-appointed receiver, hired Midwest Real Estate to find tenants and possibly a buyer for the property. He then suggested the company use Kelley as a consultant, according to a lawyer for Kevin Piunno, the firm's managing partner. Piunno met with Kelley and used him as a consultant, said his lawyer, Keith Kraus.

He said Kelley was paid several thousand dollars for consulting. Midwest is fighting a court battle claiming it was not paid for its work.

Dottore denies referring Kelley to the firm, according to his lawyer, Rob Glickman. He said Dottore's only recollection of Kelley's involvement was to suggest a pizza chain as a tenant.

But e-mails contained in a court file about the foreclosure show that Kelley is copied on many of the discussions having to do with the leasing and sale of the building.

Kelley's attorney did not return a call for comment. Dottore has not been accused of any wrongdoing.

© 2015 cleveland.com. All rights reserved.

9/13/2015 4:17 PM

Ohio Supreme Court orders Judge Leslie Ann Celebrezze off case inherited from her father http://blog.cleveland.com/metro/print.html?entry/...

© cleveland.com

## Ohio Supreme Court orders Judge Leslie Ann Celebrezze off case inherited from her father

James F. McCarty, The Plain Dealer By James F. McCarty, The Plain Dealer
Email the author | Follow on Twitter
on May 14, 2009 at 4:00 AM, updated May 14, 2009 at 9:11 AM



Plain Dealer fileDue to a provision of the Code of Judicial Conduct, Cuyahoga County Domestic Relations Judge Leslie Ann Celebrezze will have to disqualify herself from at least one court case.

Related content:

- Lawyer asks Ohio Supreme Court to remove Judge Leslie Ann Celebrezze from divorce case

- Judge James Celebrezze steered thousands of dollars of work to friend Mark Dottore

CLEVELAND — Cuyahoga County Domestic Relations Judge Leslie Ann Celebrezze must disqualify herself from at least one case -- and possibly hundreds of others -- that she inherited when she replaced her father on the bench, according to a Ohio Supreme Court ruling.

Chief Justice Thomas Moyer cited a provision of the Code of Judicial Conduct that requires judges to remove themselves from cases in which a close relative also has acted as a judge because of the potential for bias.

"A reasonable observer would be justifiably concerned that the judge would unduly favor her father's prior rulings," Moyer wrote of Celebrezze.

The order applies to only one divorce case, involving a wealthy real estate developer and his wife. But Domestic Relations Court officials fear the same prohibition could apply for all of the cases that James Celebrezze heard during 17 years on the divorce court bench.

"You're talking about thousands of cases," Administrative Judge Timothy Flanagan said Wednesday. "It would mean we would have to do some major shuffling of case assignments."

Leslie Ann Celebrezze declined to comment Wednesday. She took on as many as 600 unresolved cases -- divorces, child-custody and domestic violence, among others -- this year when she replaced her retiring father.

The order to disqualify Leslie Ann Celebrezze was sought by Marc Strauss, whose divorce case started with James Celebrezze and carried over to his daughter. Strauss accused Leslie Ann Celebrezze of bias because her friend and campaign treasurer is working as the receiver in charge of assets in the case. The receiver, Mark Dottore, was originally appointed by her father.

9/13/2015 4:15 PM



PD fileJames P. Celebrezze

In March, The Plain Dealer reported that James Celebrezze steered hundreds of thousands of dollars' worth of work to Dottore to handle assets in contested divorce cases. In a review of court records, the newspaper discovered that Celebrezze appointed Dottore as a $225-an-hour receiver in 11 divorce cases during the last six months of 2008 -- netting Dottore Cos. more than $340,000.

The judge gave no work to any other receivers during the same period, records show, despite an Ohio Supreme Court rule that such appointments be rotated equitably. And the fees charged by Dottore added tens of thousands of dollars to the legal bills of couples involved in his cases.

At the time, Flanagan said Celebrezze violated numerous court rules governing appointments. Celebrezze could not be reached Wednesday for comment.

In his four-page order released Tuesday, Moyer referred to Leslie Ann Celebrezze's "questionable use of Mr. Dottore's services initiated by James Celebrezze."

On Wednesday, Flanagan said he has asked the Supreme Court to clarify whether Moyer's order applies to other cases. He also scheduled a meeting for today with all the Domestic Relations Court judges to talk about ways to redistribute cases inherited by Leslie Ann Celebrezze.

"Until we get a clarification from the Supreme Court, I've advised her not to sign anything," Flanagan said.

Supreme Court spokesman Christopher Davey said Moyer's order applies only to the Strauss case. He declined to comment on the potential far-reaching impact of the order, saying "the judgment entry speaks for itself."

Leslie Ann Celebrezze argued in written arguments to Moyer that such a broad application of the rule would "subvert justice and the efficient administration of the court."

Her bailiff, Mark Vittardi, said Wednesday that the judge initially interpreted the order to mean she was barred from handling any cases in which her father had issued orders -- a relatively small number of cases.

Not true, said Flanagan. "Many divorce cases do come back," he said, "and some can be in litigation for years and years."

Contacted Wednesday about the order, Marc Strauss shouted in celebration and became emotional. He said he felt relief and vindication after three years in divorce court. He said he will seek a refund of more than $28,000 paid to Dottore's company and its lawyers.

"I just wanted someone to listen," he said. "Finally someone listened."

Dottore did not return calls seeking comment. In his response to the Supreme Court complaint, he characterized Strauss' accusations as "nothing more than a desperate attempt to avoid a decision by Judge Celebrezze."

© 2015 cleveland.com. All rights reserved.



# Cuyahoga County Domestic Relations Court gets blistered in performance audit

**James F. McCarty, The Plain Dealer** By James F. McCarty, The Plain Dealer

**Email the author | Follow on Twitter**

on July 14, 2009 at 12:18 PM, updated July 14, 2009 at 2:32 PM



David I. Andersen/Plain DealerThe Ohio Supreme Court today issued a sweeping and critical performance review of the Cuyahoga County Domestic Relations Court.

**Related content:**

• **Ohio Supreme Court orders Judge Leslie Ann Celebrezze off case inherited from her father**

• **Lawyer asks Ohio Supreme Court to remove Judge Leslie Ann Celebrezze from divorce case**

• **Judge James Celebrezze steered thousands of dollars of work to friend Mark Dottore**

COLUMBUS — The Ohio Supreme Court today issued a sweeping and critical performance review of the Cuyahoga County Domestic Relations Court, offering dozens of recommendations for improving the habitually inefficient and underperforming divorce court.

The high court labeled 28 of its recommendations as "critical," reflecting problems in need of immediate action.

Many of the recommendations dealt with problems highlighted in a series of stories in The Plain Dealer.

Among other things, the newspaper disclosed how retired Judge James Celebrezze and his daughter, Leslie Ann, who replaced him on the bench, used teams of special masters -- rather than judges -- to mediate cases.

The elder Celebrezze also gave hundreds of thousands of dollars worth of work as a receiver to his friend and frequent lunch partner, Mark Dottore, the newspaper also reported.

In it's 90-plus page performance audit, the high court stated that, with few exceptions, a judge has no authority "to appoint a special master in a case ... to perform essentially judicial functions."

The audit also states that the appointment of receivers must be done impartially and on the basis of merit, while avoiding favoritism and unnecessary appointments.



# cleveland.com

# Cuyahoga County divorce court's Judge Timothy Flanagan to retire from the bench

**Jim Nichols, The Plain Dealer** By **Jim Nichols, The Plain Dealer**
**Follow on Twitter**
on December 07, 2009 at 12:26 PM, updated December 08, 2009 at 4:18 PM


Timothy M. Flanagan, domestic relations judge

CLEVELAND, Ohio -- Cuyahoga County Domestic Relations Judge Timothy Flanagan will retire from the divorce-and-child-custody bench at year's end, ending a 26-year tenure as administrative judge, he confirmed Monday.

Flanagan will leave a court that had been among the state's most beleaguered until it adopted broad reforms demanded by the Ohio Supreme Court earlier this year.

"Right now, as we stand, I thought it was a good time to leave and enjoy retirement," said Flanagan, who has five years remaining on his six-year term.

Gov. Ted Strickland will choose a replacement for his fellow Democrat.

Flanagan, 63, has served the court since 1982, and has been administrative judge since the year after that. Through most of his tenure, he drew praise and little public criticism. He ran unopposed in 1996, 2002 and last year.

But a series of stories by The Plain Dealer exposed a pattern of inefficiency by the court, and questionable decisions by now-retired Judge James Celebrezze. The series showed the court to be among the slowest in granting divorces, and documented a bloated payroll that makes the court the most expensive in the state, in terms of taxpayer dollars spent per case.

The first stories appeared in March 2008, detailing judges who effectively worked part time for full-time pay and routinely missed state-imposed case-resolution deadlines. That produced a storm of complaints and protests from litigants and lawyers who seethed about mistreatment in the court, which handles divorces, custody issues and some domestic-violence cases.

Supreme Court Chief Justice Thomas Moyer later ordered a rare review of how each of the court's five judges handled

cases. The result: a 91-page report last July that was highly critical of the court collectively.

Moyer's staff told the county court it must stop exceeding recommended time frames for resolving contested divorces; assigning trouble-filled cases to visiting judges; holding fragmented trials and court hearings; and failing to control lawyers and force them to act professionally. The report also criticized Flanagan's leadership, planning and communication skills.

Flanagan at the time pointed out that as administrative judge, he has no authority to order his colleagues to work harder or faster. He also disputed just about all of its findings. He said cases drag on because divorces are more complicated in Cuyahoga County than in other counties that handle them far quicker.

He criticized former Judge James Celebrezze, however, after The Plain Dealer revealed he appointed non-lawyer and family friend Mark Dottore, to be a "referee" over 11 divorces in James Celebrezze's last six months as a judge. Dottore then billed the court more than $340,000 -- more than 1,500 hours at $225 per hour -- to winnow the caseload that Leslie Ann Celebrezze, James Celebrezze's daughter and successor, would inherit.

Flanagan called that a violation of state court rules and said he was "shocked;" no other judges had ever appointed special masters like that, he said.

In the last several months, Flanagan said Monday, he and his colleagues cleared a caseload backlog and now have "one of the most current dockets of all counties in the state of Ohio." Many other reforms were already underway when the Supreme Court issued its recommendations, Flanagan said. Among them, a 20-percent cut in staff in the last year, through buyouts.

Most problems now are solved, he said.

"At this point in my life, I want to do some different things," Flanagan said.

© 2015 cleveland.com. All rights reserved.

 cleveland.com

# Another fine mess in Cuyahoga Domestic Relations Court

**Kevin OBrien, The Plain Dealer By Kevin OBrien, The Plain Dealer**
Email the author | Follow on Twitter
on May 17, 2009 at 4:31 AM, updated May 17, 2009 at 4:39 AM

A wealthy real estate developer going through a long and nasty divorce deserves Cuyahoga County residents' thanks for exposing how the Domestic Relations Court makes a joke out of the Code of Judicial Conduct.

In an affidavit filed with the Ohio Supreme Court, Marc Strauss accused Judge Leslie Ann Celebrezze of bias because she hired Mark Dottore, her campaign treasurer, as a receiver to handle the assets in the divorce case. Dottore originally was appointed by Celebrezze's father, James Celebrezze, whom she replaced on the bench.

Chief Justice Thomas Moyer granted Strauss' request, citing a provision in the judicial code that holds a judge's "impartiality might reasonably be questioned" if that judge hears a case that was previously heard by a judge who is a close relative.

He also criticized Celebrezze's "questionable use of Mr. Dottore's services."

Moyer's ruling raised the blood pressure of Administrative Judge Timothy Flanagan, who frets that it could be applied to all of the cases James Celebreeze heard in his 17 years on the bench.

"You're talking about thousands of cases," Flanagan complained to Plain Dealer reporters Jim McCarty and Rachel Dissell. "It would mean we would have to do some major shuffling of case assignments."

Flanagan must share in the blame for this embarrassing mess. Any reasonable court observer would assume that Flanagan had researched this issue before allowing Celebrezze to assume her father's docket.

Instead, he was blindsided. Even though red flags were waving.

Last month, Flanagan, who oversees the court, accused James Celebrezze of violating a half-dozen Supreme Court rules in connection with his appointment of Dottore as a $225-an-hour receiver in 11 divorce cases that earned Dottore more than $340,000.

To further besmirch the reputation of a court that a Plain Dealer analysis found to be one of the slowest in the state, the fees charged by Dottore added tens of thousands of dollars to the legal bills of the couples involved in those cases.

Flanagan's response to the initial Dottore appointment? "I know it looks as if I was asleep at the switch . . ."

Moyer's ruling in the Strauss divorce only bolsters that assessment.

Flanagan needs to step it up, or step aside as administrative judge. The court, under his stewardship, isn't helping couples get through one of the most stressful events of their lives; it is needlessly compounding their difficulties through its inefficiency and apparent indifference.

And Leslie Ann Celebrezze needs to understand that there's nothing incompatible with loving her father and working tirelessly to be a better judge than he was.

Judicial controversy has followed this branch of the Celebrezze family for 30 years. The people of Cuyahoga County don't deserve another six years of questionable conduct from this particular seat on the bench.

© 2015 cleveland.com. All rights reserved.

Lawyer asks Ohio Supreme Court to remove Judge Leslie Ann Celebrezze from divorce case

# Lawyer asks Ohio Supreme Court to remove Judge Leslie Ann Celebrezze from divorce case

**by Rachel Dissell and James F. McCarty / Plain Dealer Reporters**
**Monday April 20, 2009, 8:00 AM**

A husband embroiled in a protracted divorce case has accused a Cuyahoga County Domestic Relations Court judge of bias because her friend and campaign treasurer is working as the receiver in charge of assets in the case.


Leslie Ann Celebrezze.

Marc Strauss, an attorney and wealthy real estate developer from Willoughby, asked the Ohio Supreme Court last week to remove Judge Leslie Ann Celebrezze from his case. He argues that the appointment of Mark Dottore as receiver was improper and prejudicial because of Dottore's close ties to Celebrezze and her family, including her father, whose judgeship she took over when he retired.

The affidavit filed with the court claims several examples of bias, including:

• Dottore acting as receiver in the case, over Strauss' objections, while serving as Leslie Ann Celebrezze's campaign treasurer.

• Dottore's brother and business partner, Charles, lent $2,000 to Leslie Ann Celebrezze's campaign.

• Mark Dottore has been a close friend of the Celebrezze family and benefited from multiple receiver appointments in the last year her father, James P. Celebrezze, was on the bench.

Strauss and his attorney, Jaye Schlachet, argue that those examples -- among others -- breach the law, Ohio Rules of Court and the Ohio Code of Judicial Conduct.

As a receiver for the Strauss case and others, Dottore earns $225 an hour for managing finances and assets. In some high-stakes divorce matters, his company has earned from several thousand to $100,000.

James Celebrezze, appointed Dottore receiver in the Strauss case in 2007 and presided over the case until the end of 2008, when he retired.

On Dec. 30, as one of his last judicial acts, James Celebrezze gave Dottore wide-ranging control over Strauss' company and finances. Strauss said Dottore's appointment was "simply an attempt to harass and cause irreparable harm to [Strauss] and his business" and would leave him penniless.

Mark Vittardi, Leslie Ann Celebrezze's bailiff, said the judge was on vacation and unreachable Tuesday.

Vittardi said it would be improper for the judge to comment on the filing, since the case is in front of her. He noted that the judge recently held Strauss in contempt of court. Court records show she sentenced Strauss to 30 days in jail if he didn't pay child and spousal support debts.

In the past three years, Strauss has appealed numerous decisions, including fees owed to Dottore and a guardian ad litem, appointed to represent the interests of the Strauss' son.

Dottore did not return phone calls to comment on the affidavit, but in an interview last month Dottore blamed Strauss for the

delays -- which resulted in higher fees -- because he filed dozens of needless motions.

Strauss has tried twice before to get Leslie Ann Celebrezze off the case. In January, he asked her to remove herself, citing similar arguments to those made in Monday's filing. In March, he asked for her to be disqualified. But the request was filed under the wrong statute and dropped.

The Ohio Supreme Court last year turned down Strauss' request to have James Celebrezze disqualified from the case because of comments the judge made, including those made about Strauss' wealth. The court ruled that while some of the judge's comments to Strauss were "unfortunate and inappropriate" they didn't warrant his removal from the case.

The new filing is more complex, and predicated on the Celebrezze family's financial relationship with Dottore, including his role in their political campaigns.

A Plain Dealer review of campaign finance records shows that James Celebrezze, his daughter and his son, Nick, a lawyer and Parma city councilman, received more than $25,000 in donations from lawyers who served alongside Dottore in divorce cases or volunteered as divorce mediators known as special masters.

Dottore was campaign treasurer for all three Celebrezzes, but in a recent interview said he has relinquished those duties.

The majority of the campaign money raised -- more than $15,000 -- was given to Leslie Ann Celebrezze in her 2008 race. Dottore also held a fund-raiser in February to retire a $26,000 campaign debt incurred by Leslie Ann Celebrezze. Campaign finance statements documenting the take from the event have not yet been filed.

Nick Celebrezze received nearly $6,000 for his Parma campaign from the same group of lawyers and law firms. He said he handles juvenile and domestic relations cases, and often works with many of the lawyers who contributed to his campaign.

"My father doesn't solicit any campaign donations for me," Nick Celebrezze said. "I do that on my own. I have two fund-raisers a year."

Many of the campaign donors said they give to all the judges, so a donation to the Celebrezzes does not indicate a special friendship or favoritism.

Attorney James Cahn donated $1,175 to the three Celebrezzes, including $600 to Nick and $500 to Leslie Ann. He said he usually supports incumbents and candidates he trusts.

"I preferred Leslie Ann over whoever her opponents were," he said.

He said he supported Nick Celebrezze because he knew his father. "I sent him some money to help him out because he's a nice kid and I'd like to see him succeed," said Cahn, who also served as a special master last year.

James Skirbunt, who along with his wife and law partner donated to James and Leslie Ann Celebrezze, said any practicing lawyer who's a reasonable person donates some money to all judges. "Judges get most donations from those who practice in their court. If we're not going to contribute to them, I'm not sure who would."

Schlachet, Marc Strauss' attorney, acknowledged having donated a small amount to Celebrezze's children. But he said he didn't see it as optional.

"You need to understand that when you went to [James] Celebrezze's courtroom there wouldn't be any qualms about collecting money for political fundr-aisers. You have to understand that this pay-to-play culture existed there."

James Celebrezze didn't return phone calls seeking his response.

**To reach this Plain Dealer reporter:** rdissell@plaind.com, 216-999-4121

Send To A Friend | Print Print this | Permalink

Reddit Reddit  Digg Digg  del.icio.us del.icio.us  Google Google  Facebook Facebook
COMMENTS (0)Post a comment

Comments are not active for this entry


cleveland.com

# Judge James Celebrezze steered thousands of dollars of work to friend Mark Dottore

**Damon Sims, Northeast Ohio Media Group** By Damon Sims, Northeast Ohio Media Group
on March 29, 2009 at 7:15 AM, updated March 29, 2009 at 7:23 AM



Plain Dealer FileMark Dottore was appointed by Judge James P. Celebrezze to a $225-and-hour receiver job to handle assets in divorce cases. In the last six months Celebrezee did not apppoint any other receivers and Dottore Comapnies netted $340,000.

Cuyahoga County Domestic Relations Judge James Celebrezze steered hundreds of thousands of dollars worth of work to a friend's company to resolve bitterly contested divorce cases, The Plain Dealer has found.

In a review of court records, the newspaper discovered that Celebrezze appointed Mark Dottore as a $225-an-hour receiver to handle assets in 11 divorce cases during the last six months of 2008 -- netting Dottore Companies more than $340,000.

The judge gave no work to any other receivers during the same period, records show, despite an Ohio Supreme Court rule that such appointments be rotated equitably. And the fees charged by Dottore added tens of thousands of dollars to the legal bills of couples involved in his cases.

Celebrezze also took the unusual step of having Dottore, who is not a lawyer, recruit divorce lawyers to serve as unpaid special masters -- quasijudicial referees sometimes used to bring warring parties to peace -- to help clear dozens of other cases before the judge retired.

When told of the newspaper's findings, Judge Timothy Flanagan, who oversees the court, expressed surprise and said Celebrezze violated a half dozen rules governing the appointment of receivers and special masters and the payment of receivers.

"I know it looks as if I was asleep at the switch, but I had no idea," Flanagan said.

Celebrezze and Dottore, however, denied violating any rules. And a lawyer for Dottore said his client is proud of what he considers to be an innovative method of resolving difficult cases.

"We wanted this to be a good thing," said James Loeb, who represents Dottore and who also served as one of the special masters. "We wanted this to be helpful. It was a good idea."

Before retiring at the end of last year, Celebrezze, 71, carried the largest and oldest backlog of contested divorce cases on a court that a Plain Dealer analysis found to be one of the slowest in the state.

The judge started clearing his backlog after the newspaper reported that he failed to meet state-recommended deadlines for disposing of 20 percent of his contested cases between 2005 and 2007.

Later in the year, the Ohio Supreme Court ordered all the county's divorce judges to stop dumping old and difficult cases on a visiting judge.

But Celebrezze also had another motive for clearing his docket. His successor on the bench was to be his daughter, Leslie Ann Celebrezze.

In his time of need, Celebrezze turned to a trusted friend and frequent beneficiary of divorce court business: Mark Dottore.

Celebrezze and Dottore acknowledge they are longtime friends and frequent lunch partners. Dottore also served as Leslie Ann's campaign treasurer and threw a fund-raiser for her in February to help pay off a $26,000 campaign debt. His brother Charles lent her campaign $2,000.

The judge asked Dottore to recruit divorce lawyers willing to work as volunteer special masters. Their mission was to mediate settlements in the most contentious cases before Celebrezze.

Dottore selected about a dozen lawyers, most of whom he had worked with on other divorce cases, and many of whom had given campaign contributions to Celebrezze or his daughter.

### Presiding judge surprised by move

By most accounts, the special masters attained their goals, striking agreements in more than 30 of Celebrezze's peskiest and most emotionally charged cases.

But Flanagan, the court's administrative judge, said Celebrezze never checked with him before turning his courtroom over to teams of nonjudges.

"I was shocked when I saw the numbers," Flanagan said. "In 27 years as a judge, I've never appointed a special master, and no one else in the courthouse is doing it. I feel it's my responsibility to help settle cases, not rely on a panel of lawyers."

Flanagan added that the way Celebrezze handled the appointments violated the Ohio Supreme Court's Rules of Superintendence, which govern every legal procedure conducted in the state's courthouses.

The rules require that judges appointing receivers or special masters must first:

• Adopt a local rule governing appointments.

• Establish a procedure for selecting appointees and compose a list of people qualified to serve as special masters or

receivers.

• Review the appointments periodically to ensure an equitable distribution of work.

• Set up a fee schedule and establish a manner of compensation for services.

• Establish a list of qualifications required for inclusion on the list.

• In addition, if either side of a divorce case believes a receiver's fees are excessive, the burden of proving reasonableness is on the receiver.

By Flanagan's count, Celebrezze violated every one of those rules.

In Cuyahoga County, the divorce court has no rules or procedures governing appointments, no list of qualifications for prospective special masters or receivers, no annual review of appointments and no fee schedules.

Flanagan said that Celebrezze also failed to establish that Dottore's fees as a receiver were reasonable and that he sometimes did not document the parameters of the receiver's duties. And Flanagan was troubled by how much money Dottore, and lawyers hired by Dottore, collected from receiverships assigned by Celebrezze.

### Action brings scrutiny from Supreme Court

According to Ohio Supreme Court case law, receivers should be appointed only as a last resort when a business is failing, property is threatened or fraud is suspected.

Supreme Court spokesman Christopher Davey said the high court learned about Celebrezze's use of receivers and special masters last year during an investigation of the divorce court. A final report is expected later this year.

"It is something we are taking a look at," Davey said.

Steven Lubet, a Northwestern University law professor who co-wrote a book on judicial conduct, said a judge is obligated to avoid nepotism and favoritism when making appointments.

"Under the American Bar Association's model rules, these sorts of appointments would be very questionable," Lubet said.

Flanagan said he plans to call a meeting of the court's judges to address the appointment issues.

"Now that I know what he was doing we're going to have to make some changes and establish some rules," Flanagan said. "We're going to take care of this because, under the current rules, we don't have the authority to appoint special masters."

Dottore and Celebrezze expressed surprise that Flanagan would be upset with a program that had worked so well.

Mediation is widely considered an ideal way to settle contested divorce cases and is practiced in other Ohio counties. It often helps to reduce attorney's fees and to avoid expensive, drawn-out trials.

Cuyahoga County has a full-time mediator, Larry Loeb, who is not related to James Loeb.

Dottore said he considers himself ideally suited to run the special master mediation program.

"I'm the voice of calm," he said in a recent interview. "I'm not a lawyer. I'm a voice of reason."

Why did Celebrezze choose Dottore?

"He trusted me," Dottore said. "I did some [receivership] cases for him, and there were great outcomes."

Celebrezze, who now volunteers as a special master for his daughter, said Dottore received nothing for his work overseeing the special masters mediation program "except a thank you and doughnuts."

"He's just happy to do it," Celebrezze said. "Obviously he does receiverships, and this is part of that."

Divorce lawyers are understandably reluctant to publicly question the working relationship between Dottore and Celebrezze. They have to work with his daughter and none wants to get a reputation as a snitch.

But one lawyer, Terri Lastovka, spoke candidly about the judge and Dottore in a deposition taken this year in a dispute over fees for lawyers and receivers.

Celebrezze appointed Lastovka as a receiver in 2007 to resolve a divorce fight involving a Pepper Pike couple and their $10 million estate.

According to the deposition, her appointment came after the couple rejected Celebrezze's suggestion that they use Dottore.

Lastovka, who had never before served as a receiver, testified that she did not ask for help. But when the case dragged into 2008, she said, Celebrezze told her to hire Dottore despite the couple's objections.

"He gave me Mark's phone number, asked me to call Mark, said Mark would help me," Lastovka said.

How did Dottore help? Lastovka testified that Dottore did nothing except talk the judge out of dismissing the divorce case and forcing the couple to refile.

"The Dottores were my best and easiest access to the judge," she said.

For this, Mark Dottore submitted a bill to Lastovka for $10,300.

Lastovka billed the Pepper Pike couple $100,000.

Celebrezze denied telling Lastovka to hire Dottore.

"I said 'Mark Dottore has done these cases, he knows how to do it, if you have any questions call him and he'd be more than happy to answer them for you,' " Celebrezze said.

© 2015 cleveland.com. All rights reserved.

 cleveland.com

## Westlake Panini's owes employees their paychecks and a judge must decide when: Michael K. McIntyre's Tipoff

Paninis-Westlake.JPG
The now-closed Westlake Panini's
**Michael K. McIntyre** By **Michael K. McIntyre**
**Email the author | Follow on Twitter**
on December 10, 2014 at 4:26 PM

When the Panini's restaurant and bar in Westlake **closed abruptly Saturday,** a number of orders were left unfilled. Chief among them: Employee paychecks.

The feuding owners and the former court-appointed receiver all say they want employees to get the pay they're owed. They're meeting with Cuyahoga County Judge Ronald Suster Thursday to hash that out.

"I owe a payroll, but I can't release it until the judge says so," said Mark Dottore, who served for about a month as a court-appointed receiver along with his brother and business partner, Charlie.

Meanwhile, the parties continue to heap blame upon each other for the restaurant's woes.

Minority shareholders had filed suit against Thomas Culkar, the majority owner, in September accusing him of a variety of financial improprieties.

They favored the involvement of a court-appointed receiver because the Panini's Franchise Group was ready to pull its affiliation as a way to remove Culkar from the restaurant, said minority owner Joe Hanna.

Hanna had been the day-to-day manager of the facility until Culkar maneuvered to have him removed from the board and took over management himself.

Dottore came into the business in October and took complete control November 3.

"They put him in," said Culkar. "I knew nobody was going to be happy with the outcome. I told my attorney it was the beginning of the end."

Quickly, Hanna and other minority shareholders -- John Kostoglou and former Browns lineman Frank Winters and his Green Bay Packers teammate Marco Rivera -- became unhappy with the work of the receiver, who was working to sell the business. Dottore was removed when the minority partners dropped their lawsuit against Culkar.

"We dropped the lawsuit and the only reason we did that was to get the receiver out of there. He was ringing

up the bills and for what?" said Hanna. "They don't know how to run a restaurant. They had no clue what they were doing. Why would a court appoint someone like that to run a business?"

Dottore provided a detailed report to the court Wednesday laying out extensive debts and upkeep issues at the restaurant. He said his mission was to shore it up and get it sold. He described it as "neglected."

"When I was in there, everything was good," said Hanna. "And he never once told me they were going to sell it or were trying to sell it."

"He doesn't understand receivership," said Dottore. "The partners wanted it sold."

Indeed, the court order appointing Dottore reads "Receiver is hereby authorized to take whatever action is necessary to prepare the company for sale."

Dottore said he made good on one payroll from before his receivership started and intended to make good on the most recent payroll, but was handcuffed when the lawsuit was dropped.

Other debts to vendors and the landlord also must be addressed in the court meeting Thursday, including Dottore's $30,000 tab. The receivership holds a cash balance of $73,381, according to Dottore's report to the court.

Hanna, whose partnership is not invested in other Panini's franchises (he and Culkar were once minority partners in the Panini's on West 6th Street in Cleveland, but were bought out), said he's still trying to work a deal to re-open a restaurant and bar at the Westlake location.

Culkar said he was shocked when the lawsuit against him was dropped and the receiver essentially fired.

"They dropped that bomb on me with a day's notice and I couldn't even be there," he said. "It's unfortunate for everybody the way this all went down."

Regarding the allegations of impropriety from the minority shareholders, Culkar said he'd have no comment. "The lawsuit was dropped."

Hanna said he was hoping to get law enforcement to investigate criminal charges against Culkar, who was the best man at his wedding before their falling out.

But on the issue of employee paychecks, he and Culkar both appear to be on the same page.

"It's Christmas," Hanna said.

© 2015 cleveland.com. All rights reserved.

9/13/2015 3:53 PM


cleveland.com

# Bingham building in Cleveland's Warehouse District could be auctioned within months

**Michelle Jarboe McFee, The Plain Dealer** By **Michelle Jarboe McFee, The Plain Dealer**

**Email the author | Follow on Twitter**

on August 13, 2010 at 4:59 PM, updated August 13, 2010 at 5:09 PM



**View full size**

David I. Andersen, The Plain Dealer file photograph

The Bingham Building in Cleveland's Warehouse District looked like this in 2001 before an $80 million redevelopment project.

CLEVELAND, Ohio -- The Bingham building, the largest redevelopment in Cleveland's Warehouse District, is headed for the auction block as the result of a months-long foreclosure effort.

A U.S. District Court judge this week appointed Cleveland receiver Mark Dottore to act as the master commissioner in charge of preparing for a sale of the property. Dottore expects that the building, which comprises 340 apartments and commercial space at 1278 W. Ninth St., could be auctioned within two to four months.

The Bingham landed in foreclosure because of a heavy debt load and ownership troubles.

In 2008, Bingham Building Limited Partnership of Downers Grove, Ill., defaulted on a $45.5 million mortgage that was insured by the U.S. Department of Housing and Urban Development. Burnside Construction Co., a Chicago-area homebuilder affiliated with the ownership group, had filed for bankruptcy in 2007. HUD took over the mortgage on the Bingham and put the note up for auction in March.

The winning bidder was Resource Real Estate, a national investor based in Philadelphia. Resource bought the note for $25 million and **filed a foreclosure complaint against the Bingham's owner in April**. Judge Kathleen O'Malley signed off on the foreclosure in July, and Resource asked for the property to be sold.

The Bingham's owner owed Resource more than $47.7 million as of April 6, according to court records. Neither the owner nor Resource responded to a request for comment on the foreclosure or the auction process.

Resource would be the first -- and likely only -- investor to collect money from a sale of the property. The city of Cleveland is unlikely to recoup its investment, a $2 million loan to help with the building's $80 million

redevelopment. The auction process would provide clear title for a new owner, which could be Resource or another bidder.

Resource owns and manages a $1.7 billion real estate portfolio that includes the **West Tech Lofts**, an apartment redevelopment in the former West Tech High School on West 93rd Street in Cleveland. The company bought a HUD note on West Tech in 2007, filed foreclosure in 2008 and acquired the property last year.

Tom Yablonsky, executive director of the Historic Warehouse District Corp., said the foreclosure has not impacted the Bingham.

"It's still a great building," he said, noting that ground-floor tenant Constantino's Market is nearly finished with an expansion. "The outsider has not seen any change. If anything, they would have seen some positives from the expansion of the grocery store."

© 2015 cleveland.com. All rights reserved.

9/13/2015 4:04 PM