IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:10CR387 |
| | ) |         1:15CV2298 |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL D. GABOR, | ) | GOVERNMENT'S RESPONSE TO |
| | ) | PETITIONER'S MOTION FOR LEAVE |
| Defendant. | ) | TO AMEND SECTION 2255 PETITION |

Now comes the United States of America, by and through counsel, Daniel L. Lemisch,

Acting United States Attorney, and Ann C. Rowland and Antoinette T. Bacon, Assistant United

States Attorneys, and responds to Defendant Michael D. Gabor's Motion for Leave to Amend

Section 2255 Petition.

Respectfully submitted,

JEFFERSON B. SESSIONS III
Attorney General of the United States

DANIEL L. LEMISCH
Acting United States Attorney
Eastern District of Michigan

By:   /s/ Ann C. Rowland
Ann C. Rowland (OH: 0015156)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3847
(216) 522-2403 (facsimile)
Ann.Rowland@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of December 2017 a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.  A copy of this pleading was sent by regular U.S. Mail to Petitioner Michael D. Gabor, 56277-060 at FCI Elkton Federal Correctional Institution, P.O. Box 10, Lisbon, Ohio  44432.

/s/ Ann C. Rowland
Ann C. Rowland
Assistant U.S. Attorney

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ 6

Introduction ........................................................................................................... 9

Procedural History ............................................................................................... 11

Law & Argument ................................................................................................. 12

    This Court has the Discretion to Treat Petitioner's Motion to Amend as an Initial
    2255 .................................................................................................................. 12

    Petitioner's Incorporation of Dimora's Claims ................................................. 13

    The Standard of Review .................................................................................... 13

        Generally .................................................................................................... 13

        Petitioner Did Not Raise McDonnell Error On Appeal ............................... 14

        Procedural Default ...................................................................................... 17

            Cause-and-Prejudice ............................................................................ 17

            Actual Innocence ................................................................................. 18

        The Harmless Error Standard ..................................................................... 19

        Conclusion .................................................................................................. 21

The McDonnell Decision ..................................................................................... 21

    Identification Requirement ................................................................................ 22

    Performance Requirement ................................................................................. 23

    Cases Decided After McDonnell ....................................................................... 25

McDonnell Has No Application to Schemes Not Requiring an Official Act .............................. 29

    The Money and Property Mail Fraud Conspiracy and Substantive Counts Are Not Affected
    By McDonnell (Counts 31 and 32) .................................................................... 29

    McDonnell Has No Application To The § 666 Conspiracy Convictions (Cts 17 & 19) ...... 30

    McDonnell Has No Impact On the State Bribery Predicates of the RICO Count ............... 31

In Closing Argument, Dimora's Counsel, Under The Jury Instructions this Court Gave, Was Able To, and Did Make, Arguments About Meetings and Phone Calls Not Constituting Official Acts ................................................................................................................ 31

Scheme-By-Scheme Analysis Of Official Acts ........................................................... 38

    Dimora's Official Powers In General ................................................................... 38

    Introduction To Scheme-By-Scheme Analysis ..................................................... 40

    RICO ..................................................................................................................... 40

        Russo Hiring Petitioner For A Partially No-Show County Job In Exchange for $5,000 in Cash ................................................................................................ 41

        Bribing A County Domestic Relations Judge For A Favorable Ruling On A Financial Matter ..................................................................................... 42

        Agreeing That Dimora Would Take Bribes From Kleem In Exchange For Voting On Juvenile Justice Center Contracts And Taking Action On Qualifying Steps .................. 43

            Background ............................................................................................ 44

            Official Acts ......................................................................................... 44

            Evidence Supporting Petitioner's Liability for this Scheme in the RICO Count..... 47

    Pumper (Counts 17, 19 and 21) ........................................................................... 47

    Introduction .......................................................................................................... 47

    Greensource .......................................................................................................... 49

    Voting, and Taking Action on Qualifying Steps Toward Changing Bid Specifications on JJC Contract and Other County Projects ........................................ 49

    Voting To Approve Two County Loans for 1170 Ivanhoe LLLC, a Pumper Company That Housed Greensource ................................................................ 52

    Pressuring or Advising County Officials To Expedite Closing the Ivanhoe Loans ......... 53

Russo Hiring Gallucci in Exchange for Gallucci Dropping Out of the Auditor's Race (Counts 31 And 32) ........................................................................................................ 53

This Court Should Deny Petitioner's Motion Without A Hearing ................................................ 55

Conclusion ...................................................................................................................................... 55

## TABLE OF AUTHORITIES

## Federal Cases

Bousley v. United States, 523 U.S. 614 (1998) ................................................................ 17, 18

Brecht v. Abrahamson, 507 U.S. 619 (1993) ................................................................ 13, 19

Chapman v. California, 386 U.S. 18 (1967) ................................................................ 19

Clark v. United States, 764 F.3d 653 (6th Cir. 2014) ................................................................ 12, 13

Coe v. Bell, 161 F.3d 320 (6th Cir. 1998) ................................................................ 13

Davis v. Ayala, 135 S. Ct. 2187 (2015) ................................................................ 10, 19, 21, 37, 56

Davis v. United States, 417 U.S. 333 (1974) ................................................................ 13

Estelle v. McGuire, 502 U.S. 62 (1991) ................................................................ 19

Evans v. United States, 504 U.S. 255 (1992) ................................................................ 24, 40, 44

Griffin v. United States, 330 F.3d 733 (6th Cir. 2003) ................................................................ 13

Kotteakos v. United States, 328 U.S. 750 (1946) ................................................................ 19, 37, 55

McDonnell v. United States, 136 S. Ct. 2355 (2016) ................................................................ passim

Murr v. United States, 200 F.3d 895 (6th Cir. 2000) ................................................................ 19, 21, 26

Neder v. United States, 527 U.S. 1 (1999) ................................................................ 19, 26

Pope v. Illinois, 481 U.S. 497 (1987) ................................................................ 20

Reed v. Ross, 468 U.S. 1 (1984) ................................................................ 17

Richardson v. United States, 526 U.S. 813 (1999) ................................................................ 19

Rose v. Clark, 478 U.S. 570 (1986) ................................................................ 20

Salinas v. United States, 522 U.S. 52 (1997) ................................................................ 40, 41

Schlup v. Delo, 513 U.S. 298 (1995) ................................................................ 18

Skilling v. United States, 561 U.S. 358 (2010) ................................................................ 29

United States v. Abbey, 560 F.3d 513 (6th Cir. 2009) ................................................................ 30

United States v. Boyland, 862 F.3d 279 (2d Cir. 2017)..................................................... 30

United States v. Clarke, 842 F.3d 288 (4th Cir. 2016) .................................................... 37

United States v. Delgado, 401 F.3d 290 (5th Cir. 2005) ................................................. 41

United States v. Dimora, 750 F.3d 619 (6th Cir. 2014)...................................... 9, 11, 16

United States v. Frady, 456 U.S. 152 (1982) ........................................................... passim

United States v. Garrido, 713 F.3d 985 (9th Cir. 2013).................................................. 30

United States v. Holzer, 816 F.2d 304 (7th Cir. 1987) ................................................... 40

United States v. Jackson, 688 F. App'x 685 (11th Cir. 2017) ........................................ 30

United States v. Jefferson, No. 1:07CR209, 2017 U.S. Dist. LEXIS 165824
    (E.D. Va. Oct. 4, 2017)............................................................................................ 25, 27

United States v. Jones, 207 F. Supp. 3d 576 (E.D.N.C. 2016) ................................ 22, 23

United States v. Jones, 647 F.2d 696 (6th Cir. 1981) ..................................................... 16

United States v. Lee, No. 1:15CR445, 2016 U.S. Dist. LEXIS 174984
    (N.D. Ohio Dec.19, 2016)............................................................................................. 22

United States v. McDonnell, 792 F.3d 478 (4th Cir. 2015)............................................ 22

United States v. McNair, 605 F.3d 1152 (11th Cir. 2011)............................................. 30

United States v. Pipkins, 378 F.3d 1281 (11th Cir. 2004) ............................................. 41

United States v. Porter, No. 7:15-022 DCR, 2017 WL 1095040 (E.D. Ky. Mar. 22, 2017) ........ 30

United States v. Posada-Rios, 158 F.3d 832 (5th Cir. 1998).......................................... 41

United States v. Pungitore, 910 F.2d 1084 (3d Cir. 1990)............................................. 41

United States v. Silver, 864 F.3d 102 (2d Cir. 2017)...................................... 26, 27, 28

United States v. Smith, 723 F.3d 510 (4th Cir. 2013) ................................... 19, 20, 26

United States v. Skelos, No. 16-1618, 2017 U.S. App. Lexis 18525 (2d Cir. Sept. 26, 2017) .... 30

United States v. Spellissy, No. 17-11067, 2017 U.S. App. LEXIS 19110
    (11th Cir. Oct. 3, 2017)................................................................................................. 24

United States v. Sun-Diamond Growers of Cal., 526 U.S. 398 (1999) ......................... 17

United States v. Terry, 707 F.3d 607 (6th Cir. 2013) .................................................... 29

United States v. To, 144 F.3d 737 (11th Cir. 1998) ...................................................... 41

United States v. Turner, 465 F.3d 667 (6th Cir. 2006) ................................................ 15

United States v. Woodward, No. 95-10234, 2017 U.S. Dist. LEXIS 172084
(D. Mass. Oct. 18, 2017) .......................................................................................... 32

United States v. Yancy, 725 F.3d 596 (6th Cir. 2013) ................................................. 17

## Federal Statutes

18 U.S.C. § 666 ............................................................................................................. 30

18 U.S.C. § 1962 ........................................................................................................... 40

## State Statutes

Ohio Revised Code § 307 .............................................................................................. 38

## Federal Rules

Fed. R. Civ P. 15(a)(2) .................................................................................................. 12

I.      **INTRODUCTION**

Following a lengthy trial in 2012, Petitioner Michael D. Gabor, who was tried with

former Cuyahoga County Commissioner James Dimora, was convicted of the following counts:

Count 1 (RICO),[1] Count 17 (Section 666 Bribery Conspiracy re: Pumper/GreenSource), Count

19 (Section 666 Bribery re: Pumper/GreenSource), Count 21 (Hobbs Act Conspiracy re:

Pumper/GreenSource), Count 28 (Obstruction), Count 31 (Honest Services Fraud Conspiracy

and Money and Property Fraud Conspiracy re: Gallucci), and Count 32 (Honest Services Fraud

and Money and Property Fraud re: Gallucci).

In affirming Petitioner's convictions, the Sixth Circuit stated:

> On each contested charge, the government produced more than enough evidence to
> convict. Begin with the bribery charges surrounding Steven Pumper: Pumper told the jury
> that he agreed with Gabor to pay kickbacks on contracts awarded to Pumper's company.
> Continue with the obstruction-of-justice charge: The jury listened to a phone call in
> which Gabor coached a co-conspirator about what to say to government investigators.
> ''[Y]ou didn't pay for your job,'' Gabor said, ''[and] I didn't pay for my job.'' R. 1020 at
> 83. Finish with the conspiracy charge: The jury could take its pick of Gabor's RICO
> violating behavior, including job buys, bribery schemes and cover-up attempts. Ample
> evidence supported these convictions.

United States v. Dimora, et al., 750 F.3d 619, 627 (6th Cir. 2014).

Petitioner's role in these schemes varied.  He was the bribe payor (1) when he paid Russo

for a job, (2) when he conspired to bribe a domestic relations judge regarding his divorce, and (3)

when he conspired with Pumper to bribe Commissioner James Dimora with kickbacks on

GreenSource contracts.  In the Ferris Kleem scheme, Gabor's role was that of a RICO co-

conspirator – he agreed that Dimora would take bribes from Kleem in the form of the Las Vegas

---

[1] Throughout this pleading, the term "indictment" refers to the Third Superseding Indictment, (R.
444: Third Superseding Indictment, PageID 9630-9777).

trip.  In the Gallucci scheme, Gabor facilitated the bribes Gallucci paid Russo in exchange for a job in the Auditor's office at an inflated salary.

In the present motion, Petitioner alleges his conviction should be vacated because of the Supreme Court's decision in <u>McDonnell v. United States</u>, 136 S. Ct. 2355 (2016), clarifying the definition of "official act." Petitioner filed the Motion to Amend now before this Court.  Thus, with respect to the schemes described above for which Petitioner was convicted, the United States will focus on the official acts the public officials performed or promised to perform in exchange for bribes, and not on the conduct of Petitioner as the bribe payor or co-conspirator. He was not alleged to have performed official acts himself in these schemes.

For the reasons set forth below, this Court should find that there is no reasonable possibility that this Court's definition of "official act" was harmful or prejudicial to Petitioner. Indeed, if the jury had been instructed under the <u>McDonnell</u> definition, the outcome would have been the same.  <u>Davis v. Ayala</u>, 135 S. Ct. 2187, 2198 (2015).

In every bribery scheme at issue in this post-conviction proceeding, the United States proved an identifiable question or matter then pending or which at any time might be pending or which by law might be brought before a public official, thus satisfying the identification prong of <u>McDonnell</u>.  For each of these matters or questions, the United States also satisfied the performance prong of <u>McDonnell</u> by establishing that (1) Petitioner voted, made a decision or otherwise took an action on an identified matter or question, or agreed to do so, or (2) exerted pressure or advised another official to perform an "official act," or advised another official, knowing or intending that such advice would form the basis for an "official act" by another official, or agreed to do so or (3) made a decision or took action on a qualifying step toward those ends.  Furthermore, <u>McDonnell</u> had no effect on the money and property fraud

10

conspiracies or on the Section 666 counts, neither of which required the jury to find an official

act.  It also had no impact on the state bribery predicates in the RICO count, or, on the

obstruction count.

## II.    PROCEDURAL HISTORY

On September 14, 2010, a federal grand jury returned a 31-count indictment, in the

originating Case No.: 1:10CR387, charging Petitioner, James C. Dimora, and others with a

multitude of federal crimes, including RICO bribery, fraud, obstruction, conspiracy, and tax

violations.  (R. 1:  Indictment, PageID 1).  On January 12, 2012, a jury trial commenced before

this Court on the Third Superseding Indictment.  (R.--:  Non-Document, Jan. 12, 2012).  The trial

continued through March 9, 2012, on which date the jury returned guilty verdicts against Gabor

on all counts in which he was charged, except Count 33.  (R. 739:  Verdict, PageID 17192).

Gabor filed a notice of appeal on August 21, 2012.  (R. 975:  Notice of Appeal, PageID

20065).  The Sixth Circuit affirmed the conviction on April 30, 2014.  United States v. Dimora,

750 F.3d 619 (6th Cir. 2014).

On November 6, 2015, Petitioner filed his first Motion to Vacate, Set Aside or Correct

Sentence, under 28 U.S.C. § 2255.  (R. 1108:  Petitioner Under 2255, PageID 31548).  The

petition did not allege error in the jury instructions on official acts, even though McDonnell had

petitioned for certiorari on that issue three weeks before.  McDonnell v. United States, 2015 U.S.

S. Ct. Briefs LEXIS 3611, *1 (Oct. 13, 2015).

On June 26, 2017, while his 2255 Motion was still pending in this Court, Petitioner filed

with the Sixth Circuit Court of Appeals his Motion for an Order Authorizing the District Court to

Entertain a Second or Successive Motion for Collateral Review, alleging error under McDonnell.

(R. 1177: Motion to Amend, PageID 32614).

On October 5, 2017, the district court denied Petitioner's original Section 2255 Petition and found no basis for a certificate of appealability (R. 1167: Opinion, PageID 32327), and Petitioner appealed on October 16, 2017.  (R. 1174: Notice of Appeal, PageID 32605).

On November 13, 2017, the Sixth Circuit denied Petitioner's Motion for an Order to Entertain a Second or Successive Motion for Collateral Review.  In its order, the Sixth Circuit stated:

> Because Gabor filed his application to file a second motion to vacate while his first motion to vacate was still pending in the district court, his second motion is not second or successive within the meaning of 28 U.S.C.§ 2255(h).  *See Clark v. United States*, 764 F.3d 653, 658 (6th Cir. 2014).  Instead, Gabor's second motion should be treated as a motion for leave to amend his first motion under Federal Rule of Civil Procedure 15.  *See id.* at 659.

(Doc. 12-2: Order, Case No. 17-3681, PageID 1).

On November 16, 2017, the district court made the following docket entry:

> On October 5, 2017, this Court entered a memorandum opinion denying defendant's motion to vacate his sentence. (Doc. No. 1167.) Unbeknownst to this Court, at the time it ruled, defendant had pending in the Sixth Circuit two applications to file second or successive motions to vacate his sentence. On November 13, 2017, the Sixth Circuit issued an order finding that defendant's applications were not second or successive because they were filed while defendant's first motion to vacate was still pending in this Court, and should, instead, be transferred to this Court where they are to be treated as motions to amend the initial motion to vacate. Accordingly, the Court hereby instructs the Clerk of Court to file the Sixth Circuit's November 13, 2017 order on this docket along with defendant's June and July 2017 applications.

## III.  LAW AND ARGUMENT

### A.  This Court has the Discretion to Treat Petitioner's Motion to Amend as an Initial  2255.

Federal Rule of Civil Procedure 15(a)(2) provides "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Applying this rule to 2255 proceedings, the Sixth Circuit stated, "A motion to amend is not a

second or successive § 2255 motion when it is filed before the adjudication of the initial § 2255

motion is complete – *i.e.,* before the petitioner has lost on the merits and exhausted [his]

appellate remedies."  Clark v. United States, 764 F.3d 653, 658 (6th Cir. 2014).  A district court

"should freely give leave [to amend] when justice so requires."  (Id. 657) (citing Coe v. Bell, 161

F.3d 320, 341-42 (6th Cir. 1998)).  Thus, this pleading will address the merits of Petitioner's

allegations.

###### B.    Petitioner's Incorporation of Dimora's Claims

Petitioner "incorporates by reference the Section 2255 Motion being filed by

Mr. Dimora . . .."  (R. 1177: Motion to Amend, PageID 32623).  To the extent that any of

Petitioner Dimora's arguments apply to Petitioner Gabor, the United States relies on its response

to Dimora's motion.  (R: 1182: Response in Opposition to Petitioner Dimora's § 2255 Motion,

PageID 32657-32785).  In this pleading, the United States will address only the counts on which

Petitioner was convicted.  Because McDonnell had no effect on obstruction statutes, this

pleading will not address the obstruction count on which Petitioner was convicted – Count 28.

###### C.    The Standard of Review

####### 1.    Generally

"To warrant relief under section 2255, a Petitioner must demonstrate the existence of an

error of constitutional magnitude which had a substantial and injurious effect or influence on . . .

the jury's verdict."  Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003) (quoting Brecht v.

Abrahamson, 507 U.S. 619, 637 (1993)).  "Relief is warranted only where a Petitioner has shown

'a fundamental defect which inherently results in a complete miscarriage of justice.'"  Griffin,

330 F.3d at 736 (quoting Davis v. United States, 417 U.S. 333, 346 (1974)).

In reviewing a challenge to jury instructions in the context of 2255 proceedings, the

Court has two options for the standard of review depending on whether Petitioner could have and

did raise the issue on direct appeal.   For the reasons set forth below, this Court should find that

Petitioner has procedurally defaulted on all counts, and should apply the cause and prejudice

standard of review.  However, if this Court determines that Petitioner did raise <u>McDonnell</u> error

on appeal, as he claims, the Court should find that he did so only with respect to four counts, and

should review only those counts under the enhanced Section 2255 harmless error standard of

review.  The Court should find that Petitioner has procedurally defaulted on the remaining

counts.

### 2.        Petitioner did Not Raise McDonnell Error on Appeal

In his present motion, Petitioner does not allege that he raised <u>McDonnell</u> error on

appeal.  (R. 1177: Motion to Amend, PageID 32627).  Indeed, in his appellate brief discussing

the jury instructions, Petitioner mentioned prejudice regarding only two schemes - the portions of

the RICO count relating to (1) Randazzo and (2) Neiheiser.  (Doc. 42: Appellant Brief, Case No.

12-4051, PageID 29-30).

Regarding the Neiheiser scheme (Counts 14 - 16), Gabor was not charged with the

substantive crime.  The government argued at sentencing that the Neiheiser scheme should form

part of the basis for Petitioner liability on the RICO.  However, the Court disagreed, concluding

that Petitioner had no knowledge of the scheme.  Thus, this Court refused to include the loss

from that scheme in the Sentencing Guideline calculation.  (R. 1052: Tr. Sentencing Hrg, PageID

30955).  Thus, Petitioner was not prejudiced in any way by the jury instructions in connection

with the Neiheiser scheme.

Regarding the Randazzo scheme (Counts 26 and 27), Petitioner was not charged in the

substantive counts and again, this Court concluded that the government had failed to meet its

burden of proving that Petitioner's knowledge of the scheme was sufficient to establish that

Petitioner had agreed that a co-conspirator would accept bribes from Randazzo.  (<u>Id.</u> at PageID

14

30951).   Thus the Randazzo scheme was not part of Petitioner's liability for the RICO count, and Petitioner was not prejudiced in any way by the jury instructions.

The remainder of Petitioner's brief on direct appeal does not reveal any further arguments regarding prejudice from the jury instructions as given.  In discussing the weight of the evidence on the Pumper/GreenSource counts, Petitioner focused on the credibility of witnesses and the things of value Pumper provided to Petitioner and Dimora.  He did not address the definition of "official act."

In discussing the Gallucci scheme on appeal, (Doc. 42: Appellant Brief, Case No. 12-4051, PageID 46 – 49), Petitioner focused on the theory of prosecution, claiming that the scheme charged election fraud, not bribery, and that pursuant to United States v. Turner, 465 F.3d 667 (6th Cir. 2006), the government's theory was flawed.  However, Turner did not involve the definition of "official act," so in no way was Petitioner raising a McDonnell issue.   Indeed, in his argument on appeal, Petitioner mischaracterized the official act as candidate Gallucci dropping out of the race.  In fact, the official act was Russo, as County Auditor, hiring Gallucci in exchange for a thing of value – Gallucci running a sham campaign and dropping out of the race.  See (R. 444: Third Superseding Indictment, ¶¶ 478 and 487).

Thus, Petitioner made no claims of prejudice from jury instructions related to his counts of conviction.

A review of Petitioner's arguments on appeal regarding jury instructions, and the Sixth Circuit's response, further clarifies the fact that Petitioner did not make McDonnell arguments on appeal.  On direct appeal, Dimora and Petitioner claimed that this Court erred in refusing to give two instructions, only one of which, in part, is a correct statement of the law under McDonnell[2] –

---

[2] The other instruction Petitioner and Dimora requested relates to the issue of paying a bribe for

"Encouraging or directing subordinate employees to assist givers does not constitute an official act, unless the public official's actions involve a matter or issue that could properly, by law, be brought before him as a public official – here as County commissioner." (Doc. 42: Appellant Brief, Case No. 12-4051, PageID 40-41).  He also alleged that the Court's instructions on official acts were expansive and confusing.  (Id. at PageID 40-41).[3]

The Sixth Circuit did not characterize the arguments of Dimora and Petitioner on appeal as raising error in the definition of "official act," later addressed in McDonnell, 136 S. Ct. 2355. The Sixth Circuit described the claims on appeal regarding jury instructions as "the court fail[ing] to instruct the jury sufficiently on the differences between gifts given in friendship and bribes given in exchange for official acts." Dimora, 750 F.3d at 624-25 (6th Cir. 2014).  Indeed, friendship was the gist of the defense at trial.

The Sixth Circuit reviewed the instructions Petitioner and Dimora proposed at trial, and found that, with the additional limiting instructions this Court gave, Petitioner and Dimora received the benefit of the instructions they had requested.  "Choosing different words to explain the same concept does not amount to an abuse of discretion."  Id. at 625 (citing United States v. Jones, 647 F.2d 696, 700 (6th Cir. 1981)).  In its analysis, the Sixth Circuit did not mention or quote this Court's definition of "official act," a clear indication that the Court of Appeals did not view Petitioner's allegations as involving that definition.  Dimora, 750 F.3d at 624-25.

---

generalized good will, which the Sixth Circuit found this Court gave, although perhaps not in the words Petitioner requested. (Doc. 42: Appellant Brief, Case No. 12-4051, PageID 41); Dimora, 750 F.3d at 626-27.

[3] "Official acts include the decisions or actions generally expected of the public official. '[O]fficial action' includes the exercise of both formal official influence (such as a public official's votes) and informal official influence (such as a public official's influence on other public officials)."  (Doc. 42: Appellant Brief, Case No. 12-4051, PageID 40-51).

Given Petitioner's failure to preserve the claims he now raises in his Section 2255 motion, this Court should find Petitioner's claims procedurally defaulted.

### 3.    **Procedural Default**

As a general rule, federal courts will not review a procedurally defaulted claim unless the defendant can show either (1) cause for the default and actual prejudice from the error, or (2) that the court's failure to consider the claim will result in a miscarriage of justice because the defendant is "actually innocent."  Bousley v. United States, 523 U.S. 614, 622 (1998) (internal quotation marks omitted).

### a.    **Cause-and-Prejudice**

With respect to the issue of cause, a claim that is "so novel that its legal basis is not reasonably available to counsel" may constitute cause to excuse a procedural default.  Reed v. Ross, 468 U.S. 1, 16 (1984).  However, a claim of error based on McDonnell does not present a novel claim.  A McDonnell claims is not "so novel that its legal basis [was] not reasonably available to counsel," because McDonnell flows from the Supreme Court's decision in United States v. Sun-Diamond Growers of Cal., 526 U.S. 398 (1999).  McDonnell at 2370.  See Bousley, 523 U.S. at 622-23.  Furthermore, futility of objection because of prior case law going against the defendant does not establish cause.  Bousley, 523 U.S. at 623; United States v. Yancy, 725 F.3d 596, 600-601 (6th Cir. 2013).  Thus, Petitioner cannot show cause for the default.

With respect to actual prejudice in a case involving a faulty jury instruction, a defendant cannot obtain relief unless he can show that the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether 'the instruction is undesirable, erroneous, or even universally condemned."  United States v. Frady,

456 U.S. 152, 169 (1982) (internal citations and quotations omitted).  The Supreme Court

explained in <u>Frady</u> that "the degree of prejudice resulting from instruction error [must] be

evaluated in the total context of the events at trial."  <u>Id.</u>  Indeed, "[A] single instruction to a jury

may not be judged in artificial isolation, but must be viewed in the context of the overall

charge."  <u>Id.</u>  The Court went on to explain, "[A] judgment of conviction is commonly the

culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of

exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged

instruction but one of many such instructions, but the process of instruction itself is but one of

several components of the trial which may result in the judgment of conviction."  <u>Id.</u>

    As will be demonstrated below, given the overwhelming evidence at trial demonstrating

an entrenched pattern of bribery, Petitioner cannot demonstrate actual prejudice.

### b.    <u>Actual Innocence</u>

    A defendant who cannot demonstrate both cause and prejudice may still obtain relief on

collateral review if he can show that he is "actually innocent."  <u>Bousley</u>, 523 U.S. at 622.  To

establish the requisite probability of actual innocence, a defendant must show that it is "'more

likely than not that no reasonable juror would have convicted him.'"  <u>Id.</u> at 623 (quoting <u>Schlup</u>

<u>v. Delo</u>, 513 U.S. 298, 327 (1995)). With respect to a claim of "actual innocence," it must be

remembered that "actual innocence means factual innocence, not mere legal insufficiency."

<u>Bousley</u>, 523 U.S. at 623-24. Thus, to prevail, Petitioner would have to show that what public

officials did amounted to no more than setting up or hosting meetings or handling a phone call or

merely contacting another government official within the meaning of <u>McDonnell.</u>  The mere

legal insufficiency of the jury instruction would not suffice. The type of prejudice described in

<u>Frady</u> must also be shown.

18

**4.**      **The Harmless Error Standard**

In the event this court finds that Petitioner preserved <u>McDonnell</u> error, the United States discusses the harmless error standard for Section 2255 proceedings in this section of its pleading.

The harmless error standard as applied to Section 2255 proceedings is more favorable to the government than the harmless error standard on direct review.  On direct review, the government must show that the error was harmless beyond a reasonable doubt under <u>Chapman v. California</u>, 386 U.S. 18 (1967).  On collateral review, however, courts apply the "substantial and injurious effect" standard of <u>Kotteakos v. United States</u>, 328 U.S. 750 (1946).  <u>See</u> <u>Brecht</u>, 507 U.S. at 623; <u>Murr v. United States</u>, 200 F.3d 895, 906 (6th Cir. 2000) (where district court had failed to instruct the jury on the unanimity requirement of <u>Richardson v. United States</u>, 526 U.S. 813 (1999) in a CCE case).  In order to obtain habeas relief "because of incorrect jury instructions, Petitioner must show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair."  <u>Murr</u>, 200 F.3d at 906, (citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991)).  Under this standard, "[t]here must be more than a reasonable possibility that the error was harmful [and] . . . the court must find that the defendant was actually prejudiced by the error."  <u>Davis v. Ayala</u>, 135 S. Ct. at 2198.

Even a "jury instruction that omits an element of the offense" does not "necessarily render a trial fundamentally unfair."  <u>Neder v. United States</u>, 527 U.S. 1, 8 (1999).  <u>See also</u> <u>United States v. Smith</u>, 723 F.3d 510, 515 (4th Cir. 2013) (using harmless error standard to review a 2255 claim for an erroneous jury instruction on witness tampering that required the government to prove only a likelihood or possibility of interference, when the correct standard was more likely than not).  In <u>Smith</u>, the Fourth Circuit explained how to apply the harmless error standard when a Section 2255 claim is made on the jury instructions: "[w]e must determine whether the erroneous instruction had a substantial and injurious effect or influence on the jury's

verdict, and to resolve this, we consider the effect or influence that the erroneous instruction had in light of the evidence presented."  Id. at 517.  In applying that standard to the evidence in the case, the Smith court rejected the Section 2255 claim because there was substantial evidence satisfying the reasonable likelihood standard.  Id. at 518.  See also Pope v. Illinois, 481 U.S. 497 (1987) (harmless error standard for misstatement of an element of the offense) and Rose v. Clark, 478 U.S. 570 (1986) (harmless error standard for erroneous burden shifting as to an element of the offense).

Here there is no possibility that Petitioner was prejudiced by any deficiency in the instructions because the overwhelming evidence at trial established that Dimora and Russo and others performed or promised to perform official acts as defined in McDonnell in exchange for things of value.  The indictment alleged, and the evidence showed, that Dimora's responsibilities included "budgeting, levying taxes, issuing bonds, letting contracts for public works services, monitoring County expenditures, administering all purchases for County use, and approving funding to build and maintain certain roads.  In addition, Petitioner had the authority to influence personnel decisions within the County, including hiring, approving raises and promotions, terminating employment, and establishing job duties."  (R. 444: Third Superseding Indictment, PageID 9634).  All of these responsibilities fall within the McDonnell standard.

The RICO count specified the following official actions Dimora and Russo took or caused to be taken, all of which comport with the McDonnell standard:  "(1) awarding public business, (2) executing public business, (3) taking and withholding public personnel actions, (4) awarding and administering public loans, grants and other funding, . . . ., (6) expediting, facilitating and influencing judicial action in pending litigation, [and] (7) expediting, facilitating and influencing official action in matters pending before public agencies."  (Id. at PageID 9642).

20

Because the indictment (which the jury had during deliberations) alleged only official acts that comport with <u>McDonnell</u>, and because this Court's instructions were not as over-inclusive as those in <u>McDonnell</u>, any possible error was incredibly slight, and does not provide a basis for collateral relief.  Petitioner has shown no actual prejudice in that the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  <u>Frady</u>, 456 U.S. at 169.  Nor, under the 2255 harmless error standard, has Petitioner shown that the instructions "were so infirm that they rendered the entire trial fundamentally unfair,"  <u>Murr</u>, 200 F.3d at 906, or that there is "more than a reasonable possibility that the error was harmful [and] . . . that the defendant was actually prejudiced by the error."  <u>Davis</u>, 135 S. Ct. at 2198.

### 5.     Conclusion

Under either of these standards of review – procedural default or harmless error – Petitioner has failed to meet his burden for the reasons set forth below.

### D.     The McDonnell Decision

<u>McDonnell</u> clarified the definition of "official acts" to delineate between conscientious public officials hearing from their constituents and acting appropriately on their concerns and corrupt public officials accepting money and property in return for using the power of their offices to benefit bribe payors.  The Supreme Court held that the jury in <u>McDonnell</u> had not been properly instructed on the meaning of "official act," and it therefore clarified the definition and outlined two requirements for proving an "official act."

### 1.     Identification Requirement

First, the government must identify a "question, matter, cause, suit, proceeding or controversy" that involves "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee."  <u>McDonnell</u>, 136 S. Ct. at 2371-72.  The matter must be "pending" or one that "may by law be

brought" before any public official, meaning that the matter must be "relatively circumscribed" and, with respect to a matter that may by law be brought, "something within the specific duties of an official's position—the function conferred by the authority of his office."  Id.  This is often dubbed the identification requirement.  See United States v. Jones, 207 F. Supp. 3d 576, 581 (E.D.N.C. 2016) (coining these terms) and United States v. Lee, No. 1:15CR445, 2016 U.S. Dist. LEXIS 174984, at *8 (N.D. Ohio Dec.19, 2016) (using these terms).

As to the identification requirement, the meetings and social gatherings identified as the relevant matters or proceedings in McDonnell missed the mark because they were insufficiently "formal," "focused and concrete."  McDonnell, 136 S. Ct. at 2368-69.  Specifically, McDonnell stated that the district court got it wrong when it concluded that Virginia business and economic development was a question or matter.  Id. at 2360.  The "pertinent 'question, matter, cause, suit, proceeding or controversy' must be more focused and concrete."  Id. at 2369.  The matter must be at least "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete."  Id.  But, McDonnell said the Fourth Circuit got it right when it concluded that the following three questions or matters qualify as matters under § 201(a)(3): "(1) 'whether researchers at any of Virginia's state universities would initiate a study of Anatabloc'; (2) 'whether the state-created Tobacco Indemnification and Community Revitalization Commission' would 'allocate grant money for the study of anatabine'; and (3) 'whether the health insurance plan for state employees in Virginia would include Anatabloc as a covered drug.'"  Id. at 2370 (quoting United States v. McDonnell, 792 F.3d 478, 515-16 (4th Cir. 2015)).

As will be demonstrated in the Scheme-by-Scheme Analysis below in Section III.G. below, all of the matters and questions on which Petitioner paid bribes or facilitated bribes were sufficiently focused and concrete.  They are all things that "can be put on an agenda, tracked for

progress, and then checked off as complete." Id. at 2369.  Thus, the evidence in this case satisfied the identification prong of the McDonnell standard.

    **2.**      **Performance Requirement**

As to the performance requirement, a public official must "make a decision or take an action on the 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." McDonnell, 136 S. Ct. at 2372 (emphasis in original).  This is often dubbed the performance requirement.  See Jones, 207 F. Supp. 3d at 581.  McDonnell provided examples of qualifying official acts including (1) "a decision or action to initiate a research study," or (2) a "decision or action on a qualifying step, such as narrowing down the list of potential research topics," or (3) "using his official position to exert pressure on another official to perform an 'official act,'" or (4) "a public official us[ing] his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official." Id. at 2370 (emphasis in original).

The Court observed that simply setting up a meeting, hosting an event or making a phone call is not always an innocent act, and is not irrelevant.  "If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act," as it often did in the present case.  Id. at 2371.  The Court explained that merely "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so) *without more*" is not sufficient.  Id. at 2372 (emphasis added).  In the present case, when the official act involved making a phone call or setting up a meeting, there was always more, as will be demonstrated below in the Scheme-by-Scheme Analysis Section III.G..

In light of the fact that McDonnell asked subordinates to attend a meeting but did not expect them to do anything beyond that, the Supreme Court explained that the district court

23

"should have instructed the jury that merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter."  McDonnell, 136 S. Ct. at 2374-75. The evidence in the present case demonstrated that the public officials involved in Petitioner's schemes clearly expected their subordinates to do more than attend a meeting or host an event to discuss a matter.  Specifically, Dimora expected them to act in accordance with his instructions to do an official act, such as including Pumper's company in bid specifications.  Since this Court's instructions limited informal action to informal official influence, and defined official action using the statutory definition, there is no material difference between the additional instructions that the Supreme Court required in McDonnell and the instructions provided by this Court.  (R. 1044: Tr. Jury Trial Vol. 35, PageID 30007-30008.)  See discussion of the jury instructions below in Section III.F. below.

The Court in McDonnell left intact its long-standing precedent that a defendant need only agree to make a decision or take an action on a question or matter.  Id. at 2371 (citing Evans v. United States, 504 U.S. 255, 268 (1992)).  That "agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain.  Nor must the public official in fact, intend to perform the 'official act,' so long as he agrees to do so."  Id.

### 3.    Cases Decided After McDonnell

In United States v. Spellissy, No. 17-11067, 2017 U.S. App. LEXIS 19110, at *4 (11th Cir. Oct. 3, 2017), the Eleventh Circuit applied the harmless error standard to an appeal from the denial of a writ of coram nobis by a defendant who had been tried and convicted of bribery before McDonnell had been decided.  The court found that any alleged over-inclusiveness in the jury instructions was harmless because the government did not rely at trial on conduct that did not satisfy the McDonnell standard.  In Spellissy, as in the present case, the evidence established that the defendant participated in reviewing and prioritizing a specific pending proposal  –

"conduct that involved the awarding of specific government contracts up for bid, and that still meets the definition of 'official act' after McDonnell." Id.  As will be demonstrated in the scheme-by scheme analysis below, the government's evidence in the present case also meets the McDonnell definition.

In United States v. Jefferson, No. 1:07CR209, 2017 U.S. Dist. LEXIS 165824, at *55-61 (E.D. Va. Oct. 4, 2017), the district court, in a 2255 proceeding, vacated some of the bribery schemes for which former Congressman Jefferson had been convicted and upheld one of the schemes.  In upholding Jefferson's conviction for pressuring the United States Trade and Development Agency ("USDTA") officials to approve funding for a feasibility study, the Court analyzed the requisite portion of the McDonnell opinion finding that exerting pressure on another public official is sufficient to sustain a conviction.  Just as Petitioner did in the present case, Jefferson "used his office to place significant pressure" on other government officials.  He called "on several occasions to check on the status of the project" which caused those officials "to pay closer attention to the project."  He also requested status updates, and expressed a level of involvement that was "abnormal," all facts that are consistent with Dimora's actions in the present case in personally involving himself in the selection of GreenSource to provide insulation products for the Juvenile Justice Center.  The court in Jefferson stated that in McDonnell, the Supreme Court did not define "exerting pressure" but that "it must at least include repeated actions by a public official to push and promote a project, encouraging other officials to find ways to keep [a] project going even after similar projects would fail."  Id. at *59. It is not necessary that a witness use the word "pressure" to describe a defendant's actions.  It is sufficient that a defendant "hold[s] a certain sway" over the official's decision making.  Id. at *60.

25

In United States v. Silver, 864 F.3d 102 (2d Cir. 2017), the court, on direct appeal, reversed the bribery convictions of Sheldon Silver, the Speaker of the New York State Assembly, because of McDonnell error in the jury instructions.  Silver has no precedential value for the present case for the following reasons: (1) Silver was on direct review and applied a standard of review far more generous than the standard of review in Section 2255 cases, (2) as discussed in Section III.F. below, the jury instructions in the present case were much more restrictive than those given by the trial court in Silver and (3) the official acts at issue in Silver are distinguishable from those in the present case.

Regarding the standard of review, Silver applied the direct appeal harmless error standard to determine if "it [was] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error" in the instructions.  Id. at 118.  In applying this standard, the court concluded that "a rational jury might not have convicted had the charge more fully described an official act'" Id.

However, here, on collateral attack, the standard of review is much more favorable to the government.  If the Court finds that Petitioner did not preserve the issue on appeal, the question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether 'the instruction is undesirable, erroneous or even universally condemned.'"  Frady, 456 U.S. at 169.  If this Court determines that Petitioner did preserve the issue, the harmless error standard for review is whether "the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair."  Murr, 200 F.3d at 906.  Even a "jury instruction that omits an element of the offense" does not "necessarily render a trial fundamentally unfair."  Neder, 527 U.S. at 8.  See also Smith, 723 F.3d at 517 ("[w]e must determine whether the erroneous instruction had a substantial and injurious effect or

26

influence on the jury's verdict, and to resolve this, we consider the effect or influence that the erroneous instruction had in light of the evidence presented.").

Regarding the jury instructions, the trial court in <u>Silver</u> charged the jury that, "Official action includes any action taken or to be taken under color of official authority,"[4] an instruction which was much more over-inclusive than the charges given in the present case, or in <u>McDonnell</u>.  <u>See</u> discussion in Section III.F. below.

Regarding the official acts, the Court in <u>Silver</u> found that a jury might have acquitted where the defendant sent a letter on official letterhead vaguely offering to help navigate the permit process for a charity race if needed, or recommending someone for a job without any evidence of pressure being applied, or took a public position on the location of a methadone clinic.  <u>Silver</u>, 864 F.3d at 120.  In the present case, the official acts of Dimora and Russo were more than vague offers of assistance, or job recommendations without pressuring other public officials, or just taking a public position on a matter.  When Dimora and Russo pressured or advised other public officials, they did so privately.  When Dimora made a request of another public official, as he did in pushing GreenSource insulation products for County contracts, his request carried great weight, and satisfied the pressure or advice requirement of <u>McDonnell</u> at 2371-72.  He held "a certain sway" over the public officials he advised or pressured.  <u>Jefferson</u>, at *60.  <u>See</u> discussion of Petitioner's powers in Section III.G.I. below.

Regarding other official acts, <u>Silver</u> found that because there was little evidence of corrupt intent or the official act was perfunctory, the court could not conclude beyond a reasonable doubt that the jury would have convicted absent the erroneous jury instruction. <u>Silver</u>, 864 F.3d at 120-23.  Contrast that finding to the present case where co-conspirators and

---

[4] <u>Silver</u>, 864 F.3d at 112.

bribe payors testified about their quid-pro-quo intent, where Title III interceptions recorded the words of the conspirators, where Petitioner used cash to conceal bribes, where Petitioner engaged in acts of obstruction, and where Petitioner paid bribes close in time to obtaining official favors.  In addition, in several schemes, the evidence established that Dimora and Russo did official acts that were controversial, ill-advised, or about which his staff had concerns, such as Dimora asking Russo to hire Petitioner in Weights and Measures even though there were no job openings, bribing a judge in a divorce case for financial gain, and Russo hiring Gallucci at an inflated salary in exchange for a sham campaign.

There is no danger in the present case that the nature of the official acts would lead a jury to acquit because the jury was specifically instructed, at defendant's request, that it could "consider the official action's lawfulness, desirability, or benefit to the public welfare . . . as it may bear upon the intent of a defendant in accepting the thing of value." (R. 1044: Tr. Jury Trial Vol. 35, PageID 29974-75, 30006).  Thus, the jury already factored into their deliberations the nature of the official acts.

Because Silver was on direct appeal, and not on collateral attack, and because the record in the present case shows overwhelming evidence of intent, overwhelming evidence of a deeply ingrained pattern of corruption, and a jury instruction limiting the definition of official act in many ways that the Silver instruction did not, Petitioner was not prejudiced and the convictions must remain intact.

28

### E.    McDonnell has no Application to Schemes Not Requiring an Official Act

#### 1.    The Money and Property Mail Fraud Conspiracy and Substantive Counts Are Not Affected by McDonnell (Counts 31 and 32)

This Court should not address the merits of Petitioner's allegations concerning the money and property fraud convictions on Counts 31 and 32 because those crimes did not require the jury to find an "official act."

Count 31 charged a conspiracy with two objects, the first object being traditional money or property fraud (described in the indictment as simply mail fraud or wire fraud), and the second object being honest services fraud.  Likewise, Count 33 charged two substantive mail fraud crimes, one being honest services fraud and one being money and property fraud.  The jury returned special verdicts on both counts finding Petitioner guilty, specifying that Petitioner was guilty of each of the two objects: conspiring to commit money or property fraud and conspiring to commit honest services fraud. (R. 739: Jury Verdict Michael D. Gabor, PageID 17197-17200).

McDonnell had no impact on the traditional money or property fraud special verdicts because the jury was required only to find that Petitioner conspired to, or did, defraud and obtain money and property by means of a false statement or material omission.  (R. 735-1: Jury Instructions, PageID 17018-17022); Sixth Circuit Pattern Instructions §§ 10.01 and 10.02.  This is in stark contrast to the finding required for the honest services fraud conspiracy counts – that Petitioner accepted a thing of value in exchange for an official act.  Skilling v. United States, 561 U.S. 358 (2010); United States v. Terry, 707 F.3d 607, 612 (6th Cir. 2013).

#### 2.    McDonnell has No Application to the § 666 Conspiracy Convictions (Counts 17 and 19)

The indictment charged the Pumper/GreenSource schemes in two counts charging a conspiracy to violate Section 666.  By its terms, Section 666 does not require proof of an "official act."  It simply requires that a defendant take a thing of value "with the intent to be

29

influenced or rewarded in connection with any business, transaction, or series of transactions" of

the organization receiving federal funds.  18 U.S.C. § 666(a)(1)(B) and (2).

Several courts have determined that McDonnell does not affect prosecutions under 18

U.S.C §§ 666(a)(1)(B).  United States v. Jackson, 688 F. App'x 685, 696, f.n.9 (11th Cir. 2017)

(Section 666 "does not use the term 'official act'") (citing United States v. McNair, 605 F.3d

1152, 1191 (11th Cir. 2011)) ("§ 666 sweeps more broadly than [the definition of official act in

the federal bribery statute]);" United States v. Boyland, 862 F.3d 279 (2d Cir. 2017);[5] United

States v. Porter, No. 7:15-022 DCR, 2017 WL 1095040, at *3 (E.D. Ky. Mar. 22, 2017).

Even prior to McDonnell, the Sixth Circuit refused to read an "official act" requirement

into § 666.  United States v. Abbey, 560 F.3d 513, 521 (6th Cir. 2009).  Indeed, Porter cited

Abbey in holding that McDonnell is not implicated in a § 666 case.  Porter, 2017 WL 1095040 at

*3.  See also, United States v. Garrido, 713 F.3d 985, 1001 (9th Cir. 2013) ("§ 666 . . . makes no

mention of an 'official act' or a requirement that anything be given in exchange or return for an

official act.").

All of the bribery schemes alleged in the Pumper Hobbs Act/GreenSouce count (Count

21) were also charged in the Pumper 666 conspiracy counts (Counts 17 and 19).  Thus, this

Court need not address any of the Pumper schemes because they are unaffected by McDonnell.

In case this Court wishes to review the Pumper schemes charged in the § 666 counts, the

government addresses them in the Scheme-by-Scheme analysis below.

---

[5] But see United States v. Skelos, No. 16-1618, 2017 U.S. App. Lexis 18525, at *7 (2d Cir. Sept. 26, 2017) in which the Second Circuit, in a summary opinion on direct appeal, distinguished Boyland because the government in Skelos agreed to include "official act" in the Section 666 instruction.  The same is true here, but given that the present case is not on direct appeal, and that Petitioner procedurally defaulted on the 666 counts, Skelos has no precedential value.

**3.      McDonnell has No Impact on the State Bribery Predicates of the RICO Count**

The RICO count of the indictment charged that Petitioner conspired with others to "conduct . . . the activities of the Enterprise [Cuyahoga County] through a pattern of racketeering activity involving multiple acts indictable under provisions of federal law . . . . and *multiple acts of bribery under the following provision of state law: Ohio Revised Code Section 2921.02 (Bribery).*"  (R. 444: Third Superseding Indictment at PageID 9641-42) (emphasis added).  This Court charged the jury on the elements of state law bribery.  (R. 1044: Tr. Jury Trial Vol. 35, PageID 30101-102).  Thus, all of the bribery schemes alleged in the substantive counts of the indictment were incorporated into the RICO conspiracy and form one of several independent bases for conviction on that count.

McDonnell interpreted the definition of official act in the federal bribery statute, not Ohio Revised Code, § 2921.02, which does not contain the phrase, "official act."  Therefore, Petitioner has not established a basis for relief from his conviction on the RICO count.

**F.      In Closing Argument, Dimora's Counsel, Under the Jury Instructions this Court  Gave, was Able to, and did Make, Arguments about Meetings and Phone Calls Not Constituting Official Acts**

The Court's instructions in the present case covered both the identification and performance prongs of McDonnell (although not in the exact language of McDonnell) and limited the definition of official act in ways that the district court in McDonnell did not.  Thus, the instructions in the present case did not suffer from the same over-inclusiveness as the instructions in McDonnell.  Taken as a whole, the instructions made clear that the official act had to be something more than non-specific benefits to the bribe payer, such as generalized goodwill or cultivating friendship, and, that the official acts had to be actions Petitioner took in his official capacity, and not personal or political acts.  In fact, given these instructions, nothing prevented

Dimora's counsel from making their arguments, and or Petitioner's counsel making his arguments, on what constituted official acts despite any <u>McDonnell</u> errors in the instructions.

In <u>McDonnell</u>, the challenged instructions were found over-inclusive because they stated official acts could include acts "'that a public official customarily performs,' including acts 'in furtherance of longer-term goals' or 'in a series of steps to exercise influence or achieve an end.'" <u>McDonnell</u>, 136 S. Ct. at 2366.  However, this Court did not include such language in its instructions and "sufficiently captured the concerns later addressed in <u>McDonnell</u>." <u>United States v. Woodward</u>, No. 95-10234, 2017 U.S. Dist. LEXIS 172084, at *21-22 (D. Mass. Oct. 18, 2017); (R. 735-1: Jury Instructions, PageID 30004-30008).

<u>McDonnell</u>, 136 S. Ct. at 2374 stated that the following three instructions should be given when a court defines "official act."

1.    "[T]he jury must identify a 'question, matter, cause, suit, proceeding or controversy' involving the formal exercise of governmental power."   <u>Id.</u>

In essence, this Court satisfied this requirement, although not in these exact words, when the Court instructed that the official act had to involve a "question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's capacity, or in such official's place of trust or profit" and, that "[t]he term "official act" does not include actions taken in a personal or non-official capacity, such as actions taken as a political party leader." (R. 1044: Tr. Jury Trial Vol. 35, PageID 30005).

32

>    2.    The 'question, matter, cause, suit, proceeding or controversy' must be
>           something specific and focused that is 'pending' or 'may by law be
>           brought before any public official,' such as the question whether to initiate
>           research studies.  Id.

By giving instructions with appropriate examples of formal and informal influence being

specific and focused, this Court satisfied this McDonnell requirement by charging, "[O]fficial

acts include the decisions or actions generally expected of the public official.  In addition,

'official action' includes the exercise of both formal official influence (such as a public official's

votes) and informal official influence (such as a public official's influence on other public

officials)."  (R. 735-1: Jury Instructions, PageID 30008). With its parentheticals, this instruction

aligns very closely to the Supreme Court's limits on the definition of official act (an official act

"may include using [an] official position to exert pressure on another official to perform an

'official act' or to advise another official, knowing or intending that such advice will form the

basis for an 'official act' by another official."  Id. at 2372.

>    3.    Merely arranging a meeting or hosting an event to discuss a matter does
>           not count as a decision or action on that matter.  Id. at 2357.

This Court gave limiting instructions (which were not given in McDonnell) that did much

to insure that the jury did not convict on an over-inclusive theory that Dimora and Russo's

relationships with bribe payors were just innocent lobbying relationships.  For example, this

Court instructed:

>    1. The term "official act" includes any decision or action on any question, matter, cause,
>    suit, proceeding or controversy, which may at any time be pending, or which may be by law
>    be brought before any public official in such official's official capacity or in such
>    official's place of trust or profit.  (R. 1044: Tr. Jury Trial Vol. 35, PageID 30007-30008).
>
>    2. Official acts include the decisions or actions generally expected of the public official.
>    In addition, "official action" includes the exercise of both formal official influence, such
>    as a public official's votes, and informal official influence, such as a public official's
>    influence on other public officials.  (Id. at 30008).

3. The term "official act" does not include actions taken in a personal or non-official capacity, such as actions taken as a political party leader.  (Id. at PageID 30008).

4. [B]ribery or kickbacks are not proved if the benefit is intended to be, and is accepted as, simply an effort to buy favor or generalized goodwill from a public official who either has been, is, or may be at some unknown, unspecified later time, in a position to act favorably on the giver's interests.  (Id. at 30005).

5. [Y]ou may consider the official action's lawfulness, desirability, or benefit to the public welfare, just as you would any other circumstances in the case, as it may bear upon the intent of a defendant in accepting the thing of value.  (Id. at 30006).[6]

6. [P]roperty given with the sole motive of cultivating friendship is not a bribe.  (Id. at PageID 30007).

Thus, the instructions in this case, taken as a whole, made clear that the official act had to be something more than non-specific benefits to the bribe payer, such as generalized goodwill or cultivating friendship, and, they had to be actions Petitioner took in his official capacity, and not personal or political acts.

In fact, given these instructions, Dimora's counsel made repeated arguments about meetings and phone calls not being official acts despite any McDonnell errors in the instructions. Although Petitioner's counsel did not make the same arguments, he certainly benefitted from them.  Specifically, Dimora's counsel argued (without objection from the government) that:

1. "He set up meetings.  That's what commissioners are supposed to do."  (R. 1045: Tr. Jury Trial Vol. 36, PageID 30274).

2. Regarding the Lakewood ice rink and the call to the Lakewood Mayor, "Look, you might want to listen to my friend . . . He doesn't say, "Look, I'm the commissioner.  This is a guy that I want you to do this for . . . That's what commissioners are supposed to do. (Id. at PageID 30278). . . . And what does [Petitioner] do? He calls [the mayor], 'Can you sit down with him?' He tells him, 'I'm sitting here with a friend.' He tells him, 'He's got a proposal to make for you.'  There's no undue influence here.  There's no official action here."  (Id. at PageID 30374).

---

[6] This language was added at the request of the defense. (R. 1044: Tr. Jury Trial Vol. 35, PageID 29974-75).

3. Regarding the above, "There's nothing wrong with calling a mayor from a dinner and saying, "you might want to listen to this. I'm a booster of Cuyahoga County. I want to see things happen good in Cuyahoga County." (Id. at PageID 30283).

4. Regarding the DAS Litigation and Petitioner's call to a Common Pleas judge, "He only had a phone conversation with her." (Id. at PageID 30294).

5. Regarding obtaining a public job for Gina Coppers, "Simply putting a piece of paper, a resume on somebody's chair is not official action. Take a look at the instructions. It defines it for you. It uses terms like 'influence,' . . ." (Id. at PageID 30305).

6. "[Petitioner] didn't have influence far and wide. He set up meetings. And you hear, when you listen to the calls, even on the calls, he's not trying to push influence." (Id. at PageID 30307).

7. Re: Kleem and First Energy, "There's no official action there. There's no pressure. There's no influence. This is a private company, a private company that public official contacted regularly." (Id. at PageID 30311).

8. Re Kleem and the taxiway, "[Petitioner's] calling for a status. . . He's not saying, 'Give him the contract.' He's not saying do anything. He's saying, 'What's the status?'" (Id. at PageID 30312).

9. Re Kleem and Coe Lake, "Same thing, Coe Lake. He took a meeting with the mayor. He took a meeting with the head of the board of development for Berea maybe on request of Mr. Kleem, maybe not on the request of Mr. Kleem. Either way, he took a meeting with these people. They told him that the funding was supported by the ADA. He called Tracey Nichols and he said, 'Hey, they're telling me this should be covered. Can you look into it? . . .' [Petitioner] didn't tell her what to do. He didn't tell her to do the funding. He said, 'Can you look into it?'" (Id. at PageID 30312).

10. Regarding funding for Alternatives Agency, "[Petitioner was told] that the purpose of that meeting is to discuss funding for halfway houses. It's a legitimate reason for a dinner . . . ." (Id. at PageID 30320).

11. Re: the Parkview loans and Pumper, "Don't be fooled. Steve Pumper knew what he was getting with a phone call to [Petitioner] was a meeting, a meeting where he would explore what loans are available. That's not influence. That's not official action. Look at the definition. There's no influence getting a meeting. There's no influence putting him in touch with the person who could tell what programs are available." (Id. at PageID 30340).

12. Re: extensions of the Parkview loans, "It goes to the Department of Development. It goes to the Loan Committee. This isn't influence. [Petitioner] didn't try to circumvent the Loan Committee. He did not try to circumvent the process. He didn't try to influence

the process. What he did was set up a meeting so somebody could see whether or not they qualified. That's not improper influence." (Id. at PageID 30344).

13. Re: Petitioner's calls to Judge McCafferty, "You heard about the calls to the Judge . . . . calls about other judges. And as Mr. Russo told you from the stand, [Petitioner] had a relationship with the judges of Cuyahoga County. It was part of his position as a Democratic Party chair. They needed his support. They sought his support. Frank Russo and [Petitioner] called judges. Was that an official action? It wasn't something he was going to vote on. It wasn't something that was going to be put in front of him." (Id. at PageID 30344).

14. Re: helping Gina Coppers get a public job, "And these phone calls to Tom Day, they're not an official act. Look at the definition. There's not an improper influence here. What does [Petitioner] tell Ms. Coppers? 'If Tom couldn't do it, he would tell me no.'" (Id. at PageID 30352).

15. Re: Gina Coppers, "This conversation he had with Renee Strong when the resume first came in, 'Just throw it on my chair'. . . . [T]hat's not an official act. That's not improper influence. Look at the definition." (Id. at PageID 30353). . . . There's no improper influence happening here . . . . They introduced her to Tom Day." (Id. at PageID 30355).

16. Re: Neiheiser and the JJC, in response to the government's argument that Neiheiser was asking Petitioner to scrutinize the bids, "To make that inference, you would have to ignore all the testimony you've heard about what happened in Cuyahoga County. It wasn't up to [Petitioner] to scrutinize the bid or not. It wasn't up to [Petitioner] to direct Mr. Maldonado. . . . This is controlled by the Ohio Revised Code. (Id. at PageID 30375).

17. Re: Randazzo and FNA obtaining public contracts at the Sewer District and in Beachwood, "Not a peep from [Petitioner] not trying to influence this, not trying to make it happen. What did he do? They sat [sic] up some dinners and some meetings with people that don't work for Cuyahoga County. He set up meetings with the mayor [of Beachwood]. He sat [sic] up [a] meeting with Ciaccia [at the Sewer District]". . . . [Petitioner] could get him a meeting. He never said – he never thought he could give him a slot [a contract]. He thought he could get him a meeting. That's what he was interested in. That's not improper influence. That's not official action. And what did Mr. Randazzo say he wanted in exchange for the palm tree? An open line of communication. Some hope of favor or generalized goodwill is not a violation of the statute. . . ." (Id. at PageID 30381-82).

18. Re: Valentin, "He told you he gave [Petitioner] granite because 'I was thinking in the future maybe I will have some – if I need some help, I could get some favor.' He said he never talked to [Petitioner] about that. Again, some hope of favor or generalized goodwill is not a violation here." And later, after counsel described the immigration issue Valentin discussed with Petitioner, "This isn't some looking for a favor . . . . At most, at most, we have favor or generalized goodwill. That is not a violation of the

statutes you're asked to look at here.  There is no official capacity.  There's no official action."  (Id. at PageID 30382-83).

19. Re: Zavarella and County jobs for his daughter, "[Zavarella testified]. . . . he gave free brickwork because [Petitioner's] a public official, and if he thought he helped [Petitioner], he was sure someday [Petitioner] could help him.  Again, hope of generalized goodwill or favor in the future is not a violation of the statutes here."  (Id. at PageID 30384).

20. In general, "There's no being influenced, intending to be influenced . . . It is not illegal for [Petitioner] to be friends with, socialize with, talk about business with people that do business with the county."  (Id. at PageID 30390-91).

Thus, Petitioner benefited from arguments that setting up meetings, attending meetings or making calls did not constitute official acts.  Counsel was also able to argue that certain matters would not come before Dimora for a vote, all without objection from the government.  United States v. Clarke, 842 F.3d 288, 296 (4th Cir. 2016) (defendant failed to demonstrate actual prejudice due, in part, to his ability to make all arguments essential to his case).  Indeed, in many of the defense arguments, Dimora's counsel supported her contentions with reference to the jury instructions this Court gave.  Accordingly, Petitioner was not prejudiced by any McDonnell error in the instructions.

Petitioner cannot show that the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," Frady, 456 U.S. at 169.  Nor can he show that the instruction had a "substantial and injurious effect," Kotteakos, 328 U.S. at 750 and specifically, that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair," with "more than a reasonable possibility that the error was harmful [and] . . . that the defendant was actually prejudiced by the error."  Davis v. Ayala, 135 S. Ct. at 2198.

### G.     Scheme-by-Scheme Analysis of Official Acts

#### 1.     Dimora's Official Powers in General

Dimora was one of three elected members of the Board of County Commissioners ("BOCC"), which had statutory power to: (1) enter into contracts with other units of government including but not limited to municipal corporations and townships (Ohio Revised Code § 307.15); (2) purchase, lease, or construct county facilities (Ohio Revised Code § 307.02); (3) sell, lease, or rent any real property owned by the county and not used for public use; (Ohio Revised Code § 307.09); (4) approve loans or grants for economic development Ohio Revised Code § 307.07); (5) issue bonds to secure grants in excess of the community improvement fund; (Ohio Revised Code § 307.284), and (6) enter into agreements for construction or repair of infrastructure (Ohio Revised Code § 307.082).

The BOCC had "control of a majority of [the Auditor's Office] budget. The only thing that they didn't have control of was the appraisal money." (R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26219-20).

According to co-conspirator Kevin Kelley, "Commissioner Dimora and Auditor Russo were two of the most powerful politicians in Cuyahoga County." (R. 1015: Tr. Jury Trial Vol. 15 (Kelley), PageID 25857). Specifically, Russo stated, "Jimmy Dimora and I were probably the two most powerful people or well-known people in Cuyahoga County." (R. 1043: Tr. Jury Trial Vol. 26 (Russo), PageID 29738). Moreover, co-conspirator Steve Pumper stated "[Dimora] had a lot of power at the time. [Dimora] had control of a lot of folks on the council [and] . . . some of the judges. . . . [Dimora] and Mr. Russo, they had a lot of control back then." (R. 1034: Tr. Jury Trial Vol. 21 (Pumper), PageID 27741). According to co-conspirator Charles Randazzo, Russo and Dimora were important to him because, "they were centers of influence in Cuyahoga County." (R. 1038: Tr. Jury Trial Vol. 25 (Randazzo), PageID 28817).

Steve Pumper, a contractor and bribe payor explained he did not work through the normal process in obtaining meetings with County staff because, "[I]t was easier to call [Dimora].  If he made a call to somebody, they jumped for him.  So I needed to get it done, and he did it for us." (R. 1034: Tr. Jury Trial Vol. 21 (Pumper), PageID 27766).

Dimora even had the power to reject a low bid and vote to award a contract to the next lowest bidder.  As Ferris Kleem testified, he was concerned about whether he would get a contract on the Juvenile Justice Center ("the JJC") project if he was the low bidder because, "the bids on the asbestos [for the County's Ameritrust building] were awarded to the second highest bidder by a million dollars.  There was a million dollars difference between the low bid and the second bidder.  And they [the BOCC] awarded it to the second bidder, a million dollars more.  . . . and I thought maybe the rules are changing . . . and I could ask [Dimora] if that was going to be the case with the Juvenile Justice Center."  (R. 1015: Tr. Jury Trial Vol. 15 (Kleem), PageID 23710-11).

Dimora contended in his 2255 motion that he was only one of three commissioners, so his "votes were uncontroversial, unanimous, and approved staff recommendations."  (R. 1162-1: Brief in Support, PageID 32301-03).  This Court should reject these arguments for two reasons.

First, it is legally irrelevant.  <u>McDonnell</u> did nothing to change the long-standing legal principles enunciated by this Court in its instructions:

> It is not a defense to claim that a public official would have lawfully performed the official action in question even without having accepted a thing of value. In other words, it is not a defense that the offer or promise of anything of value was made to the public official in exchange for an official action that is actually lawful, desirable, or even beneficial to the public. ***The law of bribery and kickbacks is not concerned with the wisdom or results of the public official's decisions, but rather with the manner in which the public official makes his decisions.*** However, you may consider the official action's lawfulness,

> desirability, or benefit to the public welfare, just as you would any
> other circumstances in the case, as it may bear upon the intent of a
> defendant in accepting the thing of value.
>
> Also, it is not necessary for the government to prove that the
> scheme actually succeeded, or that any official act was actually
> taken by the public official in the course of the scheme. What the
> government must prove is the intent to effect an exchange of
> money or other thing of value in return for official action.

(R. 1044: Tr. Jury Trial Vol. 35, PageID 30006) (emphasis added); Evans v. United States, 504

U.S. 255, 268-69 (1992) (the offense is complete when the public official receives the payment

in return for the official act – fulfillment of the promise to perform the act is not required).  See,

United States v. Holzer, 816 F.2d 304, 308 (7th Cir. 1987) (vacated on other grounds, 484 U.S.

807 (1987)).

 Second, as discussed below in the Scheme-by-Scheme Analysis in Section III. G. et seq.,

there were many instances in which Dimora and Russo took official action that was ill-advised,

such as Russo hiring Gabor for a partially no-show job at Weights and Measures even though

there were no openings, Russo hiring Gallucci at an inflated salary in exchange for running a

sham campaign, and conspiring to bribe a domestic relations judge on a financial matter for

Petitioner's financial gain.

## 2.    **Introduction to Scheme-by-Scheme Analysis**

The scheme-by-scheme analysis below summarizes the official acts involved in the

schemes for which Petitioner was convicted.

## 3.    **RICO**

To establish a criminal conspiracy violation under 18 U.S.C. § 1962(d), the United States

was required to prove only that Petitioner knowingly agreed that a conspirator (which may have

included the Petitioner) committed a violation of 18 U.S.C. § 1962(c).[7]  There is no requirement

that Petitioner "himself committed or agreed to commit the two predicate acts requisite for a

substantive RICO offense under § 1962(c)."  Salinas, 522 U.S. at 61.  Thus, to prove a RICO

conspiracy under Salinas, it was sufficient that Petitioner agreed to the commission of at least

two predicate acts (by any conspirator) on behalf of the conspiracy, Id. at 63, and, the

Government was only required to prove that Petitioner agreed that another conspirator would

commit multiple acts of the "type" or "types" of predicate crimes.  See, (R. 530: Order, PageID

11070-71, citing Id., at 65.)

### a.    Russo Hiring Petitioner for a Partially No-Show County Job in Exchange for $5,000 in Cash

If someone wanted a job in the Auditor's Office, Frank Russo – not the HR Department –

did the hiring, clearly an official act under McDonnell.  In some cases, no job applications were

submitted.  (R. 1026: Tr. Jury Trial Vol. 18, PageID 26220).

Dimora asked Frank Russo to hire Petitioner in the Auditor's office.  Russo hired him in

October 2012, and, even though he did not have openings in the Weights and Measures

Department, placed Petitioner there.  In exchange, Petitioner gave Russo $5,000.  Because the

job allowed Petitioner to work in the field, and the work load was very light, Petitioner served as

Dimora's driver (R. 1039: Tr. Jury Trial Vol. 26, (Russo), PageID 28957-59, 28963) and did

personal errands for Dimora.  (R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26205-06,

26209).

---

[7]  See, e.g., Salinas v. United States, 522 U.S. 52, 62-65 (1997).; United States v. Delgado, 401
F.3d 290, 296 (5th Cir. 2005); United States v. Pipkins, 378 F.3d 1281, 1288 (11th Cir. 2004);
United States v. Posada-Rios, 158 F.3d 832, 857 (5th Cir. 1998); United States v. To, 144 F.3d
737, 744 (11th Cir. 1998); United States v. Pungitore, 910 F.2d 1084, 1117 (3d Cir. 1990).

Petitioner contends in his brief, that Dimora asking Russo to hire Petitioner was not an official act.  (R. 1177: Motion to Amend, PageID 32637).  He seems to be arguing that the public official in this scheme was Dimora.  He is mistaken.  The public official in this scheme was Russo,  See (R. 444: Third Superseding Indictment, ¶¶ 105 and 106).

When Russo hired Petitioner in exchange for $5,000 in cash, he satisfied both the both the identification and performance prongs of McDonnell.

### b. Bribing a County Domestic Relations Judge for a Favorable Ruling on a Financial Matter

In late Fall 2004, Petitioner, with Dimora and Kelley participating, conspired to bribe a Cuyahoga County Domestic Relations Judge for a favorable order on a financial matter in Petitioner's divorce proceedings.

Petitioner, Dimora, Russo and Kevin Kelley were in Dimora's backyard.  Gabor was complaining about a financial matter pertaining to his divorce.  Dimora pointed to Kelley and said, "Go work it out with Kevin.  He knows who to get to to [sic] get to the judge. " (R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 28963-64).  Dimora asked Kelley to act as an intermediary for the bribe because Kelley knew someone who could serve as a second intermediary to the judge.  (R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26197- 205).  ("[Dimora told Petitioner], hey, you go to Kevin Kelley.  He'll get you organized with the judge. He knows who can work with the judge.").  (R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 28963-64).

Petitioner gave Kelley $10,000 in cash to convey to the judge through the second intermediary and reported back to Petitioner that he had met with the intermediary and "everything was going to work out."  (R. 1026: Tr. Jury Trial Vol. 18, PageID 26203).

On February 7, 2005, without a hearing, the judge entered an order granting, in part, the relief Petitioner sought.  (R. 1024: Tr. Jury Trial Vol. 15, PageID 25647- 25652; Gov't Ex. 125).  Petitioner did not receive the exact ruling he had requested, and complained to Petitioner and other members of the conspiracy, ultimately requesting a refund from Kelley.  (R. 1026: Tr. Jury Trial Vol. 18, PageID 26201-202; R. 1039: Tr. Jury Trial Vol. 26, PageID 28966-67).

Under McDonnell, a judge issuing a court order satisfies both the identification and performance prongs of McDonnell.

### c.    Agreeing that Dimora would take Bribes from Kleem in Exchange for Voting on Juvenile Justice Center Contracts and Taking Action on Qualifying Steps

Although Petitioner was not charged in the substantive counts pertaining to this scheme, this Court found, as set forth in more detail below, that it formed part of the basis for Petitioner's liability on the RICO count. (R. 1054: Tr. Sentencing Hrg, Page ID 30962-30970).

Ferris Kleem and his companies paid a series of bribes to Dimora over a period of years from the time Dimora was first elected Commissioner through mid-2008.  Sometimes he gave things of value for past official acts, and sometimes for future ones.  (R. 1014: Tr. Jury Trial Vol. 8 (Kleem), PageID 23707).  He paid the bribes to "gain influence at Cuyahoga County," (R. 1014: Tr. Jury Trial Vol. 7 (Kleem), PageID 23323), and to "get stuff done" on County work, (id. at PageID 23339).

These bribes included, among numerous other things, an all-expenses paid trip to Las Vegas, including a hotel room, meals, $6,000 in cash for gambling, privileges at the Bare pool and the services of a prostitute.  (R. 1014: Tr. Jury Trial Vol. 7 (Kleem), PageID 23345-47, 23376-77 23399, 23408-409, 23412, 23420, 23436-39, 23448-55, 23459-65, 23469-74; R. 1015: Tr. Jury Trial Vol. 8 (Kleem), 23688, 23377-81, 28904).  In return Petitioner agreed to perform a series of official acts on a variety of projects for Kleem's benefit.

43

Petitioner's role in this scheme centered primarily on the Las Vegas trip Kleem funded for Dimora and Russo at the time Kleem was seeking favors from Dimora relating to the Juvenile Justice Center ("JCC") contract.  Thus, this pleading will focus on the official acts Dimora performed in that part of the scheme.

### (1)        Background

The County was planning to build a new JJC.  Dimora voted several times on matters for Kleem's benefit on the JJC during the time Kleem and Petitioner were making plans for Kleem to take Petitioner on an all-expenses paid trip to Las Vegas and while they were in Las Vegas. (R. 1012: Tr. Jury Trial Vol. 5 (Massie), PageID 22878, 22935-43, 22954-56; R. 1014, Tr. Jury Trial Vol. 7 (Kleem), PageID 23323, 23377-81).  In addition, Petitioner caused other public officials to take actions on qualifying steps which, if successful, would have led to Petitioner's vote on a contract for Kleem's benefit.

### (2)        Official Acts

On February 22, 2008, Dimora and Kleem had a telephone call in which they made plans for the Las Vegas trip.  Kleem was in the process of bidding on the JJC and told Dimora, "You know, this Juvenile Justice Center, it's way over budget on the general trades. . . .  It's gonna be thirty-five million, Jimmy, instead of twenty-two.  You gonna be able to award it to me if I'm low?"  Dimora replied in the affirmative.  (Gov't. Ex. 400-L-TR, p. 5).  Kleem explained he was concerned because in a previous unrelated County project, the commissioners voted to award a contract to company that was not the low bidder. That raised red flags in the construction industry.  (R. 1015: Tr. Jury Trial Vol. 15 (Kleem) PageID 23385).  Thus, in the same conversation in which Kleem offered to pay expenses for the Las Vegas trip, Dimora committed to voting in favor of Kleem's company if its bid was low.  Evans 504 U.S. at 268-69 (fulfillment of the promise to do an official act is not an element of bribery).

44

On March 13, 2008, after the County determined that all of the JJC bids were over budget, Dimora voted to reject all bids for the main building packages, to revise the specifications and to re-advertise for bids.  (R. 1012: Tr. Jury Trial Vol. 5 (Massie), PageID 22877-78, Gov't Ex. 400-R-1 (Agenda Action)).  Kleem's bid had been thrown out because there had been a problem with his bid bond.  Thus, Dimora's vote allowed Kleem to re-submit a bid with proper bonding and at a revised cost of $36.8 million compared to the $22 million that was in the original estimate.  (Id. (Massie) at PageID 22878, 22939).

On March 20, 2008, Dimora voted to award a $4,576,000 award for concrete on the JJC to Phoenix Cement to one of Kleem's companies.  (Id. at PageID 22879; Gov't Ex. 400-R, page 7).

On April 3, 2008, Dimora voted to request an additional addendum increasing the general trades estimate from $36,800,000 to $37,000,000.  This vote came just two days before the Las Vegas trip, and one day after Kleem, at Teamz Restaurant, had given $6,000 in cash to Dimora and $6,000 in cash to Russo for gambling. (Id. at PageID 22902-03, 22979; R. 1014: Tr. Jury Trial Vol. 7 (Kleem), PageID 23412; Gov't Ex. 441, p. 7).

On that same date Petitioner and Russo had a conversation about the Las Vegas trip in which Russo told Petitioner, who was also going on the trip, that Kleem was "gonna have whores and he's got a tiki hut by the pool."  Gabor responded, "Nice . . . . That's a . . . beautiful thing. That's awesome."  Russo continued, "And Monday night we're going to dinner at this . . . restaurant. . . it's gonna be a nice time." Govt. Ex. 400-Z-TR.

On April 7, 2008, while Petitioner, Dimora and Kleem were in Las Vegas, with Kleem paying the expenses, Kleem learned that he was the second lowest bidder on the JJC general trades re-bids.  Dimora, while at the Bare Pool with Petitioner, and for the benefit of Kleem,

45

called his executive assistant in an effort to determine if the low bidder (Panzica) could be excluded.  This call, and others related to it, were decisions or actions on qualifying steps toward excluding Panzica's bid, paving the way for Petitioner to vote on Kleem's company for the contract.  This process was very similar to "narrowing down the list of potential research topics," which <u>McDonnell</u>, 136 S. Ct. at 2370 stated qualifies as an "official act."

Dimora's assistant, at Dimora's behest, called Adrian Maldonado, the County Director of Procurement and Diversity (who reported to the commissioners), to research whether the Panzica bid could be excluded for either omitting an allowance or for having an inexperienced Small Business Enterprise ("SBE").  Maldonado reported to Dimora's executive assistant, who told Dimora, that Maldonado was looking at Panzica's SBE experience to determine if it was sufficient.  If Panzica's bid was thrown out for having an insufficient SBE, or on the allowance issue, Kleem would be the low bidder and Dimora would vote to award the contract. (Gov't Ex. 400-L-TR, p.5 (Kleem asked Dimora if he would award the contract to Kleem if he was low and Dimora responded in the affirmative), 400-CC-TR, 400-FF-TR, 400-NN-TR, p.2 (all calls in which Dimora assisted Kleem by investigating the Panzica bid), <u>Id.</u> at PageID 22955-56, 22979-81, 22937-42).

Thus, Dimora (1) cast votes on JJC matters for Kleem's benefit, and (2) pressured his staff to take action which, if successful, would have eliminated Panzica's bid, resulting in Petitioner voting to award the contract to Kleem, all satisfying the identification and performance prongs of <u>McDonnell</u>.

(3)    **Evidence Supporting Petitioner's liability for the Kleem
Scheme in the RICO Count**

At sentencing, this Court determined that Petitioner had liability under the RICO count for this scheme.  (R. 1054: Tr. Sentencing Hrg, Page ID 30962-30970).   This finding was based on the following evidence:  (1) Petitioner's advance knowledge about the Las Vegas trip and what was going to happen, Govt. Ex. 400-Z-TR  (Kleem will have "whores" and Monday night we're going to dinner at the restaurant), (2) Petitioner's statement that he put his information about the trip in an envelope because "it's nobody's business." (Id.), (3) Petitioner talking with Kelley about the Las Vegas cover story – that they just ran into Kleem in Las Vegas, thus establishing Gabor's knowledge that the trip was illicit, (id. at PageID 30962-64; Govt. Exs. 509-TR, 400-RR-TR), (4) Petitioner's presence at the Bare Pool in Las Vegas when Dimora was making calls back to his office for Kleem's benefit regarding the JJC, (R. 1012: Tr. Jury Trial Vol. 5 (Massie), PageID 22935-22944; Govt. Exs. 468, 469, 471), and (5) Dimora telling Petitioner to "play dumb" when they meet Panzica's partner for dinner and Gabor understanding the reason – that Panzica did not yet know it was out of the running for the JJC contract (Govt. Ex. 400-RR-TR;  R. 1012: Tr. Jury Trial, Vol. 5 (Massie), PageID 23000-23001), and (5) Gabor receiving from Kleem, lunch at the Bare Pool, the cabanas, the chips, and being aware that things of value were being given to others.  (R. 1054: Tr. Sentencing Hrg, PageID 30970).

4.    **Pumper (Counts 17, 19 and 21)**
a.    **Introduction**

Steven Pumper paid bribes to Dimora in the form of cash, home improvements, sports tickets, dinners and the promise of a percentage of profits from one of his companies, GreenSource, all in exchange for official acts on numerous business projects and personal matters.  Regarding the cash, Pumper promised Dimora $35,000 which he gave to Petitioner in

47

$2000 to $3000 cash installments "every two weeks, a month" ending in May 2008 with a

balance owed of $5,000.  (R. 1035: Tr. Jury Trial Vol. 22 (Pumper), PageID 27889, 27891).

When asked why he paid the bribes, Pumper testified:

Gaining [Dimora's] influence.  You know, he was one vote out of three on the [BOCC].
He had a lot of power at the time.  He had control of a lot of folks on the council, on the –
some of the judges, some of the council people.  You know, so they had, between himself
and Mr. Russo, they had a lot of control back then. . . . .  Well, it benefits me because I
need things done, you know.  So from my standpoint I was able to get some loans from
the county a lot quicker and faster.  Whenever I made a call to have something done,
[Dimora] would make those calls on my behalf.  And so, yeah, it was a great benefit to be
able to just go to somebody like [Dimora] than climbing up through the chain through the
bottom. . . . It's a huge benefit.  It's a time-saving benefit when you're trying to get a
project closed out, you know, or receive money that you kneed, you know, that you need
for a project and you don't want to put up some of your own money.  It's a huge benefit
for myself. . . . He made a call for – I was going through a lawsuit with Letter Perfect on
this Cleveland Browns suit I was involved with.  And so he made a call to the judge that
was handling the case . . . to try to speed up the closing of that lawsuit and help obviously
bring down that I needed to, you know, settle with.  So by him making that call was a
help for [the judge] to go ahead and react pretty quickly to that as well.  Child Services,
when I was going through – me and my wife had a huge drinking problem, and so I was
worried about the kids.  So I had [Dimora] call over to Child Services to try to get
somebody to take a look and see what's going at the house and make sure things were
going on okay over there.  And it's better being – you know, having that reacted to
quicker than going thought the typical process.

(R. 1016: Tr. Jury Trial Vol. 9 (Pumper), PageID 27741-42).

Petitioner was convicted in Count 17 of conspiring with Dimora and Gabor to violate

Section 666 and in Count 19 with a substantive 666 count.  The evidence demonstrated a wide-

ranging conspiracy involving Pumper and his companies giving a variety of things of value to

Dimora in exchange for Dimora performing a series official acts for the benefit of Pumper or for

the benefit of Pumper's many business interests, including GreenSource.

The indictment identified 17 overt acts Petitioner performed in furtherance of the

conspiracy, all involving GreenSource.  See overt acts J, P, Q, R, S, T, U, V, W, X, BB, CC, GG,

JJ, KK, LL AND MM at PageID9724 – 31. Petitioner was also convicted in Count 21 of a Hobbs

Act violation in connection with GreenSource.  Because Petitioner's role in these crimes centered on GreenSource, this pleading will focus only on that scheme.

At sentencing, this Court found that the value of the benefit conferred on GreenSource by this scheme was too speculative to calculate.  Thus, this Court did not enhance Petitioner's Guideline calculation based on the amount of the benefit conferred.  (R. 1054: Tr. Sentencing Hrg, PageID  30909).

> **b.**    **GreenSource**
>
> **(1)**    **Voting, and Taking Action on Qualifying Steps Toward Changing Bid Specifications on JJC Contract and Other County Projects**

Pumper's family owned GreenSource, a company that manufactured an insulation product.  Dimora and Pumper had conversations about Pumper's desire to place GreenSource products in County projects. (R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26276). Specifically, Pumper was interested in having the County adjust bid specifications for its JJC project to require the specific insulation product that GreenSource manufactured.  Pumper also asked Dimora for assistance in obtaining advance word on where the County intended to build its East Side Neighborhood Family Cervices Center so Pumper could work on pitching GreenSource for the project.  Dimora agreed to help.  (R. 1034: Tr. Jury Trial Vol. 21, (Pumper), PageID 27768-70; Gov't Ex. 1700-CC).

In exchange, Pumper and Petitioner (who had been offered a job at GreenSource by Pumper) promised Dimora a share of the GreenSource profits.  (R. 1034: Tr. Jury Trial Vol. 21 (Pumper), PageID 27789-27795; Gov't Ex. 1700-J-TR, 1700-P-TR, 1700-S-TR).

At Pumper's request, and beginning at least as early as February 2008, Dimora did the following to assist Pumper and GreenSource in this effort.  (Id. at PageID 27816-18 (Pumper – "I

had a conversation with [Dimora] about giving Adrian [the County Director of Diversity and Procurement] a call and pushing that process a bit."); Gov't Ex. 1700-X; 1700-W).

First, Dimora arranged for and attended a meeting for Pumper, Dimora and Petitioner with Adrian Maldonado, the County Director of Diversity and Procurement.  (Gov't Ex. 1700-EE-TR, 1700-GG-TR, 1709; R. 1037: Tr. Jury Trial Vol. 24 (Oliver), PageID 28513, 28520 -22). Maldonado was in charge of all County contracting operations, including the bidding process, and reported to the BOCC.  (R. 1030: Tr. Jury Trial Vol. 32 (Maldonado), PageID 27011). Maldonado attended the meeting because Petitioner asked him to.  Absent the request from Dimora, he would not have attended.  (Id. at PageID 27043)  At the meeting, on March 12, 2008, Dimora told Maldonado that GreenSource produced a good product and that Maldonado needed to go by the GreenSource facility and take a look at the plant.  He also said the GreenSource product would save money for the County.  Dimora falsely stated to Maldonado that Dimora was not getting anything out of pushing GreenSource Products for County work, even though he, Pumper and Petitioner had an arrangement whereby Dimora would receive a percentage of the GreenSource profits on the JJC.  (R. 1035: Tr. Jury Trial Vol. 22, (Pumper), PageID 27822-28; Gov't Ex.  1717-TR).

Second, the next day, March 13, 2008, Dimora voted to reject all bids for the JJC main building packages, to revise the specifications and to re-advertise for bids, thus giving Pumper more time for adjusting specifications for GreenSource's benefit. (R. 1012: Tr. Jury Trial Vol. 5 (Massie), PageID 22877, Gov't Ex. 400-R-1 (Agenda Action)).

Third, Dimora arranged for Maldonado and staff from the County's Central Services Department to conduct a walkthrough of the GreenSource facility.  (R. 1021: Tr. Jury Trial Vol. 14 (Ross), PageID 25274; R. 1034: Tr. Jury Trial Vol. 21, (Pumper), PageID 27786; R. 1037: Tr.

Jury Trial Vol. 24, (Pumper), PageID 28473; Gov't Ex. 1700-V-TR ("all [Dimora] has to do is call [the County officials involved in the JJC specifications] and say, hey, these guys [GreenSource] want to introduce their product over there.")).  Maldonado took the tour because Dimora asked him to.  (R. 1030: Tr. Jury Trial Vol. 32 (Maldonado), PageID 27046-47).   This was a decision or action on a qualifying step towards a contract with GreenSource products as a subcontractor which, if this scheme had been successful, would have come before Dimora for a vote.  In Pumper's words, Maldonado could "help make decisions on changing some of the specifications and adding GreenSource to the project."  (R. 1035: Tr. Jury Trial Vol. (Pumper), PageID 27818).  McDonnell at 3702 ("a decision or action . . . on a qualifying step . . . would qualify as an 'official act.'").  Jay Ross, the head of Central Services at the County had reservations about using GreenSource.  He was not sure the GreenSource product would work well at the JJC, and he was concerned that re-working the specifications would cause delays.  (R. 1021: Tr. Jury Trial Vol. 14 (Ross), PageID 25275).

Fourth, Dimora arranged a meeting for Pumper, Paul Voinovich (the principal of Vocon, the JJC architect) and Dimora to discuss GreenSource products being used in the JJC.  (Gov't Ex. 1700-PP-TR, 1700-RR-1-TR).  In the course of arranging the meeting, Dimora said to Pumper that Dimora was trying to "help my friends make more money than they already got." (Gov't Ex. 1700-QQ-TR).  After receiving the message that Dimora wanted to meet, Voinovich told Pumper that the call from Petitioner had made him "nervous," proving he was feeling pressured.  At the meeting, Dimora spoke positively about GreenSource's product.  (R. 1035: Tr. Jury Trial Vol. 22, (Pumper), PageID 27847-50). After the meeting with Dimora, that had made Voinovich "nervous," Voinovich agreed to "write the specs for [GreenSource,]" meaning that he would specify using GreenSource products in the JJC building.  (Id. at PageID 27850; Gov't Ex.

1700-TT-TR).  Convincing the architect to include GreenSource products in the specifications

was Dimora taking an action on a qualifying step toward voting on a contract for Pumper's

benefit.

At the time of the meetings described above, it was clear that the JJC contracts were

going to be re-bid and that the bids would be due in early April 2008  If the specifications were

re-done to include GreenSource products, the County would have had to delay the bids.  (R.

1030: Tr. Jury Trial Vol. 32 (Maldonado), PageID 27052-53).  Ultimately, Dimora would have

had to vote on the bids including GreenSource specifications.  But for the search warrants being

executed in this case in July 2008, Pumper believes GreenSource would have gotten the JJC

contract, on which Dimora would have voted.  (R. 1035: Tr. Jury Trial Vol. 22, (Pumper),

PageID 27854).

### (2)  <u>Voting to Approve Two County Loans for 1170 Ivanhoe LLC, a Pumper Company that Housed GreenSource</u>

GreenSource was planning to renovate a building on Ivanhoe for its manufacturing

function.  Pumper needed some funds for the renovation and asked Dimora for help.  Dimora

agreed and set up a meeting for Pumper and his team to "get together with his staff to pitch to

them what [they were] doing and how many dollars [they were] gonna need." (R. 1034: Tr. Jury

Trial Vol. 21 (Pumper), PageID 27784).  At the meeting, Pumper told the staff what he was

"looking to do for GreenSource and asked . . .  what the process was to get these loans in place,

and this thing pushed along pretty quickly."  (<u>Id.</u> at 22785).  Petitioner "stayed mostly on top of

just making sure those loans got through.  And once everybody was agreed upon regarding the

terms, then all the attorneys took care of it from there."  (<u>Id.</u>).  Working with Dimora was much

easier than working through the normal process at the Department of Development.  Pumper

testified:  "I mean, with [Dimora] making those phone calls they could set up the meetings really

quick and get things done.  You know, the system, not only the city but in the county, they're slow.  I mean, we just needed to get things done."  (Id. at 27786).

On January 8, 2008, Dimora voted to approve two loans for one of Pumper's companies, 1170 Ivanhoe LLC, – one a $200,000 brownfield redevelopment loan and one a $800,000 commercial redevelopment fund loan.  (R. 1037: Tr. Jury Trial Vol. 24 (Oliver), PageID 28435; Gov't. Ex.  1700-N).

### (3)  Pressuring or Advising County Officials to Expedite Closing the Ivanhoe Loans

In March 2008, Pumper became frustrated that the loan, having been approved by the BOCC, had not yet closed.  Dimora's assistant called Laura Clark in the County's Department of Development and told her that Dimora had run into Pumper at a social event and that Pumper was "concerned and was sort of complaining about the pace at which the loan was closing."  So, Dimora's assistant was following up on behalf of Dimora to see what was going on.  (Id. at PageID 27653-34).  Thus, Dimora was advising or pressuring a subordinate to do an official act – expedite the closing of the loan.

The loans closed in April 2008, with Paul Oyaski signing on behalf of the BOCC.  The interest rate on the loans was 4%, the lowest interest of any County loans from the period August 2006 through November 2008.  (Gov't. Ex. 1839; Id. at PageID 27658-59).  By the time of trial, the loan was in default.  (Id. at PageID 27654).

### 5.  Russo Hiring Gallucci in Exchange for Gallucci Dropping out of the Auditor's Race  (Counts 31 and 32)

Petitioner was convicted of plotting with Russo, Gallucci and others to obtain things of value from Gallucci in the form of cash, Gallucci's sham candidacy for County Auditor against Russo in Russo's reelection campaign for County Auditor, and Gallucci withdrawing from the race late enough that the Republican Party could not replace him on the ballot, all in exchange

for Russo hiring Gallucci in the County Auditor's Office at an inflated salary.  (R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 28982; R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26219-20; R. 999: Tr. Sentencing Hrg. Vol. 1 (Court), PageID 20445; Govt. Ex. 3105-TR).

Gabor participated in the conspiracy by (1) arranging and attending a meeting for Russo and Gallucci to discuss Gallucci running a sham campaign in exchange for a job at the Auditor's Office (R. 1020: Tr. Jury Trial Vol. 13 (Gallucci), PageID 24953-54), (2) relaying Gallucci's complaint to Russo that Gallucci needed money during the campaign (R. 1039: Tr. Jury Trial Vol. 26 (Russo), Page ID 28976), (3) acting as the conduit for Russo giving $2,000 in cash per month for five months to Gallucci during the sham campaign "for Gallucci's spending money or pocket money or whatever," (Id. at PageID 28977; R. 1020: Tr. Jury Trial Vol. 13 (Gallucci), PageID 24963-64, 24980),  (4) attending a meeting to discuss Gallucci dropping out of the race (Id. at PageID 24970, 24979),  (5) serving as a conduit for a $250 cash bribe from Gallucci as a thank you to Russo for hiring Gallucci in the Auditor's Office at an inflated salary, (R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 28978-82), and (6) attempting to conceal the scheme by telling Gallucci during the investigation, "You know, you didn't pay for your job.  I didn't pay for my job."  (R. 1020: Tr. Jury Trial Vol. 13 (Gallucci) PageID 25003 - 25004).

On November 29, 2006, Russo hired Gallucci at a salary of $67,849 per year, $3,400 more than the salary of Gallucci's supervisor at the Auditor's Office.  (R. 1020: Tr. Jury Trial Vol. 13 (Gallucci), PageID 24948, 24952-54, 24960, 24969-71, 24983-85, 24988-89, 25005, 25037, 25041; R. 1039: Tr. Jury Trial Vol. 26, PageID 28976-81; Gov't. Ex. 3121).  Russo then gave Gallucci's supervisor a raise to cover up the scheme. (R. 1045: Tr. Jury Trial Vol. 36, PageID 30242 ("[Russo] raised her salary over mine."), R. 1020: Tr. Jury Trial Vol. 13, PageID

24989), all official acts that satisfy both the performance and identification prongs of

McDonnell.

Petitioner contends that the government argued improperly that the official acts in this

conspiracy were (1) Russo contacting and encouraging Gallucci to run in the County Auditor's

race against him, (2)  Gallucci withdrawing from the Auditor's race, and (3) Russo causing

Petitioner to deliver $2,000 to Gallucci on a monthly basis for five months.  (R. 1177: Motion to

Amend, PageID 32637).  Government counsel argued no such thing.  (R. 1045: Tr. Jury Trial

Vol. 36, PageID 30241-43).  Specifically, government counsel argued, "The official act is

[Russo] hiring Gallucci."  Id. at PageID 30242.  A public official making a hiring decision, and a

salary decision, in his own agency is clearly an official act that comports with the McDonnell

standard.

## IV.  THIS COURT SHOULD DENY PETITIONER'S MOTION WITHOUT A HEARING

For the reasons set forth above, this Court should deny Petitioner's 2255 motion and

should do so without a hearing.  As this Court stated in denying Petitioner's initial 2255, "A

court should hold an evidentiary hearing '[u]nless the motion and the files and records of the

case conclusively show that the prisoner is entitled to no relief[.]'" 28 U.S.C. § 2255(b). (R.

1167: Memorandum Opinion, PageID 32331).  (internal citations omitted).  Petitioner's 2255

motion makes no factual allegations outside the record.  Thus, no evidentiary hearing is

necessary or required.

## V.   CONCLUSION

On the basis of the foregoing, this Court should deny Petitioner's 2255 motion.  He

procedurally defaulted on his claims and has not demonstrated that the "ailing instruction by

itself so infected the entire trial that the resulting conviction violates due process" Frady, 456

U.S. at 169.  If this Court finds Petitioner has not procedurally defaulted and applies the harmless error standard applicable to 2255 motions, Petitioner has not demonstrated that this Court's instruction had a "substantial and injurious effect," Kotteakos, 328 U.S. 750 and specifically, that the instructions, as a whole, were so infirm that they "rendered the entire trial fundamentally unfair," with "more than a reasonable possibility that the error was harmful [and] . . . that the defendant was actually prejudiced by the error."  Davis v. Ayala, 135 S. Ct. at 2198.