# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL D. GABOR, | ) | CASE NO. 1:10-cr-387-5 |
| | ) | |
| | ) | |
| PETITIONER, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| RESPONDENT. | ) | |

In 2012, following a 37-day jury trial, petitioner Michael D. Gabor ("Gabor") and a co-defendant, James C. Dimora ("Dimora"), were convicted of various public-corruption offenses, including Count 21 of the indictment, which charged both men with conspiracy to commit Hobbs Act extortion, in violation of 18 U.S.C. § 1951. (Doc. No. 444 (Second Superseding Indictment).) Gabor was sentenced by this Court and, after an appeal to the Sixth Circuit, his convictions and sentence were affirmed. Gabor subsequently filed in this Court a motion to vacate his sentence, under 28 U.S.C. § 2255, raising claims involving judicial bias, prosecutorial misconduct, and ineffective assistance of counsel. (Doc. No. 1108.) On October 5, 2017, the Court denied Gabor's motion to vacate. (Doc. No. 1167 (Memorandum Opinion); Doc. No. 1168 (Judgment Entry).)

Four years after the jury returned its verdicts against Gabor and Dimora, the Supreme Court in *McDonnell v. United States*, --U.S.--, 136 S. Ct. 2355, 195 L. Ed. 2d 639 (2016), narrowed and focused the legal definition of "official act" in the federal bribery statute, 18

U.S.C. § 201(a)(3). Relying on the decision in *McDonnell*, Dimora moved to vacate his sentence, maintaining that the conduct for which he was convicted no longer qualified as "official acts" under the law. (Doc. No. 1162 (Dimora § 2255 Motion).) This Court denied Dimora's motion to vacate (Doc. No. 1196), and on March 28, 2019, the Sixth Circuit granted Dimora a certificate of appealability as to the *McDonnell* issue involving the definition of "official acts." (Doc. No. 1201.)

Gabor filed in the Sixth Circuit a *pro se* motion for leave to file a second or successive motion to vacate, in order to challenge under *McDonnell* this Court's definition of "official acts" in its jury instructions. (Doc. No. 1177.) On November 13, 2017, the Sixth Circuit issued a decision addressing Gabor's request for leave. Finding that the request was filed prior to this Court's ruling on Gabor's initial § 2255 motion, the Sixth Circuit interpreted Gabor's request as a motion to amend his original petition to include the *McDonnell* issue and granted the motion to amend. (Doc. No. 1176; *see* Non-document Order, 11/17/2017; *see also* Doc. No. 1177 (Second § 2255 Motion, beginning at 4[1]); Doc. No. 1184 (Opposition); Doc. No. 1193 (Reply).) In a decision dated Augusts 6, 2019, the Court denied Gabor's amended motion to vacate for the same reasons it denied Dimora's motion to vacate, but in light of the certification issued on Dimora's § 2255 motion, the Court certified Gabor's *McDonnell* claim for appellate review. (Doc. No. 1202 (Memorandum Opinion & Order); Doc. No. 1203 (Judgment Entry).)

On August 31, 2020, a panel of the Sixth Circuit vacated the Court's ruling as to Dimora's motion to vacate, finding that the Court's definition of "official act" in its jury

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic docketing system.

instructions failed to comport with the narrowed definition later announced in *McDonnell*. *Dimora v. United States*, 973 F.3d 496, 505 (6th Cir. 2020) ("Although we do not fault the trial court for failing to anticipate *McDonnell*, we conclude that its instructions were erroneous in light of that decision.") The Sixth Circuit remanded Dimora's motion to this Court for the limited purpose of re-applying the harmless error standard to determine "whether the instructional error substantially influenced the jury's verdict" on certain identified counts in which Dimora was convicted of either Hobbs Act extortion or Hobbs Act conspiracy. *Id*. at 506. On November 17, 2020, the Sixth Circuit vacated this Court's decision denying Gabor's amended motion to vacate as to the certified issue, only, and remanded the case to this Court for further proceedings, consistent with its remand in *Dimora*. (Doc. No. 1210 at 2, citing *Dimora*, 973 F.3d at 502–05.)

Following remand, the Court ordered the parties to submit supplemental briefs, but at the request of Dimora, the Court stayed its briefing schedule while Dimora appealed the Sixth Circuit's decision. (*See* Non-doc. Order, Feb. 9, 2021.) On March 23, 2021, the Supreme Court denied Dimora's request for certiorari review. (Doc. No. 1216.) Thereafter, the Court set a new briefing schedule. (Doc. No. 1220 (Government's Supplemental Brief).) Gabor, who was released from federal custody on December 29, 2019, failed to file a supplemental brief. (*See* https://www.bop.gov/inmateloc/, last visited March 14, 2022.) Having reviewed the record and the parties' briefing, and in light of the Sixth Circuit's directions and limitations on remand, the Court hereby denies Gabor's amended motion to vacate.

## I. BACKGROUND

Even though this Court and the Sixth Circuit have addressed the facts of this case on numerous occasions, to properly conduct the harmless error analysis, it is necessary to revisit the

facts of this case as they developed during trial. In 2007, the Federal Bureau of Investigation ("FBI") launched a multi-year probe into political corruption in Cuyahoga County, Ohio. At the heart of the investigation were two men: Dimora and Frank Russo ("Russo"). According to the government, Dimora and Russo were the "centers of influence" for the county government. (Doc. No. 1038, Tr. Jury Trial Vol. 25 (Randazzo), at 228.)

Russo served as County Auditor, and his department was the single largest in the county government. Dimora was one of three elected members of the Board of County Commissioners ("BOCC"), and his influence and authority as a member of this board was significant. Dimora exercised his authority and influence as county commissioner to control virtually every aspect of county government, and, by doing so, facilitated multiple fraud and bribery schemes designed to trade official acts for things of value. These things of value ranged from home improvements, expensive meals, and cash to all expense-paid trips and prostitutes.

Gabor was employed in the auditor's office. As a lower-level county employee, Gabor "did not wield Dimora's authority or receive as many meals, gifts, trips and home improvements, he was [nonetheless] unafraid to use his influence in similar ways for similar reasons." *United States v. Dimora*, 750 F.3d 619, 624 (6th Cir. 2014). The Sixth Circuit noted that Gabor:

> started on the wrong foot by buying his job from Russo for $5,000. After that start, Gabor was an auditor in name only. He spent most of his time running errands for Dimora that had nothing to do with the customary requirements of the job. Among other things, he was a go-between in arranging kickback schemes on county projects. And when Gabor learned that the FBI was investigating him, he warned his conspirators about the investigation and tried to convince them to lie about what they were up to.

*Id.*

4

## II. RULING IN MCDONNELL

On June 27, 2016, the Supreme Court interpretated the meaning of "official act" for purposes of the federal bribery statute (18 U.S.C. § 201), narrowing its application. The Court in *McDonnell* held that to constitute an "official act," the government must first "identify a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." *McDonnell*, 136 S. Ct. at 2368 (quoting 18 U.S.C. § 201(a)(3)). The Court stated that "a typical meeting, telephone call, or event arranged by a public official does not qualify as a 'cause, suit, proceeding or controversy.'" *Id*. "Pending" or "may by law be brought" suggests "something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete. In particular, 'may by law be brought' conveys something within the specific duties of an official's position[.]" *Id*. at 2369. (emphasis omitted). Further, that the matter may be brought before any public official "conveys that the matter may be pending either before the public official who is performing the official act, or before another public official." *Id*.

Second, the government must prove that "the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *McDonnell*, 136 S. Ct. 2368. The Court ruled that these criteria are not met by proof merely that an official hosted an event, meeting, or speech "related to" a pending question or matter. *Id*. at 2370.

Nevertheless, the Court stated that while "setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act,'" *id*. at 2368, such actions "could serve as evidence of an agreement to take an official act." *Id*. at 2371 And a

jury would be entitled to "conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return." *Id.* Further, the Court noted that the government is not required to prove that the defendant official actually performed the agreed task; it is enough for purposes of the federal bribery statute to show that the official "agree[d]" to make a decision or take an action. *Id.* at 2370–71 (citation omitted).

Additionally, the Supreme Court explained that merely "expressing support . . . does not qualify as a decision or action . . . as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an 'official act.'" *Id.* at 2371. Thus, a public official may engage in an 'official act' by 'exert[ing] pressure on another official to perform an 'official act,' or . . . advis[ing] another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.* at 2372.

### III. DISCUSSION

Because Gabor was only convicted of one count charging a crime under the federal extortion/bribery statute, only Count 21 (charging Hobbs Act conspiracy) is implicated by the Sixth Circuit's remand involving Gabor. In Count 21, Gabor was charged with conspiring with Steven Pumper, a local contractor, to bribe Dimora with kickbacks in exchange for Dimora's assistance with Pumper's Company, GreenSource. It is Gabor's contention that the actions taken by Dimora on behalf of Pumper, which were highlighted by the government at trial, no longer qualify as "official acts" for purposes of Hobbs Act conspiracy.

Dimora raised a similar argument in his motion to vacate Counts 21 and 20, the latter charging Dimora alone with substantive Hobbs Act extortion in connection with several companies affiliated with Pumper. In denying his motion as to the Pumper schemes, this Court recently held as follows:

> These counts [Counts 20 and 21] relate to bribes Steve Pumper paid to Dimora in the form of cash, home improvements, sport tickets, dinners, and the promise of a percentage of profits from a business venture in exchange for action taken on numerous business projects and personal matters. The government offered substantial evidence at trial as to Pumper's many projects and concerns, as well as the official actions Dimora took on Pumper's behalf. Specifically, there was evidence that Dimora agreed to, and did, cast at least six votes to either award various contracts to Pumper's companies or, in some instances, to reject the slate of bids to give Pumper's companies a second chance to bid. (Doc. No. 1038, Tr. Jury Trial Vol. 25 (Oliver), at 79–80; Gov't Exs. 1700-A (Agenda Action), 1700-B (Resolution); Doc. No. 1037, Tr. Jury Trial Vol. 24 (Oliver), at 113; Gov't Ex. 2827; Doc. No. 1012, Tr. Jury Trial Vol. 5 (Massie), at 25–26, citing Gov't Ex. 400-R-1 (Agenda Action)); Doc. No. 1037, Tr. Jury Trial Vol. 24 (Oliver), at 114; Gov't Ex. 1700-N (Agenda Action); Gov't Ex. 1700-D (Agenda Action).) There was also considerable evidence showcasing Dimora's efforts to push along Pumper's various business projects—at each step of the process—performing essential qualifying acts that would ensure that he could ultimately have the opportunity to cast a vote that would repay Pumper for his bribes. (*See, e.g.,* Doc. No. 1034, Tr. Jury Trial Vol. 21 (Pumper), at 225–27; Doc. No. 1035, Tr. Jury Trial Vol. 22 (Pumper), at 13–15; Doc. No. 1030, Tr. Jury Trial Vol. 32 (Maldonado), at 30, 62; Gov't Ex. 1700-CC-TR; Gov't Ex. 1700-EE-TR; Gov't Ex. 1700-GG-TR; Gov't Ex. 1709.)

(Doc. No. 1226 at 32–34.) This Court also noted that there was evidence at trial that demonstrated that "Dimora pressured other public officials to perform official acts in connection with Pumper's businesses, his children, and his involvement in certain litigation, including evidence that Dimora pressured" a common pleas judge to resolve a contract dispute at terms acceptable to Pumper. (*Id*. at 33.) Finding that eight of the nine sub-schemes involving Pumper and his companies contained actions by Dimora still qualified as "official acts" under

*McDonnell*, the Court concluded that it was "not left with a grave doubt as to the harmlessness of the [instructional] error;" and that there was "no basis to vacate the convictions." (*Id*. at 34.)

Specifically limited to GreenSource and the conspiracy charged in Count 21, the government's evidence demonstrated that Gabor and Pumper entered into a conspiracy whereby GreenSource would be awarded county contracts, and Gabor would be rewarded with a job in the company where he would earn commissions for business development. (Doc. No. 1034, Tr. Jury Trial Vol. 21 (Pumper), at 248–52.) Pumper testified that he and Dimora, with Gabor's help, planned to kick money back to Dimora, in the form of a percentage of Gabor's commissions, on county projects awarded to GreenSource. (*Id*. at 252–54; *see also* Doc. No. 1035, Tr. Jury Trial Vol. 22 (Pumper), at 5–7, 20–21; Doc. No. 1036, Tr. Jury Trial Vol. 23 (Pumper), at 31, 34; Gov't Ex. 1770-J; Gov't Ex. 1700-KK; Gov't Ex. 1700-R, 1700-S.) In exchange for the kickbacks, Dimora took several official actions on Pumper's behalf, including voting for two county loans to benefit GreenSource (Doc. No. 1034, Tr. Jury Trial Vol. 21 (Pumper), at 244–45; Gov't Ex. 1700-L; Gov't Ex. 1700-N), and rejecting submitted bids for the County Juvenile Justice Center ("JJC") project to give Pumper a second chance to bid on behalf of GreenSource. (Doc. No. 1012, Tr. Jury Trial Vol. 5 (Massie), at 26.)

Dimora also took numerous qualifying steps that would lead to official acts that benefited Pumper, Gabor, and GreenSource. For example, during a March 12, 2008 meeting with Adrian Maldonado, the County Director of Diversity Procurement, who oversaw the county's bidding process and reported to the commissioners, Dimora told Maldonado, who would not have attended the meeting absent Dimora's request, that: (1) GreenSource was a good product; (2) Maldonado needed to look at the GreenSource facility because the company would save the

county money; and (3) that he (Dimora) would not receive a benefit from GreenSource (notwithstanding the undisclosed kickback arrangement with Pumper and Gabor). (Doc. No. 1034, Tr. Jury Trial Vol. 21 (Pumper), at 245–56; Doc. No. 1035, Tr. Jury Trial Vol. 22 (Pumper), at 19–25; Gov't Ex. 1717.) The next day, March 13, 2008, Dimora voted to reject all JJC main building package bids, to revise the specifications and to re-advertise for bids, thus giving Pumper time to adjust his bid to address the new specifications. (Doc. No. 1012, Tr. Jury Trial Vol. 5 (Massie), at 26.) Dimora even arranged for Maldonado and his staff to tour GreenSource's facility, which Maldonado would not have done if it were not for Dimora's request.[2] (Doc. No. 1021, Tr. Jury Trial Vol. 14 (Ross), at 132; Doc. No. 1034, Tr. Jury Trial Vol. 21 (Pumper), at 243; Doc. No. 1037, Tr. Jury Trial Vol. 24 (Massie), at 153; Doc. No. 1030, Tr. Jury Trial Vol. 32 (Maldonado), at 65–66.)

In his amended motion, Gabor does not challenge the evidence establishing that he entered into a conspiracy with Dimora and Pumper to violate the Hobbs Act. Rather, his challenge is limited to the *McDonnell* issue raised by Dimora and previously rejected by this Court. The evidence offered with respect to this count demonstrated that Dimora, even before he cast his votes (which, after *McDonnell*, remain "quintessential official acts," *see Dimora*, 973 F.3d at 507 (citing *McDonnell*, 136 S. Ct. at 2368)), offered strong support for GreenSource for the purpose of exerting pressure on other public officials to make decisions that would benefit GreenSource, Pumper, and Gabor. *See McDonnell*, 136 S. Ct. at 2372 (finding that a public

---

[2] In another qualifying step, Dimora met with the JJC's architect, Paul Voinovich, in order to encourage Voinovich to write JJC building specifications in a way that benefited GreenSource. There was testimony that this act made Voinovich "nervous" and resulted in the new, more favorable specifications. (Doc. No. 1035, Tr. Jury Trial Vol. 22 (Pumper), at 44; *see* Gov't Ex. 1700-RR.) Pumper testified at trial that, but-for the FBI's investigation and the issuance of search warrants on Dimora's home and various government and private offices, GreenSource would likely have received the JJC contract on which Dimora ultimately would have voted. (*Id.* at 51–52.)

official engages in an "official act" by "exert[ing] pressure on *another* official to perform an 'official act' . . . advis[ing] another official, knowing or intending that such advice will form the basis for an 'official act' by another official") (emphasis in original). Dimora's actions, which included voting to award county construction contracts, disqualifying lower bids and orchestrating adjustments to the project specifications, and pressuring other public officials to take action favorable to GreenSource all qualify as "official acts" under a post-*McDonnell* analysis. Accordingly, the Court concludes that the instructional error did not have a substantial and injurious effect on the jury's verdict, and Gabor is, therefore, not entitled to collateral relief as to Count 21.

## IV. CONCLUSION

For the foregoing reasons, Gabor's amended motion to vacate, set aside, or correct his sentence (Doc. No. 1177) is DENIED. Further, for the same reasons, the Court CERTIFIES that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253; Fed. R. App. P. 22(b).

**IT IS SO ORDERED**.

Dated: March 31, 2022

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**